Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:      (818) 532-6499
E-mail: jpafiti@pomlaw.com
*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG FLEMING, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> IMPAX LABORATORIES INC., GEORGE FREDERICK WILKINSON, LARRY HSU, and BRYAN M. REASONS, <br><br> Defendants. | **Case No.** <br><br> **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Greg Fleming ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Impax Laboratories Inc. ("Impax" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Impax's common stock between February 20, 2014 and November 2, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Impax, a specialty pharmaceutical company, develops, manufactures, and markets bioequivalent pharmaceutical products.   Impax Laboratories, Inc. has a strategic alliance agreement with Teva Pharmaceuticals Curacao N.V. to develop, manufacture, and distribute controlled release generic pharmaceutical products.

3.     Impax was founded in 1993 and is headquartered in Hayward, California.  Impax's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "IPXL".

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Impax and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted a violation of U.S. antitrust laws; (iii) consequently, Impax's revenues during the Class Period were in part the result of illegal conduct; and (iv) as a result of the foregoing, Impax's public statements were materially false and misleading at all relevant times.

5.      On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges by the end of 2016 against Impax and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.
>
> All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.
>
> . . .
>
> Allergan, Impax and Sun declined to comment beyond their filings. Representatives of Endo, Covis, Taro and Lannett didn't respond to requests for comment. A Justice Department spokesman declined to comment.

6.      On this news, Impax's share price fell $4.00, or 19.51%, to close at $16.50 on November 3, 2016.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Impax's principal executive offices are located within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Impax securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Impax is incorporated in Delaware, and the Company's principal executive offices are located at 30831 Huntwood Avenue, Hayward, California.  Impax's common stock traded on the NASDAQ under the ticker symbol "IPXL."

14.     Defendant George Frederick Wilkinson ("Wilkinson") has served as Impax's Chief Executive Officer ("CEO") and President since April 2014.

15.     Defendant Larry Hsu ("Hsu") served as Impax's CEO and President between October 2006 and April 2014.

16.     Defendant Bryan M. Reasons ("Reasons") has served at all relevant times as Impax's Chief Financial Officer and Senior Vice President of Finance.

17.     The Defendants referenced above in ¶¶ 14-16 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Impax, a specialty pharmaceutical company, develops, manufactures, and markets bioequivalent pharmaceutical products.  Impax has a strategic alliance agreement with Teva Pharmaceuticals Curacao N.V. to develop, manufacture, and distribute controlled release generic pharmaceutical products.

### Materially False and Misleading Statements Issued During the Class Period

19.     The Class Period begins on February 20, 2014, when Impax filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 8-K").  For the quarter, Impax reported a net loss of $9.62 million, or $0.14 per diluted share, on revenue of $100.74 million, compared net income of $4.80 million, or $0.07 per diluted share, on revenue of $141.08 million for the same period in the prior year.  For 2013, Impax reported net income of $101.26 million, or $1.47 per diluted share, on revenue of $511.50 million, compared to net income of $55.87 million, or $0.82 per diluted share, on revenue of $581.69 million for 2012.

20.     In the 2013 8-K, Impax stated, in part:

"We continue to dedicate significant resources to improve our manufacturing and quality systems and advance our Quality Improvement Program," said Larry Hsu, Ph.D., president and chief executive officer of Impax Laboratories, Inc. "At the same time, we have successfully commercialized a number of new product opportunities as a result of prior investments in R&D and business development."

"We are currently planning to begin marketing and selling our allotment of a specified number of bottles of authorized generic RENVELA tablets beginning in mid-April 2014. In addition, we continue to pursue FDA approval of our pending Abbreviated New Drug Applications, including for generic RENVELA, as well as the re-filing of a New Drug Application for RYTARYTM," concluded Dr. Hsu.

The Company currently estimates sales of the authorized generic RENVELA allotment to produce gross profit of approximately $50.0 million to $70.0 million in 2014, which corresponds to 7% to 10% of the total 2013 sevelamer HCL and carbonate sales in the U.S.

21.     On February 25, 2014, Impax filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2013 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K").

22.     In the 2013 10-K, Impax stated, in part:

**Competition**

The pharmaceutical industry is highly competitive and is affected by new technologies, new developments, government regulations, health care legislation, availability of financing, and other factors. Many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. We compete with numerous other companies that currently operate, or intend to operate, in the pharmaceutical industry, including companies that are engaged in the development of controlled-release drug delivery technologies and products, and other manufacturers that may decide to undertake development of such products. Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc. and Par Pharmaceutical Companies, Inc.

Due to our focus on relatively hard to replicate controlled-release products, competition in the generic pharmaceutical market is sometimes limited to those

6

competitors who possess the appropriate drug delivery technology. The principal competitive factors in the generic pharmaceutical market are:

- the ability to introduce generic versions of products promptly after a patent expires;
- price;
- product quality;
- customer service (including maintenance of inventories for timely delivery); and
- the ability to identify and market niche products.

In the brand-name pharmaceutical market, we are not currently marketing any internally developed products. However, if we obtain FDA approval for, and start marketing, our own CNS brand-name pharmaceuticals, we expect that competition will be limited to large pharmaceutical companies, other drug delivery companies, and other specialty pharmaceutical companies that have focused on CNS disorders.

* * *

**Sales and Marketing**

We market and sell our generic pharmaceutical prescription drug products within the continental United States and the Commonwealth of Puerto Rico. We have not made sales in any other jurisdictions over the last three fiscal years. We derive a substantial portion of our revenue from sales to a limited number of customers. The customer base for our products consists primarily of drug wholesalers, warehousing chain drug stores, mass merchandisers, and mail-order pharmacies. We market our products both directly, through our Global Division, and indirectly through our Rx Partner and OTC Partner alliance and collaboration agreements. Together, our five major customers, McKesson Corporation, Cardinal Health, Amerisource-Bergen, CVS Caremark Corporation and Medco Health Solutions, accounted for 81% of our gross revenue for the year ended December 31, 2013. These five customers individually accounted for 31%, 25%, 20%, 3% and 2%, respectively, of our gross revenue for the year ended December 31, 2013. We do not have long-term contracts in effect with our five major customers. A reduction in or loss of business with any one of these customers, or any failure of a customer to pay us on a timely basis, would adversely affect our business.

23.     The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Hsu and Reasons, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     On May 1, 2014, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 8-K").  For the quarter, Impax reported net income of $6.43 million, or $0.09 per diluted share, on revenue of $118.72 million, compared to net income of $105.44 million, or $1.55 per diluted share, on revenue of $148.49 million for the same period in the prior year.

25.     In the Q1 2014 8-K, Impax stated, in part:

"Our generics business is benefitting from recent marketing initiatives, as well as consistent success in commercializing the existing portfolio of products and capitalizing on new product launches," said Fred Wilkinson, president and chief executive officer of Impax Laboratories, Inc. "These events resulted in a $21.7 million increase in sales of our Global labeled products since the fourth quarter of 2013. In addition, we recently launched authorized generic RENVELA® and expect it to be a significant contributor to our 2014 results."

"A few weeks ago we resubmitted the New Drug Application (NDA) for RYTARYTM. The U.S. Food and Drug Administration (FDA) has accepted the application and set the review date under the Prescription Drug User Fee Act (PDUFA) of October 9, 2014. We remain committed to bringing this new treatment option to patients who are suffering from Parkinson's disease."

"My management team and I will be focused on continuing the plan towards resolving the FDA quality and manufacturing issues in Hayward, while emphasizing the importance of a world class quality organization. We will leverage our resources to ensure we are capitalizing on the strategies related to the brand and generic businesses, and analyze our internal pipeline to identify opportunities for improvement and growth."

26.     On May 2, 2014, Impax filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2014 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").

27.     The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the Q1 2014 10-Q was

accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.     On August 6, 2014, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 8-K").  For the quarter, Impax reported net income of $35.07 million, or $0.50 per diluted share, on revenue of $188.12 million, compared to net income of $5.62 million, or $0.08 per diluted share, on revenue of $129.63 million for the same period in the prior year.

29.     In the Q2 2014 8-K, Impax stated, in part:

"We delivered strong revenue growth of 45%, adjusted gross margins of 64%, and nearly tripled our adjusted net income this quarter, compared to last year's second quarter" said Fred Wilkinson, president and chief executive officer of Impax Laboratories. "We experienced strong performance by several key generic products, including the successful launch of authorized generic RENVELA®, as well as continued growth of Zomig® nasal spray in our brand division."

"We remain excited about the business development and M&A landscape, which consists of a number of strategic prospects that fit our acquisition criteria. In July we acquired two generic products - Ursodiol tablets and Lamotrigine orally disintegrating tablets - as part of our strategy to expand our product offerings."

. . .

"We continue to analyze our internal generic and brand pipelines to identify opportunities for improvement that will drive growth and will communicate our progress as these plans are finalized."

30.     On August 6, 2014, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2014 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").

31.     The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

32.     On November 4, 2014, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 8-K"). For the quarter, Impax reported net income of $15.74 million, or $0.22 per diluted share, on revenue of $158.00 million, compared to a net loss of $0.18 million, or zero per diluted share, on revenue of $132.64 million for the same period in the prior year.

33.     In the Q3 3014 8-K, Impax stated, in part:

"The strong third quarter results were driven by higher sales from our key products in the generics business as well as continued growth of Zomig® nasal spray in our brand division," said Fred Wilkinson, president and chief executive officer of Impax Laboratories. "The increased revenues are the direct result of our increased focus on commercialization strategies for our current line of assets."

"Since the close of the quarter, we announced the proposed acquisition of Tower Holdings, Inc. and Lineage Therapeutics Inc. Once successfully completed, this transaction is expected to be immediately accretive and to create both near and long-term brand and generic growth opportunities. The resulting combination will have the effect of creating a more efficient capital structure and will preserve our ability to pursue additional growth opportunities that expand and diversify our business."

"We also recently announced that we have aligned our research and development organizations to enhance efficiencies and maximize our investment in product development, and we continue to commit substantial resources to advance our quality improvement initiatives."

34.     On November 4, 2014, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2014 8-K and

reporting in full the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").

35.     The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.     On February 24, 2015, Impax filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 8-K"). For the quarter, Impax reported net income of $0.12 million, or zero per diluted share, on revenue of $131.21 million, compared to a net loss of $9.62 million, or $0.14 per diluted share, on revenue of $21.49 billion for the same period in the prior year. For 2014, Impax reported net income of $57.35 million, or $0.81 per diluted share, on revenue of $596.05 million, compared to net income of $101.26 million, or $1.47 per diluted share, on revenue of $511.5 million for 2013.

37.     In the 2014 8-K, Impax stated, in part:

"In 2014 we delivered strong financial results and effectively executed on a number of business objectives that further positioned Impax for long-term growth," said Fred Wilkinson, president and chief executive officer of Impax Laboratories. "During the year, we continued implementing a global quality improvement program, achieved commercial success across our generic and brand divisions, optimized and refocused our R&D structure and accelerated our business development efforts."

"In our generic business, our revenue growth in 2014 of more than 38% was driven by the successful launch of authorized generic RENVELA® and continued success in maximizing our portfolio of solid oral and alternative dosage form products. Our brand division achieved a 39% increase in sales and a 23% increase in prescriptions of Zomig® nasal spray in 2014."

"2015 is off to an exciting start following the January approvals of RYTARYTM and generic lamotrigine ODT in blister packaging. In addition, the proposed

acquisition of Tower Holdings, Inc. and Lineage Therapeutics Inc., which we anticipate receiving FTC clearance shortly and closing promptly thereafter, will significantly expand our generic and brand product portfolios as well as the number of potential new product launches in 2015. Following the completion of the transaction, we will remain well-positioned to execute on additional growth opportunities."

38.    On February 26, 2015, Impax filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2014 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").

39.    In the 2014 10-K, Impax stated, in part:

**Competition**

The pharmaceutical industry is highly competitive and is affected by new technologies, new developments, government regulations, health care legislation, availability of financing, and other factors. Many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. We compete with numerous other companies that currently operate, or intend to operate, in the pharmaceutical industry, including companies that are engaged in the development of controlled-release drug delivery technologies and products, and other manufacturers that may decide to undertake development of such products. Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Par Pharmaceutical Companies, Inc. and Sandoz.

Due to our focus on relatively hard to replicate controlled-release products, competition in the generic pharmaceutical market is sometimes limited to those competitors who possess the appropriate drug delivery technology. The principal competitive factors in the generic pharmaceutical market are:

- the ability to introduce generic versions of products promptly after a patent expires;
- price;
- product quality;
- customer service (including maintenance of inventories for timely delivery); and
- the ability to identify and market niche products.

In the brand-name pharmaceutical market, we market Impax-labeled branded Zomig® products pursuant to the AZ Agreement. We received approval from the FDA on January 7, 2015 to market and sell RYTARY™, our first internally developed branded pharmaceutical product for the treatment of Parkinson's disease, and we currently plan to fully launch our sales and marketing efforts for the product in early April 2015. We currently expect our principal competitors in the branded pharmaceutical products market to include pharmaceutical companies that are focused on Parkinson's disease and other CNS disorders.

* * *

**Sales and Marketing**

We market and sell our generic pharmaceutical prescription drug products within the continental United States and the Commonwealth of Puerto Rico. We have not made sales in any other jurisdictions over the last three fiscal years. We derive a substantial portion of our revenue from sales to a limited number of customers. The customer base for our products consists primarily of drug wholesalers, warehousing chain drug stores, mass merchandisers, and mail-order pharmacies. We market our products both directly, through our Global Division, and indirectly through our Rx Partner and OTC Partner alliance and collaboration agreements. Together, our five major customers, McKesson Corporation, Cardinal Health, Amerisource-Bergen, CVS Caremark Corporation and Wal-Mart Stores, accounted for 80% of our gross revenue for the year ended December 31, 2014. These five customers individually accounted for 36%, 20%, 19%, 3% and 2%, respectively, of our gross revenue for the year ended December 31, 2014. We do not have long-term contracts in effect with our five major customers. A reduction in or loss of business with any one of these customers, or any failure of a customer to pay us on a timely basis, would adversely affect our business.

40. The 2014 10-K contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

41. On May 11, 2015, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 8-K"). For the quarter, Impax reported a net loss of $6.33 million, or $0.09 per diluted share, on revenue of $143.1 million, compared to net income

of $6.43 million, or $0.09 per diluted share, on revenue of $118.72 million for the same period in the prior year.

42.     In the Q1 2015 8-K, Impax stated, in part:

"With the Tower acquisition completed and RYTARY launched, we made significant progress in the first quarter executing our strategy of building a diversified specialty pharmaceutical company," said Fred Wilkinson, president and chief executive officer of Impax Laboratories. "Our first quarter 2015 financial results were impacted by the timing of several meaningful events and we currently do not expect them to impact our full year 2015 financial results."

"This quarter's revenues were negatively impacted by the later than anticipated close of the Tower acquisition, the delayed launch of lamotrigine ODT, which was launched in April due to delayed receipt of inventory from our supplier, and the deferred recognition of product sales from the launch of RYTARY. In addition, product sales mix in the combined portfolio as well as costs related to successfully launching RYTARY and the financing of the Tower acquisition led to a reduction in our first quarter earnings."

Adjusted diluted earnings per share (EPS) for the first quarter of 2015 was $0.09, compared to the first quarter 2014 adjusted diluted EPS of $0.24. On a GAAP basis, the Company reported a loss of $0.09 per diluted share for the first quarter 2015, compared to income of $0.09 per diluted share in the prior year period. The decrease in EPS is primarily attributable to unfavorable product sales mix and the timing of certain events as noted above. In addition, the first quarter 2015 results include approximately $8.5 million of expenses or $0.07 per diluted share associated with the launch of RYTARY and interest expense in connection with the Tower acquisition, for which there were no comparable amounts in the prior year period.

"Although early, we are pleased with the launch of RYTARY. The growth of weekly prescription data is consistent with our projections."

"Our balance sheet remains well positioned to support our continued pursuit of generic and branded strategic growth opportunities. We remain excited about the opportunities ahead of us and our plan to create value for patients, customers and our shareholders."

43.     On May 11, 2015, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2015 8-K and

14

reporting in full the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").

44.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45.     On August 10, 2015, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 8-K").  For the quarter, Impax reported a net loss of $1.85 million, or $0.035 per diluted share, on revenue of $214.18 million, compared to net income of $35.07 million, or $0.50 per diluted share, on revenue of $188.12 million for the same period in the prior year.

46.     In the Q2 2015 8-K, Impax stated, in part:

Fred Wilkinson, President and Chief Executive Officer of Impax, stated, "We delivered strong revenue growth in the second quarter driven by the addition of product sales from the Tower acquisition, as well as solid execution of recent product launches. The addition of the Tower generic product line coupled with the recent launch of six products from the Generics division more than offset the lost sales of authorized generic RENVELA during the quarter. Our Specialty Pharma division achieved profitability for the first time in two years as revenues more than tripled to $39.5 million compared to the same period last year, driven by the launch of RYTARY®, continued growth of Zomig® Nasal Spray and the addition of the brand products from Tower."

"Although total Company revenues increased by almost 14% in the second quarter, the overall gross margin declined primarily due to the addition of new generic products with lower margins compared to the margin of authorized generic RENVELA. Gross margin was also impacted by lower sales of our epinephrine auto-injector product during the current quarter due to a temporary supply disruption from our supplier. We have resolved the supply shortage and are in the process of re-stocking our customers. While we currently expect our gross margin to improve during the second half of 2015, we have revised our full year 2015 gross

margin guidance from the previously stated mid 50% range to the low 50% range as a result of the product sales mix in the first half of this year."

"The integration of the Tower acquisition is essentially complete. We continue to focus on achieving the strategic benefits of this transaction and the previously identified synergies of approximately $20 million by the end of 2016. Our attention will now be aimed at improving our supply chain by increasing the efficiency of our internal and external network which is intended to improve product flow and capture cost efficiencies."

"This morning we announced the sale of Daraprim®, a non-core asset we acquired in the Tower acquisition, for $55 million, recovering approximately 8% of the $700 million acquisition price. In late June, we adjusted our capital structure by issuing a convertible bond offering with a 2% coupon and terminated our term loan which had a floating interest rate of 5.5%, resulting in significant annual cash interest savings. The adjusted capital structure and the proceeds from the asset sale provide additional resources and balance sheet flexibility to pursue strategic growth opportunities," Mr. Wilkinson concluded.

47.     On August 10, 2015, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").

48.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     On November 9, 2015, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 8-K").  For the quarter, Impax reported net income of $35.76 million, or $0.49 per diluted share, on revenue of $221.1 million, compared to net income of $15.74 billion, or $0.22 per diluted share, on revenue of $158 million for the same period in the prior year.

50.     In the Q3 2015 8-K, Impax stated, in part:

"We delivered strong top-line growth during the third quarter driven by the addition of product revenues from all four areas of focus: the successful integration of brand and generic products following the strategic acquisition of Tower, increased sales from several key generic products, the addition of sales from continued growth of RYTARY® and Zomig® nasal spray, and additional revenue from generic products launched in 2015," said Fred Wilkinson, President and Chief Executive Officer of Impax. "We also achieved 21% earnings growth despite quarter over quarter margin pressure created by the absence of sales of authorized generic RENVELA® in the current quarter."

"Our generic product portfolio continues to expand, with 10 new approvals and 11 products launched through early November. We are currently on track to realizing our goal of launching up to 14 generic products this year. Additionally, our pipeline of 28 Abbreviated New Drug Applications pending approval at the U.S. Food and Drug Administration provides multiple opportunities to further expand our portfolio in 2016."

"With a strong balance sheet and cash flow generation, we are well positioned to invest in internal R&D and to pursue external growth opportunities that strengthen our portfolio. We are confident that our strategic priorities will enhance our ability to grow in the future, while delivering value to patients and our stockholders."

51.     Also on November 9, 2015, Impax filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").

52.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

53.     On February 22, 2016, Impax filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 8-K").  For the quarter, Impax reported net income of $11.43

million, or $0.16 per diluted share, on revenue of $282.09 million, compared to net income of $0.12 million, or zero per diluted share, on revenue of $131.21 million for the same period in the prior year.  For 2015, Impax reported net income of $39 million, or $0.54 per diluted share, on revenue of $860.47 million, compared to net income of $57.35 million, or $2.21 per diluted share, on revenue of $596.05 million for 2014.

54.     In the 2015 8-K, Impax stated, in part:

"Our strong 2015 financial performance is a direct result of the successful implementation of our four pillar strategy. We are a stronger and more diversified company today than we were a year ago," said Fred Wilkinson, President and Chief Executive Officer of Impax. "We established a positive compliance position across our global network and as a result, received 11 new generic product approvals. We achieved our goal of launching 14 generic products, while our Specialty Pharma division benefited from the approval and successful launch of RYTARY™ and the continued growth of Zomig® Nasal Spray. In addition, we accelerated our business development efforts with the strategic acquisition and integration of Tower Holdings, Inc., while also strengthening our capital structure."

"For 2016, our goal is to build on this momentum by continuing to focus on our strategic priorities. We currently expect that 2016 will be another growth year for Impax, with double-digit revenue and adjusted earnings per share growth. It will also be an investment year, as we will continue to invest in our quality and compliance programs, our R&D projects and expand our Specialty Pharma sales force to support organic growth. Additionally, we are initiating programs on cost efficiencies to drive future gross margin expansion."

"We ended 2015 with $340 million in cash and cash equivalents, with no senior secured debt outstanding. With one of the most flexible balance sheets in the specialty pharma industry, we are well positioned to invest in organic growth as well as judiciously pursue external growth opportunities that can strengthen our portfolio and create long-term stockholder value."

55.     On February 22, 2016, Impax also filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2015 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").

56.     In the 2015 10-K, Impax stated, in part:

18

**Competition**

The pharmaceutical industry is highly competitive and is affected by new technologies, new developments, government regulations, health care legislation, availability of financing, and other factors. Many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. We compete with numerous other companies that currently operate, or intend to operate, in the pharmaceutical industry, including companies that are engaged in the development of controlled-release drug delivery technologies and products, and other manufacturers that may decide to undertake development of such products. Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Allergan Inc., Mylan N.V., Sun Pharmaceutical Industries Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Endo International plc and Sandoz.

Due to our focus on relatively hard to replicate controlled-release products, competition in the generic pharmaceutical market is sometimes limited to those competitors who possess the appropriate drug delivery technology. The principal competitive factors in the generic pharmaceutical market are:

- the ability to introduce generic versions of products promptly after a patent expires;
- price;
- product quality;
- customer service (including maintenance of inventories for timely delivery); and
- the ability to identify and market niche products.

In the brand-name pharmaceutical market, our principal competitors are pharmaceutical companies that are focused on Parkinson's disease and other CNS disorders. In addition, with respect to products that we are developing internally and/or any additional products we may in-license from third parties, we expect that we will face increased competition from large pharmaceutical companies, drug delivery companies and other specialty pharmaceutical companies that have focused on the same disorders as our branded products.

* * *

**Sales and Marketing**

We market and sell our generic pharmaceutical prescription drug products within the continental United States and the Commonwealth of Puerto Rico. We have not made sales in any other jurisdictions over the last three fiscal years. We derive a substantial portion of our revenue from sales to a limited number of customers. The customer base for our products consists primarily of drug

wholesalers, warehousing chain drug stores, mass merchandisers, and mail-order pharmacies. We market our products both directly, through our Impax Generics and Impax Specialty Pharma divisions, and indirectly through our Rx Partner and OTC Partner alliance and collaboration agreements. Together, our five major customers, McKesson Corporation, Cardinal Health, Amerisource-Bergen, CVS Caremark Corporation and N.C. Mutual, accounted for 89% of our gross revenue for the year ended December 31, 2015. These five customers individually accounted for 46%, 22%, 19%, 1% and 1%, respectively, of our total gross revenue for the year ended December 31, 2015. We do not have long-term contracts in effect with our five major customers. A reduction in or loss of business with any one of these customers, or any failure of a customer to pay us on a timely basis, would adversely affect our business.

57.     The 2015 10-K contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58.     On May 10, 2016, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 8-K").  For the quarter, Impax reported a net loss of $10.41 million, or $0.15 per diluted share, on revenue of $225.51 million, compared to a net loss of $6.33 million, or $0.09 per diluted share, on revenue of $20143.1 million for the same period in the prior year.

59.     In the Q1 2016 8-K, Impax stated, in part:

"We reported solid financial results for the first quarter and made progress towards achieving a number of our 2016 strategic priorities," said Fred Wilkinson, President and Chief Executive Officer of Impax. "Our generic and specialty pharma business segments delivered double digit revenue and operating income growth. This positive performance was driven by last year's acquisition of Tower Holdings, Inc., from the addition of more than a dozen generic and specialty products launched over the prior twelve months and from continued growth of our specialty pharma products."

"During the quarter, we initiated the expansion of our Specialty Pharma sales force in order to support the continued growth of Rytary® and Zomig® nasal spray, while

also supporting the recent launch of EMVERM™. We also announced a restructuring plan to close one of our manufacturing and packaging facilities in order to reduce costs, improve our operating efficiencies and enhance Impax's long term competitive position. The plan is currently expected to achieve annualized cost savings of between $23 million to $27 million, beginning in 2017. By creating a more favorable and sustainable cost structure over the next several years, we will have additional capital to invest in the most promising R&D and business development projects."

"We continue to remain confident in our financial outlook for 2016. The combination of new product launches and increased sales from several of our existing generic and specialty pharma products are expected to drive growth in 2016."

The first quarter 2016 GAAP loss per diluted share reflects the recording of a reserve in the pre-tax amount of $48.0 million for an estimated receivable due from Turing Pharmaceuticals AG as of March 31, 2016 for government rebates paid by Impax on Turing's behalf related to Turing's use, marketing and sale of Daraprim®. A reconciliation of GAAP to non-GAAP specified items is provided in the "Non-GAAP Financial Measures" section.

60.     Also on May 10, 2016, Impax filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").

61.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

62.     On August 9, 2016, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 8-K").  For the quarter, Impax reported a net loss of $2.7 million, or $0.04 per diluted share, on revenue of $172.59 million, compared to a net loss

of $1.85 million, or $0.03 per diluted share, on revenue of $214.18 million for the same period in the prior year.

63.     In the Q2 2016 8-K, Impax stated, in part:

 "Our second quarter results reflect the unexpected and rapid decline in sales of diclofenac and metaxalone as a result of additional competition," said Fred Wilkinson, President and Chief Executive Officer of Impax. "In particular, the change in the diclofenac market quickly moved us from an exclusive supplier position to a five competitor market. Unfortunately, the swiftness of the change in both of these product markets combined with lower sales of mixed amphetamine salts, more than offset solid growth from our epinephrine auto-injector and oxymorphone products, as well as growth in sales across our Specialty Pharma portfolio."

"Last week we completed the acquisition of the generic product portfolio from Teva Pharmaceutical Industries Ltd. and its affiliates and initiated commercialization activities. A majority of the marketed products have growth potential, an attractive margin profile and match up well with our current portfolio. In addition, our acquisition of the full commercial rights to generic Concerta® provides an additional opportunity to add another valuable launch and accentuates the strength of our internal R&D program. Following the close of the acquisition, we continue to have the financial resources and flexibility to invest in organic growth as well as judiciously pursue external growth opportunities that can strengthen our portfolio and create long-term stockholder value."

"While the addition of these acquired products will partially offset the recent decline in Generics division revenues, we are revising our full-year financial expectations due to the five week delay in closing the transaction, further deterioration in the diclofenac market, delay in recapturing generic Adderall XR share, delay in supply of a third-party generic product and deferred timing of certain targeted 2016 generic product launches. As a result of these recent developments, we have revised our full year 2016 forecast. We currently expect adjusted EPS to be between $1.57 and $1.70, compared to $1.45 in 2015."

64.     On August 9, 2016, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").

65.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Wilkinson and Reasons, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

66.     The statements referenced in ¶¶ 19-65 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Impax and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted a violation of U.S. antitrust laws; (iii) consequently, Impax's revenues during the Class Period were in part the result of illegal conduct; and (iv) as a result of the foregoing, Impax's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

67.     On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges by the end of 2016 against Impax and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

23

Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.

. . .

Allergan, Impax and Sun declined to comment beyond their filings. Representatives of Endo, Covis, Taro and Lannett didn't respond to requests for comment. A Justice Department spokesman declined to comment.

68.     On this news, Impax's share price fell $4.00, or 19.51%, to close at $16.50 on November 3, 2016.

69.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Impax securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

71.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Impax securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Impax or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

72.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

73.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

74.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Impax;

- whether the Individual Defendants caused Impax to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

25

- whether the prices of Impax securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

75.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

76.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Impax securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Impax securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

77.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

78.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

79.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

81.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Impax securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Impax securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

82.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Impax securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Impax's business practices.

83.      By virtue of their positions at Impax, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

84.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Impax, the Individual Defendants had knowledge of the details of Impax's internal affairs.

85.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

28

Impax.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Impax's business practices.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Impax securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Impax's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Impax securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

86.     During the Class Period, Impax securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Impax securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Impax securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Impax securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

87.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

88.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

89.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     During the Class Period, the Individual Defendants participated in the operation and management of Impax, and conducted and participated, directly and indirectly, in the conduct of Impax's business affairs.  Because of their senior positions, they knew the adverse non-public information about Impax's business practices.

91.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Impax's financial condition and results of operations, and to correct promptly any public statements issued by Impax which had become materially false or misleading.

92.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Impax disseminated in the marketplace during the Class Period concerning Impax's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Impax to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Impax within the meaning of

Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Impax securities.

93.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Impax.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 11, 2016

Respectfully submitted,

**POMERANTZ LLP**

_/s/ Jennifer Pafiti_
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:     (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie

31

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**GOLDBERG LAW PC**
Michael Goldberg
Brian Schall
1999 Avenue of the Stars
Los Angeles, California 90067
Suite 1100
Telephone: 1-800-977-7401
Fax: 1-800-536-0065
Email:  michael@goldberglawpc.com
brian@goldberglawpc.com

*Attorneys for Plaintiff*

# Plaintiff's Certification

I, Greg Fleming, certify that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not purchase the security that is the subject of the complaint at the direction of

plaintiff's counsel or in order to participate in any private action arising under this title.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including

providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in the security that is the subject of the complaint during the

class period specified in the complaint are as follows:

I bought 25 shares on 10/21/2016 at $21.90
I bought 15 shares on 12/15/2015 at $41.36

5. Plaintiff has not sought to serve, or served, as a representative party on behalf of a class under

this title during the 3-year period preceding the date on which this certification is signed, except

as follows:

6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class

beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 11/10/2016



(redacted)

**IMPAX LABORATORIES INC (IPXL)**                                      **Fleming, Greg**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 12/15/2015 | Purchase | 15 | $41.3600 |
| 10/21/2016 | Purchase | 25 | $21.9000 |