ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
      – and –
SPENCER A. BURKHOLZ (147029)
LUKE O. BROOKS (212802)
ERIC I. NIEHAUS (239023)
ANGEL P. LAU (286196)
JEFFREY J. STEIN (265268)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlw.com
lukeb@rgrdlaw.com
eniehaus@rgrdlaw.com
alau@rgrdlaw.com
jstein@rgrdlaw.com

Lead Counsel for Plaintiff

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG FLEMING, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> IMPAX LABORATORIES INC., GEORGE FREDERICK WILKINSON, LARRY HSU, CAROLE BEN-MAIMON, and BRYAN M. REASONS, <br><br> Defendants. | Case No. 3:16-cv-06557-HSG <br><br> <u>CLASS ACTION</u> <br><br> AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

1254077_1

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ..................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................................ 5

III.  PARTIES ................................................................................................................... 5

IV.  FACTUAL ALLEGATIONS .................................................................................... 6

    A.  A Brief Overview of the Generic Pharmaceutical Drug Market ............................ 6

    B.  Impax Suffered a Series of Setbacks Before the Class Period Began .................... 7

    C.  Impax Colluded to Fix the Price of Digoxin .......................................................... 10

    D.  The Collusive Digoxin Price Hike Drove Impax's Rebound in 2014 .................... 14

    E.  Elevated Collusive Pricing on Digoxin Eventually Attracted Competitors
        and Impax's Profits from the Scheme Were Reduced, Causing the
        Company's Stock Price to Decline ......................................................................... 18

    F.  Impax Colluded to Fix the Price of Pyridostigmine ............................................... 22

    G.  The Structure of the Digoxin and Pyridostigmine Markets Facilitated
        Impax's Collusion .................................................................................................. 24

        1.  High Level of Market Concentration ......................................................... 25

        2.  Inelastic Demand ....................................................................................... 26

        3.  Commodity-Like Product ........................................................................... 27

        4.  No Viable Substitute ................................................................................... 27

        5.  Barriers to Entry ......................................................................................... 28

        6.  Information Sharing .................................................................................... 28

    H.  Impax and Its Co-Conspirators Are Under Multiple Governmental
        Investigations for Anticompetitive Price-Fixing ................................................... 30

    I.  Defendants Repeatedly and Falsely Denied Any Wrongdoing and
        Attributed the Digoxin Price Hike to a Nonexistent Supply Shortage ................. 36

    J.  The Individual Defendants Knew of and Controlled the Price Hikes .................... 39

    K.  Impax Misled Investors by Concealing the Impact of Competition and
        Price Erosion on Diclofenac .................................................................................. 41

        1.  May 10, 2016 .............................................................................................. 42

        2.  June 21, 2016 ............................................................................................. 48

Page

L. Impax Misled Investors by Concealing the Impact of Competition and Price Erosion on Budesonide and Failing to Timely Write Down the Resulting Impairment on the Basket of Drugs Impax Purchased from Teva and Allergan ................................................................................................ 51

V. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD ............................................... 58

A. Price-Fixing False and Misleading Statements and Omissions ........................... 58

B. Diclofenac False and Misleading Statements and Omissions ............................. 128

C. Budesonide False and Misleading Statements and Omissions ........................... 132

VI. IMPAX'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED ................................................................................. 135

A. Impax Failed to Disclose the Impact of Illegal Price-Fixing Activity on Reported Revenues ............................................................................................ 136

B. Impax Failed to Timely Record Impairment Charges on Budesonide in Violation of GAAP ........................................................................................... 138

C. Impax Failed to Disclose Adverse Revenue Trends Regarding Generic Diclofenac and Budesonide ............................................................................... 141

    1. Diclofenac ............................................................................................. 143

    2. Budesonide ............................................................................................ 146

D. The Misstatements Described Above Were Material to Impax's Financial Statements ......................................................................................................... 148

    1. The Misstatements Were Quantitatively Material .................................. 148

    2. The Misstatements Were Qualitatively Material .................................... 149

        a. The Misstatements Involve Concealment of an Unlawful Transaction ................................................................................. 149

        b. The Misstatements Masked a Change in Earnings or Other Trends .......................................................................................... 150

        c. The Misstatements Concerned a Segment or Other Portion of the Registrant's Business that Has Been Identified as Playing a Significant Role in the Registrant's Operations or Profitability ................................................................................. 150

        d. The Misstatements Affected Management's Compensation ....... 150

1

2                                                                                        **Page**

3

VII.      ADDITIONAL EVIDENCE OF SCIENTER ................................................................150

          A.      The Fraud Infected Impax's Core Operations, Which Defendants and
                  Analysts Closely Monitored ..................................................................................150

          B.      Defendants Signed Sarbanes-Oxley Certifications Attesting that They
                  Personally Supervised Impax's Controls and Procedures ...................................155

          C.      Defendants and Company Insiders Engaged in Suspicious Insider Trading .......155

          D.      Defendants' Compensation Structure Incentivized Fraud ...................................157

                  1.      2013..........................................................................................................158

                  2.      2014..........................................................................................................159

                  3.      2015..........................................................................................................160

                  4.      2016..........................................................................................................160

          E.      Defendants Wilkinson and Ben-Maimon Leave Impax.......................................161

VIII.     LOSS CAUSATION...............................................................................................................162

          A.      Losses Related to Failure to Disclose Illegal Price-Fixing Scheme ...................162

          B.      Losses Related to Failure to Disclose Increased Competition for
                  Diclofenac .............................................................................................................165

          C.      Losses Related to Failure to Disclose Failed Teva Transaction ..........................166

IX.       NO SAFE HARBOR ............................................................................................................167

X.        APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON
          THE MARKET .....................................................................................................................167

XI.       PLAINTIFF'S CLASS ACTION ALLEGATIONS.............................................................168

COUNT I .........................................................................................................................................169

COUNT II ........................................................................................................................................172

PRAYER FOR RELIEF ..................................................................................................................173

DEMAND FOR TRIAL BY JURY .................................................................................................173

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

1    1.    Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund, individually and on behalf of all other persons similarly situated ("plaintiff"), by its undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and information and belief as to all other matters, based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Impax, analysts' reports and advisories about Impax, information obtainable on the Internet, drug pricing and market share information from proprietary databases, and consultation with industry experts.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

2.    This is a securities class action on behalf of all persons who purchased or otherwise acquired Impax's common stock and its 2% Convertible Senior Notes due 2022 between February 20, 2014 and January 11, 2017, both dates inclusive (the "Class Period"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Impax Laboratories Inc. ("Impax" or the "Company") and certain of its top officials.  Defendants made false statements and omissions to investors, which concealed that Impax and several of its pharmaceutical industry peers colluded to fix generic drug prices.  Defendants also made false statements and omissions to investors, which misled investors about the impact of competition and price erosion on its sales of certain key generic drugs.

3.    Impax, a specialty pharmaceutical company, develops, manufactures, and markets bioequivalent – generic – pharmaceutical products.  The Company also develops proprietary branded products focusing on the treatment of central nervous system disorders.  Prior to the Class Period, Impax was under siege on all fronts – its top selling generic drugs suffered from new competition, its significant branded drugs were losing exclusivity, its pending applications for U.S. generic drug approval were on indefinite hold by the FDA due to compliance problems at the Company's Hayward manufacturing facilities, its application for approval of the highly-anticipated branded drug

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                                  - 1 -

1    Rytary was on indefinite hold for the same reason, and remediation costs for Hayward had piled up

2    and exceeded expectations with additional future costs uncertain.  In the third quarter of 2013, Impax

3    recorded its first quarterly loss since 3Q08 with net losses of $180,000 – a stark contrast to net

4    income of $20 million for the same period the prior year.  Under pressure to turn the Company

5    around, defendants resorted to fraud.

6        4.    Beginning in November 2013 at the latest and continuing into the present, Impax

7    entered into anticompetitive agreements with its competitors in the generic drug market.   In

8    particular, Impax colluded with its competitors to fix the prices of digoxin and pyridostigmine

9    bromide ("pyridostigmine").

10       5.    The evidence that Impax colluded to fix the prices of digoxin and pyridostigmine is

11   substantial.   The drugs' prices moved in near-perfect unison, and increased suddenly and

12   simultaneously at each drug company.  The price increases were exponential.  In November 2013,

13   just days after an industry conference attended by executives from Impax and its competitor Lannett

14   Company, Inc. ("Lannett"), both companies suddenly hiked their prices for generic digoxin more

15   than 700% to $1.07 per pill.  Likewise, between December 2014 and March 2015, Impax and

16   Valeant Pharmaceuticals ("Valeant"), Impax's primary competitor in the generic pyridostigmine

17   market, suddenly hiked the price of pyridostigmine by approximately 116% to $1.16 per pill.

18       6.    There is no non-collusive explanation for these sudden, synchronized price

19   increases – there was no supply shortage, production problem, or sudden increase in demand for

20   these drugs during this period, and no competitor left the market.  Moreover, the markets for digoxin

21   and pyridostigmine are highly susceptible to collusion – they are dominated by only a few

22   companies, and this market concentration makes collusion easy.  At the time digoxin prices were

23   raised, Impax and Lannett had a combined 94% of the market for digoxin.  Likewise, when

24   pyridostigmine prices were raised, Impax and Valeant had 100% of the pyridostigmine market.  The

25   market for both drugs featured several other characteristics that facilitated collusion:  demand for

26   both drugs was inelastic, with increases or miniscule reductions in the quantities sold even after

27   massive and sudden price hikes; both drugs were commodity-like products – generic drugs whose

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                     - 2 -

1  only distinguishing factor for purchasers was price; neither drug had a viable substitute; both drugs

2  had high barriers to entry; and information sharing and price discovery were common.

3        7.    Defendants misled investors about the competition Impax faced and about the validity

4  of its reported sales figures.  Defendants repeatedly stated to investors that the market for generic

5  drugs was highly competitive.  In fact, the market for at least some of the generic drugs Impax sold

6  was collusive, and lacked any real competition.  Impax's sales figures and other measures of Impax's

7  financial performance were also misleading.  Based on defendants' false and misleading statements,

8  investors reasonably assumed that Impax's sales figures relating to its generic drugs were an accurate

9  representation of the success of Impax's products in a competitive market.  In fact, those sales figures

10  were inflated as a result of Impax's anti-competitive conduct, and did not reflect the sales Impax

11  would have been able to achieve absent its price-fixing activity.  Reasonable investors would have

12  wanted to know this difference in the basis for Impax's sales – because Impax's sales figures were

13  inflated through its participation in an anticompetitive cartel, these figures were susceptible to being

14  deflated if and when the cartel were to break.  Furthermore, Impax's inflation of sales through illegal

15  price-fixing carried the significant risk of prosecution by state and federal antitrust authorities along

16  with the attendant negative financial and reputational harm.  Defendants downplayed that risk, falsely

17  assured investors that Impax had done nothing wrong, and offered false and misleading explanations

18  of its pricing practices generally, and for its digoxin price hike in particular.

19        8.    During the Class Period, defendants also misled investors by concealing the impact of

20  competition and price erosion on its sales of key generic drugs diclofenac sodium gel 3%

21  ("diclofenac") and budesonide.

22        9.    Impax knew that competition had already eroded its market share, volume, and

23  pricing of diclofenac by May 10, 2016 but made false and misleading statements and omissions that

24  concealed the extent and impact of competition on that key drug.  Diclofenac was a key drug for

25  Impax, comprising 21% of the Company's net sales from generics in 2015.  On January 31, 2016,

26  Impax held a near monopoly on the diclofenac market, with a 93% market share.  By May 10, 2016,

27  the Company's diclofenac market share was down substantially, and still falling, but defendants

28  concealed Impax's rapidly-declining market share from investors.

10. On May 10, 2016, 40 days into the second quarter, Impax held an earnings conference call with investors in which it materially understated the extent to which price declines had impacted revenue and concealed the main cause of revenue loss from diclofenac: volume decline. Additionally, defendants knew that price decline and market share erosion were accelerating and had reached double digits, but (1) concealed that the shift in market dynamics had already significantly impacted the quarter's results, and (2) falsely assured the market that the changes had been anticipated and accounted for in the Company's guidance. On June 21, 2016, nine days before the second quarter ended, defendants spoke to investors about diclofenac, but concealed an upcoming material write-down for the diclofenac inventory on customers' shelves to compensate customers for massive price declines. It was not until August 9, 2016 that defendants disclosed that its market share had eroded so much that Impax failed to meet its expected quarter-over-quarter revenue growth. The Company reduced guidance for the full year 2016, and wrote down the value of diclofenac on customers' shelves. Securities analysts covering the company were outraged. A Piper Jaffray analyst remarked: "[g]iven that IPXL provided guidance [on June 21], we find it hard to fathom how it could not have foreseen or known how conditions surrounding key products would further deteriorate."

11. The very next quarter, on November 9, 2016, investors were blindsided once again. This time, Impax announced a $251 million impairment charge on the basket of drugs it had purchased for $586 million from Teva Pharmaceuticals ("Teva"), Allergan plc ("Allergan"), and their affiliates. The ink was barely dry on the purchase, which had closed three months before, when Impax belatedly acknowledged that budesonide, which comprised the vast majority of the value assigned to the portfolio, would not generate meaningful future cash flows. Defendants told investors they were surprised by increased competition and that the related price degradation had occurred in September and October. In reality, defendants knew well before September that increased competition – and the sale of a key customer for the drug to Teva – already had caused prices to fall and drastically impaired the value of the drugs Impax bought from Teva and Allergan.

12. As information about defendants' fraud gradually was revealed to investors through a series of partial disclosures, the Company's stock dropped precipitously. Impax's stock price fell

1   from a Class Period high of $51.31 on April 15, 2015 to $12.40 on January 11, 2017.  Through this

2   action, plaintiff seeks to recover the damages that plaintiff and other Class members have suffered as

3   a result of defendants' violations of the federal securities laws, and the resultant decline in the value

4   of their investments in Impax.

5   **II.     JURISDICTION AND VENUE**

6        13.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

7   Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC

8   (17 C.F.R. §240.10b-5).

9        14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

10   §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

11       15.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28

12   U.S.C. §1391(b), as Impax's principal executive offices are located within this Judicial District.

13       16.    In connection with the acts, conduct and other wrongs alleged in this complaint,

14   defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

15   including, but not limited to, the United States mail, interstate telephone communications and the

16   facilities of the national securities exchange.

17   **III.    PARTIES**

18       17.    Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York

19   City, Inc. Pension Fund acquired Impax securities at artificially inflated prices during the Class

20   Period and was damaged as a result of defendants' wrongdoing as alleged in this complaint.

21       18.    Defendant Impax is incorporated in Delaware, and the Company's principal executive

22   offices are located at 30831 Huntwood Avenue, Hayward, California.  Impax's common stock traded

23   on the NASDAQ under the ticker symbol "IPXL."   Impax's generic business includes Global

24   Pharmaceuticals ("Global") as well as CorePharma and Lineage Therapeutics which were acquired

25   through Impax's acquisition of Tower Holdings, Inc. in March 2015.

26       19.    Defendant George Frederick Wilkinson ("Wilkinson") served as Impax's Chief

27   Executive Officer ("CEO") and President between April 2014 and December 2016.

28

1  20. Defendant Larry Hsu ("Hsu") served as Impax's CEO and President between

2 October 2006 and April 2014, and director between December 1999 and July 2015.

3  21. Defendant Bryan M. Reasons ("Reasons") has served at all relevant times as Impax's

4 Chief Financial Officer ("CFO") and Senior Vice President of Finance.

5  22. Defendant Carole Ben-Maimon ("Ben-Maimon") served as Impax's President of

6 Global Pharmaceuticals between September 6, 2011 and November 3, 2014.

7  23. The defendants referenced above in ¶¶19-22 are sometimes referred to herein as the

8 "Individual Defendants."

9 **IV. FACTUAL ALLEGATIONS**

10  **A. A Brief Overview of the Generic Pharmaceutical Drug Market**

11  24. Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage,

12 form, route of administration, strength or concentration and have the same active ingredients as the

13 reference-listed brand name drug – save consumers and our healthcare system tens of billions of

14 dollars annually because they introduce competition into a market where none previously existed.

15 When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices

16 and greater access to healthcare for all consumers in the United States.  In a January 31, 2012 report,

17 the Government Accounting Office noted that "[o]n average, the retail price of a generic drug is 75

18 percent lower than the retail price of a brand-name drug."

19  25. Generic drugs have long been referred to as one of the few "bargains" in the United

20 States healthcare system and historically health care experts have said that cost savings from the

21 growing number of generic drugs have gone a long way toward keeping the lid on overall increasing

22 health care costs.  This was the way the generic drug market was intended to work, and has generally

23 worked, since the implementation of the Hatch-Waxman Act in 1984.

24  26. Over the last several years, however, that price dynamic has changed for a large

25 number of generic drugs.  Prices for dozens of generic drugs have uncharacteristically risen – some

26 have skyrocketed – for no apparent reason, sparking outrage from public officials, payers and

27 consumers across the country whose costs have doubled, tripled or in some cases increased up to

28 1,000% or more.  The growing outrage and public reports of unexplained price increases caused the

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG  - 6 -

1    State of Connecticut to commence an investigation in July of 2014, which was followed shortly

2    thereafter by a Congressional inquiry and a reported criminal grand jury investigation by the United

3    States Department of Justice Antitrust Division.

4        27.    Generic drug manufacturers have argued publicly that the significant price increases

5    were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant

6    closures, or elimination of unprofitable generic drug product lines.  What regulators have found

7    through their investigations, however, is that the reason underlying many of these price increases is

8    much more straightforward, and nefarious – collusion among generic drug competitors.

9        28.    As detailed in *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056,

10   Complaint (Dkt. No. 1), ¶7 (D. Conn. Dec. 14, 2016) ("AG Complaint"), a joint complaint filed by

11   the attorneys general of 20 states following a lengthy investigation into generic drug price increases,

12   generic drug manufacturers operate, through their respective senior leadership and marketing and

13   sales executives, in a manner that fosters and promotes routine and direct interaction among their

14   competitors.[1]  The companies exploit their interactions at various and frequent industry trade shows,

15   customer conferences and other similar events, to develop relationships and sow the seeds for their

16   illegal agreements.  *Id.*, ¶7.  The anticompetitive agreements are further refined and coordinated at

17   regular "industry dinners," "girls nights out," lunches, parties, and numerous and frequent telephone

18   calls, emails and text messages.  *Id.*, ¶¶7, 55.

19   **B.    Impax Suffered a Series of Setbacks Before the Class Period Began**

20       29.    Throughout 2013 Impax was under increasing analyst and investor scrutiny arising

21   out of its inability to cure manufacturing problems at the Company's Hayward manufacturing

22   facility.  The FDA had issued a warning letter for the facility in May 2011.  In January 2013, Impax

23   announced that the FDA had issued a Complete Response Letter denying final approval of the

24

---

25   [1]    On March 1, 2017, Connecticut filed an Amended Complaint that increased the number of states
      involved in the litigation from 20 to 40.  The multistate group of plaintiff states now includes:

26   Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Idaho, Illinois,
      Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan,

27   Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York,
      North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee,

28   Utah, Vermont, Virginia, Washington and Wisconsin.

1  Company's highly-anticipated branded drug, Rytary.  According to securities analysts at Jefferies,

2  the FDA's letter indicated that due to "'the facility's involvement in the development of Rytary,'"

3  the FDA required a successful re-inspection of the Hayward facility "'before the company's NDA'"

4  for Rytary "'may be approved.'"  In light of this news, analysts ratcheted up the pressure on Impax

5  to find new sources of revenue.  For example, a January 22, 2013 Cowen and Company analyst

6  report noted that "Manufacturing Continues To Burden The Story" and stated: "Given the

7  deteriorating near-term earnings as the key in-line generic products face increased competition,

8  management needs to help bridge – and solidify – the growth story.  And they need to do that soon,

9  in our view."

10       30.    In March 2013, the situation worsened, as Impax announced that the FDA had

11  completed its re-inspection of the Hayward facility and found additional deficiencies.  This meant

12  that the FDA would not approve any new products filed from that facility.  Leerink Swann analysts

13  noted that "Most of [Impax's] new products were filed from Hayward," and reduced their estimated

14  new product revenues by $40-$45 million.  Wells Fargo slashed its 2013 earnings per share ("EPS")

15  estimate from $0.93 to $0.28 and 2014 EPS estimate from $1.11 to $0.45, observing that "[t]he only

16  way for mgmt to raise investor outlook on revenue is through acquisitions, in our view."  Wells

17  Fargo explained that Impax's growth strategy was "predicated on its drug delivery technology

18  platform, which allows for the development of limited competition generics.  Cash flows from these

19  products were then used to fund development of branded products, which are improved versions of

20  existing drugs."  They noted that the strategy itself had not failed, but that "[i]nvestors may be

21  disappointed by recent setbacks, which speak to the execution of the strategy."

22       31.    Analysts continued to reduce their expectations through April and May 2013, while

23  repeatedly commenting that Impax needed to find a way to bridge the revenue gap created by the

24  FDA's warning letter until the Hayward facility was cleared and Rytary and pending generics were

25  approved.  For example, on May 2, 2013, Wells Fargo analysts wrote that "[w]ithout an infusion of

26  new generic products, we see the base business at best being breakeven or marginally profitable for

27  the remainder of 2013."  The analysts observed that using Impax's cash on hand to acquire a

28  marketed brand product could "serve as a bridge to overcome the earnings gap until Warning Letter

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG      - 8 -

1    resolution." Likewise, on June 16, 2013, Canaccord Genuity analysts reiterated that although Impax

2    had "several sizeable opportunities" in its pipeline, "[m]ost of these opportunities are tied to

3    Warning Letter close-out."

4         32.    Throughout the summer of 2013, focus remained on the unresolved manufacturing

5    issues. On the Company's 2Q13 earnings call held August 8, 2013, defendant Reasons confirmed

6    that revenues were way down, and reeled off a litany of bad news:

7    • "This decrease in revenue was due to a significant but expected decline in sales of
     our authorized generic Adderall XR, due to additional competition in late June 2012.
8    Since the approval of another generic competitor, our market share has declined from
     the low 30% range to approximately 10% since the beginning of 2013. This has led
9    to significant decline in our revenue."

10   • "We experienced lower sales of our fenofibrate as a result of additional competition
     last October on the capsule product."
11

12   • "Zomig revenues and profit contribution will also decline significantly. Due to
     generic entry this past May this impact adversely 85% to 90% of our brand sales."

13        33.    Reasons also acknowledged the overhang caused by the FDA's warning letter: "We

14   haven't received any new product approvals in more than two years due to the warning letter in

15   Hayward." The next day, Cowen and Company analysts summed up the state of play: "The bottom-

16   line is that investors should still remain prepared for an ***extended 9-12 month delay***" on resolution of

17   the manufacturing issues, and therefore Impax's ability to monetize its still-unapproved branded and

18   generic drugs.

19        34.    In 3Q13, Impax recorded its first quarterly loss since 3Q08 with net losses of

20   $180,000 – as compared to net income of $20 million for the same period the prior year. During the

21   November 4, 2013 earnings call, defendants also disclosed that the 2013 remediation costs for the

22   Hayward problem were now estimated to be $30 million, two or three times more than previous

23   expectations. In addition, the loss of exclusivity on Zomig and increased generic competition on its

24   authorized generic oxymorphone continued to drag on revenue.

25        35.    As a result, the outlook for 4Q13 was also bleak per defendant Reasons:

26   "[T]he combination of lower revenues of our authorized generic TRILIPIX following
     our strong launch, the potential impact of recent competition on oxymorphone, and
27   reduced operating efficiencies due to lower manufacturing production levels at our
     Hayward facility may negatively impact our fourth quarter results."
28

36.     Against this backdrop stood digoxin, one of Impax's generic products with a highly concentrated market, significant barriers to entry, and no viable substitute – characteristics that are conducive to collusive activities.  Impax has been selling digoxin since July 20, 2009, when its Abbreviated New Drug Application ("ANDA") was approved by the U.S. Food and Drug Administration ("FDA").  Between 2009 and the end of 3Q13, the average price of digoxin remained stable at $0.16 per tablet.

### C.     Impax Colluded to Fix the Price of Digoxin

37.     Digoxin is used to treat heart failure and chronic atrial fibrillation.  The drug is relied upon by elderly patients for the treatment of rapid rhythm disturbances.  The World Health Organization has classified digoxin as an essential medicine.  No effective substitute exists for many patients with heart disease, and none of the comparable molecules or therapeutic equivalents are prescribed in any significant volume.  Millions in the U.S. rely on the pill every day.  During 2013, the overall market for digoxin was $198 million.  Sales by Impax and Lannett represented 94% of the total market, with Impax taking 23% and Lannett taking 71% of the market share.

38.     From October 28, 2013 to October 30, 2013, Impax, Lannett, and Par Pharmaceuticals ("Par") (a manufacturer that would soon enter the digoxin market) attended the Generic Pharmaceutical Association's ("GPhA") 2013 Fall Technical Conference in Bethesda, Maryland.  GPhA is a trade association for generic drug manufacturers and distributors.  Impax has been an active participant of the association and its employees have served as directors of the GPhA board.  From 2012 to 2014, Impax's President of the Generics Division, Carole Ben-Maimon, was a GPhA board director.  The October 28-30, 2013 conference, where Impax hosted a panel, featured networking opportunities for generic drug manufacturers – such as lunches, receptions, dinners and entertainment – and provided settings for Impax and its co-conspirators to meet in person to discuss and share market-sensitive information.

39.     Impax and Lannett hiked digoxin prices over 700% in lock-step in November 2013, immediately after the October 2013 conference.  This marked the first significant price increase for the essential drug in more than four years since Impax joined the market.[2]



*Source: Symphony Health Solutions*

40.     High market concentration enabled Impax and Lannett to immediately benefit from price hikes as purchasers had no alternative.  Indeed, 2014 market sales of digoxin increased almost three-fold to $577 million from $198 million in 2013 as a result of collusive price-fixing.  This increase was sustained through 2015 with total sales at $505 million before tapering off slightly in 2016 to $440 million.  The sales increase was solely attributable to the November 2013 price hike as the quantity of tablets sold actually declined slightly between the end of 2013 and 2016:

---

[2]     Par entered the market in January 2014 after entering into an agreement with Covis Pharma ("Covis") to distribute an authorized generic version of digoxin.  At a March 12, 2014 conference, Lannett's CEO Arthur Bedrosian ("Bedrosian") welcomed Par's entrance and stated that he expected to cede 20% of his company's market share to Par.  Indeed, through 2014, Par gained 20% market share at Lannett's expense while Impax's market share remained largely constant.

West-Ward's presence in the digoxin market during this period was marginal with less than 1% market share.  Its manufacturing capability for digoxin was compromised in February 2012 with the receipt of a warning letter from the FDA for aberrant tablets.

1
2
3
4
5
6
7
8
9
10
11



*Source: Symphony Health Solutions*

12
13
14
15
16

     41.     During Impax's November 4, 2013 earnings call, shortly after the conference and the coordinated 700% price hike that immediately followed, analysts questioned Ben-Maimon about digoxin's "huge price increase."  Ben-Maimon responded: "The price increase on dig[oxin] speaks for itself, but clearly, as a medically necessary drug, our focus there is really just to make sure that a high-quality product is available to the customer."

17
18
19
20
21
22
23
24
25
26
27

     42.     In reality, the digoxin price increase was the result of coordinated price-fixing.  It was a massive price hike that had never occurred before.  The unprecedented price moves by Impax and Lannett were highly correlated with an unusual degree of uniformity, registering at ***99% correlation*** with a statistically significant relationship that indicates the probability of obtaining such high correlation by chance is less than 1%.  At the time of the coordinated price hike, digoxin had no supply or production issues to justify the price increase.  There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages,[3] no change in formulation, and no new patent.  In fact, Par entered the scene as a brand new entrant to the digoxin market less than six weeks after Impax and Lannett's coordinated

28

---

[3]    Drug manufacturers are required by the Food and Drug Administration Safety Innovation Act of 2012 to report potential drug shortages to the FDA.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG         - 12 -

1   price hike.  Par set its digoxin price at the same level fixed by the two seasoned companies despite

2   its need to build market share from scratch.

3        43.   On Impax's February 20, 2014 earnings call, Ben-Maimon falsely characterized

4   Impax's price hike as "rational" and declined to further discuss digoxin pricing:

5          I don't want to really specifically talk about pricing on digoxin. . . .  We're pretty
       comfortable that *what we have done is rational*, and will result in ongoing
6          profitability for that product.

7        44.   Although Par's entry into the digoxin market prompted analysts' concerns about

8   potential price discounting, Lannett's CEO was unperturbed by the increased competition and

9   praised Par as "one of our rational competitors in the marketplace" during Lannett's February 6,

10  2014 earnings call:

11         Rohit Vanjani, Analyst, Oppenheimer & Co.: Hi, guys, congrats on the quarter,
       again.  On digoxin, *you said that Par is a rational competitor*.  Are you seeing
12         anything on the pricing front from them, in terms of discounting?

13         Arthur Bedrosian: Well, with discounting to our price, no.  We've seen their prices
       discounted to the brand of course, but *we're not troubled by their pricing in the
14         marketplace, not at all*.

15       45.   In the absence of price collusion, Impax's price increase on digoxin would have been

16  against its self-interest.  The rational response to the massive price increase would be to keep prices

17  lower and capture market share.  Generic drugs, including digoxin, are a commodity, with any

18  generic drug substitutable with another, and differentiated competitively with each other primarily

19  based on price.  In a market free of collusion, if one generic drug marketer raises its prices

20  significantly above those of its competitors, that marketer will lose market share.  The market for

21  generic digoxin was mature; competitors could only gain market share by competing on price.  Yet,

22  as explained above, Impax and Lannett increased the price of digoxin substantially, neither cut the

23  other's prices, and both maintained their market share:

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG      - 13 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Source: Symphony Health Solutions*

**D.      The Collusive Digoxin Price Hike Drove Impax's Rebound in 2014**

46.      Impax reaped significant benefits from the price hike immediately and attributed revenue increases in each quarter during 2014 to digoxin.  Collusive revenue from digoxin drove Impax's substantial revenue growth and profitability during 2014.

47.      On Impax's May 1, 2014 1Q14 earnings call, the Company announced a solid first quarter driven by digoxin, which offset the problems stemming from 2Q13 and 3Q13:

> Bryan Reasons – Impax Laboratories Inc. – CFO: . . . Our generic products division had a ***solid first quarter*** as we benefited from the impact of marketing initiatives and product mix.  These events also had a positive impact on our gross profit margin.  However, compared to first quarter 2013, increased generic product sales only partially offset the expected decline in branded sales of our Zomig product.  This is due to a loss of exclusivity last May on the Zomig tablets and ODT.

> \*       \*       \*

> Total generic revenues increased $7.5 million or 7% to $109 million.  This was ***primarily the result of increased sales of our Digoxin product*** and from sales of authorized generic Trilipix and generic Solaraze.  The increase was partially offset by a decrease in sales of authorized generic Adderall and fenofibrate products.

48.      In its 2Q14 Form 10-Q, filed on August 6, 2014, Impax described digoxin's contribution to the increase in its generic segment's revenue during the first six months of 2014:

> Revenues from our Global Division increased $89.9 million during the six month period ended June 30, 2014, as compared to the prior year period, driven primarily

1        by sales of our authorized generic Renvela® tablets and Trilipix® delayed release capsules, in addition to ***higher sales of our Digoxin*** and generic Solaraze® products.

2

       49.      In its 3Q14 Form 10-Q, filed on November 4, 2014, Impax attributed the generic

3

segment's revenue increase during the first nine months of 2014 to digoxin:

4

5        Revenues from our Global Division increased $119.8 million during the nine month period ended September 30, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to ***higher sales of our Digoxin*** and generic Solaraze® products.

6

7        50.      Throughout 2014, Impax was a turn-around story because of the digoxin price hike.

8 Digoxin generated net sales of $49.7 million in 2014, representing 9.4% of Impax's total net generic

9 product sales.[4]  In its 2014 Form 10-K filed on February 26, 2015, the Company again noted

10 digoxin's contribution to its 2014 revenue:

11        Revenues from our Global Division increased $150.7 million during the year ended December 31, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to ***higher sales of our Digoxin*** and generic Solaraze® products.

12

13

14        51.      In a nutshell, throughout 2014, Impax attributed the significant generic segment sales

growth mainly to digoxin:

15

16

17

18

19

20

21

22

23

24

25

26

---

[4]    Impax reported net revenues, which were all sales minus chargebacks, returns, discounts, rebates,
27 and other deductions.  Impax did not regularly report net revenues by drug.  However, in the 2016
Form 10-K, at the SEC's request, Impax identified its top five generic drugs by net revenue which,
28 in 2014, included digoxin.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG        - 15 -



52.     The increase in revenue went straight to the bottom line to boost profitability because the unjustified and collusive price hike increased gross profit margins with no incremental increase in cost.  CFO Reasons recognized digoxin's contribution to profitability during the February 24, 2015 4Q14 earnings call:

> Our total revenues in the fourth quarter increased $30 million, or 30% to $131 million.  Driving this increase was higher generic sales of Adderall XR, Digoxin, and Solaraze gel. . . .
>
> **We realized the higher pricing during 2014**.  Our adjusted gross margins in the fourth quarter 2014, increased to 51% from approximately 45% due to higher sales of the products previously mentioned.

53.     Impax's stock price increased dramatically on the turnaround story – rising from $25.20 on February 20, 2014 to $40.70 on February 26, 2015.

54.     Even as competition set in during 2015, Impax continued to benefit from the digoxin price-fixing conspiracy.  Between 2013 to 2016, Impax reaped more than $220 million from illegal, collusive revenue from digoxin alone.[5]

---

[5]   Collusive revenue represents the amount of additional revenue that Impax received due to anticompetitive behavior.  This is calculated by taking the difference between the actual price Impax received minus the "but for" price and multiplied by the actual quantity sold:

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                    - 16 -

| Collusive Revenues | 4Q13 ($m) | 2014 ($m) | 2015 ($m) | 2016 ($m) | Total ($m) |
|---|---|---|---|---|---|
| Digoxin | 25.1 | 109.1 | 64.8 | 25.4 | 224.4 |

55.     The November 2013 price hike was a structural break that could not be explained by digoxin's historical price trends and volatility, even after adjusting for inflation, or the average price movements of the prescription drug market.  Based on historical price trends and volatility, the price of digoxin would have remained around $0.14 per tablet from 2013 to 2016 without the conspiracy, or increased to $0.20 per tablet by 2016 after adjusting for inflation.  Alternatively, by adjusting the pre-collusion price of digoxin by the average price increases in the prescription drug market between 2013 and 2016, the price of digoxin would not exceed $0.22 per tablet by the end of 2016 without the collusive price hike.  Throughout the Class Period, the price of digoxin did not return to its historical pre-collusion price level, enabling Impax to continue to benefit from its illegal activities.

56.     During Impax's August 9, 2016 earnings call, Wilkinson acknowledged the importance of digoxin's revenues to Impax from 2013 to 2016 given the company's dearth of product launches, and touted Impax's ability to hold onto market share of digoxin and other key drugs:

> Over the past several years, with no-to-limited product launches, we actually held share on a number of our established products.  Slide 8 shows the market share of some of the **key generic products** in our portfolio . . . we have managed minimal share decline on many of the other key products.

---

- The actual price paid is based on the manufacturers list price (also known as Wholesale Acquisition Cost or "WAC") less wholesaler discounts (estimated using National Average Drug Acquisition Cost or "NADAC").

- The "but for" price is based on three different methodologies: (1) regression of pre-collusion price to determine "but for" price based on historical price trends and volatility, (2) regression of pre-collusion price to determine "but for" price based on historical price trends, volatility and inflation, and (3) average prescription drug market price changes in the post-collusion period.

- The actual quantity sold is used to determine collusive revenue instead of a "but for" quantity because: (1) a regression analysis found no relationship between prices and quantities, showing that as price increased significantly, this had no effect on quantity demanded; (2) digoxin is a highly inelastic drug; and (3) digoxin has no substitutes, meaning that consumers have no alternative when prices rise substantially.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16      57.     With digoxin's significance to the Company as a key product and the substantial
17  collusive revenues earned during the Class Period, Impax's statements concerning the Company's
18  sales figures and other measures of financial performance were materially misleading to investors as
    they failed to disclose that the financial results were achieved by engaging in an illegal conspiracy.
19
20      **E.     Elevated Collusive Pricing on Digoxin Eventually Attracted
               Competitors and Impax's Profits from the Scheme Were Reduced,
21             Causing the Company's Stock Price to Decline**
22      58.     Because Impax's financial results were inflated through its participation in an
23  anticompetitive cartel, these figures deflated when competitors entered the market.  The grossly
    inflated prices attracted additional participants to the digoxin market during 2015.  As those
24  competitors entered the market, existing digoxin sellers, including Impax, were forced to make
25
26
27
28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                        - 18 -

room.  As a result, net prices for digoxin declined and the impact of the collusive price-fixing environment was diminished.[6]  Impax's financial results suffered significantly as a result.

59.    On May 11, 2015, Impax reported 1Q15 results.  Impax reported a significant decline in gross margins which it attributed, in large part, to a decline in digoxin sales.

> Our adjusted gross margins in the first quarter of 2015 decreased to 47%, from approximately 61% last year, primarily due to higher sales of lower margin generic products, the impact of additional competition on generic digoxin, the later than anticipated clearance of the Tower acquisition, and the delayed launch of certain other products.

60.    Following the 1Q15 earnings release, analysts highlighted the disappointing gross margins.  For example, on May 12, 2015, Leerink Swann analysts wrote:

> IPXL's reported GM [gross margins] came in much lower than the Street was modeling at ~47.4% vs. Street's 54.9%.  The drag was attributed to the IPXL's generic biz where it saw increased pricing pressure due to increased competition for digoxin.

61.    Likewise, on May 11, 2015, Wells Fargo analysts wrote:

> Gross margin was the primary source of the EPS miss, due to generics.  Overall adjusted GM was 47.4%, vs 53.8% consensus.  Generics GM drove this shortfall, at 45.0%, down YoY from 60.4% due to revenue mix.  IPXL does not report individual product revenues but we suspect digoxin pricing erosion with additional competition was a primary culprit.

62.    The following day, Impax's stock price declined $1.25, or 2.7%, on more than three times the prior week's average trading volume.  In contrast, the S&P 500 went down only 0.3%.

63.    Three days later, at the Bank of America Merrill Lynch Health Care Conference, Impax's Mark Donohue assured investors that Impax was able to retain the majority of its customers despite the increased competition in the digoxin market:

> Sumant Kulkarni – BofA Merrill Lynch – Analyst: . . . We have a few seconds here, so last question on the base business side of things. **The fenofibrate, digoxin, and**

---

[6]    Despite the decline in Digoxin prices due to increased competition, the digoxin pricing environment remained artificially inflated.  During 2015 and 2016, digoxin pricing still far exceeded the pre-cartel pricing in late 2013.  Impax acknowledged this fact on its 2Q15 earnings call:

> As most of you know, the generic, another generic competitor for Digoxin has entered the market, making this a six-player market.  As previously disclosed and expected, margin and pricing have been impacted, as is typical in a generic multi-player market.  **This product is still more valuable than prior to the market disruption that happened 18 to 20 months ago** [*i.e.*, December 2013 to February 2014].

*your version of OPANA ER – how should we think about the competitive scenarios there*?

Mark Donohue – Impax Laboratories Inc. – VP, IR and Corporate Communications: We've been expecting competition on fenofibrate for a number of years, and it remains a good market for us. *And obviously digoxin is – there's a couple of players who have entered the market recently*. And now it's a five-player market. And we've discussed that we have seen competitive pressure in that market, but *we are holding on to the majority of the customer base*.

64.     However, three months later, during the August 10, 2015 2Q15 earnings call, CFO Reasons reported a significant decline in revenue, gross margins, and earnings which he attributed, in significant part, to a decline in digoxin sales:

[W]ithin the generic division, *revenues were down* slightly in the second quarter of 2015 compared to last year. *The main drivers of the decline were* the loss of authorized generic Renvela, *lower sales of Digoxin*, and the loss of the profit share and milestone payments.

\*       \*       \*

Our adjusted gross profit declined, as well as our *adjusted gross margin, which decreased to 50% from approximately 64% last year*. The primary drivers of this decline were the loss of sales of high-margin generic Renvela, the prior year period receipt of more than $9 million from third-party profit share and milestone payments, and *the impact of additional competition on generic Digoxin*.

\*       \*       \*

Adjusted *earnings per diluted share decreased to $0.34 in the second quarter* of 2015, compared to $0.60 last year. *This decrease was primarily attributable to* the loss of $49 million of high-margin generic Renvela sales, the loss of approximately $9 million of gross profit from third-party profit share and milestone payments, *a decline in gross profit earned on generic Digoxin due to additional competition,* higher interest expense of $6 million, and a higher adjusted tax rate.

65.     Following the 2Q15 earnings call, analysts highlighted the disappointing gross margins. An August 10, 2015 UBS analyst report summed it up: "[t]he lower gross margin guidance was disappointing."

66.     On August 10, 2015, Impax's stock price declined $1.43, or 3%, on almost two times the prior week's average trading volume. In contrast, the S&P 500 was up 1.3%. The slide continued on August 11, 2015, with Impax stock dropping another $1.03, or 2.3%, on nearly one and a half the prior week's average trading volume, while the S&P 500 dropped only 1%.

67.     After 2Q15, Impax stopped directly referencing digoxin sales.  However, several analysts estimated that digoxin revenues continued to materially decline throughout 2015 and 2016. For example, UBS provided the following digoxin sales estimates in its November 10, 2016 analyst report:

| (in millions) | Q115 | Q215 | Q315 | Q415 | Q116 | Q216 | Q316 | Q416 |
|---|---|---|---|---|---|---|---|---|
| Digoxin sales | $9.0 | $6.9 | $5.6 | $5.0 | $2.4 | $2.2 | $2.0 | $1.9 |

68.     Indeed, Impax's digoxin sales declined materially during 2015 and 2016:



Source: Symphony Health Solutions

69.     Despite the decline in digoxin revenue, Impax continued to benefit from price-fixing as digoxin prices continued to far exceed pre-cartel pricing.  Impax also continued to conceal from investors that it had engaged in illegal price-fixing activity that exposed the Company to material regulatory, reputational, and financial risks that could have material impacts on the Company's operations.  During 2015 and 2016, analysts noted their concerns regarding the impact of increasing pricing scrutiny in the generic drug industry and on Impax's generics business.  However, as discussed in §IV.I., below, defendants quieted analyst and investor concerns by concealing the illegal price-fixing activity and affirmatively denying any wrongdoing.

1

**F.      Impax Colluded to Fix the Price of Pyridostigmine**

2

70.      At the end of 2014, Impax faced the continued and indefinite halt in new product

3

launches due to ongoing compliance concerns raised by the FDA's Form 483s – and by this time not

4

only in Hayward, but also at the Company's Taiwan manufacturing facility.  In addition, its brand

5

business continued to be unprofitable and new competitors loomed over the digoxin market as

6

discussed during the November 4, 2014 earnings call:

7

Fred Wilkinson – Impax Laboratories Inc – President and CEO

8

*        *        *

9

As we've discussed on previous calls, corporate quality initiatives remain the
top priority for myself, as well as all employees of the Company.  With the ultimate
10

goal of vacating the warning letter at the Hayward facility and removing the
compliance hold on product approvals.  In August, we submitted the responses to the
11

FDA for *both the Hayward and Taiwan Form 483s that resulted from our recent
inspections*.

12

*        *        *

13

David Amsellem – Piper Jaffray & Co. – Analyst

14

Fred, if I may follow-up, *is the brand business profitable now*?

15

Fred Wilkinson – Impax Laboratories Inc – President and CEO

16

*I don't think so.*

17

*        *        *

18

Elliot Wilbur – Needham & Company – Analyst

19

*        *        *

20

Then maybe just some comments around the Digoxin market, obviously been
very strong performer.  Just whether or not you could, in fact, confirm that Mylan is
21

expected to enter that market or not? . . .

22

*        *        *

23

Fred Wilkinson – Impax Laboratories Inc – President and CEO

24

*        *        *

25

*And then finally on Digoxin, this has been a healthy market, as you have
recognized also.  We do anticipate Mylan coming into the marketplace.  In fact,
26

they are there now*.

27

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                    - 22 -

1    71.    In response, Impax bolstered revenues by colluding to fix the price of another generic

2    drug, pyridostigmine.  Pyridostigmine is an acetylcholine inhibitor that has been commonly used as a

3    first-line therapy for myasthenia gravis – a chronic muscular disorder characterized by muscle

4    weaknesses and exertion fatigue – for the past 50 years.  Pyridostigmine is used to treat the

5    symptoms of the disease.

6    72.    Impax has been selling pyridostigmine since April 24, 2003, when its ANDA was

7    approved by the FDA.  Before the end of 2014, the price of the drug had been stable and constant for

8    at least six years with Impax selling the drug at $0.39 per tablet – a slightly lower price than

9    Valeant's generic version selling at $0.48 per tablet.  Valeant's generic version of the tablet was

10   packaged by its subsidiary Oceanside Pharmaceuticals.

11   73.    Like digoxin, pyridostigmine was an ideal candidate for collusive price-fixing.  The

12   market was highly concentrated and was dominated by Impax and Valeant since at least 2009 – with

13   Impax taking 64% to 74% market share and Valeant taking 29% to 36%.  Barriers to entry were

14   significant as any new ANDA approval would take approximately three years.  No viable substitute

15   existed for myasthenia gravis patients reliant on the drug because pyridostigmine was the most

16   commonly used and safest first step treatment of the symptoms of the disease.

17   74.    Valeant was an ideal co-conspirator as Impax and Valeant had a long-standing and

18   close collaborative relationship since 2008.  According to Impax's annual report, the two companies

19   entered into a joint development agreement and a license and settlement agreement "to collaborate in

20   the development of a total of five dermatology products, including four of the Company's generic

21   products and one branded advanced form of Valeant's SOLODYN® product."  Under the

22   agreement, Valeant paid Impax significant upfront and milestone payments.  Impax also withdrew its

23   patent challenge and refrained from entering the generic market for Solodyn.

24   75.    With such favorable factors in place for a profitable collusion, between

25   December 2014 and March 2015, both companies hiked pyridostigmine prices to the identical

26   amount of $1.02 – taking prices to an unprecedented level and breaking Impax's tradition of

27   undercutting Valeant's pricing since Impax's launch of the drug in 2005.  This unprecedented and

28   collusive price hike measured at 94% correlation, with statistical significance so high that the

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                         - 23 -

probability of obtaining such large correlation by chance is less than 1%. The price hike almost tripled the price of the tablet, with 2015 sales soaring to $64 million from $28 million in 2014. The heightened sales were sustained through 2016 at $66 million. The increased sales were solely due to the collusive price hike and largely shared by the two co-conspirators. The hike occurred shortly after the October 27 to October 29, 2014 GPhA Fall Technical Conference, which both Impax and Valeant attended.

76.    At the time of the unprecedented and massive price hike, there were no known supply or production issues such as drug safety labelling changes, enforcement reports, or potential drug shortages reported to the FDA as required by regulations. Pyridostigmine prices had been consistently stable at around $0.39 to $0.48 ever since Impax's entrance into the market.

77.    Between 2014 and 2016, Impax reaped more than $47 million of illegal, collusive revenues from pyridostigmine. The December 2014 price hike was a structural break that could not be explained by pyridostigmine's historical price trends and volatility, or by the average price movements of the generic drug market. Based on historical price trends and volatility, without the conspiracy, the price of pyridostigmine would have remained stable at $0.40 per tablet between 2014 and 2016, or gradually increased to $0.46 per tablet after adjusting for inflation. Similarly, by adjusting the pre-collusion price of pyridostigmine by the average price increases in the generic drug market between 2014 and 2016, the price of pyridostigmine would not have exceeded $0.47 per tablet by the end of 2016 without the collusive price hike.

| Collusive Revenues | 4Q14 ($m) | 2015 ($m) | 2016 ($m) | Total ($m) |
|---|---|---|---|---|
| Pyridostigmine | 1.5 | 25.9 | 20.0 | 47.4 |

### G.    The Structure of the Digoxin and Pyridostigmine Markets Facilitated Impax's Collusion

78.    The digoxin and pyridostigmine markets were highly conducive to price-fixing. Characteristics that facilitated collusion include: (1) a high level of market concentration, (2) near perfectly inelastic demand, (3) the commoditized-nature of digoxin, (4) the significant barriers to entry, and (5) the ease of information sharing.

1

### 1.    High Level of Market Concentration

2    79.    The Herfindahl-Hirschman Index ("HHI") is a widely-accepted market concentration

3    measurement and is used by antitrust enforcement agencies, such as the Federal Trade Commission

4    ("FTC") and the U.S. Department of Justice ("DoJ"), for assessing market competitiveness.  An HHI

5    of 0 is indicative of perfect competition and an HHI of 10,000 is indicative of a monopoly.  The DoJ

6    and FTC's Horizontal Merger Guidelines classify a market as unconcentrated when HHI is below

7    1,500, moderately concentrated when HHI is between 1,500 and 2,500, and highly concentrated

8    when HHI exceeds 2,500.

9    80.    The score is calculated by squaring the market share of each firm competing in the

10    market and then summing the resulting numbers.  For example, in a market consisting of three

11    companies with market shares of 10%, 40% and 50%, the HHI is 4,200 (100 + 1,600 + 2,500).

12    81.    Beginning in 2012, the HHI for the digoxin market exceeded 4,500 and rose steadily

13    to over 5,000 by 3Q13 – a level indicative of a highly concentrated market.  By 4Q13, three

14    manufacturers made up substantially all of the digoxin market.  Concordia Healthcare Corp.

15    ("Concordia")/Covis manufactured Lanoxin, the branded version of digoxin.  Impax and Lannett

16    manufactured the generic version and dominated the digoxin market with 94% market share.  During

17    4Q13, Par was negotiating the distribution of an authorized generic version of digoxin with Covis

18    and began distributing the drug in January 2014.

19    82.    A highly concentrated market is vulnerable to coordinated activities because fewer

20    firms are involved in the negotiation, collusive revenues are high for each firm, and the cartel tends

21    to be stable with the absence of cheating.  These were the characteristics of the digoxin market

22    beginning in late 2013.  The three conspirators – Impax, Lannett and Par – had a formulated script

23    justifying the price hike and describing each other's action as "rational."  On February 6, 2014,

24    Lannett's CEO Bedrosian stated during an earnings call: "we see Par as one of our rational

25    competitors in the marketplace."  During Impax's February 20, 2014 earnings call, defendant Ben-

26    Maimon stated: "We're pretty comfortable that what we have done is rational . . . ."  A supposed

27    competitor's entrance into the market was much welcomed.  At the February 23, 2014 Leerink

28    Swann Global Healthcare Conference, Bedrosian commented: "We're grateful that they selected Par.

Par is one of the more rational players in the marketplace."   At the March 12, 2014 ROTH Conference, he again applauded: "We are glad that it was Par."  Despite new competition, Impax held on to its market share throughout 2014 regardless of its elevated digoxin pricing.  While Lannett yielded market share to Par, it was ungrudgingly given.  During the February 6, 2014 Lannett earnings call, Bedrosian stated: "we feel we'll probably have some reduction in units.  We're not sure of the exact amount, but I would say it would be less than 20%, in terms of the total market, so we don't see a big impact on us."  At the March 12, 2014 ROTH Conference, Bedrosian stated: "We are glad that it was Par.  And we were expecting to lose some market share to them in terms of units, and we calculated roughly allowed ourselves a 20% unit loss in the marketplace to an additional competitor."  Ultimately, although Par charged just as much as Lannett, it captured almost exactly 20% of Lannett's share during 2014 – just as predicted.

83.    The loss of market share was allowed and did not create a big impact because collusive revenues were high.   Total market sales increased from $198 million in 2013 to $505 million in 2014 alone, with substantially all of it shared by the three conspirators in a highly concentrated market.

84.    For the pyridostigmine market, the HHI reached its apex at the end of 2014 and 1Q15, registering at a high of 6,164.  Impax and Valeant represented 100% of the generic pyridostigmine market, with Valeant also manufacturing the branded version of the drug.  At the time of the collusive price hike, the two firms had already established a long-standing collaborative relationship to not compete in another drug.  Pyridostigmine was just another opportunity.

### 2.    Inelastic Demand

85.    Elasticity of demand ("Ed") is measured by the change in quantity of goods sold relative to the change in price.  When Ed is zero, demand is perfectly inelastic as there is no change in the quantity of goods sold despite a large increase in price.  Inelastic demand encourages cartel behavior as a significant increase in price has minimal effect on quantity demanded by consumers. As such, the cartel can maximize profit because price increases will directly translate into revenues.

86.    At the time of the collusive price-fixing, the digoxin and pyridostigmine markets were characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For digoxin, the

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                          - 26 -

seven-fold increase in the price of digoxin resulted in a reduction of quantities sold by a mere 8%. For pyridostigmine, the market was so inelastic that the dramatic price increase had no negative effect on sales whatsoever and quantities sold actually increased by 4.6%.   As a result, the coordinated price hike translated immediately and directly into collusive revenues shared by the co-conspirators.

### 3.     Commodity-Like Product

87.     A commodity-like product is a standardized product where price is the only distinguishing factor for purchasers.  Both digoxin and pyridostigmine are AB-rated generic drugs by the FDA, which indicates that they are bioequivalent to their respective branded versions.  In addition, the FDA's Orange Book shows that Impax's versions of digoxin and pyridostigmine are therapeutically equivalent to other manufacturers' generic versions of the same drugs.  As stated in its Orange Book, the "FDA believes that products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."  As such, pharmacists are able to substitute one manufacturer's version of a drug for another.

88.     For commodity-like products such as digoxin and pyridostigmine, all of the manufacturers must raise prices for the collusion to be viable.  Price hikes by Impax without the co-conspirators' agreement to join the heightened price levels would enable competitors to take market share away by simply setting prices below Impax's price point.  Thus, the coordinated massive price hikes could only be sustainable with the cooperation and agreement among the co-conspirators.

### 4.     No Viable Substitute

89.     The lack of a viable substitute encourages cartel behavior because consumers cannot replace the product after significant price hikes.

90.     Digoxin is the prescription of choice for doctors when it comes to heart medication, as none of the molecules that are comparable to it are prescribed in any significant volumes.  In addition, since at least 2002, digoxin has been listed as a World Health Organization "essential medicine" that is crucial to "the priority health care needs of the population."

91.     Pyridostigmine has been the most commonly used and first-line treatment therapy for patients with myasthenia gravis for over 50 years.  Because pyridostigmine is generally considered safe, it is particularly suitable for patients requiring long term treatment of the disease.

92.     In addition to the fact that no effective substitute exists for some patients on digoxin and pyridostigmine, various barriers in the medical field also serve to promote the resistance to prescription changes.   These barriers include doctors' reluctance to change well-known prescriptions, insurance and Medicare's absorption of most of the price shock, lags in co-payment tiering changes, and the restriction on Medicare from negotiating drug prices with pharmaceutical companies.

93.     The lack of a viable substitute for digoxin and pyridostigmine enabled the collusive price-fixing to be sustained over an extended period.

**5.     Barriers to Entry**

94.     Collusion is more effective in markets with high barriers to entry because new competitors cannot easily enter the market and undercut the agreed-upon price.

95.     A competitor attempting to enter the generic drug market faces the barrier of both time and costs.  The generic drug approval process creates a significant barrier to entry for the digoxin and pyridostigmine markets.  An ANDA approval by the FDA takes an average of 36 months.  Upon approval, the manufacturing facility is subject to regulatory oversight and compliance expenses.  Indeed, Impax's non-compliance at the Hayward and Taiwan manufacturing facilities demonstrates the high costs of regulatory compliance and the dire consequences of non-compliance.  Impax acknowledged in each of its annual reports that its products "are generally difficult to formulate and manufacture, providing certain competitive advantages."

96.     A high barrier to entry to the digoxin and pyridostigmine markets enabled the collusive price-fixing to be sustained over an extended period.

**6.     Information Sharing**

97.     Information sharing is important in a conspiracy to enable the cartel to come to an agreement and monitor pricing decisions and compliance.

98.     Impax and its co-conspirators were in constant contact prior to the collusive price hikes through industry conferences and trade association meetings.  The 40 state attorneys general stated that "these trade shows and customer conferences provide generic drug manufacturers, including but not limited to the Defendants, with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."  As such, the DoJ is scrutinizing "'trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers.'"[7]

99.     According to the GPhA's website, GPhA is "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The GPhA provides a forum for frequent in-person meetings and opportunities to collude:

| Meeting | Date & Location | Attendees |
|---|---|---|
| 2013 GPhA Annual Meeting | February 20-22, 2013 Orlando, Florida | Impax, Mylan, Par |
| 2013 GPhA CMC Workshop | June 4-5, 2013 Bethesda, Maryland | Impax, Lannett, Mylan, Par, Sun |
| 2013 GPhA Fall Technical Conference | October 28-30, 2013 Bethesda, Maryland | Impax, Lannett, Mylan, Par, Sun |
| 2014 GPhA Annual Meeting | February 19-21, 2014 Orlando, Florida | Impax, Mylan, Par, Sun |
| 2014 GPhA CMC Workshop | June 3-4, 2014 Bethesda, Maryland | Impax, Lannett, Mylan, Par, Sun, Valeant |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014 Bethesda, Maryland | Impax, Lannett, Mylan, Par, Sun, Valeant |
| 2015 GPhA Annual Meeting | February 9-11, 2015 Miami Beach, Florida | Impax, Mylan, Par, Valeant |

100.     Within a week after the 2013 GPhA Fall Technical Conference, Impax and Lannett implemented the lockstep and unprecedented massive price hike on digoxin.

101.     Similarly, less than two months after the 2014 GPhA Fall Technical Conference, Impax and Valeant began to implement the lockstep and unprecedented massive price hike on pyridostigmine.

---

[7]     http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

102.     Impax has always occupied a leadership role at the GPhA.  Ben-Maimon, President of Global Pharmaceuticals, acted as a director of the GPhA board from 2012 to 2014, until her resignation from Impax.  Upon her resignation, another Impax employee – Marcy MacDonald – took the board seat.  Before Ben-Maimon, Impax's former CEO, President and Director Max Mendelsohn had the board seat.  In addition to acting as directors, Impax's employees have frequently hosted panels and served as speakers at the conferences.

103.     In addition to the GPhA, Impax and other drug manufacturers have opportunities to meet and collude at association meetings hosted by the National Association of Chain Drug Stores, Healthcare Distribution Alliance, and Efficient Collaborative Retail Marketing.

104.     Besides in-person meetings, pricing and market information were communicated through investor conference calls.  For example, Lannett's CEO frequently spoke for Impax and Par.  For instance, during an earnings call on November 3, 2014, Lannett's CEO Bedrosian stated, "everybody has accepted the fact that our costs are going up dramatically and less concerned about grabbing market share."  He continued, "since the companies we're looking at here are not irrational players, I don't see them just going out and trying to grab market share."

105.     In addition to issuing directives through investor calls, pricing and market information were shared through subscription-based databases.  The availability of market-sensitive information facilitates the coordination and collusion between manufacturers.  Impax and other manufacturers have the ability to share pricing, market share, quantities and sales information on a weekly basis through subscription-based data providers such as Symphony Health Solutions, IMS, and First Data Bank.

### H.     Impax and Its Co-Conspirators Are Under Multiple Governmental Investigations for Anticompetitive Price-Fixing

106.     In light of massive generic drug price increases, on January 8, 2014, the CEO of the National Community Pharmacist Association wrote a letter to Congress requesting an oversight hearing to determine the causes of the price jumps.  The State of Connecticut also found that:

> Prices for dozens of generic drugs have uncharacteristically risen – some have skyrocketed – for no apparent reason, sparking outrage from public officials, payers and consumers across the country whose costs have doubled, tripled or in some cases increased up to 1,000% or more.  The growing outrage and public reports of

unexplained and suspicious price increases caused the State of Connecticut to commence an investigation in July of 2014, which was followed shortly thereafter by . . . the United States Department of Justice Antitrust Division.

107.    Impax and its co-conspirators were among the first generic manufacturers to be investigated by the Connecticut Attorney General, Congressional committees, and the DoJ.

108.    On July 15, 2014, Impax filed a Form 8-K with the SEC announcing that it had received a subpoena from the Attorney General of the State of Connecticut requesting documents and information concerning digoxin:

On July 14, 2014, [the Company] received a subpoena and interrogatories (the "Subpoena") from the State of Connecticut Attorney General ("Connecticut AG") concerning its investigation into sales of the Company's generic product, digoxin.  According to the Connecticut AG, *the investigation is to determine whether anyone engaged in a contract, combination or conspiracy in restraint of trade or commerce which has the effect of (i) fixing, controlling or maintaining prices or (ii) allocating or dividing customers or territories relating to the sale of digoxin in violation of Connecticut state antitrust law*.  The Company intends to cooperate with the Connecticut AG in producing documents and information in response to the Subpoena.  To the knowledge of the Company, no proceedings [by the Connecticut AG] have been initiated against the Company at this time, however no assurance can be given as to the timing or outcome of this investigation.

109.    Around the same time, the Connecticut AG served similar subpoenas on other members of the cartel.  On July 16, 2014, Lannett announced that it had received a Connecticut AG subpoena concerning the pricing of digoxin.  Less than three weeks later, on August 6, 2014, Par received a similar subpoena.

110.    On October 2, 2014, in a letter addressed to Ben-Maimon ("Sanders and Cummings Letter"), Senator Bernie Sanders and Representative Elijah E. Cummings informed Impax that "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses":

We are writing to your company to request information about the escalating prices it has been charging for the drug Digoxin, which is used to treat certain types of irregular heartbeats and heart failure.  According to the National Average Drug Acquisition Cost Data provided by the Healthcare Supply Chain Association, the average price charged for Digoxin has increased by as much as 884 percent from October 2012 to June 2014.

| Drug | SKU | Average Market Price, October 2012 | Average Market Price, June 2014 | Cost Increase | Average Percentage Increase |
|---|---|---|---|---|---|
| Digoxin | 125 mcg tablet | $.11 | $1.06 | $0.95 | 839% |

| Digoxin | 250 mcg tablet | $.11 | $1.10 | $0.99 | 884% |

This dramatic increase in generic drug prices results in decreased access for patients.

\*       \*       \*

In order to evaluate the underlying causes of recent increases in the price of your company's drug, we request that you provide the following documents and information for the time period covering January 1, 2012, to the present:

(1)    total gross revenues from the company's sales of this drug;

(2)    the dates, quantities, purchasers, and prices paid for all sales of this drug;

(3)    total expenses relating to the sales of this drug, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;

(4)    sales contracts or purchase agreements for active pharmaceutical ingredients for this drug, including any agreements relating to exclusivity, if applicable;

(5)    a description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the price of this drug;

(6)    any cost estimates, profit projections, or other analyses relating to the company's current and future sales of this drug;

(7)    price of this drug in all foreign countries or markets, including price information for the countries paying the highest and lowest price; and

(8)    the identity of company official(s) responsible for setting the price of the drug over the above time period.

111.    Simultaneously, Senator Bernie Sanders and Representative Elijah E. Cummings sent a similar letter to the CEO of Lannett.

112.    On October 22, 2014, shortly after her receipt of the Sanders and Cummings Letter, Ben-Maimon announced her resignation, effective November 3, 2014.

113.    On November 7, 2014, Impax filed a Form 8-K announcing that one of its sales representatives had received a grand jury subpoena from the DoJ's Antitrust Division concerning the sale of generic drugs:

On November 3, 2014, a sales representative of Impax Laboratories Inc. received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the grand jury of the Eastern District of Pennsylvania.    The request relates to any communication or

correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications.

114.     Lannett also announced that its Senior Vice President of Sales and Marketing received a similar subpoena from the DoJ on November 6, 2014.

115.     On December 5, 2014, the DoJ's Antitrust Division issued a grand jury subpoena to Par and requested documents relating to digoxin.  On the same day, Lannett was also served with a grand jury subpoena "regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products."

116.     On March 13, 2015, the DoJ issued a grand jury subpoena to Impax for four generic medications: digoxin, terbutaline sulfate, prilocaine/lidocaine cream, and calcipotriene topical solution.  Impax withheld the disclosure of the grand jury subpoena until May 11, 2015, when it filed its 1Q15 Form 10-Q, which stated:

> Previously on November 6, 2014, the Company disclosed that one of its sales representatives received a grand jury subpoena from the Antitrust Division of the United States Justice Department (the "Justice Department").  In connection with this same investigation, on March 13, 2015, the Company received a grand jury subpoena from the Justice Department requesting the production of information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.  In particular, the Justice Department's investigation currently focuses on four generic medications: digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution.  The Company has been cooperating and intends to continue cooperating with the investigation.  However, no assurance can be given as to the timing or outcome of the investigation.

117.     On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges by the end of 2016 against Impax and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  Bloomberg specifically named Impax as one of the manufacturers implicated through digoxin – its coordinated price increase caused Medicaid to spend 90% more on the drug from 2013 to 2014.  In the article, titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," Bloomberg reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> ***The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining***

*whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.*

Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, Lannett Co., **Impax Laboratories Inc.**, Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.

\*        \*        \*

Allergan, Impax and Sun declined to comment beyond their filings. Representatives of Endo, Covis, Taro and Lannett didn't respond to requests for comment. A Justice Department spokesman declined to comment.

118. On this news, Impax's share price fell $4.00, or 19.51%, to close at $16.50 on November 3, 2016 – on almost three times the prior week's average trading volume.

119. On December 14, 2016, the State of Connecticut and nineteen other states filed an original complaint (AG Complaint) – amended on March 1, 2017 to include twenty additional states – against six generic drug manufacturers for illegal schemes involving market share allocation and anticompetitive price inflation. At the same time, the DoJ unsealed criminal charges against the CEO and the President of Heritage Pharmaceuticals, Inc. ("Heritage"). On January 9, 2017 and January 10, 2017, Heritage's Jeffrey Glazer and Jason Malek pleaded guilty to price-fixing charges.

120. Governmental investigations are ongoing. According to the AG Complaint, "[i]n July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. The information developed through that investigation, which is still ongoing, uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States." The AG Complaint filed was only an "initial civil action" to be followed by additional filings as the states "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time."

1   121. As reported by *The New York Times* on December 15, 2016, in an interview about the

2 AG Complaint, Connecticut's Attorney General George Jepsen stated that there was more to come:

> "We believe that this is just the tip of the iceberg," George C. Jepsen, Connecticut's attorney general, whose office started the inquiry that led to the charges, said in an interview on Thursday. "I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."

   122. Similarly, the DoJ has stated that its investigations are ongoing. In a motion to stay discovery in a civil antitrust case concerning the drug propranolol, filed on February 24, 2017, the DoJ emphasized the broad-ranging nature of its ongoing investigation, the "numerous corporations and individuals" implicated, and the "plethora of evidence" amassed against these corporations and individuals:

> The Complaints refer to the United States' criminal investigation into the generic pharmaceutical industry as part of the factual basis for their antitrust claims. . . .
>
> The United States unsealed the first criminal informations in that investigation on December 14, 2016. . . . The two executives – Jeffrey Glazer and Jason Malek – pled guilty to these charges on January 9, 2017, and both are cooperating with the United States' ongoing criminal investigation.
>
> Although, to date, the United States has filed charges against only Glazer and Malek, as described in this Memorandum and detailed more fully in the Grundvig Declaration, the criminal investigation into the generic pharmaceuticals industry is ongoing and broad-ranging, and it has already implicated numerous corporations and individuals. Additional corporations and individuals may be implicated as the investigation continues to develop.
>
>      *  *  *
>
> Thus, absent a stay, discovery in these cases would sweep up evidence related to other drugs that the United States is currently investigating.
>
>      *  *  *
>
> Broad civil discovery in these cases would threaten the United States' ongoing investigation because subjects of the investigation will gain access to a plethora of evidence that they could not otherwise obtain.
>
>      *  *  *
>
> [T]he United States is conducting sensitive negotiations with potential criminal defendants and has a considerable interest in limiting sworn testimony given by its cooperators. (*See* Grundvig Decl., ¶13.)[8]

---

[8]  Memorandum of Law in Support of the United States' Motion for Reconsideration of Its Motion for a Limited Stay of Certain Discovery, *Castillo v. Actavis Elizabeth, LLC, et. al.*, No. 1:16-cv-

123.    The DoJ has intervened in numerous other civil actions involving different drugs and generic manufacturers.  In particular, on January 5, 2017, the Antitrust Division's Washington Criminal I Section submitted an Uncontested Motion of the United States to Intervene in the *In re Generic Digoxin and Doxycycline Antitrust Litigation*, in which Impax, Jeffrey Glazer, Jason Malek, Heritage, Lannett, Par, West-Ward, Sun, Actavis, Mayne, and Mylan are named as defendants.  In its motion, the DoJ asserted that "this litigation shares common questions of law and fact with an ongoing federal criminal investigation.  Continued litigation of this consolidated action is likely to result in the disclosure of information that will harm the ongoing criminal antitrust investigation."  On January 6, 2017, Judge Cynthia Rufe granted the DoJ's uncontested motion to intervene.

124.    On January 6, 2017, when the DoJ's motion to intervene was granted, Impax's stock price declined 2.8% on above average trading volume.  The S&P 500 traded up 0.4%.

125.    On January 9, 2017, when Jeffrey Glazer's guilty plea agreement was filed in the District Court in the Eastern District of Pennsylvania, Impax's stock price declined 2.9% on above average trading volume.  The S&P 500 closed slightly down by 0.4%.

126.    On January 10, 2017, when Jason Malek's guilty plea agreement was filed in the District Court in the Eastern District of Pennsylvania, Impax's stock price dropped 5.2% on above average trading volume.  The S&P 500 closed unchanged.

**I.      Defendants Repeatedly and Falsely Denied Any Wrongdoing and Attributed the Digoxin Price Hike to a Nonexistent Supply Shortage**

127.    Throughout the Class Period, Impax sought to downplay the seriousness of the governmental investigations.  In each of its Form 10-K and Form 10-Q filings, Impax assured investors that "[i]t is common for enforcement agencies to initiate investigations into sales and marketing practices, as well as pricing practices, regardless of merit."  During Impax's November 4, 2014 earnings call, an analyst questioned Wilkinson on the investigations into generic drug pricing, he responded:

> I think there's always been an analysis ongoing for looking at pricing within the pharmaceutical industry.  Sometimes it focuses on brands, sometimes it focuses on

09901 (S.D.N.Y. Feb. 24, 2017), Dkt. No. 62.  The accompanying Grundvig Declaration was filed under seal.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                              - 36 -

generics, sometimes on transfer pricing, so we're constantly under scrutiny, and I think the most important thing is to make sure that *our practices and our approaches are well within all the guidelines and the rules and regulations, and we believe they are*.

128.    At the end of 2015 and into 2016, Impax continued to reassure investors that no pricing collusion had taken place.  On Impax's November 9, 2015 earnings call, when an analyst raised questions about pricing scrutiny, Wilkinson assured investors that "in fact, *we've not done anything that we think would ever raise the scrutiny of any of the regulatory authorities*."  A year later, at the November 9, 2016 earnings call, when pressed by analysts to clarify Impax's internal review of its generic pricing at issue with the DoJ, Wilkinson stated: "I think we really don't want to comment on where we've gone.  Obviously, we are taking our judicious efforts to make sure that we've done what we need to appropriately.  We'll put our filings out in front of the market in our filings."  Shortly thereafter, however, during a proprietary event hosted by investment bank Leerink Partners LLC, Impax's management team told Leerink's analysts that they felt "good" after conducting an "internal investigation relating to the DOJ's inquiry into price collusion."  After the meeting with Impax's management – "including Fred Wilkinson (CEO), Bryan Reasons (CFO), Doug Boothe (President, Impax Generics), and Mark Donohue (VP of IR)" – Leerink stated in its December 5, 2016 analyst report that "updates on the DOJ sector probe were assuring, from an IPXL perspective" because "mgmt commented that it has completed its own internal investigation relating to the DOJ's inquiry into price collusion and feels good the company has not engaged in any impropriety."  However, to date, no filing has been made concerning Impax's "internal investigation relating to the DOJ's inquiry into price collusion."

129.    In addition to outright denials of price fixing, Wilkinson repeatedly sought to justify the unprecedented and coordinated price-fixing of digoxin that occurred at the end of 2013:

- August 10, 2015 Earnings Call:  "Obviously both the API supply and some of the other issues around the product resulted in a market disruption, at which there were two of us left out there, substantial price increase."

- September 18, 2015 Morgan Stanley Healthcare Conference:  "So, digoxin went from a seven player marketplace to a two player marketplace.  We took price, so became a very meaningful product to us.  We were very close to actually eliminating it out of our portfolio; the price has gotten so low."

- • November 11, 2015 Credit Suisse Healthcare Conference: "We may be a poster child of that one in that we had a product called Digoxin that we were one of seven marketers about 2.5 years ago. It became one of two. We took the price up fairly dramatically, made it so it was an interesting product, made some money on that."

- • May 10, 2016 Bank of America Merrill Lynch Healthcare Conference: "I mean, we had that experience with our digoxin, where there were nine competitors and then that went to two. We raised price, and then now there are seven or eight competitors and price has come back down again."

130. Based on evidence received during their investigation, the 40 state attorneys general rejected the types of rationalizations used by Wilkinson and other generic manufacturers:

> Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures or elimination of unprofitable generic drug product lines. What the Plaintiffs States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors.

131. Wilkinson's justifications for the unprecedented price hike do not explain the highly correlated and uniform price increase with Lannett that was sustained despite the entrance of new competitors, such as Par, that sought to build up market share. His pre-collusion story was inconsistent, with the number of competitors changing from seven to nine. The generic digoxin market never had nine competitors, and there were only three competitors in 2012 and 2013. *See* ¶45. The average price of digoxin had always been consistent and stable at $0.16 per pill since Impax entered the market, with Impax's market share growing steadily from 20% to 30% in the years before the collusion – demonstrating the absurdity of the suggestion that Impax was about to eliminate one of its key products from its portfolio precisely at the time when the Company was under siege on all fronts. Furthermore, no API shortage had occurred as no manufacturers reported any potential drug shortages to the FDA as required by federal law. The only shortage that occurred at the end of 2013 was Impax's shortage of revenues due to additional competitive pressure on its key drugs such as Adderall, Fenofibrate, Oxymorphone and the continued hold-up of pending ANDAs with the indefinite regulatory compliance problems at the Hayward facility.

132. These calculated price spikes were not caused by supply or production issues as defendants insisted, but by collusion conceived and directed by executives at the highest levels of many of the generic pharmaceutical companies, including Impax.

J.       **The Individual Defendants Knew of and Controlled the Price Hikes**

133.    As alleged in the AG Complaint, many of the generic pharmaceutical industry price-fixing schemes were "conceived and directed by executives at the highest level."  Defendants, the Company's senior executives, admitted that exploitation of pricing was a company focus and core strategy in the midst of a company beset by a myriad of problems.

134.    During the February 20, 2014 earnings call, an analyst asked "[a]re you following what some of your competitors are doing with aggressive price increases, and how much will that benefit you going forward?"  Defendant Ben-Maimon discussed her deliberate and "rational" strategy for exploiting pricing and that strategy was applied to digoxin:

> Obviously, we can't really talk about – for competitive reasons – about specific products and specific prices.  But as you have seen across the industry, pricing has improved, and the ability to take some price increases have clearly been available.
>
> Obviously, *we are really careful, and we want to make sure that we do that in a very rational way, so that we make sure that the price – that what we are doing sticks, and that we actually do make more money in the long run*.  But we're pretty confident that what we did through – towards the end – throughout the end of last year and the beginning of this year will result in more profitability for many of the products that we have been able to take some price on.
>
> *       *       *
>
> I don't want to really specifically talk about pricing digoxin.  You know that the market has been pretty stable with [Lannett] and us, and as you suggested, [Par] launched an AG.  We're pretty comfortable that what we have done is rational, and will result in ongoing profitability for that product.  We continue, obviously, to do everything we can to maintain our own share.

135.    At the May 15, 2014 Bank of America Merrill Health Care Conference, CEO Wilkinson stated that pricing was one of his "four initial focuses" because new "product approvals are not coming at this particular point.  So everything we have that's in the works, every opportunity in our hands, we need to make sure we maximize."  He applauded the generics team for its price hikes:

> [P]ricing position with some of our older and existing products, the in-line products, the generic commercial team has done an absolutely magnificent job of making sure that we maintain, and, in many cases, grow revenue.  So they have done a really good job.

136.    Again, in discussing his "four pillars" at the May 20, 2014 UBS Global Healthcare Conference, Wilkinson emphasized that:

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                          - 39 -

The commercial team on the generic side has done a marvelous job of making sure that they readdress and reassess each of the projects that are in their hands and the products that are on the marketplace and do the best they can with them.  In some cases that means price increases. . . .

But they've done a really good job of optimizing each opportunity.

137.  A UBS analyst noted the unprecedented price increases in the generic drug market were "kind of new relative to the way it was 5, 10 years ago."  The analyst asked Wilkinson for his thoughts and whether he saw "opportunities in this company to do more of that?"  Wilkinson responded that he did not believe the unprecedented massive price hikes were problematic to the marketplace:

Price increase that happens usually happens because there's nobody else in the marketplace or there's only one other player in the marketplace so there's the ability to move.  **And the move then usually happens in these wild percentages that could mean you're moving from $8 to $12 a bottle.  It's not these massive, massive increases that are probably problematic to the marketplace.**

There are opportunities like that.  As people fall out of bed in the manufacturing process and people have that struggle with their ability to supply, there becomes opportunity for increasing price.  It doesn't happen every day.  It happens – I think in our line we've had three or four that we've been able to do that with.  I think in even the bigger players' lines it's maybe a dozen products a year that they're able to touch with a price increase.

138.  In an adverse environment with product approvals on hold, Wilkinson and Ben-Maimon summed up Impax's main business strategy designed and implemented by Impax's senior executives during Impax's August 6, 2014 earnings call – exploit pricing:

Carole Ben-Maimon – Impax Laboratories Inc – President, Gene[r]ic Division

Of course, **we look at any opportunity to raise price when it's appropriate**.  I can't say that – we don't talk specifically about specific products here, but **we look at our portfolio regularly**, not every single day, and [other] opportunities in the marketplace to take advantage of shortages or increased share or price.

*          *          *

With regards to other launches, again, most of those coming out of Hayward are **depending on the Hayward facility and resolution of the compliances issue**. . . .

Fred Wilkinson --Impax Laboratories Inc – President & CEO

It really has to be said also, **we focused the team with the strategy** that said, **if you don't get launches, how do you maximize the opportunities of the things in your hand**.  They did an exceptional job, both in the brand and the generic side of saying, if nothing new is coming, what do I do?

139.    Although Impax did not look at pricing "every single day," Wilkinson directed that exploitation opportunities be sought out every week and every month on every product.  He stated in a November 4, 2014 earnings call:

> Sure, let me address kind of pricing.  We really don't talk much about pricing publicly on where we're going for competitive reasons, but suffice it to say, we've done what most of the other generic houses have done.  We look at opportunities.
>
> We look at how competition shifts.  ***We look at where there may be some market movement that would allow us to take advantage of some price increases, and we've implement[ed] those.  And we'll continue to evaluate our line, product by product, on probably a weekly and monthly basis to see if there are some opportunities to participate in that practice.***

### K.   Impax Misled Investors by Concealing the Impact of Competition and Price Erosion on Diclofenac

140.    In addition to colluding with Valeant to artificially raise prices of pyridostigmine, Impax partially offset the diminishing returns on its digoxin scheme in 2015 through sales of diclofenac.[9]  Diclofenac was the Company's largest product, by revenue, in 2015.  Fiscal year 2015 sales exceeded $148 million, more than 17% of the Company's total reported revenue.  As late as January 31, 2016, Impax held a near monopoly on the generic diclofenac market, with a 93% market share.  On the Company's 4Q15 earnings conference call, held on February 22, 2016, a Raymond James analyst observed that Solaraze "obviously . . . was a strong contributor in the quarter" and that "[i]t just seems like underlying demand . . . was exceptionally strong in the fourth quarter."  The analyst continued: "I'm not sure what you think is the sustainability of that uptake, but maybe some commentary on some of the additional dynamics there."  Wilkinson responded that although Impax expected a competitor would appear sometime in the first half of 2016, "***we expect that growth to be maintained***."  On the same call, defendants stated that Impax expected to grow revenue "at least 15%" over 2016, which translated into $990 million of revenue in 2016.

141.    After highlighting significant year-over-year increases in diclofenac revenue throughout 2015 and during 1Q16, defendants abruptly changed course and cited rapid deterioration in diclofenac sales as the cause for a significant reduction in 2016 revenue guidance (disclosed on a

---

[9]    Diclofenac is the generic name of the branded drug Solaraze.  In its market communications, defendants used both diclofenac and Solaraze to refer to the product.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                    - 41 -

June 21, 2016 conference call) and also a significant revenue shortfall and inventory write-down in 2Q16 (disclosed on the August 9, 2016 earnings call). Defendants blamed the rapid deterioration in diclofenac revenue on increased competition and price degradation during the second half of 2Q16. However, by no later than May 10, 2016, when Impax issued its earnings for the first quarter of 2016, defendants were already aware that increased competition had severely eroded the Company's market share and pricing, but concealed the extent, true cause, and speed of the rapid erosion through false and misleading statements and omissions. On that date, defendants materially understated the extent to which price declines had impacted revenue and concealed the main cause of revenue loss from diclofenac, volume decline. Defendants also knew that price decline and market share erosion were accelerating and had reached double digits, but (1) concealed that the shift in market dynamics already had significantly impacted the Company's second quarter results, and (2) falsely assured the market that the changes had been anticipated and accounted for in the Company's revenue guidance.

142. Defendants also misled the market on June 21, 2016, again concealing the full extent of diclofenac's price erosion and Impax's market share reduction. Indeed, by June 30, 2016, Impax's diclofenac market share was under 60% and continuing to fall, leading to further price declines. These declines obligated Impax to reimburse customers for diclofenac that was bought at higher prices, but was still on their shelves. Rather than disclose this known fact, however, defendants concealed the extent of the problem, hiding that the Company would be forced to record a $15 million shelf-stock adjustment until August 9, 2016.

### 1. May 10, 2016

143. On the Company's May 10, 2016 earnings conference call, Impax announced that in 1Q16, "[t]otal revenue for the Company increased $82 million, or 58%, over first quarter 2015." According to Wilkinson, this growth "was driven primarily by the increase in sales from products acquired last year in the Tower transaction **and higher sales of select generic products led by diclofenac sodium gel**." Although year-over-year growth was substantial, 1Q16 revenue fell approximately $22 million short of expectations.

144. Addressing trends in diclofenac revenues, Wilkinson told investors that the revenue trend was stable in Q1: "First quarter probably more normalized." Later on the same day,

Wilkinson spoke at the Bank of America Merrill Lynch Healthcare Conference and provided additional information about pricing and market share trends. Speaking about diclofenac and one other drug (metaxalone) for which Impax was the sole market supplier:

> When we guided earlier this year, we did expect that both Solaraze and metaxalone would both meet new competition sometime in the first half of this year. They both did, and both of them have – *we've defended share* but had to give up a bit of price. So our overall price decline was around 10%.

145.    Defendants minimized the impact of the price declines during the May 10, 2016 call falsely referring to them as "anticipated" and "typical of generic markets."

146.    In addition, in the Company's May 10, 2016 earnings release, defendants reaffirmed the Company's previously announced 2016 financial guidance which called for revenue growth of *at least 15%* over full year 2015. Wilkinson was quoted in the release, stating: "'*We continue to remain confident in our financial outlook for 2016*. The combination of new product launches and *increased sales from several of our existing generic* and specialty pharma products *are expected to drive growth in 2016*.'" On the earnings conference call the same day, Wilkinson stated: "This morning we are reaffirming our full-year guidance since we continue to expect that growth in 2016 will be driven by this year's new generic product launches, continued growth from last year's generic product launches, steady growth from the majority of our existing generic line and then growth from our branded portfolio." Wilkinson did not directly provide 2Q16 revenue guidance but did represent that the Company expected revenue growth in line with its annual guidance: "*we expect revenue growth quarter-over-quarter in order for us to hit . . . our annual guidance*" (*i.e.*, revenue growth of 15%).

147.    Defendants reaffirmed the bullish 2016 revenue guidance despite the fact that Impax had begun the year behind schedule. In 1Q16, Impax missed analysts' consensus revenue estimate by $22 million – a revenue shortfall of 9%. Thus, by reaffirming full year revenue guidance of at least 15% growth (*i.e.*, 2016 revenue of at least $990 million), defendants were representing to investors that 2Q through 4Q16 revenue would exceed $764 million. This compared to analysts' original consensus estimate of just $743 million of revenue during 2Q through 4Q16. Thus, on May 10, 2016, Impax effectively *raised* revenue guidance for the remainder of the year. Analysts

1   updated their estimates to account for the new increased guidance in the 2Q to 4Q16 period.  For

2   example, a May 11, 2016 JP Morgan report noted:  "*Guidance reaffirmed but full year revenue*

3   *growth target now implies a significant 2H/16 sales ramp*."

4   148.   Based on defendants' numerous misrepresentations, analysts were misled as to the

5   adverse developments in diclofenac revenue, volume, and pricing that had manifested themselves as

6   of May 10, 2016.  For example, a May 11, 2016 Susquehanna report stated: "Solaraze [diclofenac]

7   Declines Manageable . . .  We now forecast $130mln this year and $50mln next year.*"*  Likewise a

8   May 10, 2016 UBS report maintained a 2Q16 estimate for diclofenac revenue of $35 million.  A

9   May 11, 2016 RBC Capital Markets report stated: "We heard several questions around the top-line

10   shortfall which to a large degree was driven by competitive pressure on generic diclofenac sodium

11   gel ***which was anticipated*** and metaxalone.  ***Overall, the story to us sounded largely unchanged***

12   ***consistent with guidance***."   Numerous other analysts highlighted the fact that the Company

13   reaffirmed its FY 2016 guidance of at least 15% revenue growth over FY 2015.

14   149.   Defendants' May 10, 2016 statements were knowingly false and misleading for

15   several reasons:

16   150.   First, despite making pricing concessions, Impax had not "defended share."  In fact,

17   Impax had lost significant market share by April 30, 2016.  After remaining at or above 95% market

18   share during 4Q15 and 1Q16, Impax's share sank to 88% by April 30, 2016 – a decline of over 7%.

19   By May 10, 2016, the trajectory of Impax's market share decline had accelerated.  In fact, Impax's

20   share sank to 73% during May – a further decline of over 17%.

21   151.   Second, because diclofenac was the Company's largest revenue generating product in

22   2015, defendants' statements about projected company-wide revenue growth in 2Q16 and for the full

23   year concealed the extent to which diclofenac revenue was declining.  Impax's market share

24   continued to steadily drop throughout 2Q, eventually reaching 33% by August 2016.  The continued

25   decline was apparent to defendants as of May 10, 2016.  The lost market share went to new

26   competitors entering the generic diclofenac market, namely Sandoz, Taro, and Actavis.  As

27   defendants later admitted during a conference call on August 9, 2016, they were aware of significant

28   competition starting in January 2016:

> *As we entered 2016*, we expected that the authorized generic and the brand would reestablish itself fully during the year and assumed that Allergan would enter the market in the first half of the as the year [sic], as their ANDA had been approved in December.  In mid-to-late May, Sandoz had reentered, Allergan had launched, and Taro had won approval and was entering the market.

By May 10, 2016, defendants had even more evidence confirming their expectations.  On the May 10, 2016 earnings call, defendants stated: "We saw Actavis approved but have not seen them in the marketplace.  Taro has now been approved and they are out pre selling.  So, there is some pressure on the product as Sandoz also came back."  Still, defendants falsely assured investors that their guidance accounted for the new competition.

152.    Third, diclofenac revenue had not "normalized."  As Impax admitted on August 9, 2016, Q1 diclofenac revenues had declined by $38 million, of which over $9 million was due to pricing declines and $29 million was due to lower volume tied to increased competition.  This marked a material change in the diclofenac sales trend in which revenue had increased over the previous four quarters and prices had remained stable.  On the Company's August 9, 2016 earnings call, defendants described the material reversal in the diclofenac revenue trend: "While we enjoyed the short-term benefits of [being] the exclusive supplier [during 2015] we are now feeling the effects of an extremely competitive marketplace."  Defendants confirmed that this material adverse trend in diclofenac revenue existed as of the end of 1Q16 and certainly by May 10, 2016, 40 days into 2Q16: "the recent shift in market dynamics significantly impacted *our first and second quarter results due to double-digit decline in both volume and price*."  Indeed, the adverse trend that "significantly impacted" 1Q16 results accelerated into 2Q16.  Diclofenac revenue declined by *90%* in 2Q16, from $50 million to just $5 million in total sales.  Of the massive decline, $18 million was due to pricing declines and $27 million was due to lower volume tied to increased competition.

153.    Fourth, although defendants briefly discussed the impact of price erosion on the decline in diclofenac revenues, they completely concealed the larger driver of the decline in diclofenac sales – lower sales *volume*.  Three months later, defendants revealed that in 1Q16, the $38 million diclofenac revenue decline was primarily due to a $29 million impact of lower volume tied to increased competition.  Defendants admitted for the first time that the negative diclofenac

1    revenue trend "significantly impacted our first quarter results due to double-digit decline in **both

2    volume and price**."

3

4

5



6

7

8

9

10    154.    Fifth, defendants' May 10, 2016 revenue guidance statements, identified above, were

11    materially false.  For the reasons outlined above, namely the significant deterioration in diclofenac

12    market share and pricing, the **increase** in revenue guidance was unrealistic and defendants lacked a

13    reasonable basis for providing it.

14    155.    Just 42 days later, defendants were forced to admit that diclofenac revenue had not, in

15    fact, "normalized," and that Impax would not meet its increased revenue guidance.  On June 21,

16    2016, defendants slashed their previously issued 2Q through 4Q16 revenue guidance by

17    $80 million – a decrease of 11% in just six weeks.  In fact, rather than defendants' previous forecast

18    of 7% revenue growth in 2Q-4Q16 (over the same period in 2015), defendants were now forecasting

19    a year over year revenue **decline** of more than 5%.  A June 21, 2016 Leerink Partners LLC analyst

20    report noted the sharp reversal: "**new guidance implies ~8% downside** relative to the current FactSet

21    consensus sales forecast."

22    156.    The chart below reflects Impax's guidance for 2016 on February 22, 2016, May 10,

23    2016 and June 21, 2016 and analysts' estimates of quarterly guidance.[10]

24

25

26

27    _____
      [10]   Although Impax did not provide express quarterly revenue guidance, analysts calculated

28    quarterly estimates based on defendants' commentary on earnings calls and investor presentations.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                           - 46 -

| | 2/22/16 | 5/10/16 | 6/21/16[11] |
|---|---|---|---|
| 2016 revenue guidance ($) | ~$990 million | ~$990 million | $910 million |
| 2016 revenue guidance (% growth over prior year) | "at least 15%" | "at least 15%" | 6% |
| 2Q-4Q16 revenue guidance/estimate ($) | ~$743 million | ~$764 million | ~$684 million |
| 2Q-4Q16 revenue guidance/estimate (% growth over prior year) | 4% | 7% | **-5%** |
| ***Change to guidance***: increase/decrease over previously issued 2Q-4Q16 revenue guidance | N/A | **Guidance raised by 3%** | **Guidance cut by 11%** |

157.    The guidance cut was blamed entirely on expected "lower revenues on diclofenac gel and metaxalone as a result of the impact of additional competition occurring during the second quarter."  In fact, the anticipated decline in diclofenac and metaxalone revenue exceeded the $80 million cut from revenue guidance.[12]  Due to its relative size and importance, it was clear to analysts that the guidance cut was focused on diclofenac.[13]  Defendants also emphasized diclofenac as the primary cause, stating "we're obviously disappointed in the recent and rapid change in the diclofenac gel segment as a result of a greater number of competitors."  As described above, however, the same factors affecting diclofenac had already occurred by the end of 1Q16, and certainly no later than May 10, 2016, when defendants raised revenue guidance for the rest of the year.  Indeed, defendants later admitted that the dynamic shift in competition and pricing in the diclofenac market had "significantly impacted" the Company's performance in the first quarter.

158.    The severity of Impax's massive guidance cut, and its timing – just 42 days after Impax raised guidance on May 10, 2016 – provides additional strong evidence that the original guidance statements were knowingly false and misleading and/or made without any reasonable basis.

---

[11]    Impax announced the Teva acquisition on June 21, 2016.  Defendants forecasted that the acquired products would generate $80 million of revenue in 2016 which would offset the $80+ million cut to 2016 revenue guidance due to diclofenac and metaxalone.  For comparison to prior periods, the revenue guidance numbers at June 21, 2016 do not include the impact of the Teva acquisition.

[12]    Defendants attributed the $80 million cut to "[i]mpact of additional competition on diclofenac and metaxalone, partially offset by potential upside on a few base business products."

[13]    June 22, 2016 UBS analyst report: "the Teva deal was offset by increased competition for generic Solaraze."  June 27, 2016 Susquehanna analyst report: "Near-term accretion was largely offset by deeper declines in generic Solaraze."

159.   Analysts expressed their disappointment that defendants had concealed the true picture of the diclofenac market, and its impact on the Company's FY 2016 revenue guidance, just 42 days earlier.  For example, on the June 21, 2016 conference call, a Deutsche Bank analyst stated to defendants: "I think some folks are going to be a little **disappointed** that things on the base [*i.e.*, the company's existing portfolio] are essentially being patched by this [Teva] deal, at least as it relates to 2016.  **You knew the accelerated competitors last call** . . . ."  A JPMorgan analyst questioned why the Company had not already captured the diclofenac competition in the guidance issued on May 10, 2016: "My first one is on guidance, coming back to that.  **Sounds like you knew or had factored in some competition coming in** on some of those key products, trying to understand that."  A JPMorgan analyst report issued the same day noted:  "*Attractive Generics Deal But Underlying Guidance Cut Disappointing*."

### 2.   June 21, 2016

160.   Despite the massive cut to 2016 annual revenue guidance on June 21, 2016, defendants continued to conceal the true extent of diclofenac pricing erosion and market share loss as of that date.  In fact, despite the fact that 2Q16 was 90% complete, with the quarter ending just nine days later, defendants concealed that the Company would be forced to record a massive $15 million charge in 2Q16 to compensate Impax customers who had purchased diclofenac during the quarter at inflated prices that had since collapsed by as much as 60%.  As a result of the charge, which actually reversed out revenue previously booked during the quarter, 2Q revenue fell massively short of projections.  Defendants' failure to disclose the diclofenac charge was a blatant omission of material fact on June 21, 2016.  The impact of the omission was clear: analysts had been led to believe the deterioration in generic revenue, and diclofenac revenue in particular, had been appropriately accounted for in the Company's revised guidance on June 21, 2016.  For example, a June 21, 2016 Leerink report noted the base business (*i.e.*, Impax's existing portfolio of generic and branded drugs) had stabilized:  "[Teva] Deal offsets erosion of base biz, which mgmt believes has **stabilized**."

161.   Forty-nine days later, on August 9, 2016, Impax announced its 2Q16 results.  Defendants blindsided investors with 2Q16 revenue that fell massively short of projections: generic

1   division revenues were down $53 million in the second quarter, almost entirely due to diclofenac.
2   Defendants also disclosed the massive $15 million charge, which they labeled a "shelf-stock
3   adjustment."

4   162.   The following evidence creates a strong inference that defendants were aware of or
5   recklessly disregarded the $15 million diclofenac shelf stock adjustment on June 21, 2016 but
6   concealed it from investors:

7   163.   First, the pricing erosion that led to the shelf stock adjustment occurred prior to
8   June 30, 2016.  Defendants have admitted "during the second quarter of 2016, the Company
9   recorded shelf-stock adjustments totaling $15.0 million on diclofenac sodium gel and metaxalone as
10  a result of a **_decline in price during the current year [three month period ended June 30]_**."  The
11  fact that the second quarter was 90% complete as of June 21, 2016 is strong evidence that the pricing
12  erosion had already occurred and was known by defendants on June 21, 2016.

13  164.   Second, the competition that led to the pricing decline was absolutely known prior to
14  June 21, 2016.  Defendants subsequently acknowledged, on its 2Q16 earnings call, "**_the rapid . . ._**
15  **_decrease in sales, volume, price, and share for this product_**."  Defendants presented the flowing
16  slide which depicts the significant loss in market share, due to competition, began well before
17  June 21, 2016.



AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                      - 49 -

165.    Third, defendants were aware that Impax customers were holding significant inventory of diclofenac as of June 21, 2016.  Defendants later claimed: "*We got caught with this one on Solaraze* simply because of the choppiness of the market."  Defendants further explained the excess customer inventory: "the dynamics on that one is that we did see the customers acquiring product, because they were unsure of supply.  And I think that's their process that they generally do when they look at a marketplace that has been fairly turbulent.  So making sure that they have got supply for their customers is a critical piece. . . .  [The wholesaler customers] had prepared for kind of choppy supply position and end up resulting with a little excess supply out there."

166.    Fourth, defendants were aware that, because of the factors above, Impax was "obligated" to provide the shelf stock adjustment to its customers.  In its SEC filings defendants acknowledge:

> [W]e give our customers credits on our generic products that our customers hold in inventory after we have decreased the market prices of the same generic products due to competitive pricing.  Therefore, if new competitors enter the marketplace and significantly lower the prices of any of their competing products, we would likely reduce the price of our product.  *As a result, <u>we would be obligated to provide credits to our customers</u> who are then holding inventories of such products,* which could reduce sales revenue and gross margin for the period the credit is provided.

167.    Analysts were shocked that defendants had concealed the extent of the deterioration in diclofenac just weeks earlier.  For example, an August 9, 2016 Piper Jaffray analyst report noted: "Given that IPXL provided guidance following the announcement of the acquisition of Teva/Actavis generic assets [on June 21, 2016], *we find it hard to fathom how it could not have foreseen or known how conditions surrounding key products would further deteriorate*."  The Piper Jaffray report also noted:  "*We are deeply disappointed that [Impax] was slow in recognizing and communicating the extent of the competitive pressures on its key assets, at a minimum because it damages the credibility of a senior management team* . . . ."

168.    On August 9, 2016, Impax's stock price fell $7.16, or 23.4%, on nearly 12 times the prior week's average trading volume.  In contrast, the S&P 500 was flat.

**L.**   **Impax Misled Investors by Concealing the Impact of Competition and Price Erosion on Budesonide and Failing to Timely Write Down the Resulting Impairment on the Basket of Drugs Impax Purchased from Teva and Allergan**

169.   On June 21, 2016, Impax held a conference call to announce that the Company had "agreed to acquire a portfolio of 18 marketed and pipeline products across multiple dosage forms" from Teva and Allergan.  Impax agreed to pay $586 million for the portfolio.  Prior to Teva's acquisition of Allergan, the generic drugs Impax agreed to buy, and a number of others, were sold by both Allergan and Teva.  The FTC ruled that "[t]he effects of the Acquisition, if consummated, may be to substantially lessen competition in violation of Section 7 of the Clayton Act," for a number of drugs, by, among other things, "eliminating actual, direct, and substantial competition between Teva and Allergan and reducing the number of independent, significant competitors in the markets," and "eliminating future competition between Teva and Allergan and reducing the number of likely future competitors in the markets."  Thus, Teva and Allergan were required by the FTC to divest the drugs Impax ultimately purchased (and others) in connection with its $40.5 billion acquisition of Allergan's generic pharmaceutical business.

170.   On June 21, 2016, Impax did not identify the drugs it was buying, but Wilkinson told investors that the basket of drugs Impax had agreed to acquire was "made up primarily of difficult-to-manufacture or limited-competition products."  Wilkinson also told investors, "[t]his transaction is immediately accretive to earnings per share and diversifies our revenue base with minimal incremental operational expenses."  According to Wilkinson: "The 15 marketed products generated approximately $150 million in revenue and approximately $100 million in gross profit in 2015 for Teva or Allergan.  Once incorporated into our commercial product line, we expect the addition of these products will fully offset the revenue decline from the increased competition we are now facing on our diclofenac sodium gel and metaxalone products."  Reasons was similarly bullish: "This transaction is immediately accretive and provides a significant boost to our 2016 earnings."

171.   During the question and answer portion of the call, Wilkinson doubled down on his assertion that the drugs Impax agreed to buy were uniquely resistant to competitive forces:

Jason Gerberry – Leerink Partners – Analyst: . . . Are those products limited competition because of some IP barrier, manufacturing or difficult to demonstrate bio-equivalence?

Fred Wilkinson – Impax Laboratories Inc. – President & CEO: I think the answer to that is yes. It's all of those. . . . Probably each of them has their own story. Some of them it's IP, some of it, it's just limited supply position, some of it hard to make, some of it some bio-equivalence guide.

172.    Later in the call, Wilkinson reiterated, "So these products are by nature low-competition products." One analyst asked whether there were "any material changes with this product portfolio from last year to this year at all?" Wilkinson responded: "No. . . . There's been some shift in share and some other things that have gone on but nothing that's substantial. That's why we guided to this; that's why we showed you those numbers."

173.    Impax and Teva closed the transaction on August 3, 2016. On August 9, defendants held a conference call. During the call, Reasons and Wilkinson continued to paint a bullish picture of the transaction:

Reasons: "[W]e typically don't give projected operating cash flows. But clearly bringing the Teva products in *really helps not only the margin, but the operating cash flows as well*."

Wilkinson: "*Many of these products have growth potential, and we're especially pleased to be adding Budesonide*, Desmopressin, Dexmethylphenidate, and Propranolol to our generic offerings. This portfolio has an attractive margin profile and complements our current product line."

174.    Later in the call, Wilkinson identified budesonide as "the largest product in the mix." Wilkinson acknowledged that a new competitor had recently joined the budesonide market, but assured investors that Impax had anticipated the change and accounted for it with an adjustment to the purchase price:

It actually is one of the more interesting ones to us. It is moving from a three-competitor market to a four-competitor market, one that we anticipated as we went through the acquisition process.

And it was actually an adjustment in the economics related the acquisition as a result of that. Nephron did just introduce a product into the marketplace, and that product came from the Apotex file that was in the marketplace years ago, was removed and between the two of them they spent years trying to fix that file and make sure they could get it there.

175.    In response to analyst questions, Wilkinson continued to be bullish on budesonide, telling investors he was, "*[e]xcited about this space and excited about the product*. The patents do

go out to 2019.  We've seen no other people or filers, so we think that the market is pretty well-established, but we will be paying close attention to that."  Wilkinson also reiterated that the impact of additional competition on budesonide already had been accounted for in Impax's guidance model, and assured the market that there was "significant room" for future price declines:

> Sumant Kulkarni – BofA Merrill Lynch – Analyst
>
> *          *          *
>
> I have three fairly quick ones.  First on generic side assuming you have the revenue Outlook range right now, how derisked is your gross margin profile especially **given that Pulmacort [budesonide] generic is facing more competition** and Adderall XR you're trying to get more share, which I assume means taking some price?
>
> Fred Wilkinson – Impax Laboratories Inc – President & CEO
>
> Yes, great question, obviously that mix between share and price that you're always evaluate as you entertain opportunities with customers.  We believe that **both of those products have significant room to be able to absorb any kind of price alteration and adjustments.**
>
> **It was built into our model as we did the acquisition – final acquisition process from Teva**.

176.   Wilkinson continued to tout the Teva purchase on September 14, 2016, falsely assuring investors that "**[t]he integration of it went extremely well** because it's products, not people. Things usually go easier when you do that."

177.   Contrary to defendants' assurances, the Teva/Allergan purchase was a disaster.  As it turned out, the purchase was not a diverse mix of generic drugs.  Instead, budesonide made up approximately 67% of the "$150 million in revenue and approximately $100 million in gross profit in 2015 for Teva or Allergan."  And, contrary to defendants' repeated representations, budesonide was not a "low-competition product[]" nor did it have "growth potential."  Indeed, on November 9, 2016, just one quarter after the acquisition, defendants were forced to take a massive $251 million intangible asset impairment charge – nearly half the total purchase price.  The charge was triggered primarily by increased competition, key customer pricing concessions, and significant price degradation on budesonide.[14]

---

[14]   On the 3Q earnings call, defendants attributed the majority of the impairment to budesonide: "The impairment charge was driven by higher value applied to a few of the large revenue products

178.     However, defendants knew when they spoke on August 9, 2016 and September 14, 2016, that the budesonide product it had purchased was already subject to increased competition, key customer pricing concessions, and severe price degradation.  Thus, the exact same factors that triggered the massive impairment charge in 3Q16 were already known by defendants as of August 9, 2016.

179.     First, on June 14, 2016 – 56 days before the August 9, 2016 earnings call – a new competitor, Nephron, entered the generic budesonide market.[15]  Defendants later cited this event as a key factor in the budesonide impairment.  At a November 2016 investor presentation, defendants acknowledged that Nephron's entry as a new competitor was so significant that Impax had to reprice the entire Teva/Allergan acquisition.  Defendants stated: "When we looked at it, if you remember, the competitor for budesonide, ***the fourth competitor that came into the marketplace, happened in the end of May, early June***.  ***We actually repriced the deal with Teva***.  So we had a price that had Pulmicort [budesonide] with 'x' number of competitors who is now x+1.  And so we repriced what our acquisition price for that product would be and brought it down a little bit."

180.     Defendants also stated at the November 2016 investor presentation: "When the deal closed, you're in the process of converting all of the business that we acquired from Teva Allergan over to, now, an Impax contract.  That provided the opportunity for two things to happen – customers to work us a little bit and for competitors to try to steal some share.  And in this case, ***you had a brand-new competitor coming into the marketplace*** that had no share position at all."  On the 3Q16 earnings call, defendants admitted that Nephron's impact was apparent at the time of acquisition: "budesonide . . . had a new competitor.  If you've watched almost all of the competitors in there, share has not shifted, so we did not give up much to the new competitor; but all of us had to

---

such as budesonide, inhalation suspension, and propranolol tablets"; "[t]he impairment charge was driven by . . . a few of the large revenue products such as ***budesonide***, inhalation suspension, and propranolol tablets"; "[h]eavily concentrated on a handful [of acquired drugs].  It was not all 15 [acquired drugs]. . . .  I think it was really focused on ***budesonide***."

[15]    Nephron Pharmaceuticals Corporation Launches Generic Budesonide Inhalation Suspension. (http://www.prnewswire.com/news-releases/nephron-pharmaceuticals-corporation-launches-generic-budesonide-inhalation-suspension-300284345.html).

1   defend with price. ***That was happening to us at the time that the product was acquired***."[16] But just
2   one quarter before, defendants had assured investors that Nephron's entry had been "anticipated" by
3   Impax and accounted for through "an adjustment in the economics related to the acquisition."  Now,
4   this competitor had wiped out nearly all of budesonide's value.

5        181.   Second, on August 3, 2016, Teva announced that it had agreed to acquire Anda, Inc.
6   ("Anda") from Allergan.[17]  Anda was the 4th largest distributor of generic pharmaceuticals in the
7   U.S.  And, as Allergan disclosed in SEC filings, "[t]he Anda Distribution segment includes
8   distribution of generic and branded pharmaceutical products manufactured by third parties, as well
9   as by [Allergan]."  It is thus reasonable to infer that a material amount of Actavis's generic
10  budesonide product, which was acquired by Impax, had been sold through Actavis's own distributor
11  Anda, and that upon purchasing the generic budesonide product from Actavis, Anda represented a
12  material customer to Impax.  Because Teva also manufactured a generic budesonide product, the sale
13  of Anda to Teva was a major event – it meant that one of Impax's largest potential customers was
14  captive to its largest competitor.

15       182.   The timing of Teva's acquisition of Anda was also material.  The terms of the Impax
16  acquisition transaction gave Impax the right to contact Actavis's budesonide customers and any
17  prospective customers prior to the close of the acquisition to promote its budesonide product:
18  Specifically, the Asset Purchase Agreement (executed on 6/20/2016 and filed with the SEC on
19  8/9/2016) stated:  SECTION 7.6(d)  "On or after the date that is [****] prior to the Closing
20  Date . . . .  Buyer may contact the Customers and prospective customers to promote the Products and
21  the distribution thereof."[18]  Thus, it is reasonable to infer that Impax had contacted Anda, a major
22  budesonide customer, prior to the acquisition.  Budesonide projections based on those contacts

---

[16]   The $586 million purchase price never changed between June 21, 2016 and August 9, 2016.

[17]   Teva   Announces   Acquisition   of   Anda   Inc.   (http://www.tevapharm.com/news/
teva_announces_acquisition_of_anda_inc_08_16.aspx).

[18]   The precise date on which Impax was allowed to contact the customers is redacted in the
publicly-filed agreement; however, that date was "prior to the Closing Date," which was August 3,
2016.

1  would have been significantly and negatively affected by Teva's acquisition of Anda immediately

2  after Impax closed on its acquisition of budesonide.

3      183.   Notably, the terms of the acquisition transaction expressly allowed Teva to compete

4  directly with Impax on the generic drugs Impax was purchasing.  Specifically, the Asset Purchase

5  Agreement stated:

> SECTION 7.5.  Competition (a) The parties hereto agree and acknowledge that the
> provisions of this Agreement will not be construed to limit or restrict in any manner
> the right of Seller or any of its Affiliates to develop, manufacture, use, sell or
> commercialize in any manner any pharmaceutical product, including any product
> competitive with the Products [*i.e.*, including budesonide] if sold under a Product
> ANDA or other filing that is not being purchased by Buyer as part of the Transferred
> Assets hereunder, either in the Territory or outside of the Territory.

10  Thus, after the deal closed, Teva was free to market its own budesonide to Anda – a company it

11  owned.

12      184.   Defendants later cited customer (*i.e.*, distributor) action as a key factor in the

13  budesonide impairment.   In the 3Q16 Form 10-Q, defendants blamed the impairment charge

14  primarily on "price concessions . . . in order to retain **key customers**."   On the 3Q earnings call,

15  defendants stated: "In order to maintain our share position, *significant price concessions were*

16  *necessary on certain products in order to retain the business with a few of our key customers*."

17  Likewise, at a November 2016 investor presentation, when asked about the budesonide impairment

18  charge, defendants acknowledged  "When the deal closed, you're in the process of converting all of

19  the business that we acquired from Teva Allergan over to, now, an Impax contract.  That provided

20  the opportunity for two things to happen – *customers to work us a little bit* and for competitors to try

21  to steal some share."

22      185.   Defendants had a duty to disclose the impact of this key development.  Defendants

23  spent significant time on the August 9, 2016 call touting the success of Impax's Teva drug purchase

24  (the "portfolio has an attractive margin profile") and specifically called out budesonide multiple

25  times ("we're especially pleased to be adding Budesonide," "Budesonide, is the largest product in

26  the mix").  In September, defendants assured investors that integration of the acquisition had been a

27  success.  However, defendants said nothing about the capture of their key budesonide customer by

28

Impax's top competitor – *the same company that sold Impax the impaired product* – or its devastating impact on the Company's budesonide profits.

186.    Third, Impax knew the precise level of pricing degradation in Actavis's generic budesonide product as of August 2016 through Actavis Stock Keeping Unit ("SKU") pricing data available to it pursuant to the Asset Purchase Agreement.  Defendants later recognized the pricing data as another key factor in the budesonide impairment.   At the November 2016 investor presentation, defendants blamed limited visibility into the SKU pricing data prior to the acquisition as a reason why the pricing degradation was not recognized earlier, falsely claiming: "*[W]hat happened during the process, obviously, we don't see pricing.  You just see market pricing until right as the deal closed*.  When the deal closed, you're in the process of converting all of the business that we acquired from Teva Allergan over to, now, an Impax contract."

187.    This excuse directly contradicts Impax's prior claims on the June 21 call that its pricing was based on significant and thorough due diligence.  Indeed, when asked how Impax arrived at the price it agreed to pay, Reasons assured investors that "we obviously did a bunch of due diligence, studied carefully *all the data we could* on the competitive landscape and where we think each product was going.  And then based on that, modeled out a range of value.  And based on that, came up with our proposed purchase price that we negotiated."  Likewise, Wilkinson stated, "we have individual valuations on not only the basket of products but each of the individual products that come with it."

188.    "[A]ll the data" Impax could study included SKU pricing from Actavis.  The Asset Purchase Agreement governing the deal required Actavis to provide this data to Impax prior to closing the acquisition.  Specifically, the Asset Purchase Agreement stated:  SECTION 7.6(a)  "On the Effective Date, *Seller shall deliver to Buyer quarterly net sales data by SKU . . . for the previous six (6) month period*."  SECTION 7.6(c)  "On or before the date that is [****] prior to the Closing Date, *Seller shall deliver to Buyer a report setting forth (i) the monthly sold units per SKU by Customer for the Products* (as calculated by Seller in accordance with its standard practice) *for*

1   *the previous six (6) month period and (ii) the current Net Price after all discounts by SKU by*

2   *Customer*."[19]

3       189.    Fourth, the largest budesonide seller, Teva, had cited increased competition for

4   budesonide as a cause of weakening revenues in May and August 2016.  On May 9, 2016, Teva

5   blamed 1Q weakness on competition in budesonide: "The sales decrease in the United States, as you

6   can see from the geographical mix, was driven by the generics segment, mostly due to ***loss of***

7   ***exclusivity*** of esomeprazole and ***budesonide*.**  As Teva acknowledged, that competition accelerated

8   in the second quarter.  On August 4, 2016, Teva stated:  "Revenues of our US generics business was

9   impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide. . . . I think on the US

10   side, clearly the impact we highlighted, the impact of having a ***competition*** on Aripiprazole,

11   Esomeprazole, and ***Budesonide was very, very significant*."**

12       190.    Defendants' false statements and omissions about budesonide prices, the competition

13   Impax faced, and the capture of Anda by Teva misled investors.  Moreover, as detailed in §VI.B.,

14   defendants also violated the Generally Accepted Accounting Procedures ("GAAP") by failing to

15   timely take an impairment on the Teva drug purchase and failing to disclose the material changes in

16   the budesonide market and Impax's prospects for selling budesonide.

17   **V.**     **MATERIALLY FALSE AND MISLEADING STATEMENTS AND**
          **OMISSIONS ISSUED DURING THE CLASS PERIOD**

18

19       **A.**     **Price-Fixing False and Misleading Statements and Omissions**

20       191.    The Class Period begins on February 20, 2014, when Impax issued a press release and

21   filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain

22   of the Company's financial and operating results for the quarter and year ended December 31, 2013

23   (the "2013 8-K").  For the quarter, Impax reported a net loss of $9.62 million, or $0.14 per diluted

24   share, on revenue of $100.74 million compared to net income of $4.80 million, or $0.07 per diluted

25   share, on revenue of $141.08 million for the same period in the prior year.  For 2013, Impax reported

26

27   ――――――――――――
    [19]   Again, the exact date the report was to be delivered is redacted in the publicly-filed contract but

28   it was "prior to" the August 3, 2016 Closing Date.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG          - 58 -

net income of $101.26 million, or $1.47 per diluted share, on revenue of $511.50 million, compared to net income of $55.87 million, or $0.82 per diluted share, on revenue of $581.69 million for 2012.

192. In the 2013 8-K, Impax stated, in part:

In the fourth quarter 2013, Global Product sales, net increased to $84.4 million, compared to $79.8 million in the prior year period. The increase was primarily due to sales of new generic products launched throughout 2013, partially offset by customer credits earned as noted above.

\* \* \*

Global Product sales, net decreased to $383.7 million for the full year 2013, compared to $421.9 million in the prior year period. The decrease was primarily due to lower sales of authorized generic Adderall XR and fenofibrate products as a result of additional competition and customer credits earned as noted above, partially offset by new generic products launched throughout 2013.

193. During the February 20, 2014 analyst conference call discussing 4Q13 results, Reasons acknowledged that the "*potential impact of additional competition on several generic products*" should lead to lower revenues, but reported the opposite with respect to certain drugs. In his opening remarks, he referenced "*higher contract pricing on certain generic products*" and admitted "*we are currently realizing the higher pricing*, and expect an increase in product revenues on these products in 2014 compared to last year." During the question and answer session following these remarks, Reasons and Ben-Maimon discussed price increases but failed to disclose Impax's illegal activity:

Gary Nachman – Goldman Sachs – Analyst

First, for Bryan. Could you talk a little bit more about the $19 million of customer credits from pricing activities in generics? Are you following what some of your competitors are doing with aggressive price increases, and how much will that benefit you going forward? If you could talk a little bit more about which products were being impacted, if it's more like the controlled substances, or if it's some others, as well?

Bryan Reasons – Impax Laboratories Inc – CFO

Like I said in the prepared remarks, common in the industry when you take a price increase, the wholesalers have price protection. As a result, in most instances the accounting requires you to estimate an accrual – accrue that full amount up front. *And then hopefully you enjoy the impact of that price increase going forward. That's kind of how the financials work.*

I am going to have Carole actually talk about some of the generic products.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

Carole Ben-Maimon – Impax Laboratories Inc – President, Global Pharmaceuticals

Hi, Gary.  Obviously, we can't really talk about – for competitive reasons – about specific products and specific prices.  But as you have seen across the industry, ***pricing has improved, and the ability to take some price increases have clearly been available***.

Obviously, we are really careful, and ***we want to make sure that we do that in a very rational way, so that we make sure that the price – that what we are doing sticks***, and that we actually do make more money in the long run.  But we're pretty confident that what we did through – towards the end – throughout the end of last year and the beginning of this year will result in ***more profitability for many of the products that we have been able to take some price on***.

194.    Later in the call, Ben-Maimon responded to a pointed question about digoxin pricing, but again failed to disclose the price-fixing scheme, instead falsely characterizing the price increase as "rational":

Sumant Kulkarni – BofA Merrill Lynch – Analyst

Thanks for taking my questions.  The first one is a specific one on digoxin.  Could you comment on the competitive dynamics there after [a product] [sic] launched in authorized generic.  Has everything been rational, or have you seen more than typical price pressure?

Carole Ben-Maimon – Impax Laboratories Inc. – President, Global Pharmaceuticals

***I don't want to really specifically talk about pricing on digoxin.  You know that the market has been pretty stable with [Linette] [sic] and us, and as you suggested, [part of a] [sic] launched an AG.  We're pretty comfortable that what we have done is rational, and will result in ongoing profitability for that product.  We continue, obviously, to do everything we can to maintain our own share.***

195.    By virtue of the facts alleged in §§IV.C.-E., G.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In particular, defendants knew or recklessly disregarded that:

(a)    the statements referred to above about pricing in the marketplace for generic drugs were materially false and misleading because defendants failed to inform investors that pricing for digoxin was the product of illegal price-fixing;

1        (b)     the statements referred to above about competition in the generic drug

2 marketplace, including that the marketplace for generic drugs was highly competitive, were

3 materially false and misleading because the market for digoxin was collusive and lacked true

4 competition;

5        (c)     Impax's inflation of sales through illegal price-fixing constituted a violation of

6 U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

7 authorities along with the attendant negative financial and reputational harm;

8        (d)     the statements referred to above about higher pricing realized by Impax, and

9 that the price increase on digoxin was "rational," were materially false and misleading because

10 defendants failed to disclose that the digoxin price increase was the result of illegal price-fixing; and

11        (e)     Impax's revenues and income, as stated above, were inflated in part as a result

12 of illegal price-fixing and artificially-inflated generic drug prices for digoxin.

13        196.     On February 25, 2014, Impax filed an Annual Report on Form 10-K with the SEC,

14 reiterating the financial and operating results previously announced in the 2013 8-K and reporting in

15 full the Company's financial and operating results for the quarter and year ended December 31, 2013

16 (the "2013 10-K").

17        197.     In the 2013 10-K, Impax stated, in part:[20]

> We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe **present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements**.

*     *     *

> **The pharmaceutical industry is highly competitive** and is affected by new technologies, new developments, government regulations, health care legislation, availability of financing, and other factors. Many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. **We compete with numerous other companies** that currently operate, or intend to operate, in the pharmaceutical industry, including companies that are engaged in the development of controlled-release drug delivery technologies and products, and other manufacturers that may

---

[20]   Instead of repeating Impax's substantially similar materially false and misleading statements in each of the 2014 and 2015 Form 10-Ks, Plaintiffs attach to the complaint and incorporate herein an exhibit that contains each false statement contained in each Form 10-K disseminated throughout the Class Period. *See* Ex. 1.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG        - 61 -

decide to undertake development of such products. ***Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc. and Par Pharmaceutical Companies, Inc.***

Due to our focus on relatively hard to replicate controlled-release products, competition in the generic pharmaceutical market is sometimes limited to those competitors who possess the appropriate drug delivery technology. ***The principal competitive factors in the generic pharmaceutical market are***:

- the ability to introduce generic versions of products promptly after a patent expires;

- ***price***;

- product quality;

- customer service (including maintenance of inventories for timely delivery); and

- the ability to identify and market niche products.

\*       \*       \*

***Our revenues and operating results may vary significantly from year-to-year and quarter to quarter as well as in comparison to the corresponding quarter of the preceding year.  Variations may result from, among other factors***:

\*       \*       \*

- the introduction of new products by others that render our products obsolete or noncompetitive;

- ***the ability to maintain selling prices and gross margins on our products***;

\*       \*       \*

We derive a substantial portion of our revenue from sales of a limited number of products.  In 2013, our top five products in our Global Division accounted for 11%, 10%, 9%, 8% and 8%, or an aggregate of 46%, of Global product sales, net. . . . The sale of our products can be significantly influenced by market conditions, as well as regulatory actions. ***We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions***, or as a result of regulatory actions related to our products or to competing products, which could have a material impact on our results of operations. ***Actions which could be taken by our competitors, which may materially and adversely affect our business, results of operations and financial condition, may include, without limitation, pricing changes*** and entering or exiting the market for specific products.

\*       \*       \*

***The pharmaceutical industry is highly competitive*** and many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. . . .

With respect to generic pharmaceutical products, the FDA approval process often results in the FDA granting final approval to a number of ANDAs for a given product at the time a patent claim for a corresponding brand product or other market exclusivity expires.  This often forces us to face immediate competition when we introduce a generic product into the market.  *As competition from other generic pharmaceutical companies intensifies, selling prices and gross profit margins often decline, which has been our experience with our existing products*. . . . Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product that we develop is generally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  Although we cannot assure, we strive to develop and introduce new products in a timely and cost effective manner to be competitive in our industry.  Additionally, ANDA approvals often continue to be granted for a given product subsequent to the initial launch of the generic product.  These circumstances generally result in significantly lower prices and reduced margins for generic products compared to brand products.  *New generic market entrants generally cause continued price and margin erosion over the generic product life cycle*. . . .

*Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc. and Par Pharmaceutical Companies, Inc.*

\*     \*     \*

A significant proportion of our sales is made to relatively few retail drug chains, wholesalers, and managed care purchasing organizations.  These customers are continuing to undergo significant consolidation.  *Such consolidation has provided and may continue to provide them with additional purchasing leverage, and consequently may increase the pricing pressures that we face.  Additionally, the emergence of large buying groups representing independent retail pharmacies, and the prevalence and influence of managed care organizations and similar institutions, enable those groups to extract price discounts on our products*.

\*     \*     \*

Based on industry practice, generic drug manufacturers have liberal return policies and have been willing to give customers post-sale inventory allowances.  Under these arrangements, from time to time, we give our customers credits on our generic products that our customers hold in inventory after we have decreased the market prices of the same generic products due to competitive pricing.  *Therefore, if new competitors enter the marketplace and significantly lower the prices of any of their competing products, we would likely reduce the price of our product*.  As a result, we would be obligated to provide credits to our customers who are then holding inventories of such products, which could reduce sales revenue and gross margin for the period the credit is provided.

\*     \*     \*

In addition, third-party payers are attempting to control costs by limiting the level of reimbursement for medical products, including pharmaceuticals, and *increasingly challenge the pricing of these products which may adversely affect the pricing of our products*.

1          *     *     *

2          ***Consolidated total revenues for 2013 decreased $70.2 million, or 12%, as compared to 2012***.  New product launches increased revenues during the year ended December 31, 2013 by $97.1 million, or 17% compared to the prior year period, primarily related to our January 2013 launch of non-AB rated Oxymorphone Hydrochloride Extended-Release Tablets and our July 2013 launch of authorized generic Trilipix® delayed release capsules.  Decreased product volumes (excluding new product launches) decreased revenues during the year ended December 31, 2013 by $85.5 million, or 15% compared to the prior year period, while ***selling price and product mix decreased revenues by $81.8 million, or 14% compared to the prior year period.  Revenues from our Global Division decreased $50.3 million during the year ended December 31, 2013, as compared to the prior year period, driven primarily by lower sales of our authorized generic Adderall XR® and fenofibrate products***, as discussed below. . . .

9          ***Net income for the year ended December 31, 2013 was $101.3 million, an increase of $45.4 million as compared to $55.9 million for the year ended December 31, 2012***.

11          *     *     *

12          ***Total revenues for the Global Division for the year ended December 31, 2013, were $398.3 million, a decrease of 11% from 2012, resulting from decreases in Global Product sales, net, and Other Revenues***, as discussed below.

14          ***Global Product sales, net, were $383.7 million for the year ended December 31, 2013, a decrease of 9% from the same period in 2012, primarily as a result of lower sales of our authorized generic Adderall XR® and our fenofibrate products***.

16          *     *     *

17          ***Gross profit for the year ended December 31, 2013 was $144.5 million, or approximately 36% of total revenues, as compared to $219.3 million, or approximately 49% of total revenues, in the prior year***.  Gross profit as a percent of total revenues decreased in 2013 as compared to the prior year period primarily as the result of the intangible asset impairment charge noted above and an increase in expenses associated with new product launch delays caused by the warning letter related to our Hayward, California manufacturing facility, including a $6.4 million charge related to pre-launch inventory for products which will no longer be marketed and $6.7 million of inventory reserves recorded in the three month period ended March 31, 2013 for products discontinued by the Company during the period.

23          *     *     *

24          ***Based upon competitive market conditions, the Company may reduce the selling price of certain Global Division products***.

25          198.    The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Hsu and Reasons, stating that the financial information contained in the

1  2013 10-K was accurate and disclosed any material changes to the Company's internal control over

2  financial reporting.

3       199.    By virtue of the facts alleged in §§IV.C.-E., G.-J.; VI.A., D.; VII., the statements

4  referenced above were materially false and misleading.  Considered as a whole, defendants'

5  representations misled investors by presenting a materially false and misleading picture of Impax's

6  business, financials, operations and compliance policies by, among other things, failing to disclose

7  and actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In

8  particular, defendants knew or recklessly disregarded that:

9              (a)     the statements referred to above about pricing in the marketplace for generic

10  drugs were materially false and misleading because defendants failed to inform investors that pricing

11  for digoxin was the product of illegal price-fixing;

12             (b)     the statements referred to above about competition in the generic drug

13  marketplace, including that the marketplace for generic drugs was highly competitive, were

14  materially false and misleading because the market for digoxin was collusive and lacked true

15  competition;

16             (c)     the statements referred to above about Impax product pricing and pricing in

17  the generic drug marketplace were materially false and misleading because defendants failed to

18  disclose that digoxin prices were inflated by illegal price-fixing;

19             (d)     the statement referred to above that the "competitive advantages" the

20  Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

21  complex formulation, development characteristics, and special handling requirements, was

22  materially false and misleading because, in fact, Impax had illegally gained its competitive

23  advantage through fixing the price for digoxin;

24             (e)     the statement referred to above about Impax competing with Lannett and Par

25  as "principal competitors" was materially false and misleading because defendants were colluding

26  with Lannett and Par to fix the price of digoxin;

27             (f)     the statements referred to above concerning variation in revenues and

28  operating results were materially false and misleading because Impax's revenues and income

1    variations resulted, at least in part, from the artificial inflation of generic drug prices for digoxin and

2    carried the additional undisclosed risk of variation due to the inability to continue price-fixing;

3            (g)    the statements referred to above about new market entrants or new

4    competitors leading to price reduction were materially false and misleading because Impax engaged

5    in anticompetitive and collusive price-fixing activities with new entrants, such as Par;

6            (h)    Impax's inflation of sales through illegal price-fixing constituted a violation of

7    U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

8    antitrust authorities along with the attendant negative financial and reputational harm;

9            (i)    Impax's revenues and income, as stated above, were inflated in part as a result

10    of illegal price-fixing and artificially-inflated generic drug prices for digoxin; and

11            (j)    Impax failed to make required disclosures regarding the impact of artificial

12    price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

13    disclosure rules.

14        200.   On May 1, 2014, Impax issued a press release and filed a Current Report on Form

15    8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and

16    operating results for the quarter ended March 31, 2014 (the "1Q14 8-K").  For the quarter, Impax

17    reported net income of $6.43 million, or $0.09 per diluted share, on revenue of $118.72 million,

18    compared to net income of $105.44 million, or $1.55 per diluted share, on revenue of

19    $148.49 million for the same period in the prior year.

20        201.   In the 1Q14 8-K, Impax stated, in part:

21            Total revenues for the first quarter 2014 were $118.7 million, compared to
       $148.5 million in the prior year period, as the $8.3 million increase in generic Global

22    Product sales, net during the current period were more than offset by a $37.2 million
       decline in sales of Zomig products as noted above.

23            "Our generics business is benefitting from recent marketing initiatives, as

24    well as consistent success in commercializing the existing portfolio of products and
       capitalizing on new product launches," said Fred Wilkinson, president and chief

25    executive officer of Impax Laboratories Inc.   "These events resulted in a
       $21.7 million increase in sales of our Global labeled products since the fourth quarter

26    of 2013.  In addition, we recently launched authorized generic RENVELA® and
       expect it to be a significant contributor to our 2014 results."

27            *       *       *

28

For the first quarter 2014, Global Product sales, net increased $8.3 million to $106.1 million, compared to $97.8 million in the prior year period. The increase was primarily due to a favorable product mix and sales of new products launched in the second half of 2013 for which there were no comparable amounts in the prior year period.

Gross margin in the first quarter 2014 increased to 47.8%, compared to gross margin of 39.5% in the prior year period. Adjusted gross margin in the first quarter 2014 increased to 60.4%, compared to adjusted gross margin of 54.7% in the prior year period. The increase in gross margin and adjusted gross margin primarily reflects the favorable product mix and new product launches as noted above.

202. During the May 1, 2014 analyst conference call discussing 1Q14 results, Reasons stated that the increased generic revenues were due in large part to "***increased sales of our Digoxin product***," but failed to attribute those sales to collusive activity.

Our generic products division had a solid first quarter as we benefited from the impact of marketing initiatives and product mix. These events also had a positive impact on our gross profit margin. However, compared to first quarter 2013, increased generic product sales only partially offset the expected decline in branded sales of our Zomig product. This is due to a loss of exclusivity last May on the Zomig tablets and ODT.

\*          \*          \*

Total generic revenues increased $7.5 million or 7% to $109 million. This was primarily the result of increased sales of our Digoxin product and from sales of authorized generic Trilipix and generic Solaraze. The increase was partially offset by a decrease in sales of authorized generic Adderall and fenofibrate products.

Ben-Maimon similarly acknowledged the effect of pricing increases, but withheld the whole story, stating:

And then as Bryan said and you see throughout the industry, ***we have been able to maximize our product mix and take some price on a couple of products in the portfolio which has helped obviously the gross margins and also helped in the top line***.

203. On May 2, 2014, Impax filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 1Q14 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2014 (the "1Q14 10-Q").

204. In the 1Q14 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

\*       \*       \*

Total revenues for the three month period ended March 31, 2014 decreased $29.8 million, or 20%, as compared to the same period in 2013. . . .  Revenues from our Global Division increased $7.5 million during the three month period ended March 31, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Trilipix® delayed release capsules. . . .

Net income for the three month period ended March 31, 2014 was $6.4 million, a decrease of $99.0 million as compared to net income of $105.4 million for the three month period ended March 31, 2013.

\*       \*       \*

Total revenues for the Global Division for the three month period ended March 31, 2014, were $109.1 million, an increase of 7% over the same period in 2013, principally resulting from the increase in Global Product sales, net, as discussed below.

Global Product sales, net, were $106.1 million for the three month period ended March 31, 2014, an increase of 9% over the same period in 2013, primarily due to favorable product mix and sales from new generic products launched in the second half of 2013 for which there were no comparable amounts in the prior year period, partially offset by lower revenues from Adderall XR and fenofibrate products.

\*       \*       \*

Gross profit for the three month period ended March 31, 2014 was $52.1 million, or approximately 48% of total revenues, as compared to $40.2 million, or approximately 40% of total revenues, in the prior year period.  Gross profit in the current year period increased, on a percentage basis, when compared to gross profit in the prior year period due primarily to the favorable product contribution from higher margin products and lower COGS variances described above.

\*       \*       \*

**Based upon competitive market conditions, the Company may reduce the selling price of certain Global [Generics] Division products**.

205.    In addition, the 1Q14 10-Q referred investors to the materially false and misleading statements in the Company's 2013 10-K as set forth in ¶¶197, 199 concerning:  (1) the pharmaceutical industry's competitiveness, (2) its principal competitors, including Lannett and Par, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

206.    The 1Q14 10-Q contained signed certifications pursuant to SOX by defendant Wilkinson and Reasons, stating that the financial information contained in the 1Q14 10-Q was

accurate and disclosed any material changes to the Company's internal control over financial reporting.

207. By virtue of the facts alleged in §§IV.C.-E., G.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading. Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the price of its generic digoxin product. In particular, defendants knew or recklessly disregarded that:

(a) the statements referred to above about Impax product pricing, digoxin pricing, and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that the digoxin price increase was the result of illegal price-fixing;

(b) the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were materially false and misleading because the market for digoxin was collusive and lacked true competition;

(c) the statement referred to above that the "competitive advantages" the Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials, complex formulation, development characteristics, and special handling requirements, was materially false and misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the price for digoxin;

(d) the statements referred to above about digoxin sales were materially false and misleading because digoxin sales were artificially inflated by illegal price-fixing;

(e) Impax's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal antitrust authorities along with the attendant negative financial and reputational harm;

(f) Impax's revenues and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for digoxin; and

1    (g)    Impax failed to make required disclosures regarding the impact of artificial

2  price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

3  disclosure rules.

4    208.    During the May 20, 2014 UBS Health Care Conference, Wilkinson commented on

5  the Company's use of price increases to counteract the lack of new approvals, but failed to mention

6  that the price increases came from collusion:

> Second, and I think one of the real bright sides of the organization is really
> the commercial piece of the Company. If you think about the quarter that they put up
> in first quarter of this year and fourth quarter of last year, there's ***still good growth
> going on with no approvals for a couple of years***. So they've been able to optimize
> most of the activities they can from the assets in their hands.

> The commercial team on the generic side has done a marvelous job of making
> sure that they readdress and reassess each of the projects that are in their hands and
> the products that are on the marketplace and do the best they can with them. ***In some
> cases that means price increases***. Sometimes that means reenergizing some
> marketing. And sometimes it means some reintroduction of products that we've
> taken off the market.

13   209.    During the question-and-answer session that followed, Wilkinson misleadingly

14  stressed the competition in the market and downplayed the significance of price increases:

> Marc Goodman – UBS – Analyst

> So it's been interesting to watch the customers consolidate quite a bit and get
> big. And at your old shop, Actavis is one of the big players, and so big to big, it's
> one kind of dynamic. And now you're at a medium-size shop, and I was curious
> what you think about Impax and how it plays in this new role, in this new world as a
> medium-size player with really large customers.

> *          *          *

> Fred Wilkinson – Impax Laboratories Inc. – President & CEO

> *          *          *

> Many of the products we have we will be first to file or in the first wave. I mean,
> you've seen that out of the portfolio that we have. So I just think that the market
> consolidation at the customer base still is reliant on competition, and ***I think we help
> to provide that competition***, as long as we can continue to grow with the big guys.

> *          *          *

> [Goodman:]

> ***So there seems to be a theme going on in the generic space the past couple
> of years of price increases***, which is obviously fantastic for the industry and kind of

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                    - 70

new relative to the way it was 5, 10 years ago.  What are your thoughts on that, and do you see opportunities in this company to do more of that?

[Wilkinson:]

Yes, probably more written about than really actioned.  Price increase that happens usually happens because there's nobody else in the marketplace or there's only one other player in the marketplace so there's the ability to move.  And the move then usually happens in these wild percentages that could mean you're moving from $8 to $12 a bottle.  It's not these massive, massive increases that are probably problematic to the marketplace.

There are opportunities like that.  As people fall out of bed in the manufacturing process and people have that struggle with their ability to supply, there becomes opportunity for increasing price.  It doesn't happen every day.  It happens – ***I think in our line we've had three or four that we've been able to do that with***.  I think in even the bigger players' lines it's maybe a dozen products a year that they're able to touch with a price increase.

210.    By virtue of the facts alleged in §§IV.C.-E., G.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In particular, defendants knew or recklessly disregarded that:

(a)    the statements referred to above about Impax product pricing and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin prices were inflated by illegal price-fixing; and

(b)    the statements referred to above about competition in the generic drug marketplace were materially false and misleading because the market for digoxin was collusive and lacked true competition.

211.    On August 6, 2014, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2014 (the "2Q14 8-K").  For the quarter, Impax reported net income of $35.07 million, or $0.50 per diluted share, on revenue of $188.12 million, compared to net income of $5.62 million, or $0.08 per diluted share, on revenue of $129.63 million for the same period in the prior year.

212. In the 2Q14 8-K, Impax stated, in part:

"We delivered strong revenue growth of 45%, adjusted gross margins of 64%, and nearly tripled our adjusted net income this quarter, compared to last year's second quarter" said Fred Wilkinson, president and chief executive officer of Impax Laboratories. "We experienced strong performance by several key generic products, including the successful launch of authorized generic RENVELA®, as well as continued growth of Zomig® nasal spray in our brand division."

\* \* \*

Global Product sales, net increased 82.7% to $164.0 million in the second quarter 2014, compared to $89.8 million in the prior year period. The increase was driven by higher sales of several key generic products, including the mid-April launch of the Company's allotment of a specified number of bottles of authorized generic RENVELA®.

\* \* \*

Gross margin in the second quarter 2014 increased to 60.4%, compared to gross margin of 41.8% in the prior year period. Adjusted gross margin in the second quarter 2014 increased to 66.5%, compared to adjusted gross margin of 49.6% in the prior year period. The increase in gross margin and adjusted gross margin was due to the favorable contribution from several key generic products, including authorized generic RENVELA®.

213. On August 6, 2014, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 2Q14 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2014 (the "2Q14 10-Q").

214. In the 2Q14 10-Q, Impax also stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

\* \* \*

Total revenues for the three month period ended June 30, 2014 increased $58.5 million, or 45%, as compared to the same period in 2013. . . .  Decreased product volumes (excluding new product launches) decreased revenues during the three month period ended June 30, 2014 by $3.6 million, or 3%, compared to the prior year period, while selling price and product mix increased revenues by $0.5 million, or 0.4%, compared to the prior year period. Revenues from our Global Division increased $82.4 million during the three month period ended June 30, 2014, as compared to the prior year period, ***driven primarily by sales of our authorized generic Renvela® tablets and Trilipix® delayed release capsules, in addition to our Digoxin and generic Solaraze® products***.

\* \* \*

Total revenues for the six month period ended June 30, 2014 increased $28.7 million, or 10%, as compared to the same period in 2013. . . . Decreased product volumes (excluding new product launches) decreased revenues during the six month period ended June 30, 2014 by $41.9 million, or 15%, compared to the prior year period, while selling price and product mix also decreased revenues by $4.3 million, or 2%, compared to the prior year period. Revenues from our Global Division increased $89.9 million during the six month period ended June 30, 2014, as compared to the prior year period, **driven primarily by sales of our authorized generic Renvela® tablets and Trilipix® delayed release capsules, in addition to higher sales of our Digoxin and generic Solaraze® products**.

\*       \*       \*

Net income for the three month period ended June 30, 2014 was $35.1 million, an increase of $29.5 million as compared to net income of $5.6 million for the three month period ended June 30, 2013. The increase was primarily attributable to the profit earned from the launch of our authorized generic Renvela® product during the current year period.

Net income for the six month period ended June 30, 2014 was $41.5 million, a decrease of $69.6 million as compared to net income of $111.1 million for the six month period ended June 30, 2013. . . . Also contributing to the decrease in net income was a decline in sales of our Impax-labeled branded Zomig® products, as discussed above, that was partially offset by increased Global sales on several of our higher margin products.

\*       \*       \*

Total revenues for the Global Division for the three month period ended June 30, 2014, were $176.4 million, an increase of 88% over the same period in 2013, principally resulting from the increase in Global Product sales, net, as discussed below.

Global Product sales, net, were $164.0 million for the three month period ended June 30, 2014, an increase of 83% over the same period in 2013, primarily due to the launch of our authorized generic Renvela® tablets in the three month period ended June 30, 2014, in addition to the launch of our authorized generic Trilipix® delayed release capsules and generic Solaraze® during the second half of 2013, for which there were no comparable amounts in the prior year period, **as well as higher sales of our Digoxin products**. Any diminution in the consolidated revenue and/or gross profit of any of our products due to competition and/or product supply delays or disruptions or any other reasons in future periods may materially and adversely affect our consolidated results of operations in such future periods.

\*       \*       \*

Total revenues for the Global Division for the six month period ended June 30, 2014, were $285.5 million, an increase of 46% over the same period in 2013, principally resulting from the increase in Global Product sales, net, as discussed below.

Global Product sales, net, were $270.1 million for the six month period ended June 30, 2014, an increase of $82.5 million over the same period in 2013, primarily due to sales of our authorized generic Renvela® tablets launched during the three month period ended June 30, 2014, in addition to the launch of our authorized

generic Trilipix® delayed release capsules and generic Solaraze® during the second half of 2013, for which there were no comparable amounts in the prior year period, *as well higher sales of our Digoxin products*. Any diminution in the consolidated revenue and/or gross profit of any of our products, due to competition and/or product supply delays or disruptions or any other reasons in future periods may materially and adversely affect our consolidated results of operations in such future periods.

\*   \*   \*

Gross profit for the three month period ended June 30, 2014 was $106.5 million, or approximately 60% of total revenues, as compared to $39.2 million, or approximately 42% of total revenues, in the prior year period. Gross profit in the current year period increased, on a percentage basis, when compared to gross profit in the prior year period due primarily to the favorable product contribution from higher margin products.

\*   \*   \*

Gross profit for the six month period ended June 30, 2014 was $158.6 million, or approximately 56% of total revenues, as compared to $79.4 million, or approximately 41% of total revenues, in the prior year period. Gross profit in the current year period increased, on a percentage basis, when compared to gross profit in the prior year period due primarily to the favorable product contribution from higher margin products and lower COGS variances described above.

\*   \*   \*

Based upon competitive market conditions, the Company may reduce the selling price of certain Global [Generics] Division products.

215.   In addition, the 2Q14 10-Q referred investors to the materially false and misleading statements in the Company's 2013 10-K as set forth in ¶¶197, 199 concerning: (1) the pharmaceutical industry's competitiveness, (2) its principal competitors, including Lannett and Par, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

216.   The 2Q14 10-Q contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 2Q14 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

217.   During the August 6, 2014 analyst conference call discussing 2Q14 results, Wilkinson and Ben-Maimon discussed the Company's successful price increases but failed to disclose the illegal scheme that made them possible:

Carole Ben-Maimon – Impax Laboratories Inc – President, Gene[r]ic Division

Of course, *we look at any opportunity to raise price when it's appropriate*. I can't say that – we don't talk specifically about specific products here, but *we look at our portfolio regularly*, not every single day, and [other] opportunities in the marketplace to take advantage of shortages or increased share or price.

*       *       *

With regards to other launches, again, most of those coming out of Hayward are *depending on the Hayward facility and resolution of the compliances issue*. . . .

Fred Wilkinson –Impax Laboratories Inc – President & CEO

It really has to be said also, we focused the team with the strategy that said, *if you don't get launches, how do you maximize the opportunities of the things in your hand*. They did an exceptional job, both in the brand and the generic side of saying, *if nothing new is coming, what do I do*?

And so, digging in and maximizing both revenue and contribution out of the assets that you have in your hand has been a very successful strategy for us to date. They've done a really marvelous job as the results here show.

218.   By virtue of the facts alleged in §§IV.C.-E., G.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In particular, defendants knew or recklessly disregarded that:

(a)   the statements referred to above about Impax product pricing and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin prices were inflated by illegal price-fixing;

(b)   the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were materially false and misleading because the market for digoxin was collusive and lacked true competition;

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

1    (c)    the statement referred to above that the "competitive advantages" the

2    Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

3    complex formulation, development characteristics, and special handling requirements, was

4    materially false and misleading because, in fact, Impax had illegally gained its competitive

5    advantage through fixing the price for digoxin;

6    (d)    the statements referred to above about digoxin sales were materially false and

7    misleading because digoxin sales were artificially inflated by illegal price-fixing;

8    (e)    Impax's inflation of sales through illegal price-fixing constituted a violation of

9    U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

10   antitrust authorities along with the attendant negative financial and reputational harm;

11   (f)    Impax's revenues and income, as stated above, were inflated in part as a result

12   of illegal price-fixing and artificially-inflated generic drug prices for digoxin; and

13   (g)    Impax failed to make required disclosures regarding the impact of artificial

14   price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

15   disclosure rules.

16   219.   On November 4, 2014, Impax issued a press release and filed a Current Report or

17   Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's

18   financial and operating results for the quarter ended September 30, 2014 (the "3Q14 8-K").  For the

19   quarter, Impax reported net income of $15.74 million, or $0.22 per diluted share, on revenue of

20   $158.0 million, compared to a net loss of $0.18 million, or zero per diluted share, on revenue of

21   $132.64 million for the same 12 period in the prior year.

22   220.   In the 3Q14 8-K, Impax stated, in part:

23   "***The strong third quarter results were driven by higher sales from our key
     products in the generics business*** as well as continued growth of Zomig®nasal spray

24   in our brand division," said Fred Wilkinson, president and chief executive officer of
     Impax Laboratories.  "The increased revenues are the direct result of our increased

25   focus on commercialization strategies for our current line of assets."

26                          *       *       *

27   Global Product sales, net increased 28.6% to $143.6 million in the third
     quarter 2014, compared to $111.7 million in the prior year period.  The increase was

28   driven by higher sales of several key generic products, including the mid-April

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                    - 76

launch of the Company's allotment of a specified number of bottles of authorized generic RENVELA®.

Gross margin in the third quarter 2014 increased to 53.0%, compared to gross margin of 33.4% in the prior year period.  Adjusted gross margin in the third quarter 2014 increased to 56.6%, compared to adjusted gross margin of 54.3% in the prior year period.  The increase in gross margin and adjusted gross margin was due to the favorable contribution from several key generic products, including authorized generic RENVELA.

221.    On November 4, 2014, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 3Q14 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2014 (the "3Q14 10-Q").

222.    In the 3Q14 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

*        *        *

Total revenues for the three month period ended September 30, 2014 increased $25.4 million, or 19%, as compared to the same period in 2013. . . . Revenues from our Global Division increased $30.0 million during the three month period ended September 30, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to our Digoxin and generic Solaraze® products.

*        *        *

Total revenues for the nine month period ended September 30, 2014 increased $54.1 million, or 13%, as compared to the same period in 2013. . . . Revenues from our Global Division increased $119.8 million during the nine month period ended September 30, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to higher sales of our Digoxin and generic Solaraze® products.

*        *        *

Net income for the three month period ended September 30, 2014 was $15.7 million, an increase of $15.9 million as compared to a net loss of $0.2 million for the three month period ended September 30, 2013.

*        *        *

Net income for the nine month period ended September 30, 2014 was $57.2 million, a decrease of $53.6 million as compared to net income of $110.9 million for the nine month period ended September 30, 2013. . . .  Also contributing to the change in net income was an increase in Global Product sales

related to increased sales on several of our higher margin products, partially offset by a decline in sales of our Impax-labeled branded Zomig® products, as discussed above.

* * *

Total revenues for the Global Division for the three month period ended September 30, 2014, were $145.6 million, an increase of 26% over the same period in 2013, principally resulting from the increase in Global Product sales, net, as discussed below.

Global Product sales, net, were $143.6 million for the three month period ended September 30, 2014, *an increase of 29% over the same period in 2013*, primarily due to the launch of our authorized generic Renvela® tablets in the three month period ended June 30, 2014, *higher sales of our Digoxin products*, and the launch of our generic Solaraze® during the fourth quarter of 2013, for which there were no comparable amounts in the prior year period.  Any diminution in the consolidated revenue and/or gross profit of any of our products due to competition and/or product supply delays or disruptions or any other reasons in future periods may materially and adversely affect our consolidated results of operations in such future periods.

* * *

Total revenues for the Global Division for the nine month period ended September 30, 2014, were $431.2 million, an increase of 38% over the same period in 2013, principally resulting from the increase in Global Product sales, net, as discussed below.

Global Product sales, net, were $413.7 million for the nine month period ended September 30, 2014, *an increase of $114.4 million over the same period in 2013*, primarily due to sales of our authorized generic Renvela® tablets launched during the three month period ended June 30, 2014 *as well as higher sales of our Digoxin products*, in addition to the launch of our generic Solaraze® during the fourth quarter of 2013.  Any diminution in the consolidated revenue and/or gross profit of any of our products due to competition and/or product supply delays or disruptions or any other reasons in future periods may materially and adversely affect our consolidated results of operations in such future periods.

* * *

Gross profit for the three month period ended September 30, 2014 was $77.1 million, or approximately 53% of total revenues, as compared to $38.7 million, or approximately 33% of total revenues, in the prior year period.  Gross profit in the current year period increased, on a percentage basis, when compared to gross profit in the prior year period due primarily to an increased mix of higher margin products, as well as the items noted above in Cost of Revenues.

* * *

Gross profit for the nine month period ended September 30, 2014 was $235.8 million, or approximately 55% of total revenues, as compared to $118.1 million, or approximately 38% of total revenues, in the prior year period. Gross profit in the current year period increased, on a percentage basis, when

compared to gross profit in the prior year period due primarily to an increased mix of higher margin products as well as the items noted above in Cost of Revenues.

> *        *        *

Based upon competitive market conditions, the Company may reduce the selling price of certain Global [Generics] Division products.

223.    In addition, the 3Q14 10-Q referred investors to the materially false and misleading statements in the Company's 2013 10-K as set forth in ¶¶197, 199 concerning: (1) the pharmaceutical industry's competitiveness, (2) its principal competitors, including Lannett and Par, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

224.    The 3Q14 10-Q contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 3Q14 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

225.    During the November 4, 2014 analyst conference call discussing 3Q14 results, Wilkinson discussed pricing increases, but falsely maintained that the market was legal and competitive:

Louise Chen – Guggenheim Securities LLC – Analyst

> *So some your competitors have been able to raise prices for generic drugs significantly.  Do you see any opportunities for Impax to do this as well?  Why or why not?  Do you have any thoughts on the government investigation into rising price of generic drugs?*

> *        *        *

[Wilkinson:]

> Sure, let me address kind of pricing.  We really don't talk much about pricing publicly on where we're going for competitive reasons, but suffice it to say, we've done what most of the other generic houses have done.  We look at opportunities.

> *We look at how competition shifts.  We look at where there may be some market movement that would allow us to take advantage of some price increases, and we've implement those.  And we'll continue to evaluate our line, product by product, on probably a weekly and monthly basis to see if there are some opportunities to participate in that practice.*

1    As far as the federal investigation or as the – look, I think there's always been an analysis ongoing for looking at pricing within the pharmaceutical industry.

2    Sometimes it focuses on brands, sometimes it focuses on generics, sometimes on transfer pricing, so we're constantly under scrutiny, and I think the most important

3    thing is *to make sure that our practices and our approaches are well within all the guidelines and the rules and regulations, and we believe they are*.

4    226.    By virtue of the facts alleged in §§IV.C.-E., G.-J.; VI.A., D.; VII., the statements

5    referenced above were materially false and misleading.  Considered as a whole, defendants'

6    representations misled investors by presenting a materially false and misleading picture of Impax's

7    business, financials, operations and compliance policies by, among other things, failing to disclose

8    and actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In

9    particular, defendants knew or recklessly disregarded that:

10           (a)    the statements referred to above about Impax product pricing, digoxin pricing,

11   and pricing in the generic drug marketplace were materially false and misleading because defendants

12   failed to disclose that digoxin prices were inflated by illegal price-fixing;

13           (b)    the statements referred to above about competition in the generic drug

14   marketplace were materially false and misleading because the market for digoxin was collusive and

15   lacked true competition;

16           (c)    the statement referred to above that the "competitive advantages" the

17   Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

18   complex formulation, development characteristics, and special handling requirements, was false and

19   misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

20   price for digoxin;

21           (d)    the statements referred to above concerning the governmental investigation

22   into generic drug pricing on the November 4, 2014 earnings call misled investors by denying any

23   wrongdoing – suggesting that no pricing collusion had taken place – and falsely attributing the

24   digoxin price hike to shifting competition and market movement when, in fact, the price hike was

25   collusive and unjustified with only three competitors for years before the massive price increase and

26   the market was consistently stable at $0.16 per pill since at least 2009;

27

28

1       (e)    the statements referred to above about digoxin sales were materially false and

2 misleading because digoxin sales were artificially inflated by illegal price-fixing;

3       (f)    Impax's inflation of sales through illegal price-fixing constituted a violation of

4 U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

5 antitrust authorities along with the attendant negative financial and reputational harm;

6       (g)    Impax's revenues and income, as stated above, were inflated in part as a result

7 of illegal price-fixing and artificially inflated generic drug prices for digoxin; and

8       (h)    Impax failed to make required disclosures regarding the impact of artificial

9 price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

10 disclosure rules.

11     227.   On February 24, 2015, Impax filed a Current Report on Form 8-K with the SEC,

12 signed by defendant Reasons, announcing certain of the Company's financial and operating results

13 for the quarter and year ended December 31, 2014 (the "2014 8-K").  For the quarter, Impax

14 reported net income of $0.12 million or zero per diluted share, on revenue of $131.21 million,

15 compared to a net loss of $9.62 million or $0.14 per diluted share, on revenue of $21.49 billion for

16 the same period in the prior year.  For 2014, Impax reported net income of $57.35 million, or $0.81

17 per diluted share, on revenue of $596.05 million, compared to net income of $101.26 million, or

18 $1.47 per diluted share, on revenue of $511.5 million for 2013.

19     228.   In the 2014 8-K, Impax stated, in part:

20       Global Pharmaceuticals total revenues increased 35.5% to $117.9 million in
        the fourth quarter 2014, compared to $87.0 million in the prior year period.  The
21      increase is due to higher sales of several key generic products as well as the impact
        of customer credits that were recorded in the prior year period of $19.2 million as a
22      result of customer credits relating to certain pricing activities.

23       Gross margin in the fourth quarter 2014 increased to 44.8%, compared to
        gross margin of 30.4% in the prior year period.  Adjusted gross margin in the fourth
24      quarter 2014 increased to 49.8%, compared to adjusted gross margin of 41.8% in the
        prior year period.  The increase in gross margin and adjusted gross margin was due to
25      the favorable contribution from sale of several generic products.

26               *      *      *

27       For the full year 2014, total revenues increased 16.5% to $596.0 million,
        compared to $511.5 million for the full year 2013.

28

1                           *        *        *

2            "In our generic business, our revenue growth in 2014 of more than 38% was
    driven by the successful launch of authorized generic RENVELA ® and continued
3    success in maximizing our portfolio of solid oral and alternative dosage form
    products."
4
                            *        *        *
5
            Global Pharmaceuticals total revenues increased 37.8% to $549.1 million for
6    the full year 2014, compared to $398.3 million for the full year 2013.  The increase
    was driven by sales of authorized generic RENVELA tablets launched during the
7    second quarter of 2014, as well as higher sales of several key generic products.

8            Gross margin for the full year 2014 increased to 52.6%, compared to gross
    margin of 36.3% for the full year 2013.  Adjusted gross margin for the full year 2014
9    increased to 59.0%, compared to adjusted gross margin of 50.6% for the full year
    2013.  The increase in gross margin and adjusted gross margin was primarily due to
10   the favorable contribution from sales of several generic products, including
    authorized generic RENVELA.
11
            229.     During the February 24, 2015 analyst conference call discussing 4Q14 results,
12
    Reasons admitted that increased revenues derived from "higher generic sales of Adderall XR,
13
    **Digoxin,** and Solaraze gel," but failed to disclose any collusion.  Instead, Wilkinson stressed the
14
    opposite, describing an increasingly competitive generic market:
15
    Gregg Gilbert – Deutsche Bank – Analyst
16
            So Fred, what do you think as you look at three to five years are the elements
17   of the impact strategy that most need to be either added or bulked up.  **I assume you
    agree that the US generic environment is going to become more competitive over
18   time**.

19   [Wilkinson:]

20           **Sure**.

21           230.     Later in the call, Wilkinson falsely described competition in the digoxin market:

22   Elliot Wilbur – Needham & Company – Analyst

23           Okay.  And then if I could just ask two specific product questions as well.
    **The first is on Digoxin.  There's been just some new competition in the market
24   there with Mylan's relaunch and also have heard from trade sources that Sun via
    Caraco may be relaunching in that market.**  And then I know one of your
25   competitors talked about some API issues as well, so maybe you could just provide a
    little bit of color on the current dynamics in that key product?
26
                            *        *        *
27

28

[Wilkinson:]

*Sure.  Sure.  Obviously, there's a key focus, as you know, Digoxin is a product that you would have anticipated competition would reestablish itself.  With a different price point, there's an opportunity for people to come back in.*

\*          \*          \*

We've seen at least one new player come back into the marketplace, not taking great share today, but we do anticipate there'll probably be some evolution to that.  We have heard the same rumors of additional competition coming although we've not seen them in the marketplace yet.  *But we do anticipate it and our model expects that they'll be competition and potentially some press [sic] erosion on that product.*

231.    On February 26, 2015, Impax filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2014 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  The 2014 10-K repeated each materially false and misleading statement in the 2013 10-K as set forth in ¶¶197, 199.  *See.* Ex. 1.

232.    Additionally, the 2014 10-K contained the following materially false and misleading statements:

Consolidated total revenues for the year ended December 31, 2014 increased $84.5 million, or 17%, as compared to the year ended December 31, 2013. New product launches increased revenues during the year ended December 31, 2014 by $84.4 million, or 17%, compared to the prior year period, primarily related to sales of our authorized generic Renvela® tablets and generic Solaraze®. Decreased product volumes (excluding new product launches) decreased revenues during the year ended December 31, 2014 by $20.3 million, or 4%, compared to the prior year period, while selling price and product mix increased revenues by $20.4 million, or 4%, compared to the prior year period. *Revenues from our Global Division increased $150.7 million during the year ended December 31, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to higher sales of our Digoxin* and generic Solaraze® products.

\*          \*          \*

Global Product sales, net, were $528.5 million for the year ended December 31, 2014*, an increase of 38% from the same period in 2013, primarily as a result of sales of our authorized generic Renvela® tablets launched during the three month period ended June 30, 2014 as well as higher sales of our Digoxin products*, in addition to the launch of our generic Solaraze® during the fourth quarter of 2013.

233.    The 2014 10-K contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 2014 10-K was

1   accurate and disclosed any material changes to the Company's internal control over financial

2   reporting.  In addition, the 2014 10-K was signed by defendant Hsu as a director of Impax.

3   234.   By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced

4   above were materially false and misleading.  Considered as a whole, defendants' representations

5   misled investors by presenting a materially false and misleading picture of Impax's business,

6   financials, operations and compliance policies by, among other things, failing to disclose and

7   actively concealing that Impax had colluded to fix the prices of its generic digoxin and

8   pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

9   (a)   the statements referred to above about Impax product pricing, digoxin pricing,

10   and pricing in the generic drug marketplace were materially false and misleading because defendants

11   failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

12   (b)   the statements referred to above about competition in the generic drug

13   marketplace, including that the marketplace for generic drugs was highly competitive, were

14   materially false and misleading because the markets for digoxin and pyridostigmine were collusive

15   and lacked true competition;

16   (c)   the statement referred to above that the "competitive advantages" the

17   Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

18   complex formulation, development characteristics, and special handling requirements, was false and

19   misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

20   prices for digoxin and pyridostigmine;

21   (d)   the statements referred to above about digoxin sales were materially false and

22   misleading because digoxin sales were artificially inflated by illegal price-fixing;

23   (e)   Impax's inflation of sales through illegal price-fixing constituted a violation of

24   U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

25   antitrust authorities along with the attendant negative financial and reputational harm;

26   (f)   Impax's revenues and income, as stated above, were inflated in part as a result

27   of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

28   and

(g)     Impax failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

235.    On May 11, 2015, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2015 (the "1Q15 8-K").  For the quarter, Impax reported a net loss of $6.33 million, or $0.09 per diluted share, on revenue of $143.1 million, compared to net income of $6.43 million, or $0.09 per diluted share, on revenue of $ 118.72 million for the same period in the prior year.

236.    In the 1Q15 8-K, Impax stated, in part:

This increase [in total revenues] is the result of higher sales of the Company's existing products (up 9.1%) and revenue from approximately three weeks of sales of products acquired in the Company's acquisition of Tower Holdings, Inc. (including operating subsidiaries CorePharma LLC and Amedra Pharmaceuticals LLC), and Lineage Therapeutics Inc. (together, "Tower") on March 9, 2015.

*       *       *

Total revenues for the Impax Generics division increased 18.0% to $128.7 million in the first quarter 2015, compared to $109.1 million in the prior year period.  The increase is due to the addition of $12.3 million in product sales from the Tower acquisition and $7.3 million from higher sales in existing Impax products.

Gross margin in the first quarter 2015 decreased to 40.6%, compared to gross margin of 47.8% in the prior year period.  Adjusted gross margin in the first quarter 2015 decreased to 45.0%, compared to adjusted gross margin of 60.4% in the prior year period.  The decrease in gross margin and adjusted gross margin was primarily the result of higher sales of lower margin generic products, the impact of additional competition on generic digoxin, the later than anticipated close of the Tower acquisition and the delayed launch of certain products.

237.    On May 11, 2015, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 1Q15 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2015 (the "1Q15 10-Q").

238.    In the 1Q15 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

1                              *        *        *

2          Consolidated total revenues for the three month period ended March 31, 2015 increased by $24.4 million, or 21%, as compared to the same period in 2014. Consolidated total revenues for the three month period ended March 31, 2015 include $13.6 million in revenues from the Tower acquisition. . . . Increased product volumes (including product volumes from the acquisition) increased revenues during the three month period ended March 31, 2015 by $31.9 million, or 27%, compared to the prior year period, while selling price and product mix decreased revenues by $8.7 million, or 7%, compared to the prior year period.

7          Revenues from our Impax Generics division increased by $19.6 million during the three month period ended March 31, 2015, as compared to the prior year period, driven primarily by sales of volumes from the acquired companies and from sales of our authorized generic Adderall XR®. . . .

9          Net loss for the three month period ended March 31, 2015 was $6.3 million, a decrease of $12.8 million as compared to net income of $6.4 million for the three month period ended March 31, 2014.

11                             *        *        *

12         Total revenues for Impax Generics for the three month period ended March 31, 2015, were $128.7 million, an increase of 18% over the same period in 2014, principally resulting from the addition of $12.3 million in revenue from the Tower and Lineage acquisition and an increase in sales of our authorized generic Adderall XR®.

15                             *        *        *

16         Gross profit for the three month period ended March 31, 2015 was $52.3 million, or approximately 41% of total revenues, as compared to $52.1 million, or approximately 48% of total revenues, in the prior year period.

18                             *        *        *

19         Based upon competitive market conditions, the Company may reduce the selling price of certain Global [Generics] Division products.

20  239.    In addition, the 1Q15 10-Q referred investors to the materially false and misleading statements in the Company's 2014 10-K as set forth in ¶¶212-232, 234 concerning: (1) the pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including Lannett, Par, and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

26  240.    The 1Q15 10-Q contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 1Q15 10-Q was

1    accurate and disclosed any material changes to the Company's internal control over financial

2    reporting.

3        241.    During the May 11, 2015 analyst conference call discussing 1Q15 results, Wilkinson

4    made the following materially false statements and omissions regarding Impax's competitive role in

5    the marketplace:

6        Michael Faerm – Wells Fargo Securities, LLC – Analyst

7            Hi.  Thanks for taking the question.  My questions on the sector M&A more
         generally, as potentially some of the big are getting bigger here, how do you think
8            about the impact on smaller US generics players like yourselves, when it comes to
         things like pricing, potential products becoming available, and other factors?
9            Thanks.

10       [Wilkinson:]

11           Yes.  So we're a rooter for something to happen with the big three that are in
         discussions here, because we think that there will be opportunities for acquisitions,
12           with the some of the necessary divested products.  We've been at the table for those
         before, most recently with the Actavis transaction before us.  And so, those are the
13           nice opportunities that come out of it.

14           ***I'm a believer that a mid tier generic house is going to be required by the
         customers, in order to keep pricing, and keep supply and keep competition***
15           ***appropriate, so that they don't rely on one, on possibly two suppliers, but they have***
         ***a range of suppliers to come from***.  And what is most important for a Company our
16           size, is to make sure that we have a portfolio products that are coming that is unique
         and diverse, and has some unique items in it, that we may be one of one, or one of
17           two, and so therefore, the customer is always going to need to have an interaction
         with you.

18       242.    By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced

19   above were materially false and misleading.  Considered as a whole, defendants' representations

20   misled investors by presenting a materially false and misleading picture of Impax's business,

21   financials, operations and compliance policies by, among other things, failing to disclose and

22   actively concealing that Impax had colluded to fix the prices of its generic digoxin and

23   pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

24           (a)     the statements referred to above about Impax product pricing and pricing in

25   the generic drug marketplace were materially false and misleading because defendants failed to

26   disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

27

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                    - 87 -

(b)     the statements referred to above about competition in the generic drug marketplace were materially false and misleading because the markets for digoxin and pyridostigmine were collusive and lacked true competition;

(c)     the statement referred to above that the "competitive advantages" the Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials, complex formulation, development characteristics, and special handling requirements, was materially false and misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the prices for digoxin and pyridostigmine;

(d)     Impax's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal antitrust authorities along with the attendant negative financial and reputational harm;

(e)     Impax's revenues and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine; and

(f)     Impax failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

243.    On April 30, 2015, Impax released its Corporate Compliance Program Declaration and stated, in part:

> Impax strives to conduct all aspects of our business in accordance with the highest standards of business ethics and to **comply with all laws and regulations that govern our industry**.
>
> As part of this effort, Impax has adopted an enterprise-wide Comprehensive Compliance Program ("CCP") that is designed to **prevent, detect, and resolve potential compliance issues**.  Our CCP seeks to **comply with all applicable federal and state laws, regulations, and industry guidance** including the "Compliance Program Guidance for Pharmaceutical Manufacturers" developed by the United States Department of Health and Human Services, Office of the Inspector General and the Pharmaceutical Research and Manufacturers of America's "Code on Interactions with Healthcare Professionals." The CCP **applies to our officers, directors and employees in their activities on behalf of Impax, including any of its subsidiaries or divisions**.

244.     During the May 14, 2015 Bank of America Merrill Lynch Health Care Conference, Mark Donohue, the Company's Vice President of Investor Relations and Corporate Communications misrepresented the nature of digoxin and pyridostigmine price increases, and did not disclose the Company's illegal scheme:

Sumant Kulkarni – BofA Merrill Lynch – Analyst

How do you think about pricing potential on your base business, given that we've seen some increases in the past there?

Mark Donohue – Impax Laboratories Inc. – VP, IR and Corporate Communications

Well, as you know, there's more price declines in our space than there are price increases.  And we are experiencing low single digit price declines across the generic portfolio.  *We look at opportunities to raise prices if something comes up in terms of our products, but right now I can't say that there is that many products to where we see a potential price increase*.  But the business has been very stable for some of our larger products, especially.  It's been a pretty stable market.

[Kulkarni:]

*                *                *

Sure.  We have a few seconds here, so last question on the base business side of things.  The fenofibrate, digoxin, and your version of OPANA ER – how should we think about the competitive scenarios there?

[Donohue:]

We've been expecting competition on fenofibrate for a number of years, and it remains a good market for us.  *And obviously digoxin is – there's a couple of players who have entered the market recently.  And now it's a five-player market.  And we've discussed that we have seen competitive pressure in that market, but we are holding on to the majority of the customer base*.

245.     During the June 11, 2015 Goldman Sachs Health Care Conference, Wilkinson specifically discussed the origins of digoxin price increases, but again failed to disclose illegal price-fixing:

Gary Nachman – Goldman Sachs – Analyst

You're definitely one of the companies that have benefited from big price increases in certain parts of the generic space.  So where are you seeing most of those opportunities and how sustainable are they?

[Wilkinson:]

*I think we are the poster child for price increase, that's Digoxin.  Digoxin was a product that had seven or eight competitors to it.  All but two fell out of the marketplace, opportunity to raise price.  We did.  We gained share on price*

*contribution from that.  **And now I think there are five players and the price has come down, not to the original point, but it's come down and we're spreading share out.***  So these are generally shorter-term opportunities that you take based on market conditions and we'll continue to evaluate those.  We have not had a lot of price increase products within the Company, just because, if you look at our top 10 products, most of those there are – we're in a one, two, three competitor environment and they've stayed pretty stable into that environment, and you really wouldn't create much value by raising price there.  It's reasonably stable and we would like it to stay that way.*

246.    By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

(a)    the statements referred to above about Impax product pricing, digoxin pricing, and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

(b)    the statements referred to above about competition in the generic drug marketplace were materially false and misleading because the markets for digoxin and pyridostigmine were collusive and lacked true competition;

(c)    the statements referred to above about compliance with laws and regulations governing Impax's business, and the programs Impax had in place to ensure compliance with such laws and regulations were materially false and misleading because defendants had engaged in an illegal price-fixing scheme to inflate the prices of digoxin and pyridostigmine;

(d)    the statement referred to above about the existence of seven or eight competitors in the digoxin market prior to the collusive and massive price hike was materially false and misleading because the generic digoxin market never had seven or eight competitors and there were only three competitors in 2012 and 2013; and

(e)    Impax's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal antitrust authorities along with the attendant negative financial and reputational harm.

247.     On August 10, 2015, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2015 (the "2Q15 8-K").  For the quarter, Impax reported a net loss of $1.85 million, or $0.03 per diluted share, on revenue of $214.18 million, compared to net income of $35.07 million, or $0.50 per diluted share, on revenue of $188.12 million for the same period in the prior year.

248.     In the 2Q15 8-K, Impax stated, in part:

Total revenues for the second quarter 2015 increased 14% to $214.2 million, compared to $188.1 million in the prior year period.  The increase was primarily due to the addition of product revenues from the Company's acquisition on March 9, 2015 of Tower Holdings, Inc. and Lineage Therapeutics Inc. (together with its subsidiaries, "Tower"), and sales from new brand and generic product launched in 2015.

\*          \*          \*

Fred Wilkinson, President and Chief Executive Officer of Impax, stated, "We delivered strong revenue growth in the second quarter driven by the addition of product sales from the Tower acquisition, as well as solid execution of recent product launches.  The addition of the Tower generic product line coupled with the recent launch of six products from the Generics division more than offset the lost sales of authorized generic RENVELA during the quarter. . . .

"Although total Company revenues increased by almost 14% in the second quarter, the overall gross margin declined primarily due to the addition of new generic products with lower margins compared to the margin of authorized generic RENVELA. . . .  While we currently expect our gross margin to improve during the second half of 2015, we have revised our full year 2015 gross margin guidance from the previously stated mid 50% range to the low 50% range as a result of the product sales mix in the first half of this year."

\*          \*          \*

Total revenues for the Impax Generics division decreased $1.7 million to $174.7 million in the second quarter 2015, compared to $176.4 million in the prior year period.  The decrease was primarily due to the absence of authorized generic RENVELA sales during the current period compared to revenues of $49.1 million in the second quarter 2014, and significantly lower sales of generic digoxin as a result of additional competition during the current period. . . .   The decrease in total revenues was partially offset by the addition of product sales from the Tower acquisition and sales from six generic products launched during the second quarter 2015.

Gross margin in the second quarter 2015 decreased to 36.6%, compared to gross margin of 60.4% in the prior year period.  Adjusted gross margin in the second quarter 2015 decreased to 43.1%, compared to adjusted gross margin of 66.5% in the prior year period. . . .  In addition, the lower gross margin and adjusted gross margin in the second quarter 2015 was due to the current year impact of higher sales of

lower margin generic products, additional competition on generic digoxin, and the temporary supply disruption of the epinephrine auto-injector product as noted above.

249.   On August 10, 2015, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 2Q15 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2015 (the "2Q15 10-Q").

250.   In the 2Q15 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present one or more competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

*        *        *

Consolidated total revenues for the three month period ended June 30, 2015 increased by $26.1 million to $214.2 million, or 14%, as compared to the same period in 2014.  Of the $214.2 million in consolidated total revenues for the three month period ended June 30, 2015, $58.5 million in revenues were from the Tower acquisition.  The increase in revenues in the current year period from the Tower acquisition were largely offset by the loss of revenues from sales of our authorized generic Renvela® tablets during the current period. . . .  Increased product volumes (including product volumes from the acquisition) increased revenues during the three month period ended June 30, 2015 by $22.2 million, or 12%, compared to the prior year period.  The increase in consolidated total revenues from new product launches and product volumes were partially offset in the current period by decreased revenues of $20.7 million, or 11%, as compared to the prior year period, resulting from unfavorable product selling price and product mix.

Revenues from our Impax Generics division decreased by $1.7 million during the three month period ended June 30, 2015, as compared to the prior year period, driven primarily by the loss of sales of authorized generic Renvela® during the current period partially offset by revenues from the Tower acquisition.

*        *        *

Consolidated total revenues for the six month period ended June 30, 2015 increased by $50.4 million to $357.3 million, or 16%, as compared to the same period in 2014.  Of the $357.3 million in consolidated total revenues for the six month period ended June 30, 2015, $72.1 million in revenues were from the Tower acquisition. . . .  Increased product volumes (including product volumes from the acquisition) increased revenues during the six month period ended June 30, 2015 by $53.2 million, or 17%, compared to the prior year period, while selling price and product mix decreased revenues by $28.5 million, or 9%, compared to the prior year period.

Revenues from our Impax Generics division increased by $17.9 million during the six month period ended June 30, 2015, as compared to the prior year period, driven primarily by the increase in revenues from the Tower acquisition, offset by decreased sales of authorized generic Renvela® during the current period.

1                                      *       *       *

2          Net loss for the three month period ended June 30, 2015 was $1.9 million, a
   decrease of $37.0 million as compared to net income of $35.1 million for the three
3   month period ended June 30, 2014.  The decrease was primarily attributable to lower
   margins from product sales and higher operating expenses in each case compared to
4   the prior year period.

5                                      *       *       *

6          Net loss for the six month period ended June 30, 2015 was $8.2 million, a
   decrease of $49.7 million as compared to net income of $41.5 million for the six
7   month period ended June 30, 2014.  The decrease was primarily attributable to lower
   margins from product sales and higher operating expenses, in each case compared to
8   the prior year period.

9                                      *       *       *

10         Total revenues for Impax Generics for the three month period ended June 30,
   2015, were $174.7 million, a decrease of 1% over the same period in 2014,
11   principally resulting from the loss of sales of authorized generic Renvela® during the
   current period, largely offset by the addition of $44.3 million in revenue from the
12   Tower acquisition.

13         Total revenues for Impax Generics for the six month period ended June 30,
   2015, were $303.4 million, an increase of 6% over the same period in 2014,
14   principally resulting from the addition of $56.6 million in revenue from the Tower
   acquisition as well as increased sales from Diclofenac Sodium and Lamotrigine
15   ODT, offset by decreased revenues from sales of authorized generic Renvela®
   during the current period.
16
                                       *       *       *
17
           Gross profit for the three month period ended June 30, 2015 was
18   $63.9 million, or approximately 37% of total revenues, as compared to
   $106.5 million, or approximately 60% of total revenues, in the prior year period.
19
                                       *       *       *
20
           Gross profit for the six month period ended June 30, 2015 was
21   $116.5 million, or approximately 38% of total revenues, as compared to
   $158.6 million, or approximately 56% of total revenues, in the prior year period.  The
22   decrease in sales of authorized generic Renvela® during the current year period,
   previously a high margin product, was the primary driver for the reduced gross profit
23   compared to the prior year period, as well as unfavorable product mix.

24                                     *       *       *

25         Based upon competitive market conditions, the Company may reduce the
   selling price of certain Impax Generics products.
26
           251.    In addition, the 2Q15 10-Q referred investors to the materially false and misleading
27
statements in the Company's 2014 10-K as set forth in ¶¶231-232, 234 concerning: (1) the
28

pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including Lannett, Par and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

252.    The 2Q15 10-Q contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 2Q15 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

253.    During the August 10, 2015 analyst conference call discussing 2Q15 results, the Company made the following false statements and omissions regarding competition in the digoxin market:

Fred Wilkinson – Impax Laboratories Inc. – President and CEO

\*          \*          \*

Turning to the next slide, that outlines our highlights for the quarter.  We had a solid second quarter, delivering approximately 14% growth on revenue over Q2 2014, and about 50% growth over the last quarter.  We are up against a tough comparison for both revenue and gross margin from the prior year, primarily due to the prior year's exclusive launch and strong sales of authorized generic Renvela.

\*          \*          \*

*As most of you know, the generic, another generic competitor for Digoxin has entered the market, making this a six-player market.  As previously disclosed and expected, margin and pricing have been impacted, as is typical in a generic multi-player market*.  This product is still more valuable than prior to the market disruption that happened 18 to 20 months ago.

\*          \*          \*

[Reasons:]

. . . Our adjusted gross profit declined, as well as our adjusted gross margin, which decreased to 50% from approximately 64% last year.  The primary drivers of this decline were the loss of sales of high-margin generic Renvela, the prior year period receipt of more than $9 million from third-party profit share and milestone payments, and the impact of *additional competition on generic Digoxin*.

\*          \*          \*

Adjusted earnings per diluted share decreased to $0.34 in the second quarter of 2015, compared to $0.60 last year.  This decrease was primarily attributable to the loss of $49 million of high-margin generic Renvela sales, the loss of approximately

$9 million of gross profit from third-party profit share and milestone payments, *a decline in gross profit earned on generic Digoxin due to additional competition*, higher interest expense of $6 million, and a higher adjusted tax rate. . . .

Turning to slide 13, within the generic division, revenues were down slightly in the second quarter of 2015 compared to last year.  The main drivers of the decline were the loss of authorized generic Renvela, *lower sales of Digoxin*, and the loss of the profit share and milestone payments.

\*       \*       \*

[Wilkinson:]

*A new competitor on Digoxin caused some incremental price reductions, and so therefore some margin decline*.  We're seeing a little more aggressiveness on a couple of our competitors on some of our other products that we have to respond to, but there's nothing that is out of line from what we've seen in the last six quarters sequentially.   So price declines are anticipated in the industry, and as more competition comes in then as competitors sharpen their pencil, obviously, there's a need to respond to pricing.  But nothing out of the ordinary.

\*       \*       \*

*Obviously both the API supply and some of the other issues around [digoxin] resulted in a market disruption, at which time there were two of us left out there, substantial price increase*.  And then as competitors resolved both our API position and reignited interest in the product, they came back in.  *This is now probably the poster child of a product that had few competitors, a lot of competitors, then a few and then a lot*.  I think it's probably pretty well stabilized, although the new competitor will need some share, and so we should anticipate there will be a slight diminution [sic] of all of our share and price, as everybody makes room for a new competitor.  Probably the last quarter we call it out too, because I think it's pretty well stabilized into what's still an interesting product, but not as large a contributor to the Company.

254.   By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

(a)   the statements referred to above about Impax product pricing, digoxin pricing, and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                       - 95

1    (b)  the statements referred to above about competition in the generic drug

2 marketplace, including that the marketplace for generic drugs was highly competitive, were

3 materially false and misleading because the markets for digoxin and pyridostigmine were collusive

4 and lacked true competition;

5    (c)  the statement referred to above that the "competitive advantages" the

6 Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

7 complex formulation, development characteristics, and special handling requirements, was false and

8 misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

9 prices for digoxin and pyridostigmine;

10    (d)  the statements referred to above concerning API supply in the digoxin market

11 on the August 10, 2015 earnings call misled investors because no API shortage had in fact occurred

12 as no manufacturers reported any potential drug shortages to the FDA as required by federal law;

13    (e)  the statement referred to above that there were a lot of competitors in the

14 digoxin market prior to the collusive and massive price hike was materially false and misleading

15 because the generic digoxin market had only three competitors in 2012 and 2013;

16    (f)  the statements referred to above about digoxin sales were materially false and

17 misleading because digoxin sales were artificially inflated by illegal price-fixing;

18    (g)  Impax's inflation of sales through illegal price-fixing constituted a violation of

19 U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

20 antitrust authorities along with the attendant negative financial and reputational harm;

21    (h)  Impax's revenues and income, as stated above, were inflated in part as a result

22 of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

23 and

24    (i)  Impax failed to make required disclosures regarding the impact of artificial

25 price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

26 disclosure rules.

27

28

255.     During the September 18, 2015 Morgan Stanley Health Care Conference, Wilkinson falsely attributed digoxin and pyridostigmine price increases to market opportunities rather than illegal price collusion:

Emil Chen – Morgan Stanley – Analyst

. . . So just to quickly wrap up our discussion on generic, can you also briefly talk about the pricing environment you're seeing?  That's been a very popular theme throughout this conference.  So just from your perspective, what you're seeing in the US market?

[Wilkinson:]

*So we have an example of, it was probably a textbook case of how price effects the market and that's our digoxin.  So, digoxin went from a seven player marketplace to a two player marketplace.  We took price, so became a very meaningful product to us.  We were very close to actually eliminating it out of our portfolio; the price has gotten so low.  Price escalated very nicely, others came back into the marketplace and now the price has come back down.  So it's a five or six player marketplace, fairly competitive in nature, still a good product for us and still nice revenue generator, profit generator, but I think those opportunities will come and go as different market conditions evolve.  And I think the market will take price increases as you can and we'll also have to deal with price declines as they occur from the competitive environments.*

We have seen, I think probably almost everybody here has seen the 3% to 5% to 7% price decline on different, more commoditized products and those that have gotten competitive.  We've also seen those few opportunities that there are to take price increase.  But I think that's just the nature of our business that's nothing different in my mind that it looked two years ago and four years ago.  *So I think there are still pricing pressures that will hit our marketplace.  But those are generally competitive driven.  So as markets become more crowded, there will be price reductions.*

256.     By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

(a)     the statements referred to above about Impax product pricing, digoxin pricing, and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                    - 97

1    (b)    the statements referred to above about competition in the generic drug

2  marketplace, including that the marketplace for generic drugs was highly competitive, were

3  materially false and misleading because the markets for digoxin and pyridostigmine were collusive

4  and lacked true competition; and

5    (c)    the statement referred to above about competitors in the digoxin market prior

6  to the collusive and massive price hike was materially false and misleading because the generic

7  digoxin market had only three competitors in 2012 and 2013.

8    257.   On November 9, 2015, Impax issued a press release and filed a Current Report on

9  Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's

10 financial and operating results for the quarter ended September 30, 2015 (the "3Q15 8-K").  For the

11 quarter, Impax reported net income of $35.76 million, or $0.49 per diluted share, on revenue of

12 $221.1 million, compared to net income of $15.74 billion, or $0.22 per diluted share, on revenue of

13 $158 million, for the same period in the prior year.

14    258.   In the 3Q15 8-K, Impax stated, in part:

15     "We delivered strong top-line growth during the third quarter driven by the
      addition of product revenues from all four areas of focus: the successful integration
16     of brand and generic products following the strategic acquisition of Tower, increased
      sales from several key generic products, the addition of sales from continued growth
17     of RYTARY ® and Zomig ® nasal spray, and additional revenue from generic
      products launched in 2015," said Fred Wilkinson, President and Chief Executive
18     Officer of Impax.  "We also achieved 21% earnings growth despite quarter over
      quarter margin pressure created by the absence of sales of authorized generic
19     RENVELA® in the current quarter."

20                              *        *        *

21     Total revenues for the Impax Generics division increased $35.0 million to
      $180.7 million in the third quarter 2015, compared to $145.6 million in the prior year
22     period.  The increase was primarily due to the addition of product sales from the
      Tower acquisition, increased sales from diclofenac sodium gel 3% (a product
23     licensed under the Company's agreement with Tolmar, Inc.), and sales from seven
      generic products launched during the current period and earlier in the year. . . .

24
       Gross margin in the third quarter 2015 decreased to 37.6%, compared to gross
25     margin of 53.0% in the prior year period.  Adjusted gross margin in the third quarter
      2015 decreased to 42.8%, compared to adjusted gross margin of 56.6% in the prior
26     year period. . . .  In addition, the lower gross margin and adjusted gross margin in the
      third quarter 2015 compared to the prior year period was due to the current year
27     impact of higher sales of lower margin generic products.

28

259.    Also on November 9, 2015, Impax filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 3Q15 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2015 (the "3Q15 10-Q").

260.    In the 3Q15 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present one or more competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

*       *       *

Consolidated total revenues for the three month period ended September 30, 2015 increased by 40% or $63.1 million to $221.1 million, compared to $158.0 million in the prior year period.  The increase was primarily due to the addition of product revenues from the Tower acquisition, increased sales of diclofenac sodium gel, a product licensed under the Company's agreement with Tolmar, and the addition of sales from RYTARY® and seven generic products launched in the second and third quarters of 2015. . . .  Product volumes (including acquisitions) increased revenues by approximately 31.5%, while product selling price decreased revenues by approximately 1.6%, in each case compared to the prior year period. . . .

Revenues from our Impax Generics division increased by $35.0 million during the three month period ended September 30, 2015, as compared to the prior year period, driven primarily by revenues from the Tower acquisition and increased sales volume from diclofenac sodium gel 3%, partially offset by reduced sales from our other existing products, and by the loss of authorized generic Renvela® during the current year period.

*       *       *

Consolidated total revenues for the nine month period ended September 30, 2015 increased by $113.5 million to $578.4 million, or 24%, as compared to the same period in 2014.  The increase in consolidated total revenues during the current year period was primarily due to the addition of product revenues from our acquisition of Tower, increased sales of diclofenac sodium gel, the addition of sales from RYTARY® and seven generic products launched in the second and third quarters of 2015. . . .  Year to date product volumes (including from acquisitions) increased revenues by approximately 22.4%, while product selling price decreased revenues by approximately 6.3%, in each case compared to the prior year period. . . .

Revenues from our Impax Generics division increased by $52.9 million during the nine month period ended September 30, 2015, as compared to the prior year period, driven primarily by the increase in revenues from the Tower acquisition and increased sales volume from diclofenac sodium gel, partially offset by the absence of sales of authorized generic Renvela® during the current period, for which there were sales during the prior year period.

*       *       *

Net income for the three month period ended September 30, 2015 was $35.8 million, an increase of $20.0 million as compared to net income of $15.7 million for the three month period ended September 30, 2014.

\*      \*      \*

Net income for the nine month period ended September 30, 2015 was $27.6 million, a decrease of $29.6 million as compared to net income of $57.2 million for the nine month period ended September 30, 2014.  The decrease was primarily attributable to lower margins from product sales and higher operating expenses, in each case compared to the prior year period.  We also experienced higher amortization charges related to intangible assets and costs related to the fair value of inventory, resulting from the Tower acquisition.

\*      \*      \*

Total revenues for Impax Generics for the three month period ended September 30, 2015, were $180.7 million, an increase of 24% over the same period in 2014, principally resulting from the addition of revenue from the Tower acquisition as well as increased sales volumes from diclofenac sodium gel partially offset by the loss of sales of authorized generic Renvela® during the current period.

\*      \*      \*

Total revenues for Impax Generics for the nine month period ended September 30, 2015, were $484.1 million, an increase of 12% over the same period in 2014, principally resulting from the addition of product revenue from the Tower acquisition as well as increased sales from diclofenac sodium gel and seven generic products including Lamotrigine ODT, partially offset by the absence of revenues from sales of authorized generic Renvela® during the current year period, for which there were sales during the prior year period.

\*      \*      \*

Gross profit for the three month period ended September 30, 2015 was $67.9 million, or approximately 38% of total revenues, as compared to $77.1 million, or approximately 53% of total revenues, in the prior year period.  The decline in gross profit and gross margin was primarily driven by product mix.

\*      \*      \*

Gross profit for the nine month period ended September 30, 2015 was $184.5 million, or approximately 38% of total revenues, as compared to $235.8 million, or approximately 55% of total revenues, in the prior year period.  The decline in gross profit and gross margin was primarily driven by product mix.  The loss of sales during the current year period of authorized generic Renvela®, a high margin product, was replaced by lower margin products from the Tower acquisition and sales of diclofenac sodium gel.

\*      \*      \*

Based upon competitive market conditions, the Company may reduce the selling price of certain Impax Generics products.

261.    In addition, the 3Q15 10-Q referred investors to the materially false and misleading statements in the Company's 2014 10-K as set forth in ¶¶231-232, 234 concerning: (1) the pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including Lannett, Par and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

262.    The 3Q15 10-Q contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 3Q15 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

263.    During the November 9, 2015 analyst conference call discussing 3Q15 results, Wilkinson discussed competition in the generic market, but failed to disclose Impax's anticompetitive behavior:

Tim Chiang – BTIG – Analyst

Fred, I wanted to ask you about your generic business.  It seems like your generic business is growing.  I wanted to dig down a little bit with some of the new products that you've gotten approval on.

How much share are you getting on average with these new products that you've launched?

[Wilkinson:]

*        *        *

I would say that we've been kind of functioning as most companies would *depending on the number of competitors*.  Some of these products have been introduced into two and three competitor marketplaces.  Others have gone into five and six, so you have very different share position based on the amount of competition out there.  There is still room for these products.

So as you've seen in most of them, we've prepared for launch.  We've got ourselves out in the marketplace and almost all of them achieving 10%-plus share in places where there is, we're one of two and one of three, we're in the 40% or 50% share position.  So it really just *depends on the competitive environment*.  There will inevitably be an approval or two that we'll take and may not much because *the market is far too competitive*.

Therefore, we'll just have it in our backdrop for taking advantage of the opportunity should the market shift.

264.     Later in the call, Wilkinson falsely and misleadingly attributed price increases to market opportunity and continued to withhold information about Impax's illegal scheme:

Divya Harikesh – Goldman Sachs – Analyst

This is Divya Harikesh on behalf of Gary.  I just had a question on – broadly on pricing, given the scrutiny pricing has come under, can you comment on the pricing environment as you see it?  And your ability to take price within the branded as well as gene[r]ic portfolio?

Fred Wilkinson – Impax Laboratories Inc. – President & CEO

Sure.  Obviously, there's a lot of noise on pricing going on right now.  As we mentioned in the prepared remarks, our growth in third quarter – actually our growth over the whole year has been generated by volume and new product launches.  In fact, in third quarter, we had an overall price decline of around 1%.  So we had greater volume increases that we did on price.  That's driven primarily by the generic – just the general diminution of the generic marketplace, which is very slow kind of reduction in some of the prices of some of the older products.

***We have taken price from time to time.  We generally do that based on market conditions.  We do that based on what we see in the competitive environment.  So we will avail ourselves as the opportunity to take price – in fact, we've not done anything that we think would ever raise the scrutiny of any of the regulatory authorities.***

265.     By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

(a)     the statements referred to above about Impax product pricing and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

(b)     the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were materially false and misleading because the markets for digoxin and pyridostigmine were collusive and lacked true competition;

1      (c)     the statement referred to above that the "competitive advantages" the

2    Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

3    complex formulation, development characteristics, and special handling requirements, was false and

4    misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

5    prices for digoxin and pyridostigmine;

6      (d)     the statements referred to above concerning the governmental investigation

7    into generic drugs pricing on the November 9, 2015 earnings call misled investors by denying any

8    wrongdoing – stating that no pricing collusion had taken place – and falsely attributing price

9    increases to market conditions when, in fact, the digoxin and pyridostigmine price hikes were

10   collusive and unjustified with no change in market conditions before the massive price increase, no

11   supply or production issues, no change in competitive landscape, and pricing was consistently stable

12   pricing for years before the hike;

13     (e)     Impax's inflation of sales through illegal price-fixing constituted a violation of

14   U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

15   antitrust authorities along with the attendant negative financial and reputational harm;

16     (f)     Impax's revenues and income, as stated above, were inflated in part as a result

17   of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

18   and

19     (g)     Impax failed to make required disclosures regarding the impact of artificial

20   price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

21   disclosure rules.

22     266.    During the November 11, 2015 Credit Suisse Health Care Conference, Wilkinson

23   made the following false statements and omissions:

24   Unidentified Participant

25                          *      *      *

26   **And then on generics, on how you guys factor in price increases as you sort of
     think about the rest of this year and 2016.**

27

28

[Wilkinson:]

*Sure. So I mean I think pricing may be one of the most over talked topics. You know, generics get the opportunity probably in 1 or 2 products out of every 30 or 40 that are in your portfolio.*

*We may be a poster child of that one in that we had a product called Digoxin that we were one of seven marketers about 2.5 years ago. It became one of two. We took the price up fairly dramatically, made it so it was an interesting product, made some money on that. And then as normally happens in an open competitive marketplace, many players came back in, price fell back down. It's still an interesting product but nowhere near as interesting as it was before. So those were those unique and rare opportunities that we may have to take price, but they generally correct themselves by competition coming back in, and that's exactly what happened with Digoxin.*

Our growth that we reported in third quarter, third quarter 2015 over third quarter 2014 was about 40% in revenue. As it turns out, there was about 45% of that growth was unit volume, so just simply adding more products to the portfolio and growing share of what we had. That was matched up with a price degradation of around 3%. So, you know, we're a typically – typical generic house in that it's not often that price becomes an opportunity, *it's more that there's the opportunity to try to manage the price as more competition comes and it kind of evolves*.

Pricing will be an opportunity for all of us. We'll take it as we can. I think there have been some interesting moves in the pricing environment that most people will have gotten either offended by or there's been a lot of noise around. But I think generally our view is that price following, *where you're following competition and/or pricing where you're taking an opportunistic picture based on market provision is still within the purview and should not be an issue for an organization like us*. But that pricing as a general opportunity to increase your generic products just is – I don't think any company's really seen that.

267.    By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading. Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products. In particular, defendants knew or recklessly disregarded that:

(a)    the statements referred to above about Impax product pricing, digoxin pricing, and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

(b)    the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were

1    materially false and misleading because the markets for digoxin and pyridostigmine were collusive

2    and lacked true competition;

3               (c)    the statement referred to above about the existence of seven competitors in the

4    digoxin market prior to the collusive and massive price hike was materially false and misleading

5    because the generic digoxin market never had seven competitors and there were only three

6    competitors in 2012 and 2013; and

7               (d)    Impax's inflation of sales through illegal price-fixing constituted a violation of

8    U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

9    antitrust authorities along with the attendant negative financial and reputational harm.

10         268.    In January 2016, Impax released its updated Code of Conduct Policy ("CCP") and

11    stated that the Corporate Compliance Program is led by the Chief Compliance Officer, who reports

12    directly to the CEO, with responsibility to implement the CCP and:

13            Oversight of Impax's compliance activities is provided at both the executive
14            and Board level.

                            *      *      *

15

16            It is Impax's policy to follow all laws and regulations in the countries and
            communities where we conduct business.  There are no exceptions.

17                            *      *      *

18            At Impax, we follow both the letter and the spirit of the laws that affect us.

19                            *      *      *

20            It is our policy that information provided in public communications,
21            including our filings with the United States Securities and Exchange Commission
            and other regulatory authorities in the countries where we do business, be
22            comprehensive, fair, accurate, timely and understandable.

23            All colleagues, including those involved in the financial disclosure process or
            who otherwise have access to sensitive and/or confidential Company information,
24            including the Chief Executive Officer and Chief Financial Officer, are responsible
            for assuring compliance with this policy.

25            All such colleagues are required to be familiar with the disclosure
            requirements that apply to Impax in accordance with local laws and regulations.  You
26            are prohibited from knowingly misrepresenting, omitting, or causing others to
            mispresent or omit, material facts about Impax to others, whether within or outside
27            Impax . . . .

28                            *      *      *

Antitrust, Unfair Competition and Restraint of Trade

Impax is committed to free and open competition in the marketplace, and requires employees to strictly adhere to the antitrust laws in the countries where we do business.

Antitrust laws are often complex, difficult to interpret, and apply to a wide range of business activities. The following examples provide a general guide to antitrust compliance:

- No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns Impax or its suppliers, distributors, wholesalers or customers.

- No employee may agree with a customer on resale price; imply that such resale price is a condition of sale, contract renewal, or advertising allowance; or discuss with or imply to a customer that the Company will attempt to influence the pricing of another customer or competitor.

- No employee shall engage in group boycotts, or allocate or divide customers, territories or production with a competitor.

*       *       *

Examples of conduct that violates Impax policy include:

- Agreements or understandings with competitors on price.

- Agreements or understandings with competitors to "divide up" customers, products, services or territories.

- "Bid-rigging" (for example, reaching a prior agreement with competitors to govern conduct in the bidding process) or making agreements or reaching understandings with competitors not to bid in public or private procurements.

- Agreements or understandings with competitors to disadvantage other competitors.

- Parties entering into these types of agreements can be prosecuted under criminal law, resulting in significant fines for corporations and fines and imprisonment for the employees involved.

An unlawful agreement on "price" can cover a broad range of agreements among competitors that directly or indirectly affect the price of goods or services. This includes, for example, agreements on price ranges, minimum prices, list prices, advertised prices, pricing formulas, discounts, rebates, profit margins, credit and warranty terms or other terms of sale.

An "agreement" or "understanding" need not be in writing for it to be unlawful. It can be oral or inferred from the conduct of the parties, as in the following examples:

- An informal observation to a competitor about a company's likely future prices;

- •     Comments to a competitor about the desirability of an entire industry following a price increase; or

- •     Comments to a competitor about the desirability of ceasing discounts to certain customers.

These kinds of situations have each been used (along with other circumstantial evidence) to charge companies and individuals with criminal price-fixing. It is for this reason that you should avoid any conduct or activity, formal or informal, from which even an appearance of improper conduct could be drawn.

The obligation to scrupulously avoid even an appearance of impropriety applies in business settings, as well as to communications with competitors in casual social settings (golf games, civic events, etc.). In addition, a supplier in one market may be a competitor in another.

269.     On February 22, 2016, Impax filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 8-K"). For the quarter, Impax reported net income of $11.43 million, or $0.16 per diluted share, on revenue of $282.09 million, compared to net income of $0.12 million, or zero per diluted share, on revenue of $131.21 million for the same period in the prior year. For 2015, Impax reported net income of $39 million, or $0.54 per diluted share, on revenue of $860.47 million, compared to net income of $57.35 million, or $2.21 per diluted share on revenue of $596.05 million for 2014.

270.     In the 2015 8-K, Impax stated, in part:

"Our strong 2015 financial performance is a direct result of the successful implementation of our four pillar strategy. We are a stronger and more diversified company today than we were a year ago," said Fred Wilkinson, President and Chief Executive Officer of Impax. "We established a positive compliance position across our global network and as a result, received 11 new generic product approvals. We achieved our goal of launching 14 generic products, while our Specialty Pharma division benefited from the approval and successful launch of RYTARY™ and the continued growth of Zomig® Nasal Spray. In addition, we accelerated our business development efforts with the strategic acquisition and integration of Tower Holdings, Inc., while also strengthening our capital structure."

\*     \*     \*

Total revenues for the Impax Generics division increased $108.9 million to $226.8 million in the fourth quarter 2015, compared to $117.9 million in the prior year period. The increase was primarily due to higher sales from diclofenac sodium gel, the addition of product sales from the Tower acquisition, and sales from 14 generic products launched throughout 2015, including seven products launched during the fourth quarter 2015.

Gross margin in the fourth quarter 2015 decreased to 33.7%, compared to gross margin of 44.8% in the prior year period.  Adjusted gross margin in the fourth quarter 2015 decreased to 40.5%, compared to adjusted gross margin of 49.8% in the prior year period.  The decrease in gross margin and adjusted gross margin was primarily due to the impact of higher sales of lower margin generic products during 2015 compared to the prior year.

\*      \*      \*

Total revenues for the Impax Generics division increased $161.9 million to $710.9 million for the full year 2015, compared to $549.1 million for the full year 2014.  The increase was primarily due to the addition of product sales from the Tower acquisition as well as increased sales from diclofenac sodium gel and from 14 generic products launched during 2015.  The increase in full year 2015 revenues was partially offset by the absence of revenues from sales of authorized generic Renvela® during 2015, for which there were sales during the prior year.

Gross margin for the full year 2015 decreased to 36.7%, compared to gross margin of 52.6% for the full year 2014.  Adjusted gross margin for the full year 2015 decreased to 42.6%, compared to adjusted gross margin of 59.0% for the full year 2014.  The decrease in gross margin and adjusted gross margin was primarily due to the loss of sales of authorized generic Renvela during 2015, which was replaced by lower margin generic products from the Tower acquisition and sales of diclofenac sodium gel.

\*      \*      \*

The Company's full year 2016 estimates are based on management's current expectations, including with respect to prescription trends, pricing levels, inventory levels, and the anticipated timing of future product launches and events.  The 2016 guidance assumes 12 to 14 generic product launches including six to eight new generic product approvals. . . .

- Total Company revenues to increase at least 15% over full year 2015.

- Adjusted gross margins as a percent of total revenue are expected to be approximately 50%.

271.   On February 22, 2016, Impax also filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2015 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  The 2015 10-K repeated each materially false and misleading statement in the 2013 10-K as set forth in ¶¶197, 199.  *See* Ex. 1.

272.   Additionally, the 2015 10-K contained the following materially false and misleading statements:

Consolidated total revenues for the year ended December 31, 2014 increased $84.5 million, or 17%, as compared to the year ended December 31, 2013. New product launches increased revenues during the year ended December 31, 2014 by

$84.4 million, or 17%, compared to 2013, primarily related to sales of our authorized generic Renvela® tablets and generic Solaraze®. Decreased product volumes (excluding new product launches) decreased revenues during the year ended December 31, 2014 by $20.3 million, or 4%, compared to 2013, while selling price and product mix increased revenues by $20.4 million, or 4%, compared to 2013. Revenues from our Impax Generics division increased $150.7 million during the year ended December 31, 2014, as compared to 2013, driven primarily by sales of our authorized generic Renvela® tablets, ***in addition to higher sales of our Digoxin*** and generic Solaraze® products.

\*       \*       \*

Impax Generics sales, net, were $528.5 million for the year ended December 31, 2014, an increase of 38% from 2013, primarily as a result of sales of our authorized generic Renvela® tablets launched during the three month period ended June 30, 2014, ***higher sales of our Digoxin products*** and the launch of our generic Solaraze® during the fourth quarter of 2013.

273.    The 2015 10-K contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

274.    During the February 22, 2016 analyst conference call discussing 4Q15 results, Wilkinson made the following false statements and omissions in response to an analyst's question about competition:

Louise Chen – Guggenheim Securities LLC – Analyst

\*       \*       \*

***And then, secondly, some of your competitors have talked about pricing pressure for generic drugs increasing.  Curious if you saw this, and even if you haven't, what might be causing this?  Thanks.***

[Wilkinson:]

\*       \*       \*

On pricing, we've heard all the noise.  At JPMorgan it was pretty noisy there about people prognosticating some price declines.  ***We've really seen nothing out of the ordinary on our product portfolio***.  Our product portfolio, we lasted through 2014 and 2015 with no introductions.  So we've managed our portfolio fairly efficiently without reduction in price, and in many cases some improvement in our share position.

***Our anticipation is always that new competition will drive reduction in price, and that if the FDA continues on their efficiency mode, and continues to approve more ANDAs, that will put more pricing pressure on those products where competition could be driven***.  But we don't see any external factor that should have a

1  fundamental shift in pricing in generics. ***It's primarily just the traditional
2  competition that comes and the need to then decide whether you're going to meet
   competition by reducing price or give up the share***.

3  275.   By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced

4  above were materially false and misleading.  Considered as a whole, defendants' representations

5  misled investors by presenting a materially false and misleading picture of Impax's business,

6  financials, operations and compliance policies by, among other things, failing to disclose and

7  actively concealing that Impax had colluded to fix the prices of its generic digoxin and

8  pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

9          (a)     the statements referred to above about Impax product pricing and pricing in

10  the generic drug marketplace were materially false and misleading because defendants failed to

11  disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

12         (b)     the statements referred to above about competition in the generic drug

13  marketplace, including that the marketplace for generic drugs was highly competitive, were

14  materially false and misleading because the markets for digoxin and pyridostigmine were collusive

15  and lacked true competition;

16         (c)     the statement referred to above that the "competitive advantages" the

17  Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

18  complex formulation, development characteristics, and special handling requirements, was false and

19  misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

20  prices for digoxin and pyridostigmine;

21         (d)     the statements referred to above about compliance with laws and regulations

22  governing Impax's business, and the programs Impax had in place to ensure compliance with such

23  laws and regulations were materially false and misleading because defendants had engaged in an

24  illegal price-fixing scheme to inflate the prices of digoxin and pyridostigmine;

25         (e)     the statements referred to above about digoxin sales were materially false and

26  misleading because digoxin sales were artificially inflated by illegal price-fixing;

27

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                    - 110 -

1    (f)  Impax's inflation of sales through illegal price-fixing constituted a violation of

2 U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

3 antitrust authorities along with the attendant negative financial and reputational harm;

4    (g)  Impax's revenues and income, as stated above, were inflated in part as a result

5 of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

6 and

7    (h)  Impax failed to make required disclosures regarding the impact of artificial

8 price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

9 disclosure rules.

10    276. On May 10, 2016, Impax issued a press release and filed a Current Report on Form

11 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and

12 operating results for the quarter ended March 31, 2016 (the "1Q16 8-K").  For the quarter, Impax

13 reported a net loss of $10.41 million, or $0.15 per diluted share, on revenue of $225.51 million,

14 compared to a net loss of $6.33 million, or $0.09 per diluted share, on revenue of $143.1 million for

15 the same period in the prior year.

16    277. In the 1Q16 8-K, Impax stated, in part:

17    "We reported solid financial results for the first quarter and made progress
     towards achieving a number of our 2016 strategic priorities," said Fred Wilkinson,

18    President and Chief Executive Officer of Impax.  "Our generic and specialty pharma
     business segments delivered double digit revenue and operating income growth.

19    This positive performance was driven by last year's acquisition of Tower Holdings,
     Inc., from the addition of more than a dozen generic and specialty products launched

20    over the prior twelve months and from continued growth of our specialty pharma
     products."

21
            *   *   *

22
    "We continue to remain confident in our financial outlook for 2016.  The

23    combination of new product launches and increased sales from several of our
     existing generic and specialty pharma products are expected to drive growth in

24    2016."

25            *   *   *

26    Total revenues for the Impax Generics division increased $41.3 million to
     $170.1 million in the first quarter 2016, compared to $128.7 million in the prior year

27    period.  The increase was primarily due to higher sales volumes from diclofenac
     sodium gel, increased product sales from the Tower acquisition which the Company

28

completed in early March 2015, and sales resulting from more than a dozen generic products launched over the past twelve months.

Gross margin in the first quarter 2016 decreased to 35.3%, compared to gross margin of 40.6% in the prior year period.  Adjusted gross margin in the first quarter 2016 decreased to 39.3%, compared to adjusted gross margin of 45.0% in the prior year period.

\*       \*       \*

The Company's full year 2016 financial guidance remains unchanged from when it was issued on February 22, 2016.  The Company's full year 2016 estimates are based on management's current expectations, including with respect to prescription trends, pricing levels, inventory levels, and the anticipated timing of future product launches and events.  The 2016 guidance assumes 12 to 14 generic product launches including six to eight new generic product approvals. . . .

- Total Company revenues to increase at least 15% over full year 2015.

- Adjusted gross margins as a percent of total revenue are expected to be approximately 50%.

278.    Also on May 10, 2016, Impax filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 1Q16 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2016 (the "1Q16 10-Q").

279.    In the 1Q16 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

\*       \*       \*

Consolidated total revenues for the three month period ended March 31, 2016 increased by 58% or $82.4 million to $225.5 million, compared to $143.1 million in the prior year period.  The increase was primarily due to the addition of product revenues from the Tower acquisition that closed in March 2015, increased sales of diclofenac sodium gel, a product licensed under our agreement with Tolmar, and the addition of sales from Rytary®, which we launched in April 2015.  Product volumes (including acquisitions) and new product launches increased total revenues by 44.3% and 23.8%, respectively, while product selling price decreased total revenues by 10.6%, in each case compared to the prior year period.

Revenues from our Impax Generics division increased by $41.3 million during the three month period ended March 31, 2016, as compared to the prior year period, driven primarily by revenues resulting from the Tower acquisition and increased sales volume from diclofenac sodium gel, partially offset by reduced sales from our other existing products, in each case compared to the prior year period. . . .

1   Net loss for the three month period ended March 31, 2016 was $10.4 million, an increase of $4.1 million as compared to a net loss of $6.3 million for the three month period ended March 31, 2015.

2

3   *       *       *

4   Total revenues for Impax Generics for the three month period ended March 31, 2016, were $170.1 million, an increase of 32% over the same period in 2015, principally resulting from the increased sales volumes of diclofenac sodium gel as well as the addition of revenue resulting from the Tower acquisition partially offset by the decrease in sales from our other existing products.

5

6

7   *       *       *

8   Gross profit for the three month period ended March 31, 2016 was $60.0 million, or 35% of total revenues, as compared to $52.3 million, or 41% of total revenues, in the prior year period. The increase in gross profit was primarily driven by the increase in sales from diclofenac sodium gel and the decrease in gross margin was attributable to higher sales from our lower margin products in each case compared to the prior year period.

9

10

11  *       *       *

12

13  Based upon competitive market conditions, the Company may reduce the selling price of certain Impax Generics division products.

14  280.    In addition, the 1Q16 10-Q referred investors to the materially false and misleading

15  statements in the Company's 2015 10-K as set forth in ¶¶271-272, 275 concerning: (1) the

16  pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including

17  Lannett, Par, and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing

18  pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of

19  revenues and operating results.

20  281.    The 1Q16 10-Q contained signed certifications pursuant to SOX by defendants

21  Wilkinson and Reasons, stating that the financial information contained in the 1Q16 10-Q was

22  accurate and disclosed any material changes to the Company's internal control over financial

23  reporting.

24  282.    During the May 10, 2016 analyst conference call discussing 1Q15 results, Wilkinson

25  made the following false statements and omissions regarding pricing:

26  *There has been significant commentary this year regarding pricing in the generic industry. So before we hit that as our first question, I'm going to go ahead and take this on now.* I want to address what we see in our business model as it's positioned to operate in the market.

27

28

We are a top-15 US generic company in terms of gross sales and currently market approximately 55 products.  Our diversified portfolio includes a mix of controlled release, immediate release and alternative dose forms including controlled substances.  The portfolio is not heavily concentrated in any therapeutic area and we largely don't operate in the commodity generic space. The majority of our products, therefore, compete in markets with only a few competitors.

*        *        *

I think we've kind of hammered on the pricing piece pretty well.  We had anticipated price in the mid-single-digit range price degradation.  That is what we are seeing essentially in the first quarter.  That is what we experienced during the second half, and actually all of 2015.

***We see pricing pressures on individual products as more competition comes***.  But that's offset generally by product launches.  We don't really see anything in the winds that have dramatically changed any pricing pressures in the environment.  We have said that probably for two quarters now.  And we have now heard other people starting to step up and say many of the same things Taro and Mylan and others describe the scenario fairly similarly on their calls.

283.    By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

(a)      the statements referred to above about Impax product pricing and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

(b)      the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were materially false and misleading because the markets for digoxin and pyridostigmine were collusive and lacked true competition;

(c)      the statement referred to above that the "competitive advantages" the Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials, complex formulation, development characteristics, and special handling requirements, was false and

1   misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

2   prices for digoxin and pyridostigmine;

3           (d)    Impax's inflation of sales through illegal price-fixing constituted a violation of

4   U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

5   antitrust authorities along with the attendant negative financial and reputational harm;

6           (e)    Impax's revenues and income, as stated above, were inflated in part as a result

7   of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

8   and

9           (f)    Impax failed to make required disclosures regarding the impact of artificial

10   price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

11   disclosure rules.

12       284.    During the May 11, 2016 Bank of America Merrill Lynch Health Care Conference,

13   Wilkinson made the following false statements and omissions:

14       Sumant Kulkarni – Bank of America Merrill Lynch – Analyst

15       Continuing on the theme of pricing erosion, how much of that would you say
16   is attributable to customer consolidation, them getting stronger, versus FDA
    approving more things under the GDUFA scheme now or just irrational participants
17   in the market?

18       [Wilkinson:]

19       *Okay. Well, I think the irrational participants in the marketplace is always
what drives the bizarre price changes. When you see something that drops from
20   being 60% of the brand price to 10% of the brand price that's usually not the
customers. That's usually not the number of competitors. It's a single competitor
21   or two competitors that decide to do something. Very strange, because they're
simply going after share, and share really has never been the modulator for how
22   you win and lose in a generic marketplace. It's how well you do in keeping your
gross margin up and your profitability up*.

23               *        *        *

24       So the customer consolidation I think is probably third on that list. I think number of
competitors and the number of approvals from FDA might be second, *but the bizarre
25   pricing events happen when somebody really drops a price and a competitor does
something abnormal*.

26       [Kulkarni:]

27       In this environment do you see any opportunities to take price increases on
28   generics, or is that a thing of the past?

1    [Wilkinson:]

2          *I think there's still the opportunity.  Last I looked, it's still a free market.
     So if you are in a marketplace – I mean, we had that experience with our digoxin,*
3    *where there were nine competitors and then that went to two.  We raised price, and
     then now there are seven or eight competitors and price has come back down*
4    *again*.

5          So I think you'll take the opportunity as it comes along.  Should there be a
     shortage in any of the environments I think everybody would take a look at that.  It's
6    harder to raise price because the customers do have some contracts in place that
     make you work harder to do it, but you can still take price, because both parties do
7    very well with that one.

8          285.    During the June 8, 2016 Goldman Sachs Global Health Care Conference, Wilkinson

9    made the following false statements and omissions about competition in the generic market:

10   Gary Nachman – Goldman Sachs – Analyst

11         . . . *The big focus right now, guys, in the generic market is price (multiple
     speakers) competition*. . . .  What do you guys see from that perspective on a macro
12   level?  What do you think is really driving this pressure, if you had to rank some of
     these reasons? . . . .

13
     Fred Wilkinson – Impax Laboratories Inc. – CEO
14
                                   *         *         *
15
           We did come through an era where, without the number of approvals, you
16   started to see some long life of generics that was unusual.  In fact, *Impax benefited
     dramatically from that, because it was during that time we were in warning letter,*
17   *and we were not getting approvals, and many of our products were lasting much
     longer than what is a typical lifecycle*.
18
                                   *         *         *
19
     [Nachman:]
20
           It's still a dynamic generic market.
21
     [Wilkinson:]
22
           Very dynamic.  You've got to stay very close to the customer and a very
23   strong understanding of your competition.

24   [Nachman:]

25         Well, in that sense, on a more – well, potentially positive side, price
     increases.  Is it still something that you guys can easily do as a generic manufacturer
26   whenever there's competitive scenarios to do so?

27

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                              - 116 -

1  [Wilkinson:]

2  ***I think price increases in the generic business has never been easy to do.
   You usually need some kind of market dynamic to happen***.  The ability to go do
3  general across-the-board price increases have, in my opinion, again, have slowed a
   little bit, and that's because of some of the contractual relationships [that you have
4  with your] partners.

5  286.   By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced

6  above were materially false and misleading.  Considered as a whole, defendants' representations

7  misled investors by presenting a materially false and misleading picture of Impax's business,

8  financials, operations and compliance policies by, among other things, failing to disclose and

9  actively concealing that Impax had colluded to fix the prices of its generic digoxin and

10  pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

11  (a)   the statements referred to above about Impax product pricing, digoxin pricing,

12  and pricing in the generic drug marketplace were materially false and misleading because defendants

13  failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

14  (b)   the statements referred to above about competition in the generic drug

15  marketplace, including that the marketplace for generic drugs was highly competitive, were

16  materially false and misleading because the markets for digoxin and pyridostigmine were collusive

17  and lacked true competition;

18  (c)   the statement referred to above about the existence of nine competitors in the

19  digoxin market prior to the collusive and massive price hike was materially false and misleading

20  because the generic digoxin market never had nine competitors and there were only three

21  competitors in 2012 and 2013; and

22  (d)   Impax's inflation of sales through illegal price-fixing constituted a violation of

23  U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

24  antitrust authorities along with the attendant negative financial and reputational harm.

25  287.   On August 9, 2016, Impax issued a press release and filed a Current Report on Form

26  8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and

27  operating results for the quarter ended June 30, 2016 (the "2Q16 8-K").  For the quarter, Impax

28  reported a net loss of $2.7 million, or $0.04 per diluted share, on revenue of $172.59 million,

1   compared to a net loss of $1.85 million, or $0.03 per diluted share, on revenue of $214.18 million for

2   the same period in the prior year.

3         288.    In the 2Q16 8-K, Impax stated, in part:

4   The decrease [in total revenues] was primarily due to a 30% reduction in Generics
    division revenues which includes the impact of an approximate $15.0 million shelf-

5   stock adjustment as a result of competition on diclofenac sodium gel 3% (Solaraze®)
    and metaxalone (Skelaxin®), as well as lower sales of mixed amphetamine salts

6   (Adderall XR®) partially offset by a 29% increase in Specialty Pharma division
    revenues.

7
                                    *         *         *
8
         Total revenues for the Impax Generics division decreased 30.3% to
9   $121.7 million in the second quarter 2016, compared to $174.7 million in the prior
    year period. . . .
10
         Gross margin in the second quarter 2016 decreased to 30.7%, compared to
11   gross margin of 36.6% in the prior year period.  Adjusted gross margin in the second
    quarter 2016 decreased to 40.2%, compared to adjusted gross margin of 43.1% in the
12   prior year period.

13                                  *         *         *

14        The Company's full year 2016 financial guidance has been updated as of
    August 9, 2016, as noted below.  The Company's full year 2016 estimates are based
15   on management's current expectations, including with respect to prescription trends,
    pricing levels, inventory levels, and the anticipated timing of future product launches
16   and events.  The 2016 guidance assumes 12 to 14 generic product launches including
    six to eight new generic product approvals.
17
                                    *         *         *
18
         • UPDATED – Total Company revenues of approximately $900 million to
19   $940 million (previously an increase of at least 15% over full year 2015 total revenue
    of $860 million).
20
         • Adjusted gross margins as a percent of total revenue are expected to be in
21   the low 50% range.

22        289.    On August 9, 2016, Impax also filed a Quarterly Report on Form 10-Q with the SEC,

23   reiterating the financial and operating results previously announced in the 2Q16 8-K and reporting in

24   full the Company's financial and operating results for the quarter ended June 30, 2016 (the "2Q16

25   10-Q").

26        290.    In the 2Q16 10-Q, Impax stated, in part:

27   We also develop, manufacture, sell and distribute specialty generic pharmaceuticals
    that we believe present one or more competitive advantages, such as difficulty in raw

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                      - 118 -

materials sourcing, complex formulation or development characteristics or special handling requirements.

\*        \*        \*

Consolidated total revenues for the three month period ended June 30, 2016 decreased by 19% or $41.6 million to $172.6 million, compared to $214.2 million in the prior year period.  The decrease was primarily due to lower Impax Generics division product sales partially offset by an increase in sales of Impax Specialty Pharma division products.  Existing product selling price decreased total revenues by 14.2% and product volumes decreased total revenues by 7.0%, while volumes from new product launches increased total revenues by 1.9%.

Revenues from our Impax Generics division decreased by $53.0 million during the three month period ended June 30, 2016, as compared to the prior year period, driven primarily by increased competition in diclofenac sodium gel and metaxalone as well as lower market share of generic Adderall XR®, in each case compared to the prior year period.

\*        \*        \*

Consolidated total revenues for the six month period ended June 30, 2016 increased by 11% or $40.8 million to $398.1 million, compared to $357.3 million in the prior year period.  The increase was primarily due to the addition of product revenues from the Tower acquisition that closed in March 2015, increased sales of diclofenac sodium gel, a product licensed under our agreement with Tolmar, the addition of sales from Rytary®, which we launched in April 2015, and the addition of sales from Emverm®, which we launched in March 2016.  Product volumes (including acquisitions) and new product launches increased total revenues by 20.5% and 5.4%, respectively, while product selling price decreased total revenues by 14.5%, in each case compared to the prior year period.

Revenues from our Impax Generics division decreased by $11.6 million during the six month period ended June 30, 2016, as compared to the prior year period, driven primarily by lower revenues due to mixed results from both price and volume from products acquired in the Tower acquisition as well as from our legacy products.

\*        \*        \*

Net loss for the three month period ended June 30, 2016 was $2.7 million, an increase of $0.8 million as compared to a net loss of $1.9 million for the three month period ended June 30, 2015.  The increase in net loss compared to the prior year period was primarily attributable to lower gross profit as a result of lower Impax Generics division sales combined with higher operating expenses, which were partially offset by the absence of a loss on debt extinguishment in the current period compared to a loss of $16.9 million incurred in the second quarter 2015.

Net loss for the six month period ended June 30, 2016 was $13.1 million, an increase of $4.9 million as compared to a net loss of $8.2 million for the six month period ended June 30, 2015.

\*        \*        \*

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

Total revenues for Impax Generics for the three month period ended June 30, 2016, were $121.7 million, a decrease of 30% over the same period in 2015, driven primarily by increased competition in diclofenac sodium gel and metaxalone as well as lower market share of generic Adderall XR®, in each case compared to the prior year period.

\*     \*     \*

Total revenues for Impax Generics for the six month period ended June 30, 2016, were $291.8 million, a decrease of 4% over the same period in 2015, principally driven by increased competition in metaxalone as well as lower market share of generic Adderall XR®, partially offset by the increased sales of diclofenac sodium gel and Epinephrine Auto-Injector, both acquired in the Tower acquisition in March 2015.

\*     \*     \*

Gross profit for the three month period ended June 30, 2016 was $37.4 million, or 31% of total revenues, as compared to $63.9 million, or 37% of total revenues, in the prior year period.  The decrease in gross profit was primarily driven by the decrease in sales of certain products as described above.  The decrease in gross margin in the current period compared to the prior year period was primarily attributable to lower sales from our higher margin products versus the product sales mix for the prior year period as well as the impact of the $15.0 million in shelf-stock adjustments.

\*     \*     \*

Gross profit for the six month period ended June 30, 2016 was $97.3 million, or 33% of total revenues, as compared to $116.5 million, or 38% of total revenues, in the prior year period.  The decrease in gross profit was primarily driven by the decrease in sales of certain products as described above including the shelf-stock adjustments partially offset by an increase in sales of diclofenac sodium gel and Epinephrine Auto-Injector, compared to the prior year period.  The decrease in gross margin in the current period compared to the prior year period was primarily attributable to lower sales from our higher margin products versus the product sales mix for the prior year period.

\*     \*     \*

Based upon competitive market conditions, the Company may reduce the selling price of certain Impax Generics division products.

291.    Additionally, the 2Q16 10-Q contained a Restatement Agreement to Credit Agreement dated as of August 3, 2016 by and among Impax and Royal Bank of Canada.  In the Amended and Restated Credit Agreement, as Exhibit I to the Restatement Agreement, Impax stated, in part:

ARTICLE VI

Affirmative Covenants

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

So long as the Termination Conditions have not been satisfied, the Borrower [Impax] will, and will (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Restricted Subsidiaries to:

\*       \*       \*

SECTION 6.08    Compliance with Material Laws.  Comply in all material respects with its Organization Documents and the requirements of all Laws (including Environmental Laws) and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

292.    In addition, the 2Q16 10-Q referred investors to the materially false and misleading statements in the Company's 2015 10-K as set forth in ¶¶271-272, 275 concerning: (1) the pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including Lannett, Par, and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

293.    The 2Q16 10-Q contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 2Q16 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

294.    By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

(a)     the statements referred to above about Impax product pricing and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

(b)     the statements referred to above about competition in the generic drug marketplace were materially false and misleading because the markets for digoxin and pyridostigmine were collusive and lacked true competition;

(c)     the statement referred to above that the "competitive advantages" the Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials, complex formulation, development characteristics, and special handling requirements, was false and misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the prices for digoxin and pyridostigmine;

(d)     the statements referred to above about compliance with laws and regulations governing Impax's business, and the programs Impax had in place to ensure compliance with such laws and regulations were materially false and misleading because defendants had engaged in an illegal price-fixing scheme to inflate the prices of digoxin and pyridostigmine;

(e)     Impax's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal antitrust authorities along with the attendant negative financial and reputational harm;

(f)     Impax's revenues and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine; and

(g)     Impax failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

295.     On November 9, 2016, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2016 (the "3Q16 8-K").  For the quarter, Impax reported adjusted diluted earnings per share of $0.37, on revenue of $227.9 million, compared to adjusted diluted earnings per share of $0.40, on revenue of $221.1 million, for the same period in the prior year.

296.     In the 3Q16 8-K, Impax stated, in part:

Generic division revenues declined 3% in the third quarter 2016 compared to the prior year period as strong sales of epinephrine auto-injector (authorized generic Adrenaclick®) and oxymorphone, sales from the successful launch of three new generic products and the recent addition of products acquired from Teva Pharmaceuticals Industries Ltd. and affiliates of Allergan plc (the "Teva Transaction"), were more than offset by lower sales of diclofenac sodium gel 3% (Solaraze®), mixed amphetamine salts (Adderall XR®) and metaxalone (Skelaxin®).

\* \* \*

"Our third quarter 2016 results reflect the volatility we have experienced as a result of additional competition on a few of our largest generic products," said Fred Wilkinson, President and Chief Executive Officer of Impax. "Successful marketing and operational strategies are helping us to capitalize on several generic opportunities, including epinephrine auto-injector and oxymorphone, and we defended our share position across the majority of our generic portfolio. That said, the ongoing impact of an increasingly challenging market environment continues to weigh on our results and consequently we are revising our outlook for fiscal 2016 to reflect the impact of lower pricing across an increased number of products in our generic portfolio."

"Despite the current industry headwinds, we remain confident that the actions we are taking will position Impax for long-term, organic growth. Within our Generics division, we intend to defend and aggressively pursue share growth of existing products, focus on maximizing new product launches, and invest in future R&D opportunities and supply chain optimization."

\* \* \*

Total revenues for the Impax Generics division decreased 3.0% to $175.3 million in the third quarter 2016, compared to $180.7 million in the prior year period. The decrease was primarily due to the continued impact of competition on diclofenac and metaxalone, as well as lower revenue from sales of mixed amphetamine salts.

Gross margin in the third quarter 2016 was a loss of 111.9% compared to gross margin of 37.6% in the prior year period. Adjusted gross margin in the third quarter 2016 increased to 43.8%, compared to adjusted gross margin of 42.8% in the prior year period.

\* \* \*

The Company's full year 2016 financial guidance has been updated as of November 9, 2016, as noted below. The Company's full year 2016 estimates are based on management's current expectations, including with respect to prescription trends, pricing levels, inventory levels, and the anticipated timing of future product launches and events.

\* \* \*

• UPDATED – Total Company revenues of approximately $840 million to $855 million (previously $900 million to $940 million).

● UPDATED – Adjusted gross margins as a percent of total revenue are expected to be 48% to 50% (previously low 50% range).

297.    On November 9, 2016, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 3Q16 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2016 (the "3Q16 10-Q").

298.    In the 3Q16 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present one or more competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

*        *        *

Consolidated total revenues for the three month period ended September 30, 2016 increased by 3%, or $6.8 million, to $227.9 million, compared to $221.1 million in the prior year period.  The increase was primarily due to lower Impax Generics division product sales which were more than offset by an increase in sales of Impax Specialty Pharma division products.  Existing product selling price decreased total revenues by 9.1% while product volumes remained relatively unchanged and volumes from new product launches, including those resulting from acquisitions increased our total revenues by 12.2% compared to the prior year period.

Revenues from our Impax Generics division decreased by $5.3 million during the three month period ended September 30, 2016, as compared to the prior year period, driven primarily by increased competition for diclofenac sodium gel and metaxalone as well as lower market share of generic Adderall XR®, in each case compared to the prior year period.

*        *        *

Consolidated total revenues for the nine month period ended September 30, 2016 increased by 8%, or $47.6 million, to $626.0 million, compared to $578.4 million in the prior year period.  The increase was primarily due to new product launches (including acquisitions) as existing product volume increases were offset by price declines.  Existing product volumes and new product launches (including acquisitions) increased total revenues by 12.8% and 7.8%, respectively, while product selling price decreased total revenues by 12.4%, in each case compared to the prior year period.

Revenues from our Impax Generics division decreased by $17.0 million during the nine month period ended September 30, 2016, as compared to the prior year period, driven primarily by lower pricing across most of the product portfolio, partially offset by increased volumes, including those resulting from product acquisitions.

*        *        *

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

Net loss for the three month period ended September 30, 2016 was $179.3 million, a decrease of $215.1 million as compared to net income of $35.8 million for the three month period ended September 30, 2015.

\*     \*     \*

Net loss for the nine month period ended September 30, 2016 was $192.4 million, a decrease of $220.0 million as compared to net income of $27.6 million for the nine month period ended September 30, 2015.

\*     \*     \*

Total revenues for Impax Generics for the three month period ended September 30, 2016 were $175.3 million, a decrease of 3% over the same period in 2015, driven primarily by increased competition for diclofenac sodium gel and metaxalone as well as lower market share of generic Adderall XR®.

\*     \*     \*

Total revenues for Impax Generics for the nine month period ended September 30, 2016 were $467.1 million, a decrease of 4% over the same period in 2015, principally driven by increased competition for metaxalone as well as competition for fenofibrate and lower market share of generic Adderall XR®, partially offset by the increased sales of Epinephrine Auto-Injector acquired in the Tower Acquisition in March 2015.

\*     \*     \*

Gross loss for the three month period ended September 30, 2016 was $196.2 million, or 112% of total revenues, as compared to gross profit of $68.0 million, or 38% of total revenues, in the prior year period. The decrease in gross profit and margin was primarily driven by the impairment charges and higher amortization noted above as well as the decrease in sales of certain products as described above.

\*     \*     \*

Gross loss for the nine month period ended September 30, 2016 was $98.8 million, or 21% of total revenues, as compared to gross profit of $184.5 million, or 38% of total revenues, in the prior year period. The decrease in gross profit and margin compared to the prior year period was primarily driven by the intangible asset impairment charges, increased amortization, and restructuring costs noted above.

\*     \*     \*

Based upon competitive market conditions, the Company may reduce the selling price of certain Impax Generics division products.

299.   In addition, the 3Q16 10-Q referred investors to the materially false and misleading statements in the Company's 2015 10-K as set forth in ¶¶271-272, 275 concerning: (1) the pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including

1   Lannett, Par, and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing

2   pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of

3   revenues and operating results.

4       300.   The 3Q16 10-Q contained signed certifications pursuant to SOX by defendants

5   Wilkinson and Reasons, stating that the financial information contained in the 3Q16 10-Q was

6   accurate and disclosed any material changes to the Company's internal control over financial

7   reporting.

8       301.   During the November 9, 2016 analyst conference call discussing 3Q16 results,

9   Wilkinson made the following false statements and omissions regarding the reason for its

10   disappointing results:

11         Thank you, Mark, and good morning to everyone.  Thanks for joining us.  As
    is evidenced by the quarter's earnings season, it's clearly been a very difficult and

12   challenging year for most of the pharmaceutical segment, and obviously Impax was
    not immune to this.  The impact of pricing activities is being felt up and down the

13   entire distribution channel.

14         For us, it started earlier this year as *we encountered aggressive competition*,
    and lower pricing on a couple of limited-competition generic products.

15

16       302.   During the question-and-answer session, analysts asked Wilkinson pointed questions

17   about the DoJ investigation, but he failed to disclose the price-fixing scheme:

18       Andrew Finklestein – SSG – Analyst

           *         *         *

19

20       Then also something that's certainly been a concern, if you could address the DOJ
    issues with regard to generic pricing, and whether your views on that evolved since
    yesterday?  Thanks very much.

21

22       Fred Wilkinson – Impax Laboratories Inc. – President and CEO

           *         *         *

23

24         Then the last question, the DOJ question.  We've seen many people
    responding to this question, and obviously this is – you've seen in our filings we've

25   disclosed what's gone on with the DOJ.  This is more than two years old as far as the
    subpoena.  We've cooperated with the DOJ.  I think at this particular point we're not

26   in a position to either pontificate on when any kind of conclusion will happen and
    any impact on the business.  I think we've got the information that's appropriate on

27   our filings.  We do continue to work with the DOJ, although not much conversation
    as of recent.  We'll see where they go.

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

1      [Finklestein:]

2           Could you clarify what review you've done internally?

3      [Wilkinson:]

4           I think we really don't want to comment on where we've gone.  Obviously,
       we are taking our judicious efforts to make sure that we've done what we need to
5      appropriately.  We'll put our filings out in front of the market in our filings.

6      303.    Following the call, during a proprietary event hosted by investment bank Leerink

7  Partners LLC, Impax's management team told Leerink's analysts that they felt "good" after

8  conducting an "internal investigation relating to the DOJ's inquiry into price collusion."  Leerink

9  reported that it met with Impax management "including Fred Wilkinson (CEO), Bryan Reasons

10 (CFO), Doug Boothe (President, Impax Generics), and Mark Donohue (VP of IR)."  In its report

11 following the meeting, Leerink stated in its December 5, 2016 analyst report that "updates on the

12 DOJ sector probe were assuring, from an IPXL perspective" because "mgmt commented that it has

13 completed its own internal investigation relating to the DOJ's inquiry into price collusion and feels

14 good the company has not engaged in any impropriety."

15 304.    By virtue of the facts alleged in §§IV.C.-J.; VI.A., D.; VII., the statements referenced

16 above were materially false and misleading.  Considered as a whole, defendants' representations

17 misled investors by presenting a materially false and misleading picture of Impax's business,

18 financials, operations and compliance policies by, among other things, failing to disclose and

19 actively concealing that Impax had colluded to fix the prices of its generic digoxin and

20 pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

21           (a)     the statements referred to above about Impax product pricing and pricing in

22 the generic drug marketplace were materially false and misleading because defendants failed to

23 disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

24           (b)     the statements referred to above about competition in the generic drug

25 marketplace, including that the marketplace for generic drugs was highly competitive, were

26 materially false and misleading because the markets for digoxin and pyridostigmine were collusive

27 and lacked true competition;

28

1       (c)     the statement referred to above that the "competitive advantages" the

2   Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

3   complex formulation, development characteristics, and special handling requirements, was false and

4   misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

5   prices for digoxin and pyridostigmine;

6       (d)     the statements referred to above concerning the governmental investigation

7   into generic drug pricing on the November 9, 2016 earnings call were materially false and

8   misleading because defendants were colluding with other generic drug manufacturers to fix the

9   prices of digoxin and pyridostigmine;

10      (e)     Impax's inflation of sales through illegal price-fixing constituted a violation of

11  U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

12  antitrust authorities along with the attendant negative financial and reputational harm;

13      (f)     Impax's revenues and income, as stated above, were inflated in part as a result

14  of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

15  and

16      (g)     Impax failed to make required disclosures regarding the impact of artificial

17  price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

18  disclosure rules.

19  **B.      Diclofenac False and Misleading Statements and Omissions**

20  305.    On the Company's May 10, 2016 earnings conference call, Impax announced that in

21  1Q16, "[t]otal revenue for the Company increased $82 million, or 58%, over first quarter 2015." On

22  the call, Reasons assured analysts that diclofenac price declines were anticipated:  "Regarding

23  pricing, we did experience downward pressure on a few high-volume generic products during the

24  first quarter due to additional competition, primarily diclofenac gel, ***which we anticipated*** and

25  metaxalone.  As you know, ***this is typical of generic markets***.  Additional competitors usually result

26  in price [declines]."

27  306.    On the same call, Wilkinson reaffirmed FY 2016 revenue guidance, stating: "This

28  morning we are reaffirming our full-year guidance since we continue to expect that growth in 2016

will be driven by this year's new generic product launches, continued growth from last year's generic product launches, steady growth from the majority of our existing generic line and then growth from our branded portfolio."  Wilkinson further stated, "*[w]e expect revenue growth quarter-over-quarter in order for us to hit . . . our annual guidance*."

307.    When an analyst specifically asked about diclofenac's performance, Wilkinson withheld information about its downfall and instead falsely claimed that revenues had stabilized:

Andrew Finklestein – Susquehanna Capital – Analyst

Good morning. Thanks very much for taking the question. I was hoping you could say a little bit more about what the contribution was from some of the key generic products in the quarter? I know you don't like to give a lot of specific number for those. *But given Solaraze in particular was a big contributor in the dynamics, can you talk a little bit, maybe, how the contribution in Q1 compared the Q4 numbers?* . . . .

Fred Wilkinson – Impax Laboratories Inc. – President & CEO

I think the way to look at Solaraze is fourth quarter, we were probably a good 35% to 40% higher in revenue than first quarter. But if you go back and look sequentially, our first quarter looked very much like third quarter of 2015.

Fourth quarter of 2015 was a quarter where Sandoz was out both brand and generic. You had activists [sic] announcing that they were approved but didn't come. You had the dynamics of the marketplace, everybody kind of looking for product.

And there was a lot of product that was moved into the marketplace during that quarter to fulfill all the gaps that were out there. *First quarter probably more normalized.* And I think if you're a diligent reader of the Q, you should figure out that those sales of Solaraze. It was a good contributor for us but down sequentially from fourth quarter *about on target to what third quarter look like.*

308.    Later on the same day, May 10, 2016, Wilkinson spoke at the Bank of America Merrill Lynch Healthcare Conference and provided additional information about pricing trends. Speaking about diclofenac and one other drug (metaxalone) for which Impax was the sole market supplier:

*When we guided earlier this year, we did expect that both Solaraze and metaxalone would both meet new competition sometime in the first half of this year*.  They both did, and both of them have – *we've defended share* but had to give up a bit of price.  So our overall price decline was around 10%.

309.    In the Company's May 10, 2016 earnings press release, defendants stated, in part:

The Company's full year 2016 financial guidance remains unchanged from when it was issued on February 22, 2016.

*       *       *

- Total Company revenues to increase at least 15% over full year 2015.

- Adjusted gross margins as a percent of total revenue are expected to be approximately 50%.

310. In the same press release, Wilkinson stated: "'We continue to remain confident in our financial outlook for 2016. The combination of new product launches and increased sales from several of our existing generic and specialty pharma products are expected to drive growth in 2016.'"

311. As set forth in §§IV.K.; VI.C.1., D.; VII., the statements referenced above were materially false and misleading. In particular, defendants knew or recklessly disregarded that:

(a) Despite making pricing concessions, Impax had not "defended share." In fact, Impax had lost significant market share by April 30, 2016. After remaining at or above 95% market share during 4Q15 and 1Q16, Impax's share sank to 88% by April 30, 2016 – a decline of over 7%. By May 10, 2016, the trajectory of Impax's market share decline had accelerated. In fact, Impax's share sank to 73% during May – a further decline of over 17%.

(b) Because diclofenac was the Company's largest revenue generating product in 2015 and 1Q16, defendants' statements about projected company-wide revenue growth in 2Q through 4Q16 concealed the extent to which diclofenac revenue was declining. Impax's market share continued to steadily drop throughout 2Q, eventually reaching 33% by August 2016. The continued decline could reasonably have been anticipated by defendants as of May 10, 2016. The lost market share went to new competitors entering the generic diclofenac market, namely Sandoz, Taro, and Actavis. However, defendants falsely assured investors that their guidance accounted for the new competition.

(c) Diclofenac revenue had not "normalized." As Impax admitted on August 9, 2016, Q1 diclofenac revenues had declined by $38 million, of which over $9 million was due to pricing declines and $29 million was due to lower volume tied to increased competition. This marked a material change in the diclofenac sales trend in which revenue had increased over the previous four quarters and prices had remained stable.

1    (d)    Fourth, although defendants briefly discussed the impact of price erosion on

2  the decline in diclofenac revenues, they completely concealed the larger driver of the decline in

3  diclofenac sales – lower sales *volume*.  Three months later, defendants revealed that in 1Q16, the

4  $38 million diclofenac revenue decline was primarily due to a $29 million impact of lower volume

5  tied to increased competition.  Defendants admitted for the first time that diclofenac revenue trend

6  "significantly impacted our first quarter . . . results due to double-digit decline in *both volume and*

7  *price*."

8    (e)    Fifth, defendants' May 10, 2016 revenue guidance statements, identified

9  above, were materially false.  For the reasons outlined above, namely the significant deterioration in

10  diclofenac market share and pricing, the increase in revenue guidance was unrealistic and defendants

11  lacked a reasonable basis for providing it.  As defendants later admitted, the "shift in market

12  dynamics" had "significantly impacted" the Company's first and second quarter "results due to

13  double-digit decline in both volume and price."

14    312.    On a June 21, 2016 conference call with investors the Company adjusted its 2016

15  revenue guidance and blamed it on expected "lower revenues on diclofenac gel and metaxalone as a

16  result of the impact of additional competition occurring during the second quarter."  Defendants

17  added:  "we're obviously disappointed in the recent and rapid change in the diclofenac gel segment

18  as a result of a greater number of competitors."  However, despite the fact that 2Q16 was 90%

19  complete, with the quarter ending just nine days later, defendants concealed that the Company would

20  be forced to record a massive $15 million charge in 2Q16 to compensate Impax customers who had

21  purchased diclofenac during the quarter at inflated prices that had since collapsed by as much as

22  60%.  As a result of the charge, which reversed out revenue previously booked during the quarter,

23  2Q revenue fell materially short of  projections.

24    313.    By virtue of the facts set forth in §§IV.K.2.; VI.C.1., D.; VII., the statement above

25  was materially misleading and incomplete, because despite the adjustment to the 2016 annual

26  revenue guidance on June 21, 2016, defendants continued to conceal the true extent that erosion of

27  diclofenac pricing and market share loss had on Impax's second quarter which ended just nine days

28  later.  As a result of defendants' omission, the market was unaware of the full extent of deterioration

1   and also was led to believe that deterioration of diclofenac revenue had been fully accounted for in

2   the Company's revised guidance.  On August 9, 2016, Impax announced revenue that fell far short of

3   its projections: generic division revenues were down $53 million, primarily due to diclofenac.  The

4   Company also took a significant writedown on the value of existing diclofenac inventory on its

5   customers' shelves.  This writedown, known as a "shelf-stock adjustment" credited customers for the

6   difference between the original sales price and the revised lower sales price.  Defendants also

7   presented significant details on the adverse diclofenac revenue trend for the first time, revealing that

8   the revenue and pricing trends had markedly declined beginning in 1Q16.

9       314.    In addition to the above statements, Impax's Form 10-Q for 1Q16, filed with the SEC

10   on May 10, 2016, was materially false and misleading because Impax failed to disclose adverse

11   revenue trends regarding diclofenac, in violation of SEC disclosure rules, as described at §VI.C.

12      **C.    Budesonide False and Misleading Statements and Omissions**

13      315.    On August 9, 2016, defendants held a conference call to address, *inter alia*, the Teva

14   transaction involving Budesonide.  During the call, Reasons and Wilkinson painted a bullish picture

15   of the transaction:

16   Bryan Reasons – Impax Laboratories Inc – CFO

17   [W]e typically don't give projected operating cash flows.  But clearly bringing the
18   Teva products in ***really helps not only the margin, but the operating cash flows as
     well***.

19                              *       *       *

20   Fred Wilkinson – Impax laboratories Inc. – President & CEO

21   ***Many of these products have growth potential, and we're especially pleased to be
     adding Budesonide***, Desmopressin, Dexmethylphenidate, and Propranolol to our
22   generic offerings.  This portfolio has an attractive margin profile and complements
     our current product line.

23                              *       *       *

24   [Wilkinson:]

25                              *       *       *

26

27      [Re: budesonide] We're approximately a 20% share position in the market
     and are obviously looking to build on that share and work this market as if it's a new
     product launch for us.  ***Excited about this space and excited about the product***.  The

28

patents do go out to 2019.  We've seen no other people or filers, so we think that the market is pretty well-established, but we will be paying close attention to that.

\*       \*       \*

Sumant Kulkarni – BofA Merrill Lynch – Analyst

\*       \*       \*

First on generic side assuming you have the revenue Outlook range right now, how derisked is your gross margin profile especially given that Pulmacort [respules] generic is facing more competition and Adderall XR you're trying to get more share, which I assume means taking some price?

[Wilkinson:]

Yes, great question, obviously that mix between share and price that you're always evaluate as you entertain opportunities with customers.  We believe that **_both of those products have significant room to be able to absorb any kind of price alteration and adjustments_**.

It was built into our model as we did the acquisition – final acquisition process from Teva.

316.     Later in the call, Wilkinson identified budesonide as "the largest product in the mix" and acknowledged that a new competitor had recently joined the budesonide market, but assured investors that Impax had anticipated the change and accounted for it with an adjustment to the purchase price:

It actually is one of the more interesting ones to us.  **_It is moving from a three-competitor markets to a four-competitor market, one that we anticipated as we went through the acquisition process._**

**_And it was actually an adjustment in the economics related the acquisition as a result of that_**.  Nephron did just introduce a product into the marketplace, and that product came from the Apotex file that was in the marketplace years ago, was removed and between the two of them they spent years trying to fix that file and make sure they could get it there.

317.     Wilkinson continued to tout the Teva purchase on September 14, 2016, assuring investors that "**_[t]he integration of it went extremely well_** because it's products, not people.  Things usually go easier when you do that."

318.     As set forth in §§IV.L.; VI.B., C.2., D.; VII., the statements referenced above were materially false and misleading because contrary to defendants' assurances, the Teva purchase was a disaster from the beginning, budesonide was not a low competition product, it did not have growth

1   potential, and the integration of budesonide had not gone well.  In particular, defendants knew or

2   recklessly disregarded that:

3           (a)   on June 14, 2016 – 56 days before the August 9, 2016 earnings call – a new

4   competitor, Nephron, entered the generic budesonide market.  Defendants later cited this event as a

5   key factor in the budesonide impairment;

6           (b)   as of August 3, 2016, Anda, one of Impax's largest potential customers was

7   captive to its largest competitor;

8           (c)   Impax knew the precise level of pricing degradation in Actavis's generic

9   budesonide product as of August 2016 through pricing data available to it pursuant to the Asset

10  Purchase Agreement.  Defendants later recognized the pricing data as another key factor in the

11  budesonide impairment; and

12          (d)   the largest budesonide seller, Teva had cited increased competition for

13  budesonide as a cause of weakening revenues in May and August 2016.

14      319.   On November 9, 2016, just one quarter after the acquisition, defendants were forced

15  to take a massive $251 million intangible asset impairment charge – nearly half the total purchase

16  price.  The charge was triggered primarily by increased competition, key customer pricing

17  concessions, and significant price degradation on budesonide.  Defendants knew when they spoke on

18  August 9, 2016 and September 14, 2016, that the budesonide product it had purchased was already

19  subject to increased competition, key customer pricing concessions, and severe price degradation.

20  Thus, the exact same factors that triggered the massive impairment charge in 3Q16 were already

21  known by defendants as of August 9, 2016.

22      320.   In addition to the above statements, Impax's Form 10-Q for 2Q16, filed with the SEC

23  on August 9, 2016, was materially false and misleading because (1) Impax failed to timely record

24  impairment charges on budesonide, in violation of GAAP; and (2) Impax failed to disclose adverse

25  revenue trends regarding budesonide , in violation of SEC disclosure rules, as described at §§VI.B.-

26  C.

27

28

## VI.    IMPAX'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED

321.    As alleged herein, throughout the Class Period defendants were engaged in illegal price fixing activity on two of its generic products: digoxin and pyridostigmine.  In addition, defendants concealed adverse revenue trends affecting two of its primary generic drugs, diclofenac and budesonide.  Defendants' failure to disclose these issues rendered Impax's Class Period financial statements materially misstated for the following reasons:

(a)    Impax failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules;

(b)    Impax failed to timely record impairment charges on budesonide in violation of GAAP; and

(c)    Impax failed to disclose adverse revenue trends regarding diclofenac and budesonide in violation of SEC disclosure rules.

322.    The above misstatements affected the following Class Period financial statements:

| | FY 2013 Form 10-K | Q1–Q3 2014 Form 10-Qs | FY 2014 Form 10-K | Q1-Q3 2015 Form 10-Qs | FY 2015 Form 10-K | Q1 2016 Form 10-Q | Q2 2016 Form 10-Q |
|---|---|---|---|---|---|---|---|
| Impax failed to disclose the impact of illegal price-fixing activity on reported revenues, in violation of SEC disclosure rules | x digoxin | x digoxin | x digoxin pyridostigmine | x digoxin pyridostigmine | x digoxin pyridostigmine | x digoxin pyridostigmine | x digoxin pyridostigmine |
| Impax failed to timely record impairment charges, in violation of GAAP | | | | | | | x budesonide |
| Impax failed to disclose adverse revenue trends regarding key generic products, in violation of SEC disclosure rules | | | | | | x diclofenac | x budesonide |

323.    As described below at §VI.D., the above misstatements were material to Impax's Class Period financial statements, in accordance with SEC rules on materiality.

**A.      Impax Failed to Disclose the Impact of Illegal Price-Fixing Activity on Reported Revenues**

324.      As alleged in detail at §§IV.C.-J., during the Class Period, Impax was engaged in illegal price-fixing activity on digoxin and pyridostigmine.  SEC MD&A disclosure rules[21] required defendants to disclose the impact of the artificial digoxin and pyridostigmine price increases on Impax's reported revenues.

325.      The SEC explicitly requires disclosures detailing ***changes in price that impact reported revenues***.  Item 303 of Reg S-K states:

> To the extent that the financial statements disclose material increases in net sales or ***revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices*** or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services . . . ***discuss the impact of*** . . . ***changing prices on the registrant's net sales and revenues*** and on income from continuing operations.[22]

326.      SEC Staff Accounting Bulletin No. 104 ("SAB 104") required additional MD&A disclosures regarding the impact of the artificial digoxin and pyridostigmine price increases,

---

[21]   SEC Financial Reporting Release No. 72, *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent. . . .
>
>      The purpose of MD&A is not complicated.  It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations."  The MD&A requirements are intended to satisfy three principal objectives:
>
> •      to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;
>
> •      to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and
>
> •      to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

[22]   SEC Rules and Regulations, Item 303 of Regulation S-K, Management's Discussion and Analysis of Financial Condition and Results of Operations, ¶¶(a)(3)(ii), (iii), and (iv).

1    including the origin of the price increases (*i.e.*, illegal price-fixing activity), on Impax's reported

2    revenues during the Class Period.  SAB 104 states:

3        *Changes in revenue* should not be evaluated solely in terms of volume and price
         changes, but *should also include an analysis of the reasons and factors*
4        *contributing to the increase or decrease*.

5        327.    Likewise, SEC Release No. 33-8350 provides the following analogous disclosure

6    guidance requiring an analysis of volume *and price changes* affecting the Company's revenues:

7        For example, if a company's financial statements reflect materially lower revenues
         resulting from a decline in the volume of products sold when compared to a prior
8        period, MD&A should not only identify the decline in sales volume, but also should
         *analyze the reasons underlying the decline in sales when the reasons are also*
9        *material and determinable*.  The analysis should reveal underlying material causes
         of the matters described, including for example, if applicable, difficulties in the
10       manufacturing process, a decline in the quality of a product, loss in *competitive*
         *position and market share*, or a combination of conditions.[23]

11

12       328.    As alleged herein, Impax's reported revenues were significantly impacted by illegal

13   price-fixing activity.  For example, as detailed at §IV.C., defendants aggressively increased prices on

14   its generic digoxin product at the end of fiscal 2013.  The price of a pill of digoxin rose to $1.07 in

15   2014 from $0.16 in 2012.  Immediately following these artificial price hikes, digoxin became a

16   major driver of Impax's generics revenue.  For example, on the 1Q14 earnings call, defendant

17   Reasons stated: "Total *generic revenues increased $7.5 million or 7%* to $109 million.  This was

18   *primarily the result of increased sales of our Digoxin product* and from sales of authorized generic

19   Trilipix and generic Solaraze."  As detailed in §IV.D., the price-fixing activity continued, defendants

20   continued to highlight Digoxin's role in driving generics revenue growth.

21       329.    Starting in 2015, the grossly inflated prices attracted new participants to the generic

22   digoxin market.  As new competitors entered the market, existing digoxin sellers, including Impax,

23   were forced to make room for the new market participants.  As a result, digoxin prices declined and

24   the impact of the collusive price-fixing was diminished.  *See* §IV.E.  However, revenues remained

25   severely inflated – with the digoxin price per unit still far exceeding the pre-collusive pricing

26   environment.

27
_____
28   [23]   SEC Release Nos. 33-8350; 34-48960; FR-72.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                              - 137 -

330.     As set forth in §IV.F., defendants also materially increased generic revenues by artificially hiking the prices of pyridostigmine, as a result of illegal price-fixing activity, beginning in 4Q14.

331.     Defendants' failure to disclose the true cause of the artificial digoxin and pyridostigmine price increases on its reported revenues was in clear violation of the SEC disclosure rules described above.  By failing to make the required SEC disclosures regarding price increases, defendants were able to conceal the impact of illegal price-fixing activity on the Company's future performance.  The SEC has explicitly stated that "[o]ne of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that *readers can ascertain the likelihood that past performance is indicative of future performance*."[24]

332.     Likewise, SAB 104 states:

> The Commission stated in FRR 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and *prospective analysis* of the registrant's financial condition and results of operations, *with a particular emphasis on the registrant's prospects for the future*."

333.     As alleged herein, the illegal price-fixing activity: (1) was not a sustainable business practice, *and* (2) subjected the Company to material legal, regulatory, and financial risks.  Both of these factors had material consequences on the Company's future performance.  As such, defendants were required to disclose the true cause of artificial digoxin and pyridostigmine price increases, tied to illegal price-fixing activity, so that *investors could "ascertain the likelihood that past performance was indicative of future performance*."  By failing to do so, Impax's Class Period financial statements were materially misstated and in violation of SEC disclosure rules.

**B.     Impax Failed to Timely Record Impairment Charges on Budesonide in Violation of GAAP**

334.     As detailed herein, on August 3, 2016 Impax paid $586 million to acquire 18 generic drugs from Teva/Allergan.  The primary generic drug acquired in the transaction was budesonide.

---

[24]   SEC Release Nos. 33-8350; 34-48960; FR-72.

335.    GAAP[25] required Impax to allocate the purchase price for the Teva transaction based upon the estimated fair value of the assets acquired.  Defendants allocated the majority of the purchase price to "Marketed product rights" which were finite-lived intangible assets in accordance with Financial Accounting Standards Board  Accounting Standards Codification 350, *Intangibles – Goodwill and Other Intangibles* ("ASC 350").  Following the acquisition, Impax was required to regularly test the finite-lived intangible assets for impairment in accordance with Financial Accounting Standards Board  Accounting Standards Codification 360-10, *Impairment and Disposal of Long-Lived Assets* ("ASC 360").  In its 2016 10-K Impax stated:

> We regularly evaluate and will continue to regularly evaluate whether events or circumstances have occurred to indicate all, or a portion, of the carrying amount of intangible assets . . . may no longer be recoverable, in which case an impairment charge to earnings would become necessary.

> *        *        *

> Finite lived intangible assets, consisting of marketed product rights . . .are tested for impairment when events or changes in circumstances indicate that the carrying value of the asset may not be recoverable. . . .  We recognize an impairment loss when and to the extent that the estimated fair value of an intangible asset is less than its carrying value.

336.    ASC 360 provides examples of events or changes in circumstances that management should consider when assessing whether an intangible asset should be tested for impairment.  According to the PriceWaterhouseCoopers pharmaceuticals accounting guide, management of pharmaceutical and life sciences entities should also consider other industry-specific indicators including the development of a competing drug.[26]

337.    Impax failed to timely recognize the impairment of the intangible assets acquired in the Teva transaction.  As a result, Impax's 2Q16 and 3Q16 financial statements were materially misstated and in violation of GAAP.

---

[25]    GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.

[26]    US GAAP – Issues and solutions for the pharmaceuticals and life sciences industries; PriceWaterhouseCoopers; March 2017.

338.   In its 3Q16 results, issued on November 9, 2016, defendants disclosed a massive $251 million intangible asset impairment charge which was triggered, primarily, by lower than expected future cash flows on its generic budesonide product.  The decline in expected future budesonide revenues was blamed on  increased competition, key customer pricing concessions, and significant price degradation.  In its 3Q16 Form 10-Q, the Company stated:

> Upon closing the Teva Transaction on August 3, 2016, the Company initiated the process of transferring and securing Teva's and Allergan's customers for the acquired products to its account.  **The Company assumed certain price concessions would occur** following the closing, however, the Company elected to take **additional price reductions on certain of the acquired products** in order to retain key customers.  **These reductions produced significantly lower than expected operating cash flows from the Acquired Product Lines and triggered an impairment analysis. The Company's impairment analysis resulted in the recognition of a total $251.0 million non-cash impairment charge to earnings.**[27]

339.   As alleged herein,  three months earlier, on August 9, 2016 when Impax issued its Form 10-Q for 2Q16, defendants were already aware of increased competition, the need for key customer pricing concessions, and severe price degradation in the budesonide market.  Thus, the exact same factors that triggered a massive impairment charge in 3Q16 were already known by defendants as of August 9, 2016.  As set forth in §IV.L., evidence that these impairment triggers existed prior to August 9, 2016 included:

(a)   On June 14, 2016, a new competitor, Nephron, entered the generic budesonide market.  Defendants acknowledged at a November 2016 investor presentation that Nephron entering the budesonide market as a new competitor was so significant that Impax had to reprice the entire Teva/Allergan acquisition.

(b)   On August 3, 2016, Teva announced that it had agreed to acquire Anda from Allergan/Actavis.  The sale of Anda to Teva was a major event.

(c)   The SKU level pricing data available directly from Actavis before August 9, 2016 indicated pricing degradation in Actavis's generic budesonide product (which Impax acquired)

---

[27]   On the 3Q earnings call, defendants attributed the majority of the impairment to budesonide: "The impairment charge was driven by higher value applied to a few of the large revenue products such as budesonide, inhalation suspension, and propranolol tablets"; "[t]he impairment charge was driven by . . . a few of the large revenue products such as **budesonide**, inhalation suspension, and propranolol tablets"; "[h]eavily concentrated on a handful [of acquired drugs].  It was not all 15 [acquired drugs]. . . .  I think it was really focused on **budesonide**."

1   as of August 2016.  Defendants told investors they considered all available data, and later recognized

2   the pricing data as a key factor in the budesonide impairment.  After taking the write-down,

3   defendants blamed limited visibility into the SKU pricing data prior to the acquisition as a reason

4   why the pricing degradation was not recognized earlier.  But, according to the Asset Purchase

5   Agreement, Impax did have access to the SKU level pricing data from Actavis prior to closing the

6   acquisition.

7           (d)     Teva, the largest budesonide seller, had cited increased competition for

8   budesonide as a cause of weakening revenues in May and August 2016.  On May 9, 2016, Teva

9   blamed 1Q weakness on competition in budesonide: "The sales decrease in the United States, as you

10  can see from the geographical mix, was driven by the generics segment, mostly due to ***loss of***

11  ***exclusivity*** of esomeprazole and ***budesonide***."  On August 4, 2016, Teva blamed 2Q weakness on

12  competition in budesonide: "Revenues of our US generics business was impacted by competition to

13  our Aripiprazole, Esomeprazole, and Budesonide. . . .  I think on the US side, clearly the impact we

14  highlighted, the impact of having a ***competition*** on Aripiprazole, Esomeprazole, and Budesonide was

15  ***very, very significant***."

16          340.    Defendants were aware, by August 9, 2016, that each of these recent developments

17  would materially limit future cash flows from Impax's generic budesonide product.  In accordance

18  with GAAP, these factors were undeniably "events or circumstances [that] indicat[ed] all, or a

19  portion, of the carrying amount of [Impax's] intangible assets . . . [were] no longer . . . recoverable,"

20  thus triggering an immediate impairment charge.  In fact, each of these factors were belatedly cited

21  by defendants as primary causes of the budesonide impairment charge in 3Q16.  Defendants' failure

22  to timely record the budesonide impairment charge as of August 9, 2016 rendered Impax's 2Q16

23  financial statements materially misstated and in violation of  GAAP.

24      **C.   Impax Failed to Disclose Adverse Revenue Trends Regarding Generic
                 Diclofenac and Budesonide**

25

26          341.    As alleged herein, during 2016, investors were blindsided by defendants' surprise

    negative announcements regarding key generic products.  First, defendants blamed plummeting

27  diclofenac sales for a significant reduction in FY 2016 revenue guidance (disclosed on a June 21,

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

1    2016 conference call) and also a significant revenue shortfall and inventory write-down in 2Q16

2    (disclosed on the August 9, 2016 earnings call).  Then defendants recorded material impairment

3    charges in both 3Q16 and 4Q16 when Impax belatedly acknowledged that the primary generic drug

4    it had acquired in the Teva/Allergan transaction, budesonide, would not generate meaningful future

5    cash flows and had to be written off.  As detailed below, defendants were aware of, or should have

6    reasonably anticipated, the adverse revenue trends affecting diclofenac and budesonide.

7         342.    SEC disclosure rules required defendants to disclose these  material adverse trends in

8    its Class Period financials statements.  Importantly, the SEC requires disclosure of material trends

9    and uncertainties to warn investors that past reported financial results are not indicative of future

10   results.  In particular, SEC Release 33-8350 states:

11        One of the most important elements necessary to an understanding of a
          company's performance, and **the extent to which reported financial information is**
12        **indicative of future results**, is the discussion and analysis of known trends, demands,
          commitments, events and uncertainties.  Disclosure decisions concerning trends,
13        demands, commitments, events, and uncertainties generally should involve the:

14        •      consideration of financial, operational and other information known
                 to the company;
15
16        •      identification, based on this information, of **known trends** and
                 uncertainties; and

17        •      assessment of whether these trends and uncertainties will have, or are
                 reasonably likely to have, a material impact on the company's
18               liquidity, capital resources or results of operations.

19        As we have explained in prior guidance, disclosure of a trend, demand,
          commitment, event or uncertainty is required unless a company is able to conclude
20        either that it is not reasonably likely that the trend, uncertainty or other event will
          occur or come to fruition, or that a material effect on the company's liquidity, capital
21        resources or results of operations is not reasonably likely to occur.

22                                *      *      *

23        One of the principal objectives of MD&A is to provide information about the
          quality and potential variability of a company's earnings and cash flow, so that
24        readers can ascertain **the likelihood that past performance is indicative of future**
          **performance.  Ascertaining this indicative value depends to a significant degree on**
25        **the quality of disclosure about the facts and circumstances surrounding known**
          **material trends and uncertainties** in MD&A.
26
     343.    Likewise, SAB 104 states:
27
          MD&A requires a discussion of liquidity, capital resources, results of
28        operations and other information necessary to an understanding of a registrant's

financial condition, changes in financial condition and results of operations.  This includes unusual or infrequent transactions, ***known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue,*** operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.  The Commission stated in FRR 36 that MD&A should "***give investors an opportunity to look at the registrant through the eyes of management*** by providing a historical and prospective analysis of the registrant's financial condition and results of operations, ***with a particular emphasis on the registrant's prospects for the future***."

344.    In describing adverse trends in revenue, the SEC also explicitly requires disclosures detailing ***changes in price and volume that impact reported revenues***.  Item 303 of Reg S-K states:

To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to ***increases in prices or to increases in the volume or amount of goods or services being sold*** or to the introduction of new products or services.

345.    Defendants have acknowledged, in direct correspondence to the SEC, that Impax was required to disclose ***known or anticipated*** trends related specifically to its generic drug pricing and competition.  In late 2016, the SEC reminded the Company that "***recent competitor and pricing activities***" in the budesonide market must be considered for disclosure "***as a known trend or uncertainty***" in accordance with Item 303(a) of Regulation S-K.  In the Company's response, defendants acknowledged that future pricing reductions consistent with an "***anticipated or known trend or uncertainty affecting its future operations***" were required to be disclosed.

### 1.    Diclofenac

346.    As alleged herein (*see* §IV.K.), after highlighting significant year-over-year increases in diclofenac revenue throughout 2015 and during 1Q16, defendants abruptly changed course and cited rapid deterioration in diclofenac sales as the cause for a significant reduction in 2016 revenue guidance (disclosed on a June 21, 2016 conference call) and also a significant revenue shortfall and inventory write-down in 2Q16 (disclosed on the August 9, 2016 earnings call).   The rapid deterioration in diclofenac revenue was blamed on increased competition and price degradation during the second half of 2Q16.  However, as of May 10, 2016 when Impax issued its Form 10-Q for 1Q16, defendants were already aware of an adverse trend in diclofenac revenue.  This trend reflected current and anticipated increases in competition and price degradation in the generic diclofenac

1    market that could reasonably have been expected to significantly impact the Company's 2Q results.

2    Evidence indicating defendants' awareness of an adverse trend in diclofenac revenue as of May 10,

3    2016 includes the following:

4           (a)    Diclofenac was the Company's largest  product, by revenue, in 2015.  FY

5    2015 sales exceeded $148 million, more than 17% of the Company's total reported revenue.  This

6    spike in revenue was due to a period of market exclusivity.  As the Company subsequently

7    acknowledged, this revenue was unsustainable and, by the beginning of 2016, defendants expected

8    new competitors to enter the market: "***As we entered 2016***, we expected that the authorized generic

9    and the brand would reestablish itself fully during the year and assumed that Allergan would enter

10   the market in the first half of the as the year, as their ANDA had been approved in December.  In

11   mid-to-late May, Sandoz had reentered, Allergan had launched, and Taro had won approval and was

12   entering the market."

13          (b)    Impax had already begun losing significant market share by April 30, 2016

14   and by the time the 1Q Form 10-Q was issued on May 10, 2016, the trajectory of Impax's market

15   share decline had rapidly accelerated.  Diclofenac revenue declined by 90% in 2Q16, from

16   $50 million to just $5 million in total sales.  Of the massive decline, $18 million was due to pricing

17   declines and $27 million was due to lower volume tied to increased competition.  The 1Q16 10-Q

18   was issued on May 10, 2016, 40 days into 2Q16.

19          (c)    Impax's market share continued to steadily drop throughout 2Q, eventually

20   reaching 33% by August 2016.  The continued decline could reasonably have been anticipated by

21   defendants as of May 10, 2016.

22          (d)    The Company subsequently admitted that 1Q diclofenac revenues had

23   declined by $38 million, of which over $9 million was due to pricing declines and $29 million was

24   due to lower volume tied to increased competition.  This marked a material change in the diclofenac

25   sales trend in which revenue had increased over the previous four quarters and prices had remained

26   stable.  Defendants subsequently confirmed that this material adverse trend in diclofenac revenue

27   existed as of the end of 1Q16 and certainly by May 10, 2016, 40 days into 2Q16: "***the recent shift***

28

1   *in market dynamics significantly impacted our first* and second *quarter results due to double-digit*

2   *decline in both volume and price*."

3       347.    As described above, SEC disclosure rules required Impax to disclose the adverse

4   diclofenac revenue trend that existed as of May 10, 2016 as an "*anticipated or known trend*

5   *affecting its future operations*" in its 1Q16 Form 10-Q.  In particular, defendants were required to

6   disclose to investors how *past diclofenac performance* (*i.e.*, revenue in FY 2015 and 1Q16) *was not*

7   *indicative of future performance* (*i.e.*, revenue in 2Q16).  Defendants did almost exactly the

8   opposite – misleading investors by indicating that diclofenac revenue had "normalized" in 1Q16.  To

9   further conceal the adverse trend, defendants also made the following misrepresentations as of

10   May 10, 2016:

11       (a)    Defendants represented to investors that "*[w]e expect revenue growth*

12   *quarter-over-quarter in order for us to hit . . . our annual guidance*" (*i.e.*, revenue growth of 15%).

13   The fact that 2016 revenue guidance was reaffirmed despite an approximate $22 million revenue

14   shortfall in 1Q16 indicated that revenue growth would significantly accelerate over the remainder of

15   FY 2016.  Because diclofenac was the Company's largest revenue generating product in FY 2015

16   and among the largest in 1Q16, defendants' statements about projected company-wide revenue

17   growth in 2Q and FY 2106 concealed the extent to which diclofenac revenue was declining.

18       (b)    Defendants concealed the decline in  diclofenac sales volume.  Defendants

19   briefly discussed the impact of price declines on the decline in diclofenac sales, but concealed the

20   larger driver of the decline in diclofenac sales – lower sales *volume*.  In doing so, defendants

21   explicitly violated SEC disclosure rules requiring a "discussion of the extent to which [revenue

22   decreases] are attributable to *[decreases] in the volume or amount of goods or services being sold*."

23   Three months later, defendants revealed that in 1Q16, the $38 million diclofenac revenue decline

24   was primarily due to a $29 million impact of lower volume tied to increased competition.

25   Defendants admitted for the first time that diclofenac revenue trend "significantly impacted our first

26   quarter results due to *double-digit decline in both volume and price*."

27       348.    Based on defendants' numerous misrepresentations, analysts were misled as to the

28   adverse trends in diclofenac revenue, volume, and pricing that existed as of May 10, 2016.  For

1   example, a May 11, 2016 Susquehanna report stated: "Solaraze [diclofenac] Declines

2   Manageable . . . We now forecast $130mln this year and $50mln next year." Likewise a May 10,

3   2016 UBS report maintained a 2Q16 estimate for diclofenac revenue of $35 million. Dozens of

4   other analysts highlighted the fact that the Company reaffirmed its FY 2016 guidance of at least

5   15% revenue growth over FY 2015.

6        349.   On June 21, 2016, defendants belatedly told investors that diclofenac revenue had not,

7   in, fact, normalized. The Company adjusted its FY 2016 revenue guidance and blamed it on

8   expected "lower revenues on diclofenac gel and metaxalone as a result of the impact of additional

9   competition occurring during the second quarter." Defendants added: "we're obviously

10   disappointed in the recent and rapid change in the diclofenac gel segment as a result of a greater

11   number of competitors." As described above, defendants were aware of current and anticipated

12   increases in competition in the diclofenac market on May 10, 2016. Thus, the exact same adverse

13   trend in diclofenac revenue that triggered the significant reduction to FY 2016 revenue guidance on

14   June 21, 2016 already existed and was known by defendants 22 days earlier on May 10, 2016.

15   Defendants failed to disclose this adverse trend to investors, in violation of SEC disclosure rules.

16        350.   Despite the adjustment to the FY 2016 annual revenue guidance on June 21, 2016,

17   defendants continued to conceal how the adverse trend in diclofenac revenue was impacting the

18   second quarter which ended just nine days later. On August 9, 2016, the full extent of the adverse

19   diclofenac revenue trend was revealed to investors. Impax announced revenue that fell far short of

20   its projections: generic division revenues were down $53 million, primarily due to diclofenac. The

21   Company also took a significant writedown on the value of existing diclofenac inventory on its

22   customers' shelves. This writedown, known as a "shelf-stock adjustment," credited customers for

23   the difference between the original sales price and the revised lower sales price. Defendants also

24   presented significant details on the adverse diclofenac revenue trend for the first time, revealing that

25   the revenue and pricing trends had markedly reversed beginning in 1Q16.

26              **2.**    **Budesonide**

27        351.   As detailed above (§IV.L.), as of August 9, 2016 when Impax issued its Form 10-Q

28   for 2Q16, defendants were aware of increased competition and related price degradation in the

1    generic budesonide market that could reasonably have been expected to impact Impax's future

2    revenue.  In particular, each of the factors described clearly indicated that "*reported financial*

3    *information [was not] indicative of future results*."

4         352.    The SEC disclosure rules described above required Impax to disclose known or

5    anticipated trends in budesonide revenue, including competition and pricing trends, that were

6    reasonably expected to impact the Company's future results as of August 9, 2016.  In particular,

7    defendants were required to disclose to investors that *past budesonide revenue was not indicative of*

8    *future budesonide revenue*.  Instead, defendants did exactly the opposite – misleading investors by

9    indicating that budesonide revenue was expected to *increase* in FY 2016 compared to FY 2015.[28]

10        353.    Based on defendants' misrepresentations, analysts were misled as to the adverse

11   trends in budesonide revenue and pricing that existed as of August 9, 2016.  Less than three months

12   later, on November 9, 2016, defendants disclosed a massive impairment charge tied to adverse trends

13   in budesonide competition and pricing.  In particular, defendants blindsided investors by disclosing

14   that the drugs acquired in the Teva acquisition, including budesonide, had experienced a 35% price

15   decline due to increased competition.

16        354.    The SEC reviewed the Company's 3Q disclosures regarding budesonide, including

17   the disclosure of 35% price declines, and reminded the Company that "*recent competitor and*

18   *pricing activities*" in the budesonide market must be considered for disclosure "*as a known trend or*

19   *uncertainty*" in accordance with Item 303(a) of Regulation S-K.  In the Company's response,

20   defendants acknowledged that pricing reductions consistent with an "*anticipated or known trend or*

21   *uncertainty affecting its future operations*" were required to be disclosed.  Impax also emphasized

22   to the SEC that "the Company included disclosure throughout the [November 9, 2016] Form 10-Q

23   that the pricing reductions would result in lower than expected cash flows for the Company, which

---

24   [28]   On June 21, 2016, Impax disclosed that the Teva/Allergan-acquired generics portfolio had 2015
25   revenue of "approximately $150 million" and was "expected to add approximately $80 million of
     revenue in the second half of 2016."  Therefore revenue on the acquired generics portfolio was
26   expected to *increase* in 2016.  Approximately 67% of the generics portfolio, as measured by the
     prior 12 months' sales, consisted of budesonide.  As a result, defendants' representations to investors
27   indicated that budesonide revenue was expected to increase in 2016.  The same representation, in the
     form of unchanged revenue guidance for the acquired generics portfolio, was repeated on August 9,
28   2016.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                                              - 147 -

1  indicate an unfavorable impact on the Company's future results. . . .  [T]he Company respectfully

2  submits that the disclosure included in the Form 10-Q satisfy the requirements of Item 303(a) of

3  Regulation S-K."  As alleged herein, the same disclosures defendants referenced in the November 9,

4  2016 Form 10-Q, whereby the Company warned investors that "the [budesonide] pricing reductions

5  would result in lower than expected cash flows for the Company," were required in the August 9,

6  2016 Form 10-Q based on the factors known to defendants at that time.

### D.   The Misstatements Described Above Were Material to Impax's Financial Statements

7

8  355.   SEC Codification of Staff Accounting Bulletins Topic 1-M, *Materiality* ("SEC Topic

9  1-M") sets forth the generally accepted methods for accountants to evaluate materiality as it relates

10  to the financial statements of SEC registrants.  SEC Topic 1-M states: "The omission . . . of an item

11  in a financial report is material if, in the light of surrounding circumstances, the magnitude of the

12  item is such that it is probable that the judgment of a reasonable person relying upon the report

13  would have been changed or influenced by the inclusion . . . of the item."  SEC Topic 1-M also

14  states that both "quantitative" and "qualitative" factors must be considered in assessing materiality.[29]

15  As detailed below, each of the misstatements and disclosure violations described above were both

16  quantitatively and qualitatively material to Impax's Class Period financial statements.

### 1.   The Misstatements Were Quantitatively Material

17

18  356.   The misstatements and disclosure violations described above were quantitatively

19  material to Impax's Class Period financial statements.  As described below, Impax recognized

20  material amounts of revenue from digoxin, budesonide, and diclofenac during the Class Period.

21  (a)   Digoxin was among Impax's largest generic drugs, based on revenue.  After

22  the Class Period, the SEC required the Company to retroactively disclose product sales for each of

23  its top five revenue-generating products during the Class Period.  For fiscal 2014, Digoxin was the

24  Company's 5th largest product.  Impax sold nearly $50 million of generic Digoxin in FY 2014

25

26

---

[29]   SEC Topic 1M provides: "there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material."

27

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

- 148 -

1  which was over 8% of the Company's total reported revenue.  Digoxin remained one of the

2  Company's top 10 products, by net revenue, in 2016.

3          (b)      Sales of Impax's budesonide generic product were approximately

4  $158 million in the 12 months leading up to Impax's acquisition of the product from Teva/Allergan.

5  At the time of the acquisition, Impax provided revenue guidance that called for increased sales in

6  2016.  Analysts estimated that budesonide would generate annualized revenue of at least $75 million

7  in 2016.  By comparison, Impax's top five products averaged $74 million in revenue in 2016.  Thus,

8  based on the revenue guidance Impax provided to investors following the acquisition, budesonide

9  was expected to be among the Company's top products, by revenue.

10          (c)      Diclofenac was the Company's largest product, by revenue, in 2015.  Fiscal

11  year 2015 sales exceeded $148 million, more than 17% of the Company's total reported revenue.

12          **2.      The Misstatements Were Qualitatively Material**

13  357.    Each of the misstatements and disclosure violations described above were also

14  qualitatively material to Impax's Class Period financial statements.  The misstatements and

15  disclosure violations met at least the following qualitative materiality criteria listed in SEC Topic

16  1M.

17          **a.      The Misstatements Involve Concealment of an Unlawful Transaction**

18  

19  358.    SEC Topic 1M states: "***Among the considerations that may well render material a***

20  ***quantitatively small misstatement of a financial statement item are: . . . Whether the misstatement***

21  ***involves concealment of an unlawful transaction***."[30]   As alleged herein, the digoxin and

22  pyridostigmine misstatements identified above involved illegal price-fixing activity.  This

23  automatically rendered the digoxin and pyridostigmine misstatements material to Impax's Class

24  Period financial statements.

25  

26  ──────────
[30]    *See also* Wiley GAAP 2017 – Interpretation and Application of Generally Accepted Accounting

27  Principles: "litigation proceedings against the company pursuant to price-fixing or antitrust allegations . . . ***can have a material impact on the enterprise's future profitability*** and, thus . . .

28  would not be capable of being evaluated for materiality based solely upon numerical calculations."

**b.** **The Misstatements Masked a Change in Earnings or Other Trends**

359.     The digoxin, pyridostigmine, budesonide, and diclofenac misstatements identified above involved concealment of adverse revenue trends in which past performance was not indicative of future performance.

**c.** **The Misstatements Concerned a Segment or Other Portion of the Registrant's Business that Has Been Identified as Playing a Significant Role in the Registrant's Operations or Profitability**

360.     The digoxin, pyridostigmine, budesonide, and diclofenac misstatements identified above concerned Impax's most important segment: generic drugs.  In addition, during the Class Period, Impax highlighted the importance of making strategic acquisitions to expand its generic product portfolio.  As detailed herein, budesonide was part of an important acquisition that Impax entered into during the Class Period.  The Teva/Allergan acquisition played a key role in Impax's future operations and profitability.

**d.** **The Misstatements Affected Management's Compensation**

361.     SEC Topic 1M includes the following qualitative materiality consideration: "*Whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation*."  The misstatements described above impacted defendants' incentive compensation.

**VII.     ADDITIONAL EVIDENCE OF SCIENTER**

**A.     The Fraud Infected Impax's Core Operations, Which Defendants and Analysts Closely Monitored**

362.     Defendants regularly acknowledged that Impax's viability as a competitor in the generic drug market depended heavily on industry competition and pricing.  That is why Impax's generic pricing was one of the first topics defendants addressed in virtually all of the earnings conference calls throughout the Class Period.

363.     As then-CEO Wilkinson put it during a May 10, 2016 earnings conference call:

> There are spot pockets where there are multiple competitors that you would expect some price degradation.  But this is nothing new than what we have seen over the last 6, to 8, to 10, to 12 years in the generic industry.  Is that competition

essentially causes prices challenges and as there is greater competition, then you're going to see more price degradation.

364.    Similarly, defendant Reasons recognized that, "Additional competitors usually result in price [declines]."

365.    Throughout the Class Period, the Individual Defendants themselves confirmed their personal involvement and awareness of the details concerning the topics central to their scheme to defraud: pricing of generic drugs, including digoxin and pyridostigmine.  For instance, during the May 15, 2014 Bank of America Merrill Lynch Health Care Conference, Wilkinson described the importance of increasing price when possible:

> Second, and I think this is a very important issue *because of the warning letter, is that we have to optimize each launch and each product opportunity that we have*.  Because we don't – we are not getting as many shots on goal as others because approvals are not coming at this particular point.  *So everything we have that's in the works, every opportunity in our hands, we need to make sure we maximize.*

> And if you look at some of the recent launches and you look at share position we have with some of our older products, *pricing position with some of our older and existing products*, the in-line products, *the generics commercial team has done an absolutely magnificent job of making sure that we maintain and, in many cases, grow revenue*.  So they have done a really good job.

366.    Defendants repeatedly evidenced their close watch over every change in generic prices and competitive dynamics.  For instance, during a November 11, 2015 Credit Suisse Healthcare Conference, the following exchange occurred between an analyst and then-CEO Wilkinson:

> Unidentified Participant

> *            *            *

> And then on generics, on how you guys factor in price increases as you sort of think about the rest of this year and 2016.

> Fred Wilkinson – Impax Laboratories, Inc – President and CEO

> Sure.  So I mean I think pricing may be one of the most over talked topics.  You know, generics get the opportunity probably in 1 or 2 products out of every 30 or 40 that are in your portfolio.

> We may be a poster child of that one in that we had a product called Digoxin that we were one of seven marketers about 2.5 years ago.  It became one of two.  *We took the price up fairly dramatically, made it so it was an interesting product, made some money on that.  And then as normally happens in an open competitive*

*marketplace, many players came back in, price fell back down.*  It's still an interesting product but nowhere near as interesting as it was before.  So those were those unique and rare opportunities that we may have to take price, but they generally correct themselves by competition coming back in, and that's exactly what happened with Digoxin.

367.   Defendants also admitted that they closely monitor markets in an effort to "maximize the opportunities" to *increase* prices.  The following exchange occurred during an August 6, 2014 earnings conference call:

Louise Chen – Guggenheim Securities LLC – Analyst

     Good morning. . . .  Second question is that some of your competitors have been able to significantly raise prices for their generic drug and I'm just wondering if Impax sees any opportunities here?

                         *        *        *

Carole Ben-Maimon – Impax Laboratories Inc – President, Gene[r]ic Division

     Of course, *we look at any opportunity to raise price when it's appropriate*.  I can't say that – we don't talk specifically about specific products here, *but we look at our portfolio regularly*, not every single day, and [other] opportunities in the marketplace to take advantage of shortages or increased share or price.

                         *        *        *

Fred Wilkinson – Impax Laboratories Inc – President & CEO

     It really has to be said also, we focused the team with the strategy that said, *if you don't get launches, how do you maximize the opportunities of the things in your hand*.  They did an exceptional job, both in the brand and the generic side of saying, *if nothing new is coming, what do I do*?

     And so, digging in and maximizing both revenue and contribution out of the assets that you have in your hand has been a very successful strategy for us to date.  They've done a really marvelous job as the results here show.

368.   Analysts repeatedly noted the importance of Impax's generic pricing throughout the Class Period:

| Date | Analyst | Author | Commentary |
|---|---|---|---|
| 10/29/14 | BRG The Buckingham Research Group | David G. Buck/James B. Dawson | • "Risks . . . Generic pricing although strong currently remains an industry risk as well as pace of generic approvals at FDA." |
| 3/23/15 | Guggenheim | Louise Chen/ Swati Kumar | • "Multiple upside opportunities in generics business. . . .  We believe further upside could come from additional pricing power in both these segments.  The company expects generic gross margins to be in the low 50s, but this does not include pricing |

| Date | Analyst | Author | Commentary |
|------|---------|--------|------------|
| | | | opportunities or improved efficiencies in COGs as part of the company's capital plan and upgrade." |
| 4/7/15 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . . 5) greater than expected pricing pressure for generics . . . ." |
| 7/20/15 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "Where Could We be Wrong? – Like many of its peers, IPXL has benefitted from improved pricing on generics in the past few years.  IPXL has made progress diversifying its portfolio and bulking up its pipeline, but some key products could still be vulnerable if pricing gains don't hold.  If price erosion returns to traditional norms, that could pressure margins which are above historical levels."<br><br>• "The key risks to the stock include: . . . (6) the potential for past settlements to attract anti-trust scrutiny, (7) increased congressional/legal scrutiny of generics pricing . . . ." |
| 11/10/15 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "The key risks to the stock include: . . . (6) the potential for past settlements to attract anti-trust scrutiny, (7) increased congressional/legal scrutiny of generics pricing . . . ." |
| 11/10/15 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . . 5) greater than expected pricing pressure for generics . . . ." |
| 12/15/15 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "Risks . . . IPXL has been targeted in an ongoing investigation of generic price increases like a number of its competitors."<br><br>• "The key risks to the stock include: . . . (6) the potential for past settlements to attract anti-trust scrutiny, (7) increased congressional/legal scrutiny of generics pricing . . . ."<br><br>• "Key downside risks to our valuation include: . . . 4) any change in the ability to take regular price increases across most of the portfolio and maintain high prices for the HGT drugs . . . ." |
| 1/4/16 | RBC Capital Markets | Randall Stanicky, CFA/James C. Chen, CFA | • "Our view:  We do not think there is any change in Impax's pricing strategy on either the brand or generic side.  The company has previously participated in raising prices significantly on products following the removal of competitors with Digoxin where pricing ultimately came back down following the re-entry of competition. . . .  The broader industry pricing question is one that we think will get significantly more focus in 2016." |
| 2/23/16 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "Pricing – We continue to watch for signs of pricing pressure across the group despite most management teams downplaying the significance to recent results and outlooks.  IPXL noted mid single digit erosion in 2015 with some added pressure on certain immediate |

| Date | Analyst | Author | Commentary |
|------|---------|--------|------------|
| | | | release products in 4Q." |
| 3/1/16 | RBC Capital Markets | Randall Stanicky, CFA | • "Pricing environment:   In response to Endo commentary around potential moderation in 2016E pricing, Impax does not see any change on its generic portfolio.  This is consistent with commentary at GPhA and what we have heard from generic peers in recent weeks." |
| 6/21/16 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . .  5)  greater-than-expected pricing pressure for generics . . . ." |
| 7/27/16 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "The key risks to the stock include: . . . (7) increased congressional/legal scrutiny of generics pricing which has also led to government and private litigation . . . ." |
| 8/9/16 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . .  5)  greater-than-expected pricing pressure for generics . . . ." |
| 11/9/16 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . . 5) fines related to the ongoing investigation into the pricing of certain generics . . . ." |
| 12/5/16 | Leerink | Jason M. Gerberry, JD/Etzer Darout, Ph.D. | • "With generic pricing headwinds in the near-to-medium term, cost containment could be back in vogue. . . .  The sector has seen gross margins reach all-time highs in the last three years in large part due to an inflationary price tailwind. . . .  As mgmt looks at the rest of the industry – the squeeze on pricing will most likely drive pressure on competitors GMs . . . ."<br><br>• "Mgmt addresses DOJ investigation:   At the meeting, mgmt commented that it has completed its own internal investigation relating to the DOJ's inquiry into price collusion and feels good the company has not engaged in any impropriety. Mgmt commented that they haven't had conversations with the DOJ in over one year and noted that if any of the company's products implicated in the Bloomberg story are indicated, they'd expect broader investigation could linger, so investors should not expect this sector-level story to go away with the first indictment." |
| 12/22/16 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include:  . . .  2) increasing competitive intensity in generics, 3) greater-than-expected pricing pressure for generics . . . ." |

**B.     Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised Impax's Controls and Procedures**

369.    Throughout the Class Period, defendants Hsu, Wilkinson and Reasons repeatedly certified that they personally supervised and participated in the evaluation of Impax's financial controls and procedure, and that the Company's financial disclosures fairly and accurately presented its financial condition.  Further, in each 10-Q and 10-K report, Impax states that "[t]he Company's chief operating decision maker evaluates the financial performance of the Company's segments based upon segment income (loss) before income taxes."  Moreover, Impax's many misleading 10-Q and 10-K reports were always followed by earnings calls during which all of the Individual Defendants described the favorable, but inaccurate, financial results (several examples of such calls are set forth above).

**C.     Defendants and Company Insiders Engaged in Suspicious Insider Trading**

370.    The significant level of insider trading during the Class Period raises a strong inference that defendant Hsu and certain Company insiders knew that they were deceiving the public by inflating Impax revenues and were further motivated to engage in this course of conduct for personal financial gains.  While defendants engaged in their scheme to defraud investors by materially overstating the Company's revenues through their collusion to fix prices in generic drugs, defendant Hsu and certain Company insiders suspiciously sold over a half million Impax shares for proceeds of approximately $15 million.  The sales are summarized in the following chart:

| Insider Sales:  February 20, 2014 to January 11, 2017 (Class Period) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Insider | Title | Date | Shares | Price | Proceeds | End of Class Period Holdings | % Sold |
| Benet (Leslie Z) | Director | 08/31/15 | 20,000 | $40.92 | $818,400 | | |
| Benet (Leslie Z) | Director | 08/15/16 | 10,092 | $22.81 | $230,199 | | |
| **Benet Total:** | | | **30,092** | | **$1,048,599** | **147,525** | **16.94%** |
| | | | | | | | |
| Fleming (Nigel Ten) | Director | 05/06/14 | 4,000 | $26.34 | $105,360 | | |
| Fleming (Nigel Ten) | Director | 05/12/14 | 1,333 | $26.58 | $35,431 | | |
| Fleming (Nigel Ten) | Director | 05/16/14 | 1,900 | $25.72 | $48,868 | | |
| Fleming (Nigel Ten) | Director | 08/31/15 | 29,166 | $41.02 | $1,196,389 | | |
| **Fleming Total:** | | | **36,399** | | **$1,386,048** | **37,301** | **49.39%** |

| | | Insider Sales:  February 20, 2014 to January 11, 2017 (Class Period) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Insider | Title | Date | Shares | Price | Proceeds | End of Class Period Holdings | % Sold |
| Hsu (Lawrence) | Director | 05/06/14 | 219,386 | $26.28 | $5,765,464 | | |
| Hsu (Lawrence) | Director | 05/21/14 | 3,800 | $26.53 | $100,814 | | |
| Hsu (Lawrence) | Director | 05/22/14 | 50,000 | $27.22 | $1,361,000 | | |
| Hsu (Lawrence) | Director | 06/05/14 | 50,000 | $28.25 | $1,412,500 | | |
| Hsu (Lawrence) | Director | 06/06/14 | 50,000 | $28.52 | $1,426,000 | | |
| **Hsu Total:** | | | **373,186** | | **$10,065,778** | **2,886,448** | **11.45%** |
| Markbreiter (Charles Michael) | Director | 03/11/14 | 4,000 | $27.54 | $110,160 | | |
| Markbreiter (Charles Michael) | Director | 05/06/14 | 2,851 | $26.48 | $75,494 | | |
| Markbreiter (Charles Michael) | Director | 05/07/14 | 1,149 | $26.30 | $30,219 | | |
| Markbreiter (Charles Michael) | Director | 05/07/14 | 7,500 | $26.39 | $197,925 | | |
| Markbreiter (Charles Michael) | Director | 05/08/14 | 1,000 | $26.85 | $26,850 | | |
| Markbreiter (Charles Michael) | Director | 08/25/15 | 9,399 | $41.67 | $391,656 | | |
| Markbreiter (Charles Michael) | Director | 08/26/15 | 10,000 | $42.78 | $427,800 | | |
| Markbreiter (Charles Michael) | Director | 08/28/15 | 8,000 | $42.48 | $339,840 | | |
| Markbreiter (Charles Michael) | Director | 08/31/15 | 20,000 | $41.39 | $827,800 | | |
| **Markbreiter Total:** | | | **63,899** | | **$2,427,745** | **42,301** | **60.17%** |

371.   Further, the insider sales were unusual compared to the prior trading history for Leslie Benet, Nigel Fleming, Lawrence Hsu and Charles Markbreiter.  The following chart shows these same individuals' insider sales in the two years prior to the Class Period:

| Insider Sales:  January 1, 2012 to February 19, 2014 (Pre-Class Period) | | | | | |
|---|---|---|---|---|---|
| Insider | Title | Date | Shares | Price | Proceeds |
| Benet (Leslie Z) | Director | 08/13/12 | 1,300 | $23.96 | $31,148 |
| Benet (Leslie Z) | Director | 08/14/12 | 3,500 | $24.24 | $84,840 |
| **Benet Total:** | | | **4,800** | | **$115,988** |
| | | | | | |
| Fleming (Nigel Ten) | Director | 08/06/12 | 6,667 | $23.92 | $159,475 |
| Fleming (Nigel Ten) | Director | 08/13/12 | 6,000 | $23.91 | $143,460 |
| Fleming (Nigel Ten) | Director | 08/20/12 | 6,000 | $23.99 | $143,940 |

| Insider Sales:  January 1, 2012 to February 19, 2014 (Pre-Class Period) | | | | | |
|---|---|---|---|---|---|
| **Insider** | **Title** | **Date** | **Shares** | **Price** | **Proceeds** |
| Fleming (Nigel Ten) | Director | 08/27/12 | 6,000 | $23.92 | $143,520 |
| Fleming (Nigel Ten) | Director | 03/25/13 | 6,000 | $15.60 | $93,600 |
| Fleming (Nigel Ten) | Director | 04/01/13 | 6,000 | $15.31 | $91,860 |
| Fleming (Nigel Ten) | Director | 04/08/13 | 6,000 | $16.20 | $97,200 |
| **Fleming Total:** | | | **42,667** | | **$873,055** |
| | | | | | |
| Markbreiter (Charles Michael) | Director | 11/16/12 | **6,667** | **$19.73** | **$131,540** |

372.     During the two years prior to the Class Period, these same Company insiders sold only 54,134 shares of their Impax stock, resulting in proceeds of only $1.1 million.  Notably, defendant Hsu did not sell any shares during this time period.  During the Class Period, however, Leslie Benet, Nigel Fleming, Lawrence Hsu, and Charles Markbreiter engaged in a selling spree of 503,576 shares of their Impax stock for proceeds of almost $15 million.  The pre-Class Period sales by defendant Hsu and Company insiders highlight the suspicious nature of their Class Period trades.

| | **Pre-Class Period Sales** | **Class Period Sales** | **% Increase in Class Period Sales** |
|---|---|---|---|
| Benet | $115,988 | $1,048,599 | 804% |
| Fleming | $873,055 | $1,386,048 | 59% |
| Hsu | $0 | $10,065,778 | $10,065,778 |
| Markbreiter | $131,540 | $2,427,745 | 1746% |

373.     The insider sales were also suspicious in timing.  As demonstrated above, the sales were predominantly made between May 2014 and August 2015, at times when defendants were materially overstating the Company's revenues through their collusion to fix prices in the generic drugs of digoxin and pyridostigmine.  Indeed, defendant Hsu sold all of his shares (for over $10 million in proceeds) at prices on and near a two-month high in Impax stock.  The suspiciousness of the insider stock sales and their proximity to Impax's collusion to fix generic prices raises a strong inference that these insiders knew of defendants' price-fixing scheme when they sold their shares and used that information in connection with the sales.

**D.     Defendants' Compensation Structure Incentivized Fraud**

374.     As a result of Impax's compensation structure, defendants had a direct incentive to acquire generic drugs from other pharmaceutical companies and manipulate Impax's generic

1   revenues and income as part of their scheme to defraud.  Impax explained its compensation structure

2   in annual Proxy Statements.  According to these statements, Impax based its incentive awards on

3   both: (a) the Company's accomplishment of group goals, and (b) each executive's accomplishment

4   of individual goals.  The executives' awards depended more heavily on group goals, but the exact

5   percentages varied from year to year.  Importantly, if the Company or an executive exceeded its

6   goals, the executives could receive **well over 100%** of their allocated incentive awards.

7             **1.**      **2013**

8        375.   In 2013, when the digoxin price-fixing scheme took effect, 95% of the CEO's award

9   and 85% of the other executives' awards depended on group goals.  The group goals focused on

10   revenue:

11       •    "net sales target of $432.8 million and stretch target of $497.7 million[; and]

12       •    "EBIT, target of a loss of $3.5 million and stretch target of a loss of $2.6 million."

13        376.   The 2013 Proxy Statement reported that Impax had met these benchmarks, which

14   resulted in significant cash bonuses to defendants:

15           For 2013, we achieved adjusted net sales of $511.5 million, representing
16   118% attainment of our revenue-based target goal and 103% attainment of our
    revenue-based stretch goal (weighted 20%) and a gain of $78.1 million in EBIT,
17   representing over 150% attainment of our EBIT-based target and stretch goals
    (weighted 80%).  Because we achieved over 100% attainment of our net sales-based
18   and EBIT-based target and stretch goals, our compensation committee determined
    that our overall 2013 performance exceeded our target and stretch level of
19   performance and ***recommended that each named executive officers receive a cash
incentive award payout equal to 150% of the named executive officer's corporate
performance goal portion of his or her target bonus***.  The use of identical
20   performance goals tied to the net sales-based and EBIT-based criteria for all of our
    named executive officers supports our stated compensation philosophies of
21   rewarding named executive officers for positive performance, aligning the interests
    of our executives with those of our stockholders and maintaining executive cohesion
22   and teamwork through the implementation of similar compensation for officers who
    are at similar executive levels.

23        377.   Defendants cashed in, due in part to inflated sales of digoxin in 4Q13.  In incentive

24   awards alone, Hsu made $1.1 million, Reasons made $343,000, and Ben-Maimon took home

25   $431,000.

## 2.      2014

378.    In 2014, during the height of the digoxin scheme and the beginning of the pyridostigmine scheme, 96% of the CEO's award and 85% of the other executives' awards depended on group goals.  These goals again focused on earnings and sales, including "EBIT, target of $30.6 million and stretch target of $91.4 million" and "net sales target of $443.9 million and stretch target of $518.9 million."   The Company indicated that the Individual Defendants received substantial awards based on their "strong" performance:

> For 2014, we achieved adjusted net sales of $596 million, representing over 150% attainment of our revenue-based target and stretch goals (weighted 20%) and $142.8 million in EBIT, representing over 150% attainment of our EBIT-based target and stretch goals (weighted 80%).  Because we achieved over 100% attainment of our net sales-based and EBIT-based target and stretch goals, our compensation committee determined that our overall 2014 performance exceeded our target and stretch level of performance and ***determined that each named executive officers receive a cash incentive award payout equal to 150% of the named executive officer's corporate performance goal portion of his or her target bonus***.  The use of identical performance goals tied to the net sales-based and EBIT-based criteria for all of our named executive officers supports our stated compensation philosophies of rewarding named executive officers for positive performance, aligning the interests of our executives with those of our stockholders.

379.    Defendants achieved these benchmarks due to an entire year of inflated sales from digoxin and pyridostigmine.  As a result, the incentive awards were substantial.  Although each worked for less than a full year, Wilkinson made $862,000, Hsu made $340,000, and Ben-Maimon made $453,000.  Reasons worked a full year, and took home $418,000 in incentive awards alone.

380.    In addition, the bulk of Wilkinson's multi-million dollar stock award was "performance-based" and pegged solely to Impax's stock price.  In order for his 375,000 shares to be eligible for vesting, Impax's stock price had to rise to $30, $34, and $38 for 30 consecutive trading days.  If the targeted stock price levels were achieved, 187,500 shares would vest on Wilkinson's first anniversary with the Company and another 187,500 shares would vest on his second anniversary.  These shares would be forfeited if stock prices did not achieve the targeted levels within the fifth anniversary of his employment or if he was no longer employed at Impax prior to their vesting.  As such, Wilkinson was especially incentivized to drive near-term inflation of financial performance, whether or not such inflation was sustainable long term, as long as the stock price held up at the targeted levels for at least 30 consecutive days.  By virtue of Impax's revenue

1   growth and profitability in 2014, which was driven by illegal digoxin price-fixing, all 375,000 shares

2   were eligible to be vested by March 19, 2015, and did vest on Wilkinson's first and second

3   anniversaries with the Company.

4           **3.**       **2015**

5         381.   In 2015, when Impax continued to earn artificially-inflated revenues due to the lasting

6   effects of the digoxin and pyridostigmine schemes, group awards determined 100% of the CEO's

7   award and 75% of other executives' awards.  Group goals again focused on financial performance,

8   including "net sales target of $860 million" and "adjusted EBITDA target of $269.1 million."  The

9   Company met these goals and credited the Individual Defendants for its success:

> For 2015, we achieved net sales of $861.4 million, representing 100% attainment of our internal net sales-based target (weighted 33%) and $284.4 million in adjusted EBITDA, representing 106% attainment of our internal EBITDA-based target (weighted 67%), representing a total weighted corporate financial performance achievement of 104%.  The 104% corporate financial performance achievement would have resulted in funding the Short-Term Incentive pool at 110% in accordance with the pay for performance funding threshold described above.  In recognition of certain key achievements of our company during 2015 including among other accomplishments, resolution of the warning letter at our Hayward facility, ***the compensation committee exercised its discretion to increase funding of the Short-Term Incentive pool from 110% to 125% of the target funding amount***.  The compensation committee determined that such achievements reflected exemplary performance by our company, including by members of our executive management team.

17         382.   Defendants achieved these goals due to another year of inflated sales from digoxin

18   and pyridostigmine.  As a result, Wilkinson made $972,000 and Reasons made $337,000 in incentive

19   awards alone.

20           **4.**       **2016**

21         383.   In addition to revenue-based goals, the Company also created goals designed to

22   incentivize its executives to acquire generic drugs from other pharmaceutical companies.  In 2016,

23   group awards determined 100% of the CEO's award and 75% of other executives' awards.  One of

24   the group goals was to "Develop and bring to market new products."  In addition, the President of

25   Generics had individual goals to "Expand generics product portfolio through internal and external

26   opportunities," and "Deliver on new generic product opportunities."  The prospect of high incentive

27   awards drove the Individual Defendants to complete deals that significantly added to Impax's

portfolio, such as the acquisition of 18 generic drugs from Teva, which the Company announced on June 21, 2016.

384.   The following table summarizes total compensation for several Impax executives during the Class Period:

| Name (Position) | Year | Salary | Bonus | Stock | Options | Incentive | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Buchi (Interim CEO) | 2016 | $4,583 | $0 | $115,889 | $114,083 | $0 | $0 | **$234,555** |
| Wilkinson (CEO) | 2016 | $907,800 | $0 | $2,972,344 | $2,827,648 | $0 | $5,060,600 | **$11,768,392** |
| | 2015 | $882,692 | $132,600 | $2,767,600 | $2,747,660 | $972,400 | $94,924 | **$7,592,876** |
| | 2014 | $552,500 | $0 | $11,534,677 | $0 | $862,793 | $28,900 | **$12,978,870** |
| Hsu (CEO) | 2014 | $364,507 | $0 | $121,152 | $119,370 | $340,406 | $3,110,700 | **$4,055,689** |
| | 2013 | $746,235 | $0 | $1,671,271 | $1,470,281 | $1,119,353 | $72,371 | **$5,079,511** |
| Reasons (CFO) | 2016 | $496,620 | $0 | $868,780 | $826,545 | $0 | $56,579 | **$2,248,524** |
| | 2015 | $482,885 | $32,643 | $814,000 | $804,175 | $337,311 | $544,346 | **$3,105,360** |
| | 2014 | $446,157 | $0 | $580,520 | $584,100 | $418,500 | $47,110 | **$2,076,387** |
| | 2013 | $385,000 | $0 | $266,252 | $392,075 | $343,035 | $65,109 | **$1,451,471** |
| Boothe (President, Generics) | 2016 | $207,692 | $250,000 | $1,528,692 | $503,485 | $0 | $9,512 | **$2,499,381** |
| Ben-Maimon (President, Generics) | 2014 | $458,022 | $0 | $580,520 | $584,100 | $453,248 | $1,351,249 | **$3,427,139** |
| | 2013 | $486,257 | $0 | $446,152 | $392,075 | $431,246 | $31,962 | **$1,787,692** |

**E.   Defendants Wilkinson and Ben-Maimon Leave Impax**

385.   On October 22, 2014, just 20 days after receiving the Sanders and Cummings Letter regarding generic drug price hikes, Impax announced that defendant Ben-Maimon, M.D., President of the generics business (known as Global Pharmaceuticals which accounted for nearly 90% of Impax's revenues), resigned.  This departure was seen as abrupt and unexpected by analysts and industry insiders.

386.   Analyst Michael Faerm, from Wells Fargo Securities, specifically noted in an October 23, 2014 report that Ben-Maimon's "[d]eparture comes as a surprise."  Her departure was especially alarming considering the concerted ramp-up by the Company in its generic business during this time period, including the acquisition with Tower.

387.    At year-end 2016, the Company again announced a significant abrupt departure by an executive.  This time Wilkinson, the CEO, suddenly left after an eventful and turbulent year for Impax (as described above).

388.    When asked by analysts about the departure at the January 11, 2017 JPMorgan Healthcare conference, the Company remained vague, simply stating that "*there were discussions between Fred and the Board and there was a decision made mutually that he would move on*."

## VIII.   LOSS CAUSATION

389.    The markets for Impax's common stock and Convertible Senior Notes were open, well-developed and efficient at all relevant times.  During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market that artificially inflated the price of Impax's publicly-traded securities.  Defendants misled investors about Impax's financial health and performance and its prospects for future financial success by failing to disclose: (i) Impax and several of its pharmaceutical industry peers colluded to fix generic drug prices in violation of U.S. and state antitrust laws; (ii) consequently, Impax's revenues during the Class Period were in part the result of illegal conduct; (iii) foreseeable market forces for diclofenac, a key product, would drive down revenues; (iv) acquisitions of overvalued generic drugs from other pharmaceutical companies would result in multiple write-downs and impairment charges; and (v) as a result of the foregoing, Impax's public statements were materially false and misleading at all relevant times.

390.    Later, when defendants' prior misrepresentations and fraudulent conduct were absorbed by the market, the price of Impax's publicly-traded securities fell significantly, as the artificial inflation came out of the price over time.  As a result of their purchases of Impax's publicly-traded securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### A.    Losses Related to Failure to Disclose Illegal Price-Fixing Scheme

391.    Partial disclosures relating to the illegal price-fixing activity and its impact to the Company's operations began to enter the market in mid-2015.

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

1    392.    Starting in November 2013, Impax used an illegal price-fixing scheme to charge

2  dramatically inflated prices for generic digoxin, and these prices remained unconstrained for over

3  eighteen months.  Investors began to understand the unsustainability of these prices on May 11,

4  2015, when Impax made its first partial disclosure.  After market close, the Company held a

5  conference call to discuss its 1Q15 earnings.  During the call, Reasons disclosed that gross margins

6  had decreased to 47% from 61% the prior year, which he attributed to "the impact of additional

7  competition on generic digoxin."

8    393.    Analysts took note.  Leerink analysts blamed the substandard performance on

9  "increased competition for digoxin," and Wells Fargo analysts said, "we suspect digoxin pricing

10  erosion with additional competition was a primary culprit" for the unexpectedly narrow gross

11  margins.  The following day, the Company's stock dropped $1.25 per share, or 2.7%, to close at

12  $44.85 – on over three times the past week's average volume.  Meanwhile, the S&P 500 dropped

13  only 0.3%.

14    394.    Impax's stock price remained inflated, however, because defendants continued to

15  conceal the existence and full impact of defendants' price-fixing scheme.

16    395.    The next partial disclosure occurred on August 10, 2015, when the Company

17  announced 2Q15 earnings.  During a conference call that morning, Reasons reported significant

18  declines in revenue, gross margins, and earnings compared to the prior year, and specifically named

19  "additional competition on generic Digoxin" as a primary cause for each.

20    396.    That same day, analysts expressed surprise about the negative news.  For example, a

21  UBS analyst report stated "the lower gross margin guidance was disappointing. . . ."  The news

22  caused Impax's stock price to fall for two consecutive days.  On August 10, 2015, it fell $1.43, or

23  3.0%, to close at $45.64 – on a volume of nearly double the prior week's average.  The next day, it

24  fell another $1.03, or 2.3%, to close at $44.61 – again on a volume above the prior week's average.

25  By contrast, the S&P 500 actually *increased* 1.3% on August 10, and fell only 1.0% on August 11.

26    397.    Even after this loss, Impax's stock price remained inflated, however, because

27  defendants continued to conceal the existence and full impact of their price-fixing scheme.  For the

28

1   next year and a half, Impax convinced investors that the massive price hikes for digoxin resulted

2   from legal activity, and not illegal collusion.

3         398.   Then on November 3, 2016, media outlets reported that U.S. prosecutors might file

4   criminal charges by the end of 2016 against Impax and several other pharmaceutical companies for

5   unlawfully colluding to fix generic drug prices.  Bloomberg specifically named Impax as one of the

6   manufacturers implicated through digoxin, reporting that its coordinated and seven-fold price

7   increase caused Medicaid to spend 90% more on the drug during 2013 and 2014.

8         399.   On this news, Impax's share price fell $4.00, or 19.5%, to close at $16.50 on

9   November 3, 2016 – on almost three times the past week's average trading volume.  The Company's

10  Convertible Senior Notes dropped $3.46, losing 4.0% of their value.  As a comparison, the S&P 500

11  fell only 0.4% that day.  Industry analysts immediately attributed the drop to the recent reports.  On

12  November 4, 2016, Bloomberg reported that, even among other major generic drug companies,

13  Impax was the "most exposed on [the DoJ] probe."

14        400.   Nevertheless, the price remained artificially inflated as Impax executives continued to

15  conceal the existence and full impact of their price-fixing scheme.

16        401.   The final price-fixing disclosures came in early January 2017.  Right as the market

17  closed on January 5, 2017, the DoJ affirmatively acted against Impax by intervening in a civil

18  antitrust action in the Eastern District of Pennsylvania.  The following day, Friday, January 6, 2017,

19  the Court granted the DoJ's motion and added it to the action.  The bad news continued on Monday,

20  January 9, when Jeffrey Glazer, Heritage's former CEO, pled guilty to price-fixing charges,

21  admitting he had conspired with competitors to increase the price of generic drugs.  The following

22  day, Jason Malek, Heritage's former President, followed suit and also pled guilty to price-fixing.

23  This wave of negative news caused drops in Impax's stock price on January 6, 9, 10, and 11.  The

24  stock price, which began the slide at $14.20, declined $0.40 (2.8%), $0.40 (2.9%), $0.70 (5.2%), and

25  $0.30 (2.4%), respectively, before closing at $12.40 on January 11; each day had above-average

26  trading volumes.  The Convertible Senior Notes also dropped during this time period, losing $0.91

27  (1.1%) on January 6, $0.15 (0.2%) on January 9, and $0.24 (0.3%) on January 10.  By contrast, the

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG               - 164 -

S&P 500 *increased* 0.4% on January 6, decreased just 0.4% on January 9, remained steady on January 10, and *increased* 0.3% on January 11.

**B.    Losses Related to Failure to Disclose Increased Competition for Diclofenac**

402.    Partial disclosures relating to the sudden influx of competition for diclofenac and its impact to the Company's operations began to enter the market in mid-2016.

403.    In May 2016, Wilkinson told investors that diclofenac – one of Impax's key products – would "meet new competition sometime in the first half of this year."  Impax knew this new competition would have a dramatic impact on revenues, but he publicly minimized it, calling the change "anticipated" and promising that Impax had "defended share" and still "expect[ed] revenue growth."  During a June 21, 2016 earnings call, defendants revealed that diclofenac revenue had not "normalized," and announced significant reductions to its 2016 revenue guidance based on "lower revenues on diclofenac gel and metaxalone as a result of the impact of additional competition occurring during the second quarter."

404.    During the call, analysts immediately questioned why Impax did not disclose the impact of the diclofenac competition earlier.  A Deutsche Bank analyst observed that "You knew the accelerated competitors last call . . . ."  A JP Morgan analyst echoed the sentiment: "Sounds like you knew or had factored in some competition coming in on some of those key products, trying to understand that."  As a result of this news, Impax's stock price dropped $3.66, or 11.4%, to close at $28.31; the trading volume was six times greater than the prior week's average.  The Convertible Senior Notes fell $4.00, losing 4.4% of their value.  Meanwhile, the S&P 500 *increased* 0.3%.

405.    Although the news was disappointing, with only nine days left in the quarter, analysts felt confident that they understood the negative impact from the diclofenac competition and could reliably predict Q2 results.  On June 21, 2016, Leerink analysts commented that they felt Impax's portfolio had "stabilized."

406.    The market did not fully understand the devastating impact of the diclofenac competition until August 9, 2016, when Impax held its 2Q16 earnings call.  During the call, defendants blindsided investors by disclosing the true status of diclofenac: its profits had dropped off

1   a cliff, driving generic division revenues down $53 million in the second quarter alone.   The

2   Company also had to take a massive $15 million "shelf-stock adjustment" to write down the value of

3   existing diclofenac in its customers' inventories.

4       407.    Analysts were shocked that defendants had concealed the extent of the deterioration

5   in diclofenac just weeks earlier.   On August 9, 2016, a Piper Jaffray analyst report expressed the

6   market's frustration: "***we find it hard to fathom how [Impax] could not have foreseen or known***

7   ***how conditions surrounding key products would further deteriorate***."   The same report also noted:

8   "***We are deeply disappointed that [Impax] was slow in recognizing and communicating the extent***

9   ***of the competitive pressures on its key assets, at a minimum because it damages the credibility of a***

10   ***senior management team*** . . . ."   As a result of this news, Impax's stock price plummeted $7.16, or

11   ***23.4%***, to close at $23.43; the trading volume was ***12 times*** higher than the prior week's average.

12   The Company's Convertible Senior Notes dropped $7.77, losing 8.3% of their value.[31]   On the same

13   day of this decline, the S&P 500 ***remained stable.***

14       **C.**    **Losses Related to Failure to Disclose Failed Teva Transaction**

15       408.    The disclosure relating to the failed Teva transaction and its impact to the Company's

16   operations caused a significant price drop.

17       409.    On June 21, 2016, Impax announced that it had purchased a basket of generic drugs

18   from Teva, that the transaction was "immediately accretive," and that the drugs were "primarily []

19   difficult-to-manufacture or limited competition products."   However, following the transaction,

20   defendants concealed that budesonide – by far the most valuable drug in the basket – faced increased

21   competition, key customer pricing concessions, and severe price degradation at the time the deal

22   closed.   Defendants finally disclosed the truth on November 9, 2016, when they announced a

23   $251 million impairment charge related to the deal.

24       410.    As a result of this news, Impax's stock price plummeted again.   This time, it dropped

25   $3.60, or ***20.5%***, to close at $14.00 on November 9, 2016 – on over four times the past week's

26   average trading volume.   The Convertible Senior Notes fell $2.13, losing 2.6% of their value.

27

28   [31]   The percentage drop runs from Friday, August 5.

1 During the same time period, the S&P 500 *increased* 1.1%.  Analysts immediately attributed the

2 decline to the impairment charge.  A Leerink analyst noted: "So far, TEVA deal has been a mess for

3 IPXL."

4       411.    Each disclosure of adverse facts which removed inflation from Impax's stock price

5 was connected to defendants' false statements and omissions and fraudulent conduct alleged herein.

6 The timing and magnitude of Impax's stock price declines negate any inference that the loss suffered

7 by plaintiff and other Class members was caused by changed market conditions, macroeconomic or

8 industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  As a

9 direct result of defendants' wrongful acts and omissions, and the precipitous decline in the market

10 value of the Company's securities, plaintiff and other Class members have suffered significant losses

11 and damages.

12 **IX.   NO SAFE HARBOR**

13       412.    Impax's verbal "Safe Harbor" warnings accompanying its oral forward-looking

14 statements ("FLS") issued during the Class Period were ineffective to shield those statements from

15 liability.

16       413.    The defendants are also liable for any false or misleading FLS pleaded because, at the

17 time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

18 authorized and/or approved by an executive officer of Impax who knew that the FLS was false.

19 **X.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

20

21       414.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-

on-the-market doctrine in that:

22

23     •    defendants made public misrepresentations or failed to disclose material facts during
the Class Period;

24     •    the omissions and misrepresentations were material;

25     •    Impax securities (common stock and 2% Convertible Senior Notes) are traded in an
efficient market; the Company's securities were liquid and traded with moderate to

26             heavy volume during the Class Period;

27     •    the Company's common stock was traded on the NASDAQ and was covered by
multiple analysts;

28

- • the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- • plaintiff and members of the Class purchased, acquired and/or sold Impax securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

415. Based upon the foregoing, plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

416. Alternatively, plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

417. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Impax securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein and the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

418. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Impax common stock was actively traded on the NASDAQ and its 2% Convertible Senior Notes traded in an efficient market. While the exact number of Class members is unknown to plaintiff at this time and can be ascertained only through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Impax or its transfer agent and may be notified of the  pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

419.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

420.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

421.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Impax;

- whether the Individual Defendants caused Impax to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Impax securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

422.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Against All Defendants for Violations of Section 10(b)
### and Rule 10b-5 Promulgated Thereunder)

423.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

1   424.   This Count is asserted against defendants and is based upon Section 10(b) of the

2   Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

3   425.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and

4   course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

5   practices and courses of business which operated as a fraud and deceit upon plaintiff and the other

6   members of the Class; made various untrue statements of material facts and omitted to state material

7   facts necessary in order to make the statements made, in light of the circumstances under which they

8   were made, not misleading; and employed devices, schemes and artifices to defraud in connection

9   with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class

10   Period, did:  (i) deceive the investing public, including plaintiff and other Class members as alleged

11   herein; (ii) artificially inflate and maintain the market price of Impax securities; and (iii) cause

12   plaintiff and other members of the Class to purchase or otherwise acquire Impax securities and

13   options at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of

14   conduct, defendants, and each of them, took the actions set forth herein.

15   426.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the

16   defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and

17   annual reports, SEC filings, press releases and other statements and documents described above,

18   including statements made to securities analysts and the media that were designed to influence the

19   market for Impax securities.  Such reports, filings, releases and statements were materially false and

20   misleading in that they failed to disclose material adverse information and misrepresented the truth

21   about Impax's business practices.

22   427.   By virtue of their positions at Impax, defendants had actual knowledge of the

23   materially false and misleading statements and material omissions alleged herein and intended

24   thereby to deceive plaintiff and the other members of the Class, or, in the alternative, defendants

25   acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such

26   facts as would reveal the materially false and misleading nature of the statements made although

27   such facts were readily available to defendants.  Said acts and omissions of defendants were

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

1    committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or

2    recklessly disregarded that material facts were being misrepresented or omitted as described above.

3         428.   Information showing that defendants acted knowingly or with reckless disregard for

4    the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or

5    directors of Impax, the Individual Defendants had knowledge of the details of Impax's internal

6    affairs.

7         429.   The Individual Defendants are liable both directly and indirectly for the wrongs

8    complained of herein.  Because of their positions of control and authority, the Individual Defendants

9    were able to and did, directly or indirectly, control the content of the statements of Impax.  As

10   officers and/or directors of a publicly-held company, the Individual Defendants had a duty to

11   disseminate timely, accurate, and truthful information with respect to Impax's business practices.  As

12   a result of the dissemination of the aforementioned false and misleading reports, releases and public

13   statements, the market price of Impax securities was artificially inflated throughout the Class Period.

14   In ignorance of the adverse facts concerning Impax's business and financial condition which were

15   concealed by defendants, plaintiff and the other members of the Class purchased or otherwise

16   acquired Impax securities at artificially-inflated prices and relied upon the price of the securities, the

17   integrity of the market for the securities and/or upon statements disseminated by defendants, and

18   were damaged thereby.

19        430.   During the Class Period, Impax securities were traded on an active and efficient

20   market.  Plaintiff and the other members of the Class, relying on the materially false and misleading

21   statements described herein, which the defendants made, issued or caused to be disseminated, or

22   relying upon the integrity of the market, purchased or otherwise acquired shares of Impax securities

23   at prices artificially inflated by defendants' wrongful conduct.  Had plaintiff and the other members

24   of the Class known the truth, they would not have purchased or otherwise acquired said securities, or

25   would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the

26   time of the purchases and/or acquisitions by plaintiff and the Class, the true value of Impax securities

27   was substantially lower than the prices paid by plaintiff and the other members of the Class.  The

28

market price of Impax securities declined sharply upon public disclosure of the facts alleged herein

to the injury of plaintiff and the other Class members.

431.   By reason of the conduct alleged herein, defendants knowingly or recklessly, directly

or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

432.   As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that

the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants)

433.   Plaintiff repeats and realleges each and every allegation contained above as if fully set

forth herein.

434.   During the Class Period, the Individual Defendants participated in the operation and

management of Impax, and conducted and participated, directly and indirectly, in the conduct of

Impax's business affairs.  Because of their senior positions, they knew the adverse non-public

information about Impax's business practices.

435.   As officers and/or directors of a publicly-owned company, the Individual Defendants

had a duty to disseminate accurate and truthful information with respect to Impax's financial

condition and results of operations, and to correct promptly any public statements issued by Impax

which had become materially false or misleading.

436.   Because of their positions of control and authority as senior officers, the Individual

Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Impax disseminated in the marketplace during the Class Period concerning

Impax's results and operations.  Throughout the Class Period, the Individual Defendants exercised

their power and authority to cause Impax to engage in the wrongful acts complained of herein.  The

Individual Defendants therefore, were "controlling persons" of Impax within the meaning of Section

1  20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which

2  artificially inflated the market price of Impax securities.

3      437.    By reason of the above conduct, the Individual Defendants are liable pursuant to

4  Section 20(a) of the Exchange Act for the violations committed by Impax.

5                              **PRAYER FOR RELIEF**

6      WHEREFORE, plaintiff demands judgment against defendants as follows:

7      A.      Determining that the instant action may be maintained as a class action under Rule 23

8  of the Federal Rules of Civil Procedure, and certifying plaintiff as the Class representative;

9      B.      Requiring defendants to pay damages sustained by plaintiff and the Class by reason of

10  the acts and transactions alleged herein;

11      C.      Awarding plaintiff and the other members of the Class prejudgment and post

12  judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

13  awarding such other and further relief as this Court may deem just and proper.

14                           **DEMAND FOR TRIAL BY JURY**

15      Plaintiff hereby demands a trial by jury.

16  DATED:  April 17, 2017                    ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
17                                            SPENCER A. BURKHOLZ
                                              LUKE O. BROOKS
18                                            ERIC I. NIEHAUS
                                              ANGEL P. LAU
19                                            JEFFREY J. STEIN

20

21                                                  s/ Luke O. Brooks
                                              LUKE O. BROOKS
22

23                                            655 West Broadway, Suite 1900
                                              San Diego, CA  92101
24                                            Telephone:  619/231-1058
                                              619/231-7423 (fax)

25

26

27

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG                    - 173 -

1

2
        ROBBINS GELLER RUDMAN
          & DOWD LLP
3
        SHAWN A. WILLIAMS
        Post Montgomery Center
4
        One Montgomery Street, Suite 1800
        San Francisco, CA  94104
5
        Telephone:  415/288-4545
        415/288-4534 (fax)

6
        ROBBINS GELLER RUDMAN
          & DOWD LLP
7
        SAMUEL H. RUDMAN
        58 South Service Road, Suite 200
8
        Melville, NY  11747
        Telephone:  631/367-7100
9
        631/367-1173 (fax)

10
        Lead Counsel for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - 3:16-cv-06557-HSG

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 17, 2017.

  s/ Luke O. Brooks
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  lukeb@rgrdlaw.com

# Mailing Information for a Case 4:16-cv-06557-HSG Fleming v. Impax Laboratories Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Luke O Brooks**
  lukeb@rgrdlaw.com,schateauneuf@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Spencer A. Burkholz**
  SpenceB@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Angel Puimei Lau**
  alau@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Eric Ian Niehaus**
  ericn@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Jeffrey James Stein**
  jstein@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`