1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
          – and –
6   SPENCER A. BURKHOLZ (147029)
    LUKE O. BROOKS (212802)
7   ERIC I. NIEHAUS (239023)
    ANGEL P. LAU (286196)
8   JEFFREY J. STEIN (265268)
    655 West Broadway, Suite 1900
9   San Diego, CA  92101
    Telephone:  619/231-1058
10  619/231-7423 (fax)
    spenceb@rgrdlw.com
11  lukeb@rgrdlaw.com
    eniehaus@rgrdlaw.com
12  alau@rgrdlaw.com
    jstein@rgrdlaw.com
13
    Lead Counsel for Plaintiff
14
                    UNITED STATES DISTRICT COURT
15
                   NORTHERN DISTRICT OF CALIFORNIA
16
                          OAKLAND DIVISION
17

18  GREG FLEMING, Individually and on Behalf   ) Case No. 4:16-cv-06557-HSG
    of All Others Similarly Situated,          )
19                                             ) CLASS ACTION
                            Plaintiff,         )
                                               )
20           vs.                               ) SECOND AMENDED COMPLAINT FOR
                                               ) VIOLATION OF THE FEDERAL
21  IMPAX LABORATORIES INC., GEORGE            ) SECURITIES LAWS
    FREDERICK WILKINSON, LARRY HSU,            )
22  CAROLE BEN-MAIMON, and BRYAN M.            )
    REASONS,                                   )
23                                             )
                            Defendants.        )
24  _____)

25

26

27

28

1491380_2

1

## TABLE OF CONTENTS

2
**Page**

3    I.      NATURE OF THE ACTION ..................................................................................1

4    II.     JURISDICTION AND VENUE .............................................................................6

5    III.    PARTIES ...............................................................................................................6

6    IV.     IMPAX'S COLLUSIVE PRICE-FIXING SCHEME ...........................................7

7            A.    A Brief Overview of the Generic Pharmaceutical Drug Market ...............7

8            B.    Impax Suffered a Series of Setbacks Before the Class Period Began .....8

9            C.    Impax Colluded to Fix the Price of Digoxin.............................................11

10           D.    The Collusive Digoxin Price Hike Drove Impax's Rebound in 2014 ......15

11           E.    Elevated Collusive Pricing on Digoxin Eventually Attracted Competitors
                   and Impax's Profits from the Scheme Were Reduced, Causing the
12                 Company's Stock Price to Decline ...........................................................19

13           F.    Impax Colluded to Fix the Price of Pyridostigmine .................................23

14           G.    The Structure of the Digoxin and Pyridostigmine Markets Facilitated
                   Impax's Collusion ....................................................................................26
15
                   1.    High Level of Market Concentration...........................................26
16
                   2.    Inelastic Demand .........................................................................28
17
                   3.    Commodity-Like Product ............................................................28
18
                   4.    No Viable Substitute ...................................................................29
19
                   5.    Barriers to Entry..........................................................................30
20
                   6.    Information Sharing......................................................................30
21
             H.    Impax and Its Co-Conspirators Are Under Multiple Governmental
22                 Investigations for Anticompetitive Price-Fixing .....................................32

23           I.    Additional Scienter Allegations................................................................39

24                 1.    The Individual Defendants Were Aware of and Responsible for the
                         Anticompetitive Price Increases ..................................................40
25
                         a.    Ben-Maimon Had Direct Personal Knowledge of Impax's
26                             Collusive Pricing Strategy ...............................................46

27                       b.    Wilkinson Had Direct Personal Knowledge of Impax's
                               Collusive Pricing Strategy ...............................................49
28

**Page**

         c.     Hsu Had Direct Personal Knowledge of Impax's Collusive
Pricing Strategy ................................................................... 55

         d.     Reasons Had Direct Personal Knowledge of Impax's
Collusive Pricing Strategy ................................................... 57

     2.     Defendants' False Exculpatory Statements are Evidence of
Scienter ..................................................................................... 59

     3.     The Magnitude, Importance and Duration of the Fraud Supports a
Finding of Scienter .................................................................... 60

     4.     Contemporaneous Red Flags Support a Finding of Scienter .................. 61

     5.     Corporate Scienter ..................................................................... 62

     6.     Analysts' Focus on Generics Pricing Supports a Finding of
Scienter ..................................................................................... 63

     7.     Defendants Signed Sarbanes-Oxley Certifications Attesting that
They Personally Supervised Impax's Controls and Procedures .............. 65

     8.     Defendants and Company Insiders Engaged in Suspicious Insider
Trading ...................................................................................... 66

     9.     Defendants' Compensation Structure Incentivized Fraud ...................... 68

         a.     2013 ...................................................................................... 69

         b.     2014 ...................................................................................... 70

         c.     2015 ...................................................................................... 71

         d.     2016 ...................................................................................... 72

     10.    Defendants Wilkinson and Ben-Maimon's Abrupt Departures from
Impax Supports a Finding of Scienter ........................................... 73

V.    PRICE FIXING FALSE AND MISLEADING STATEMENTS AND
OMISSIONS ............................................................................... 74

    A.    2014 Price Fixing False and Misleading Statements and Omissions .................. 74

    B.    2015 Price Fixing False and Misleading Statements and Omissions .................. 96

    C.    2016 Price Fixing False and Misleading Statements and Omissions ................ 120

    D.    Impax Failed to Disclose the Impact of Illegal Price-Fixing Activity on
Reported Revenues ................................................................... 143

1
2                                                                                          **Page**
3
4
VI.   IMPAX MISLED INVESTORS BY MISREPRESENTING AND
      CONCEALING THE IMPACT OF COMPETITION AND PRICE EROSION
      ON DICLOFENAC .............................................................................146

      A.    Diclofenac False and Misleading Statements on February 22, 2016..................147

      B.    Diclofenac False and Misleading Statements and Omissions on May 10,
            2016...........................................................................................148

            1.    May 10, 2016 False and Misleading Statements Relating to Price
                  Erosion and Market Share.........................................................148

            2.    May 10, 2016 False and Misleading Statements Regarding
                  Diclofenac's Historical Sales Performance ...............................151

            3.    May 10, 2016 False and Misleading Revenue Guidance Statements ......152

            4.    Impax Failed to Disclose Adverse Revenue Trends Regarding
                  Generic Diclofenac in the May 10, 2016 Form 10-Q Financial
                  Statement.................................................................................155

            5.    Defendants Sought Financing for an Acquisition ....................160

      C.    Diclofenac False and Misleading Statements and Omissions on June 21,
            2016...........................................................................................161

VII.  IMPAX MISLED INVESTORS BY CONCEALING THE IMPACT OF
      COMPETITION AND PRICE EROSION ON BUDESONIDE AND FAILING
      TO TIMELY WRITE DOWN THE RESULTING IMPAIRMENT ON THE
      BASKET OF DRUGS IMPAX PURCHASED FROM TEVA AND ALLERGAN ......164

      A.    Budesonide False and Misleading Statements and Omissions on June 21,
            2016...........................................................................................164

      B.    Budesonide False and Misleading Statements and Omissions on August 9,
            2016 and September 14, 2016...............................................................167

      C.    Impax Failed to Timely Record Impairment Charges on Budesonide in
            Violation of GAAP .........................................................................174

      D.    Impax Failed to Disclose Adverse Revenue Trends Regarding Budesonide ......177

VIII. THE MISSTATEMENTS DESCRIBED ABOVE WERE MATERIAL TO
      IMPAX'S FINANCIAL STATEMENTS................................................179

      A.    The Misstatements Were Quantitatively Material ...............................180

      B.    The Misstatements Were Qualitatively Material ................................181

Page

1.    The Misstatements Involve Concealment of an Unlawful Transaction..............................................................181

2.    The Misstatements Masked a Change in Earnings or Other Trends........182

3.    The Misstatements Concerned a Segment or Other Portion of the Registrant's Business that Has Been Identified as Playing a Significant Role in the Registrant's Operations or Profitability.............182

4.    The Misstatements Affected Management's Compensation ...................182

IX.    LOSS CAUSATION...............................................................................182

    A.   Losses Caused by Defendants' Price Fixing False and Misleading Statements and Omissions ...................................................................183

    B.   Losses Caused by Defendants' Diclofenac False and Misleading Statements and Omissions ...................................................................187

    C.   Losses Caused by Defendants' Budesonide False and Misleading Statements and Omissions ...................................................................189

X.    NO SAFE HARBOR .............................................................................190

XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET.......................................................................................190

XII.    PLAINTIFF'S CLASS ACTION ALLEGATIONS..................................191

COUNT I ....................................................................................................192

COUNT II ...................................................................................................195

PRAYER FOR RELIEF ...............................................................................195

DEMAND FOR TRIAL BY JURY ...............................................................196

1    Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc.
2   Pension Fund, individually and on behalf of all other persons similarly situated ("plaintiff"), by its
3   undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and
4   plaintiff's own acts, and information and belief as to all other matters, based on the investigation
5   conducted by and through plaintiff's attorneys, which included, among other things, a review of the
6   defendants' public documents, conference calls and announcements made by defendants, United
7   States Securities and Exchange Commission ("SEC") filings, wire and press releases published by
8   and regarding Impax, analysts' reports and advisories about Impax, information obtainable on the
9   Internet, drug pricing and market share information from proprietary databases, interviews with
10  former Impax employees and consultation with industry experts.  Plaintiff believes that substantial
11  evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for
12  discovery.

13  **I.      NATURE OF THE ACTION**

14          1.      This is a securities class action on behalf of all persons who purchased or otherwise
15  acquired Impax's common stock and its 2% Convertible Senior Notes due 2022 between
16  February 20, 2014 and January 11, 2017, both dates inclusive (the "Class Period"), for violations of
17  Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule
18  10b-5 promulgated thereunder, against Impax Laboratories Inc. ("Impax" or the "Company") and
19  certain of its top officials.  Defendants made false statements and omissions to investors, which
20  concealed that Impax and several of its pharmaceutical industry peers colluded to fix generic drug
21  prices.  Defendants also made false statements and omissions to investors, which misled investors
22  about the impact of competition and price erosion on its sales of certain key generic drugs.

23          2.      Impax, a specialty pharmaceutical company, develops, manufactures, and markets
24  bioequivalent – generic – pharmaceutical products.  The Company also develops proprietary branded
25  products focusing on the treatment of central nervous system disorders.  Prior to the Class Period,
26  Impax was under siege on all fronts – its top selling generic drugs suffered from new competition, its
27  significant branded drugs were losing exclusivity, its pending applications for U.S. generic drug
28  approval were on indefinite hold by the FDA due to compliance problems at the Company's

1   Hayward manufacturing facilities, its application for approval of the highly-anticipated branded drug

2   Rytary was on indefinite hold for the same reason, and remediation costs for Hayward had piled up

3   and exceeded expectations with additional future costs uncertain.  In the third quarter of 2013, Impax

4   recorded its first quarterly loss since 3Q08 with net losses of $180,000 – a stark contrast to net

5   income of $20 million for the same period the prior year.  Under pressure to turn the Company

6   around, defendants resorted to fraud.

7       3.      Beginning in November 2013 at the latest and continuing throughout the Class

8   Period, Impax entered into anticompetitive agreements with its competitors in the generic drug

9   market.  In particular, Impax colluded with its competitors to fix the prices of digoxin and

10  pyridostigmine bromide ("pyridostigmine").

11      4.      The evidence that Impax colluded to fix the prices of digoxin and pyridostigmine is

12  substantial.  The drugs' prices moved in near-perfect unison, and increased suddenly and

13  simultaneously at each drug company.  The price increases were exponential.  In November 2013,

14  just days after an industry conference attended by executives from Impax and its competitor Lannett

15  Company, Inc. ("Lannett"), both companies suddenly hiked their prices for generic digoxin more

16  than 700% to $1.07 per pill.  Likewise, between December 2014 and March 2015, Impax and

17  Valeant Pharmaceuticals ("Valeant"), Impax's primary competitor in the generic pyridostigmine

18  market, suddenly hiked the price of pyridostigmine by approximately 116% to $1.16 per pill.

19      5.      There is no non-collusive explanation for these sudden, synchronized price

20  increases – there was no supply shortage, production problem, or sudden increase in demand for

21  these drugs during this period, and no competitor left the market.  Moreover, the markets for digoxin

22  and pyridostigmine are highly susceptible to collusion – they are dominated by only a few

23  companies, and this market concentration makes collusion easy.  At the time digoxin prices were

24  raised, Impax and Lannett had a combined 94% of the market for digoxin.  Likewise, when

25  pyridostigmine prices were raised, Impax and Valeant had 100% of the pyridostigmine market.  The

26  market for both drugs featured several other characteristics that facilitated collusion:  demand for

27  both drugs was inelastic, with increases or miniscule reductions in the quantities sold even after

28  massive and sudden price hikes; both drugs were commodity-like products – generic drugs whose

1    only distinguishing factor for purchasers was price; neither drug had a viable substitute; both drugs

2    had high barriers to entry; and information sharing and price discovery were common.

3         6.    Defendants misled investors about the competition Impax faced and about the validity

4    of its reported sales figures.  Defendants repeatedly stated to investors that the market for generic

5    drugs was highly competitive.  In fact, the market for at least some of the generic drugs Impax sold

6    was collusive, and lacked any real competition.  Impax's sales figures and other measures of Impax's

7    financial performance were also misleading.  Defendants' false and misleading statements and

8    omissions led investors to believe that higher generic drug pricing was sustainable and that Impax's

9    sales figures relating to its generic drugs were an accurate representation of the success of Impax's

10   products in a competitive market.  In fact, those sales figures were inflated as a result of Impax's

11   anti-competitive conduct, and did not reflect the sales Impax would have been able to achieve absent

12   its price-fixing activity.  Reasonable investors would have wanted to know this difference in the

13   basis for Impax's sales – because Impax's sales figures were inflated through its participation in an

14   anticompetitive cartel, these figures were susceptible to being deflated if and when the cartel were to

15   break.  Furthermore, Impax's inflation of sales through illegal price-fixing carried the significant risk

16   of prosecution by state and federal antitrust authorities along with the attendant negative financial

17   and reputational harm.  Defendants downplayed that risk, falsely assured investors that Impax had

18   done nothing wrong, and offered false and misleading explanations of its pricing practices generally,

19   and for its digoxin price hike in particular.

20        7.    As demonstrated by their statements to investors and access to internal generic

21   pricing information, the Individual Defendants possessed direct personal knowledge of Impax's

22   generic drug pricing strategy and the pricing environment of other manufacturers, including the

23   highly unusual coordinated price hikes alleged herein.  Moreover, when specifically asked about the

24   digoxin price-hike Impax CEO Wilkinson provided false exculpatory explanations for the increase;

25   he attributed the  price hike to a nonexistent materials shortage and a loss of competitors that had

26   occurred nearly two years before the price increase.  These false excuses provide further evidence of

27   defendants' consciousness of guilt – if Impax truly had hiked digoxin prices 700% in concert with

28   Lannett for non-collusive, legitimate, and independent reasons, Wilkinson would have had no reason

1   to invent reasons for why it was done.  Defendants' responses to analyst questions about the

2   government's investigation into generic drug price-fixing, and the subpoena Impax received in that

3   investigation also support a strong inference of scienter.  As detailed herein, defendants had access to

4   the available contradictory information rendering their denials knowingly false.   Indeed, it would

5   have been severely reckless for defendants to issue repeated and specific denials that Impax was

6   engaged in collusion without accessing the relevant information.

7   8.   In 2016, defendants diversified their fraud: On May 10, 2016, they lied to investors

8   about the true cause, extent and impact of revenue declines on diclofenac sodium gel 3%

9   ("diclofenac"), a drug that previously was Impax's top revenue generator, and falsely reaffirmed

10   guidance they knew they could not meet.  Then, on June 21, 2016, defendants hid from investors that

11   Impax was obligated to return $15 million to customers who had bought diclofenac at high prices.

12   Finally, between June and September 2016, Impax touted a $586 million drug acquisition for which

13   the drug budesonide was a cornerstone, even though defendants knew what they bought was by then

14   worth far less.  Less than two months later, defendants were forced to admit Impax had overpaid by

15   $251 million.

16   9.   Impax knew that competition had already eroded its market share, volume, and

17   pricing of diclofenac by May 10, 2016 but made false and misleading statements and omissions that

18   concealed the extent and impact of competition on that key drug.  Diclofenac was a key drug for

19   Impax, comprising 21% of the Company's net sales from generics in 2015.  On January 31, 2016,

20   Impax held a near monopoly on the diclofenac market, with a 93% market share.  By May 10, 2016,

21   the Company's diclofenac market share was down substantially, and still falling, but defendants'

22   false and misleading statements concealed Impax's rapidly-declining market share from investors.

23   10.   On May 10, 2016, 40 days into the second quarter, defendants held an earnings

24   conference call with investors in which they materially understated the extent to which price declines

25   had impacted revenue, and concealed entirely the main cause of revenue loss from diclofenac:

26   volume decline.  Additionally, defendants knew that price decline and market share erosion were

27   accelerating and had reached double digits, but (1) concealed that the shift in market dynamics had

28   already significantly impacted the quarter's results, and (2) falsely assured the market that the

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                                      - 4 -

1   changes had been anticipated and accounted for in the Company's guidance.  On June 21, 2016, nine

2   days before the second quarter ended, defendants again spoke to investors about diclofenac, but

3   concealed an upcoming material write-down for the diclofenac inventory on customers' shelves to

4   compensate customers for massive price declines.  It was not until August 9, 2016 that defendants

5   disclosed that Impax's market share had eroded so much that Impax failed to meet its expected

6   quarter-over-quarter revenue growth.  The Company reduced guidance for the full year 2016, and

7   wrote down the value of diclofenac on customers' shelves.  Securities analysts covering the company

8   were outraged.  A Piper Jaffray analyst remarked: "[g]iven that IPXL provided guidance [on

9   June 21], we find it hard to fathom how it could not have foreseen or known how conditions

10  surrounding key products would further deteriorate."

11        11.     The very next quarter, on November 9, 2016, investors were blindsided once again.

12  This time, Impax announced a $251 million impairment charge on the basket of drugs it had

13  purchased for $586 million from Teva Pharmaceuticals ("Teva"), Allergan plc ("Allergan"), and

14  their affiliates.  The ink was barely dry on the purchase, which had closed three months before, when

15  Impax belatedly acknowledged that budesonide, which comprised the vast majority of the value

16  assigned to the portfolio, would not generate meaningful future cash flows.  Defendants told

17  investors they were surprised by increased competition and that the related price degradation had

18  occurred in September and October.  In reality, defendants knew well before September that

19  increased competition – and the sale of a key customer for the drug to Teva – already had caused

20  prices to fall and drastically impaired the value of the drugs Impax bought from Teva and Allergan.

21        12.     As information about defendants' fraud gradually was revealed to investors through a

22  series of partial disclosures, the Company's stock dropped precipitously.  Impax's stock price fell

23  from a Class Period high of $51.31 on April 15, 2015 to $12.40 on January 11, 2017.  Through this

24  action, plaintiff seeks to recover the damages that plaintiff and other Class members have suffered as

25  a result of defendants' violations of the federal securities laws, and the resultant decline in the value

26  of their investments in Impax.

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                        - 5 -

## II.      JURISDICTION AND VENUE

13.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

15.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Impax's principal executive offices are located within this Judicial District.

16.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.      PARTIES

17.      Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund acquired Impax securities at artificially inflated prices during the Class Period and was damaged as a result of defendants' wrongdoing as alleged in this complaint.

18.      Defendant Impax is incorporated in Delaware, and the Company's principal executive offices are located at 30831 Huntwood Avenue, Hayward, California.  Impax's common stock traded on the NASDAQ under the ticker symbol "IPXL."  Impax's generic business includes Global Pharmaceuticals ("Global") as well as CorePharma and Lineage Therapeutics which were acquired through Impax's acquisition of Tower Holdings, Inc. in March 2015.

19.      Defendant George Frederick Wilkinson ("Wilkinson") served as Impax's Chief Executive Officer ("CEO") and President between April 2014 and December 2016.

20.      Defendant Larry Hsu ("Hsu") served as Impax's CEO and President between October 2006 and April 2014, and director between December 1999 and July 2015.

21.      Defendant Bryan M. Reasons ("Reasons") has served at all relevant times as Impax's Chief Financial Officer ("CFO") and Senior Vice President of Finance.

1       22.    Defendant Carole Ben-Maimon ("Ben-Maimon") served as Impax's President of

2   Global Pharmaceuticals between September 6, 2011 and November 3, 2014.

3       23.    The defendants referenced above in ¶¶19-22 are sometimes referred to herein as the

4   "Individual Defendants."

5   **IV.    IMPAX'S COLLUSIVE PRICE-FIXING SCHEME**

6       **A.    A Brief Overview of the Generic Pharmaceutical Drug Market**

7       24.    Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage,

8   form, route of administration, strength or concentration and have the same active ingredients as the

9   reference-listed brand name drug – save consumers and our healthcare system tens of billions of

10  dollars annually because they introduce competition into a market where none previously existed.

11  When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices

12  and greater access to healthcare for all consumers in the United States.  In a January 31, 2012 report,

13  the Government Accounting Office noted that "[o]n average, the retail price of a generic drug is 75

14  percent lower than the retail price of a brand-name drug."

15      25.    Generic drugs have long been referred to as one of the few "bargains" in the United

16  States healthcare system and historically health care experts have said that cost savings from the

17  growing number of generic drugs have gone a long way toward keeping the lid on overall increasing

18  health care costs.  This was the way the generic drug market was intended to work, and has generally

19  worked, since the implementation of the Hatch-Waxman Act in 1984.

20      26.    Over the last several years, however, that price dynamic has changed for a large

21  number of generic drugs.  Prices for dozens of generic drugs have uncharacteristically risen – some

22  have skyrocketed – for no apparent reason, sparking outrage from public officials, payers and

23  consumers across the country whose costs have doubled, tripled or in some cases increased up to

24  1,000% or more.  The growing outrage and public reports of unexplained price increases caused the

25  State of Connecticut to commence an investigation in July of 2014, which was followed shortly

26  thereafter by a Congressional inquiry and a reported criminal grand jury investigation by the United

27  States Department of Justice Antitrust Division.

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:16-cv-06557-HSG        - 7 -

27.     Generic drug manufacturers have argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.  What regulators have found through their investigations, however, is that the reason underlying many of these price increases is much more straightforward, and nefarious – collusion among generic drug competitors.

28.     As detailed in *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056, Complaint (ECF No. 1), ¶7 (D. Conn. Dec. 14, 2016) ("AG Complaint"), a joint complaint filed by the attorneys general of 20 states following a lengthy investigation into generic drug price increases, generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors.[1]  The companies exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements.  Amended AG Complaint, ¶9.  The overarching conspiracy rested on "general rules of the road" whereby manufacturers did not take advantage of another competitor's price increase by lowering prices to gain market share, but instead allowing each competitor to have a certain percentage of market share "based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry."  *Id.*, ¶¶90-91.  The anticompetitive agreements are further refined and coordinated at regular "industry dinners," "girls nights out," lunches, parties, and numerous and frequent telephone calls, emails and text messages.  *Id.*, ¶¶9, 81-88.

**B.     Impax Suffered a Series of Setbacks Before the Class Period Began**

29.     Throughout 2013 Impax was under increasing analyst and investor scrutiny arising out of its inability to cure manufacturing problems at the Company's Hayward manufacturing

---

[1]     On March 1, 2017, Connecticut filed an Amended Complaint that increased the number of states involved in the litigation from 20 to 40, and on October 31, 2017, the State AGs filed a motion for leave to file a Consolidated Amended Complaint in *Connecticut v. Aurobindo Pharma USA, Inc.*, Civ. A. No. 17-3768 (E.D. Pa.), adding five new states, the District of Columbia and Puerto Rico. On June 18, 2018, the State AG's motion for leave to amend was granted, and the Plaintiff States' Consolidated Amended Complaint, MDL No. 2724 ("Amended AG Complaint") was filed, and two additional states joined as plaintiffs bringing the total number of states in the multistate group to 47 plus the District of Columbia and Puerto Rico.

1   facility.  The FDA had issued a warning letter for the facility in May 2011.  In January 2013, Impax

2   announced that the FDA had issued a Complete Response Letter denying final approval of the

3   Company's highly-anticipated branded drug, Rytary.  According to securities analysts at Jefferies,

4   the FDA's letter indicated that due to "'the facility's involvement in the development of Rytary,'"

5   the FDA required a successful re-inspection of the Hayward facility "'before the company's NDA'"

6   for Rytary "'may be approved.'"  In light of this news, analysts ratcheted up the pressure on Impax

7   to find new sources of revenue.  For example, a January 22, 2013 Cowen and Company analyst

8   report noted that "Manufacturing Continues To Burden The Story" and stated: "Given the

9   deteriorating near-term earnings as the key in-line generic products face increased competition,

10  management needs to help bridge – and solidify – the growth story.  And they need to do that soon,

11  in our view."

12          30.     In March 2013, the situation worsened, as Impax announced that the FDA had

13  completed its re-inspection of the Hayward facility and found additional deficiencies.  This meant

14  that the FDA would not approve any new products filed from that facility.  Leerink Swann analysts

15  noted that "Most of [Impax's] new products were filed from Hayward," and reduced their estimated

16  new product revenues by $40-$45 million.  Wells Fargo slashed its 2013 earnings per share ("EPS")

17  estimate from $0.93 to $0.28 and 2014 EPS estimate from $1.11 to $0.45, observing that "[t]he only

18  way for mgmt to raise investor outlook on revenue is through acquisitions, in our view."  Wells

19  Fargo explained that Impax's growth strategy was "predicated on its drug delivery technology

20  platform, which allows for the development of limited competition generics.  Cash flows from these

21  products were then used to fund development of branded products, which are improved versions of

22  existing drugs."  They noted that the strategy itself had not failed, but that "[i]nvestors may be

23  disappointed by recent setbacks, which speak to the execution of the strategy."

24          31.     Analysts continued to reduce their expectations through April and May 2013, while

25  repeatedly commenting that Impax needed to find a way to bridge the revenue gap created by the

26  FDA's warning letter until the Hayward facility was cleared and Rytary and pending generics were

27  approved.  For example, on May 2, 2013, Wells Fargo analysts wrote that "[w]ithout an infusion of

28  new generic products, we see the base business at best being breakeven or marginally profitable for

1   the remainder of 2013."   The analysts observed that using Impax's cash on hand to acquire a

2   marketed brand product could "serve as a bridge to overcome the earnings gap until Warning Letter

3   resolution."  Likewise, on June 16, 2013, Canaccord Genuity analysts reiterated that although Impax

4   had "several sizeable opportunities" in its pipeline, "[m]ost of these opportunities are tied to

5   Warning Letter close-out."

6          32.     Throughout the summer of 2013, focus remained on the unresolved manufacturing

7   issues.  On the Company's 2Q13 earnings call held August 8, 2013, defendant Reasons confirmed

8   that revenues were way down, and reeled off a litany of bad news:

9          •      "This decrease in revenue was due to a significant but expected decline in sales of
               our authorized generic Adderall XR, due to additional competition in late June 2012.
10             Since the approval of another generic competitor, our market share has declined from
               the low 30% range to approximately 10% since the beginning of 2013.  This has led
11             to significant decline in our revenue."

12         •      "We experienced lower sales of our fenofibrate as a result of additional competition
               last October on the capsule product."
13
           •      "Zomig revenues and profit contribution will also decline significantly.  Due to
14             generic entry this past May this impact adversely 85% to 90% of our brand sales."

15         33.     Reasons also acknowledged the overhang caused by the FDA's warning letter: "We

16  haven't received any new product approvals in more than two years due to the warning letter in

17  Hayward."  The next day, Cowen and Company analysts summed up the state of play: "The bottom-

18  line is that investors should still remain prepared for an ***extended 9-12 month delay***" on resolution of

19  the manufacturing issues, and therefore Impax's ability to monetize its still-unapproved branded and

20  generic drugs.

21         34.     In 3Q13, Impax recorded its first quarterly loss since 3Q08 with net losses of

22  $180,000 – as compared to net income of $20 million for the same period the prior year.  During the

23  November 4, 2013 earnings call, defendants also disclosed that the 2013 remediation costs for the

24  Hayward problem were now estimated to be $30 million, two or three times more than previous

25  expectations.  In addition, the loss of exclusivity on Zomig and increased generic competition on its

26  authorized generic oxymorphone continued to drag on revenue.

27         35.     As a result, the outlook for 4Q13 was also bleak per defendant Reasons:

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                          - 10 -

"[T]he combination of lower revenues of our authorized generic TRILIPIX following our strong launch, the potential impact of recent competition on oxymorphone, and reduced operating efficiencies due to lower manufacturing production levels at our Hayward facility may negatively impact our fourth quarter results."

36.     Against this backdrop stood digoxin, one of Impax's generic products with a highly concentrated market, significant barriers to entry, and no viable substitute – characteristics that are conducive to collusive activities.  Impax has been selling digoxin since July 20, 2009, when its Abbreviated New Drug Application ("ANDA") was approved by the U.S. Food and Drug Administration ("FDA").  Between 2009 and the end of 3Q13, the average price of digoxin remained stable at $0.16 per tablet.

## C.     Impax Colluded to Fix the Price of Digoxin

37.     Digoxin is used to treat heart failure and chronic atrial fibrillation.  The drug is relied upon by elderly patients for the treatment of rapid rhythm disturbances.  The World Health Organization has classified digoxin as an essential medicine.  No effective substitute exists for many patients with heart disease, and none of the comparable molecules or therapeutic equivalents are prescribed in any significant volume.  Millions in the U.S. rely on the pill every day.  During 2013, the overall market for digoxin was $198 million.  Sales by Impax and Lannett represented 94% of the total market, with Impax taking 23% and Lannett taking 71% of the market share.

38.     From October 28, 2013 to October 30, 2013, Impax, Lannett, and Par Pharmaceuticals ("Par") (a manufacturer that would soon enter the digoxin market) attended the Generic Pharmaceutical Association's ("GPhA") 2013 Fall Technical Conference in Bethesda, Maryland.  GPhA is a trade association for generic drug manufacturers and distributors.  Impax has been an active participant of the association and its employees have served as directors of the GPhA board.  From 2012 to 2014, Impax's President of the Generics Division, Carole Ben-Maimon, was a GPhA board director.  The October 28-30, 2013 conference, where Impax hosted a panel, featured networking opportunities for generic drug manufacturers – such as lunches, receptions, dinners and entertainment – and provided settings for Impax and its co-conspirators to meet in person to discuss and share market-sensitive information.

39.     Impax and Lannett hiked digoxin prices over 700% in lock-step in November 2013, immediately after the October 2013 conference.  This marked the first significant price increase for the essential drug in more than four years since Impax joined the market.[2]



Source: Symphony Health Solutions

40.     High market concentration enabled Impax and Lannett to immediately benefit from price hikes as purchasers had no alternative.  Indeed, 2014 market sales of digoxin increased almost three-fold to $577 million from $198 million in 2013 as a result of collusive price-fixing.  This increase was sustained through 2015 with total sales at $505 million before tapering off slightly in 2016 to $440 million.  The sales increase was solely attributable to the November 2013 price hike as the quantity of tablets sold actually declined slightly between the end of 2013 and 2016:

---

[2]    Par entered the market in January 2014 after entering into an agreement with Covis Pharma ("Covis") to distribute an authorized generic version of digoxin.  At a March 12, 2014 conference, Lannett's CEO Arthur Bedrosian ("Bedrosian") welcomed Par's entrance and stated that he expected to cede 20% of his company's market share to Par.  Indeed, through 2014, Par gained 20% market share at Lannett's expense while Impax's market share remained largely constant.

West-Ward's presence in the digoxin market during this period was marginal with less than 1% market share.  Its manufacturing capability for digoxin was compromised in February 2012 with the receipt of a warning letter from the FDA for aberrant tablets.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                          - 12

1
2
3
4
5
6
7
8
9
10



Source: Symphony Health Solutions

11    41.    During Impax's November 4, 2013 earnings call, shortly after the conference and the

12  coordinated 700% price hike that immediately followed, analysts questioned Ben-Maimon about

13  digoxin's "huge price increase."  Ben-Maimon responded: "The price increase on dig[oxin] speaks

14  for itself, but clearly, as a medically necessary drug, our focus there is really just to make sure that a

15  high-quality product is available to the customer."

16    42.    In reality, the digoxin price increase was the result of coordinated price-fixing.  It was

17  a massive price hike that had never occurred before.  The unprecedented price moves by Impax and

18  Lannett were highly correlated with an unusual degree of uniformity, registering at ***99% correlation***

19  with a statistically significant relationship that indicates the probability of obtaining such high

20  correlation by chance is less than 1%.  At the time of the coordinated price hike, digoxin had no

21  supply or production issues to justify the price increase.  There were no clinical investigator

22  inspections, no drug safety labelling changes, no post-market requirements and commitments studies

23  required by the FDA to assess possible serious risks associated with the drug, no FDA notification of

24  drug shortages,[3] no change in formulation, and no new patent.  In fact, Par entered the scene as a

25  brand new entrant to the digoxin market less than six weeks after Impax and Lannett's coordinated

26

27

28  [3]   Drug manufacturers are required by the Food and Drug Administration Safety Innovation Act of
2012 to report potential drug shortages to the FDA.

1    price hike.  Par set its digoxin price at the same level fixed by the two seasoned companies despite

2    its need to build market share from scratch.

3          43.    On Impax's February 20, 2014 earnings call, Ben-Maimon falsely characterized

4    Impax's price hike as "rational" and declined to further discuss digoxin pricing:

5          I don't want to really specifically talk about pricing on digoxin. . . .  We're pretty
           comfortable that **what we have done is rational**, and will result in ongoing
6          profitability for that product.

7          44.    Although Par's entry into the digoxin market prompted analysts' concerns about

8    potential price discounting, Lannett's CEO was unperturbed by the increased competition and

9    praised Par as "one of our rational competitors in the marketplace" during Lannett's February 6,

10   2014 earnings call:

11         Rohit Vanjani, Analyst, Oppenheimer & Co.: Hi, guys, congrats on the quarter,
           again.  On digoxin, **you said that Par is a rational competitor**.  Are you seeing
12         anything on the pricing front from them, in terms of discounting?

13         Arthur Bedrosian: Well, with discounting to our price, no.  We've seen their prices
           discounted to the brand of course, but **we're not troubled by their pricing in the**
14         **marketplace, not at all**.

15         45.    In the absence of price collusion, Impax's price increase on digoxin would have been

16   against its self-interest.  The rational response to the massive price increase would be to keep prices

17   lower and capture market share.  Generic drugs, including digoxin, are a commodity, with any

18   generic drug substitutable with another, and differentiated competitively with each other primarily

19   based on price.  In a market free of collusion, if one generic drug marketer raises its prices

20   significantly above those of its competitors, that marketer will lose market share.  The market for

21   generic digoxin was mature; competitors could only gain market share by competing on price.  Yet,

22   as explained above, Impax and Lannett increased the price of digoxin substantially, neither cut the

23   other's prices, and both maintained their market share:

24

25

26

27

28



*Source: Symphony Health Solutions*

**D.   The Collusive Digoxin Price Hike Drove Impax's Rebound in 2014**

46.   Impax reaped significant benefits from the price hike immediately and attributed revenue increases in each quarter during 2014 to digoxin.  Collusive revenue from digoxin drove Impax's substantial revenue growth and profitability during 2014.

47.   On Impax's May 1, 2014 1Q14 earnings call, the Company announced a solid first quarter driven by digoxin, which offset the problems stemming from 2Q13 and 3Q13:

> Bryan Reasons – Impax Laboratories Inc. – CFO: . . . Our generic products division had a ***solid first quarter*** as we benefited from the impact of marketing initiatives and product mix.  These events also had a positive impact on our gross profit margin. However, compared to first quarter 2013, increased generic product sales only partially offset the expected decline in branded sales of our Zomig product.  This is due to a loss of exclusivity last May on the Zomig tablets and ODT.
>
> *                    *                    *
>
> Total generic revenues increased $7.5 million or 7% to $109 million.  This was ***primarily the result of increased sales of our Digoxin product*** and from sales of authorized generic Trilipix and generic Solaraze.  The increase was partially offset by a decrease in sales of authorized generic Adderall and fenofibrate products.

48.   In its 2Q14 Form 10-Q, filed on August 6, 2014, Impax described digoxin's contribution to the increase in its generic segment's revenue during the first six months of 2014:

> Revenues from our Global Division increased $89.9 million during the six month period ended June 30, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets and Trilipix® delayed release capsules, in addition to ***higher sales of our Digoxin*** and generic Solaraze® products.

49.     In its 3Q14 Form 10-Q, filed on November 4, 2014, Impax attributed the generic segment's revenue increase during the first nine months of 2014 to digoxin:

> Revenues from our Global Division increased $119.8 million during the nine month period ended September 30, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to ***higher sales of our Digoxin*** and generic Solaraze® products.

50.     Throughout 2014, Impax was a turn-around story because of the digoxin price hike. Digoxin generated net sales of $49.7 million in 2014, representing 9.4% of Impax's total net generic product sales.[4]   In its 2014 Form 10-K filed on February 26, 2015, the Company again noted digoxin's contribution to its 2014 revenue:

> Revenues from our Global Division increased $150.7 million during the year ended December 31, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to ***higher sales of our Digoxin*** and generic Solaraze® products.

51.     In a nutshell, throughout 2014, Impax attributed the significant generic segment sales growth mainly to digoxin:



52.     The increase in revenue went straight to the bottom line to boost profitability because the unjustified and collusive price hike increased gross profit margins with no incremental increase

---

[4]   Impax reported net revenues, which were all sales minus chargebacks, returns, discounts, rebates, and other deductions.  Impax did not regularly report net revenues by drug.  However, in the 2016 Form 10-K, at the SEC's request, Impax identified its top five generic drugs by net revenue which, in 2014, included digoxin.

in cost.  CFO Reasons recognized digoxin's contribution to profitability during the February 24, 2015 4Q14 earnings call:

> Our total revenues in the fourth quarter increased $30 million, or 30% to $131 million.  Driving this increase was higher generic sales of Adderall XR, Digoxin, and Solaraze gel. . . .
>
> ***We realized the higher pricing during 2014***.  Our adjusted gross margins in the fourth quarter 2014, increased to 51% from approximately 45% due to higher sales of the products previously mentioned.

53.    Impax's stock price increased dramatically on the turnaround story – rising from $25.20 on February 20, 2014 to $40.70 on February 26, 2015.

54.    Even as competition set in during 2015, Impax continued to benefit from the digoxin price-fixing conspiracy.  Between 2013 to 2016, Impax reaped more than $220 million from illegal, collusive revenue from digoxin alone.[5]

| Collusive Revenues | 4Q13 ($m) | 2014 ($m) | 2015 ($m) | 2016 ($m) | Total ($m) |
|---|---|---|---|---|---|
| Digoxin | 25.1 | 109.1 | 64.8 | 25.4 | 224.4 |

55.    The November 2013 price hike was a structural break that could not be explained by digoxin's historical price trends and volatility, even after adjusting for inflation, or the average price movements of the prescription drug market.  Based on historical price trends and volatility, the price of digoxin would have remained around $0.14 per tablet from 2013 to 2016 without the conspiracy,

---

[5]    Collusive revenue represents the amount of additional revenue that Impax received due to anticompetitive behavior.  This is calculated by taking the difference between the actual price Impax received minus the "but for" price and multiplied by the actual quantity sold:

- The actual price paid is based on the manufacturers list price (also known as Wholesale Acquisition Cost or "WAC") less wholesaler discounts (estimated using National Average Drug Acquisition Cost or "NADAC").

- The "but for" price is based on three different methodologies: (1) regression of pre-collusion price to determine "but for" price based on historical price trends and volatility, (2) regression of pre-collusion price to determine "but for" price based on historical price trends, volatility and inflation, and (3) average prescription drug market price changes in the post-collusion period.

- The actual quantity sold is used to determine collusive revenue instead of a "but for" quantity because: (1) a regression analysis found no relationship between prices and quantities, showing that as price increased significantly, this had no effect on quantity demanded; (2) digoxin is a highly inelastic drug; and (3) digoxin has no substitutes, meaning that consumers have no alternative when prices rise substantially.

or increased to $0.20 per tablet by 2016 after adjusting for inflation.  Alternatively, by adjusting the pre-collusion price of digoxin by the average price increases in the prescription drug market between 2013 and 2016, the price of digoxin would not exceed $0.22 per tablet by the end of 2016 without the collusive price hike.  Throughout the Class Period, the price of digoxin did not return to its historical pre-collusion price level, enabling Impax to continue to benefit from its illegal activities.

56.     During Impax's August 9, 2016 earnings call, Wilkinson acknowledged the importance of digoxin's revenues to Impax from 2013 to 2016 given the company's dearth of product launches, and touted Impax's ability to hold onto market share of digoxin and other key drugs:

> Over the past several years, with no-to-limited product launches, we actually held share on a number of our established products.  Slide 8 shows the market share of some of the *key generic products* in our portfolio . . . we have managed minimal share decline on many of the other key products.



57.     With digoxin's significance to the Company as a key product and the substantial collusive revenues earned during the Class Period, Impax's statements concerning the Company's

1  sales figures and other measures of financial performance were materially misleading to investors as

2  they failed to disclose that the financial results were achieved by engaging in an illegal conspiracy.

3      **E.    Elevated Collusive Pricing on Digoxin Eventually Attracted
                Competitors and Impax's Profits from the Scheme Were Reduced,**

4      **Causing the Company's Stock Price to Decline**

5          58.    Because Impax's financial results were inflated through its participation in an

6  anticompetitive cartel, these figures deflated when competitors entered the market.  The grossly

7  inflated prices attracted additional participants to the digoxin market during 2015.  As those

8  competitors entered the market, existing digoxin sellers, including Impax, were forced to make

9  room.  As a result, Impax lost market share, net prices for digoxin declined slightly and the impact of

10 the collusive price-fixing environment was diminished.[6]

11         59.    Through their investigations, the Attorneys General found that the conspiratorial

12 conduct identified in their allegations was "pervasive and industry-wide and the schemes identified

13 herein are part of a larger, overarching understanding about how generic manufacturers fix prices

14 and allocate markets to suppress competition."  Amended AG Complaint, ¶11.  The overarching

15 understanding applied whether the scheme involved allocation of market share or an agreement to

16 fix prices.  *Id.*, ¶¶8, 14.  According to the Amended AG Complaint, "[t]his overarching agreement is

17 widespread across the generic drug industry and is broader than the Defendants named in this

18 Complaint."  *Id.*, ¶92.

19         60.    The overarching conspiracy rested on "general rules of the road" that were put in

20 place by generic manufacturers over a decade ago – that each competitor was entitled to a certain

21 percentage of market share "based on the number of competitors in the particular drug market, with a

22

23 _____
   [6]   Despite the slight decline in Digoxin prices due to increased competition, the digoxin pricing
   environment remained artificially inflated.  *See* ¶39, *supra*.  Indeed, during 2015 and 2016, digoxin

24 pricing still far exceeded the pre-cartel pricing in late 2013.  Impax acknowledged this fact on its
   2Q15 earnings call:

25         As most of you know, the generic, another generic competitor for Digoxin has

26         entered the market, making this a six-player market.  As previously disclosed and
           expected, margin and pricing have been impacted, as is typical in a generic multi-

27         player market.  ***This product is still more valuable than prior to the market
           disruption that happened 18 to 20 months ago*** [*i.e.*, December 2013 to February

28         2014].

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                    - 19 -

1    potential adjustment based on the timing of their entry." *Id.*, ¶¶90-91.  In general, the earlier entrant

2    was entitled to additional market share.  *Id.*  In practice, a generic manufacturer with more than its

3    fair share of the market would walk away from a customer by instigating a price increase to allow its

4    competitor seeking to obtain its fair share to bid slightly below the increased pricing.  *Id.*, ¶99.  After

5    the market reached an equilibrium, the manufacturers then agreed on not competing on prices or

6    significantly raising prices in coordination.  *Id.*  At the equilibrium state, manufacturers did not take

7    advantage of another competitor's price increase by bidding lower prices, as doing so would be

8    "viewed as 'punishing' a competitor for raising prices – which [was] against the rules."  *Id.*, ¶106.

9            61.     Adherence to the "general rules of the road" by all competitors was crucial to

10   maintaining high prices, because even a single deviant could lead to competition and lower prices.

11   *Id.*, ¶107.  Even for a new entrant to the market seeking to attain market share, "an underlying code

12   of conduct," widespread in the industry, was adhered to that allowed the new entrant and existing

13   manufacturers to determine "a generally agreed-upon standard of 'fair share' in order to avoid

14   competing and keep prices high."  *Id.*, ¶¶14, 100.

15           62.     In the case of digoxin, and consistent with the rules of the road governing collusive

16   scheme described in the Amended AG Complaint, Lannett ceded market share to Par when Par

17   entered the market in January 2014 and began distributing an authorized generic version of digoxin.

18   Through 2014, Par gained 20% market share at Lannett's expense while Impax's market share

19   remained largely constant.  When additional competitors entered the digoxin market in 2015, it was

20   Impax's turn to cede share in order to maintain equilibrium under the "general rules of the road."

21   Impax's market share fell throughout 2015 from approximately 42% at the end of 2014, to 37% as of

22   the end of 1Q15 (March 31, 2015), 34% as of the end of 2Q15 (June 30, 2015), 32% at the end of

23   3Q15 (September 30, 2015) and 29% as of the end of 2015.  Although there were slight price

24   declines, digoxin prices remained inflated at levels near the collusive level initially established by

25   Impax and Lannett in November 2013.

26           63.     On May 11, 2015, Impax reported 1Q15 results.  Impax reported a significant decline

27   in gross margins which it attributed, in large part, to a decline in digoxin sales.

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                                    - 20 -

1          Our adjusted gross margins in the first quarter of 2015 decreased to 47%,
   from approximately 61% last year, primarily due to higher sales of lower margin
2   generic products, the impact of additional competition on generic digoxin, the later
   than anticipated clearance of the Tower acquisition, and the delayed launch of certain
3   other products.

4          64.    Following the 1Q15 earnings release, analysts highlighted the disappointing gross

5   margins.  For example, on May 12, 2015, Leerink Swann analysts wrote:

6          IPXL's reported GM [gross margins] came in much lower than the Street was
   modeling at ~47.4% vs. Street's 54.9%.  The drag was attributed to the IPXL's
7   generic biz where it saw increased pricing pressure due to increased competition for
   digoxin.

8
9          65.    Likewise, on May 11, 2015, Wells Fargo analysts wrote:

10         Gross margin was the primary source of the EPS miss, due to generics.
   Overall adjusted GM was 47.4%, vs 53.8% consensus.  Generics GM drove this
11  shortfall, at 45.0%, down YoY from 60.4% due to revenue mix.  IPXL does not
   report individual product revenues but we suspect digoxin pricing erosion with
12  additional competition was a primary culprit.

13         66.    The following day, Impax's stock price declined $1.25, or 2.7%, on more than three

14  times the prior week's average trading volume.  In contrast, the S&P 500 went down only 0.3%.

15         67.    Three days later, at the Bank of America Merrill Lynch Health Care Conference,

16  Impax's Mark Donohue assured investors that Impax was able to retain the majority of its customers

17  despite the increased competition in the digoxin market:

18         Sumant Kulkarni – BofA Merrill Lynch – Analyst: . . . We have a few seconds here,
   so last question on the base business side of things.  *The fenofibrate, digoxin, and
19  your version of OPANA ER – how should we think about the competitive scenarios
   there*?

20         Mark Donohue – Impax Laboratories Inc. – VP, IR and Corporate Communications:
   We've been expecting competition on fenofibrate for a number of years, and it
21  remains a good market for us.  *And obviously digoxin is – there's a couple of
   players who have entered the market recently*.  And now it's a five-player market.
22  And we've discussed that we have seen competitive pressure in that market, but *we
   are holding on to the majority of the customer base*.

23         68.    However, three months later, during the August 10, 2015 2Q15 earnings call, CFO

24  Reasons reported a significant decline in revenue, gross margins, and earnings which he attributed,

25  in significant part, to a decline in digoxin sales:

26         [W]ithin the generic division, *revenues were down* slightly in the second quarter of
   2015 compared to last year.  *The main drivers of the decline were* the loss of
27  authorized generic Renvela, *lower sales of Digoxin*, and the loss of the profit share
   and milestone payments.

28

\*       \*       \*

Our adjusted gross profit declined, as well as our ***adjusted gross margin, which decreased to 50% from approximately 64% last year***. The primary drivers of this decline were the loss of sales of high-margin generic Renvela, the prior year period receipt of more than $9 million from third-party profit share and milestone payments, and ***the impact of additional competition on generic Digoxin***.

\*       \*       \*

Adjusted ***earnings per diluted share decreased to $0.34 in the second quarter*** of 2015, compared to $0.60 last year. ***This decrease was primarily attributable to*** the loss of $49 million of high-margin generic Renvela sales, the loss of approximately $9 million of gross profit from third-party profit share and milestone payments, ***a decline in gross profit earned on generic Digoxin due to additional competition,*** higher interest expense of $6 million, and a higher adjusted tax rate.

69.     Following the 2Q15 earnings call, analysts highlighted the disappointing gross margins. An August 10, 2015 UBS analyst report summed it up: "[t]he lower gross margin guidance was disappointing."

70.     On August 10, 2015, Impax's stock price declined $1.43, or 3%, on almost two times the prior week's average trading volume. In contrast, the S&P 500 was up 1.3%. The slide continued on August 11, 2015, with Impax stock dropping another $1.03, or 2.3%, on nearly one and a half the prior week's average trading volume, while the S&P 500 dropped only 1%.

71.     After 2Q15, Impax stopped directly referencing digoxin sales. However, several analysts estimated that digoxin revenues continued to materially decline throughout 2015 and 2016. For example, UBS provided the following digoxin sales estimates in its November 10, 2016 analyst report:

| (in millions) | Q115 | Q215 | Q315 | Q415 | Q116 | Q216 | Q316 | Q416 |
|---|---|---|---|---|---|---|---|---|
| Digoxin sales | $9.0 | $6.9 | $5.6 | $5.0 | $2.4 | $2.2 | $2.0 | $1.9 |

72.     Indeed, Impax's digoxin sales declined materially during 2015 and 2016:

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:16-cv-06557-HSG

Digoxin Tablets: Total WAC Sales

Source: Symphony Health Solutions

73.     Despite the decline in digoxin revenue, Impax continued to benefit from price-fixing as digoxin prices continued to far exceed pre-cartel pricing.  Impax also continued to conceal from investors that it had engaged in illegal price-fixing activity that exposed the Company to material regulatory, reputational, and financial risks that could have material impacts on the Company's operations.  During 2015 and 2016, analysts noted their concerns regarding the impact of increasing pricing scrutiny in the generic drug industry and on Impax's generics business.  However, as discussed in §IV.I., below, defendants quieted analyst and investor concerns by concealing the illegal price-fixing activity and affirmatively denying any wrongdoing.

**F.     Impax Colluded to Fix the Price of Pyridostigmine**

74.     At the end of 2014, Impax faced the continued and indefinite halt in new product launches due to ongoing compliance concerns raised by the FDA's Form 483s – and by this time not only in Hayward, but also at the Company's Taiwan manufacturing facility.  In addition, its brand business continued to be unprofitable and new competitors loomed over the digoxin market as discussed during the November 4, 2014 earnings call:

Fred Wilkinson – Impax Laboratories Inc. – President and CEO

*       *       *

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                              - 23 -

1
2
3
4

       As we've discussed on previous calls, corporate quality initiatives remain the top priority for myself, as well as all employees of the Company.  With the ultimate goal of vacating the warning letter at the Hayward facility and removing the compliance hold on product approvals.  In August, we submitted the responses to the FDA for **both the Hayward and Taiwan Form 483s that resulted from our recent inspections**.

*     *     *

5
6

David Amsellem – Piper Jaffray & Co. – Analyst

       Fred, if I may follow-up, **is the brand business profitable now**?

7
8

Fred Wilkinson – Impax Laboratories Inc. – President and CEO

       ***I don't think so.***

9
10

*     *     *

Elliot Wilbur – Needham & Company – Analyst

11
12

*     *     *

13
14

       Then maybe just some comments around the Digoxin market, obviously been very strong performer.  Just whether or not you could, in fact, confirm that Mylan is expected to enter that market or not? . . .

15
16

*     *     *

Fred Wilkinson – Impax Laboratories Inc. – President and CEO

17
18

*     *     *

       ***And then finally on Digoxin, this has been a healthy market, as you have recognized also.  We do anticipate Mylan coming into the marketplace.  In fact, they are there now***.

19
20

       75.    In response, Impax bolstered revenues by colluding to fix the price of another generic

21

drug, pyridostigmine.  Pyridostigmine is an acetylcholine inhibitor that has been commonly used as a

22

first-line therapy for myasthenia gravis – a chronic muscular disorder characterized by muscle

23

weaknesses and exertion fatigue – for the past 50 years.  Pyridostigmine is used to treat the

24

symptoms of the disease.

25

       76.    Impax has been selling pyridostigmine since April 24, 2003, when its ANDA was

26

approved by the FDA.  Before the end of 2014, the price of the drug had been stable and constant for

27

at least six years with Impax selling the drug at $0.39 per tablet – a slightly lower price than

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:16-cv-06557-HSG        - 24 -

1   Valeant's generic version selling at $0.48 per tablet.  Valeant's generic version of the tablet was

2   packaged by its subsidiary Oceanside Pharmaceuticals.

3          77.     Like digoxin, pyridostigmine was an ideal candidate for collusive price-fixing.  The

4   market was highly concentrated and was dominated by Impax and Valeant since at least 2009 – with

5   Impax taking 64% to 74% market share and Valeant taking 29% to 36%.  Barriers to entry were

6   significant as any new ANDA approval would take approximately three years.  No viable substitute

7   existed for myasthenia gravis patients reliant on the drug because pyridostigmine was the most

8   commonly used and safest first step treatment of the symptoms of the disease.

9          78.     Valeant was an ideal co-conspirator as Impax and Valeant had a long-standing and

10  close collaborative relationship since 2008.  According to Impax's annual report, the two companies

11  entered into a joint development agreement and a license and settlement agreement "to collaborate in

12  the development of a total of five dermatology products, including four of the Company's generic

13  products and one branded advanced form of Valeant's SOLODYN® product."   Under the

14  agreement, Valeant paid Impax significant upfront and milestone payments.  Impax also withdrew its

15  patent challenge and refrained from entering the generic market for Solodyn.

16         79.     With such favorable factors in place for a profitable collusion, between

17  December 2014 and March 2015, both companies hiked pyridostigmine prices to the identical

18  amount of $1.02 – taking prices to an unprecedented level and breaking Impax's tradition of

19  undercutting Valeant's pricing since Impax's launch of the drug in 2005.  This unprecedented and

20  collusive price hike measured at 94% correlation, with statistical significance so high that the

21  probability of obtaining such large correlation by chance is less than 1%.  The price hike almost

22  tripled the price of the tablet, with 2015 sales soaring to $64 million from $28 million in 2014.  The

23  heightened sales were sustained through 2016 at $66 million.  The increased sales were solely due to

24  the collusive price hike and largely shared by the two co-conspirators.  The hike occurred shortly

25  after the October 27 to October 29, 2014 GPhA Fall Technical Conference, which both Impax and

26  Valeant attended.

27         80.     At the time of the unprecedented and massive price hike, there were no known supply

28  or production issues such as drug safety labelling changes, enforcement reports, or potential drug

shortages reported to the FDA as required by regulations.   Pyridostigmine prices had been consistently stable at around $0.39 to $0.48 ever since Impax's entrance into the market.

81.   Between 2014 and 2016, Impax reaped more than $47 million of illegal, collusive revenues from pyridostigmine.  The December 2014 price hike was a structural break that could not be explained by pyridostigmine's historical price trends and volatility, or by the average price movements of the generic drug market.  Based on historical price trends and volatility, without the conspiracy, the price of pyridostigmine would have remained stable at $0.40 per tablet between 2014 and 2016, or gradually increased to $0.46 per tablet after adjusting for inflation.  Similarly, by adjusting the pre-collusion price of pyridostigmine by the average price increases in the generic drug market between 2014 and 2016, the price of pyridostigmine would not have exceeded $0.47 per tablet by the end of 2016 without the collusive price hike.

| Collusive Revenues | 4O14 ($m) | 2015 ($m) | 2016 ($m) | Total ($m) |
|---|---|---|---|---|
| Pyridostigmine | 1.5 | 25.9 | 20.0 | 47.4 |

**G.   The Structure of the Digoxin and Pyridostigmine Markets Facilitated Impax's Collusion**

82.   The digoxin and pyridostigmine markets were highly conducive to price-fixing. Characteristics that facilitated collusion include: (1) a high level of market concentration; (2) near perfectly inelastic demand; (3) the commoditized-nature of both drugs; (4) the significant barriers to entry; and (5) the ease of information sharing.

**1.   High Level of Market Concentration**

83.   The Herfindahl-Hirschman Index ("HHI") is a widely-accepted market concentration measurement and is used by antitrust enforcement agencies, such as the Federal Trade Commission ("FTC") and the U.S. Department of Justice ("DoJ"), for assessing market competitiveness.  An HHI of 0 is indicative of perfect competition and an HHI of 10,000 is indicative of a monopoly.  The DoJ and FTC's Horizontal Merger Guidelines classify a market as unconcentrated when HHI is below 1,500, moderately concentrated when HHI is between 1,500 and 2,500, and highly concentrated when HHI exceeds 2,500.

84.    The score is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, in a market consisting of three companies with market shares of 10%, 40% and 50%, the HHI is 4,200 (100 + 1,600 + 2,500).

85.    Beginning in 2012, the HHI for the digoxin market exceeded 4,500 and rose steadily to over 5,000 by 3Q13 – a level indicative of a highly concentrated market.  By 4Q13, three manufacturers made up substantially all of the digoxin market.  Concordia Healthcare Corp. ("Concordia")/Covis manufactured Lanoxin, the branded version of digoxin.  Impax and Lannett manufactured the generic version and dominated the digoxin market with 94% market share.  During 4Q13, Par was negotiating the distribution of an authorized generic version of digoxin with Covis and began distributing the drug in January 2014.

86.    A highly concentrated market is vulnerable to coordinated activities because fewer firms are involved in the negotiation, collusive revenues are high for each firm, and the cartel tends to be stable with the absence of cheating.  These were the characteristics of the digoxin market beginning in late 2013.  The three conspirators – Impax, Lannett and Par – had a formulated script justifying the price hike and describing each other's action as "rational."  On February 6, 2014, Lannett's CEO Bedrosian stated during an earnings call: "we see Par as one of our rational competitors in the marketplace."  During Impax's February 20, 2014 earnings call, defendant Ben-Maimon stated: "We're pretty comfortable that what we have done is rational . . . ."  A supposed competitor's entrance into the market was much welcomed.  At the February 23, 2014 Leerink Swann Global Healthcare Conference, Bedrosian commented: "We're grateful that they selected Par.  Par is one of the more rational players in the marketplace."  At the March 12, 2014 ROTH Conference, he again applauded: "We are glad that it was Par."  Despite new competition, Impax held on to its market share throughout 2014 regardless of its elevated digoxin pricing.  While Lannett yielded market share to Par, it was ungrudgingly given.  During the February 6, 2014 Lannett earnings call, Bedrosian stated: "we feel we'll probably have some reduction in units.  We're not sure of the exact amount, but I would say it would be less than 20%, in terms of the total market, so we don't see a big impact on us."  At the March 12, 2014 ROTH Conference, Bedrosian stated: "We are glad that it was Par.  And we were expecting to lose some market share to them in terms of units,

1  and we calculated roughly allowed ourselves a 20% unit loss in the marketplace to an additional

2  competitor." Ultimately, although Par charged just as much as Lannett, it captured almost exactly

3  20% of Lannett's share during 2014 – just as predicted.

4       87.    The loss of market share was allowed and did not create a big impact because

5  collusive revenues were high.  Total market sales increased from $198 million in 2013 to

6  $505 million in 2014 alone, with substantially all of it shared by the three conspirators in a highly

7  concentrated market.

8       88.    For the pyridostigmine market, the HHI reached its apex at the end of 2014 and 1Q15,

9  registering at a high of 6,164.  Impax and Valeant represented 100% of the generic pyridostigmine

10  market, with Valeant also manufacturing the branded version of the drug.  At the time of the

11  collusive price hike, the two firms had already established a long-standing collaborative relationship

12  to not compete in another drug.  Pyridostigmine was just another opportunity.

13           **2.**     **Inelastic Demand**

14       89.    Elasticity of demand ("Ed") is measured by the change in quantity of goods sold

15  relative to the change in price.  When Ed is zero, demand is perfectly inelastic as there is no change

16  in the quantity of goods sold despite a large increase in price.  Inelastic demand encourages cartel

17  behavior as a significant increase in price has minimal effect on quantity demanded by consumers.

18  As such, the cartel can maximize profit because price increases will directly translate into revenues.

19       90.    At the time of the collusive price-fixing, the digoxin and pyridostigmine markets were

20  characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For digoxin, the

21  seven-fold increase in the price of digoxin resulted in a reduction of quantities sold by a mere 8%.

22  For pyridostigmine, the market was so inelastic that the dramatic price increase had no negative

23  effect on sales whatsoever and quantities sold actually increased by 4.6%.  As a result, the

24  coordinated price hike translated immediately and directly into collusive revenues shared by the co-

25  conspirators.

26           **3.**     **Commodity-Like Product**

27       91.    A commodity-like product is a standardized product where price is the only

28  distinguishing factor for purchasers.  Both digoxin and pyridostigmine are AB-rated generic drugs

by the FDA, which indicates that they are bioequivalent to their respective branded versions.  In addition, the FDA's Orange Book shows that Impax's versions of digoxin and pyridostigmine are therapeutically equivalent to other manufacturers' generic versions of the same drugs.  As stated in its Orange Book, the "FDA believes that products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."  As such, pharmacists are able to substitute one manufacturer's version of a drug for another.

92.     For commodity-like products such as digoxin and pyridostigmine, all of the manufacturers must raise prices for the collusion to be viable.  Price hikes by Impax without the co-conspirators' agreement to join the heightened price levels would enable competitors to take market share away by simply setting prices below Impax's price point.  Thus, the coordinated massive price hikes could only be sustainable with the cooperation and agreement among the co-conspirators.

### 4.     No Viable Substitute

93.     The lack of a viable substitute encourages cartel behavior because consumers cannot replace the product after significant price hikes.

94.     Digoxin is the prescription of choice for doctors when it comes to heart medication, as none of the molecules that are comparable to it are prescribed in any significant volumes.  In addition, since at least 2002, digoxin has been listed as a World Health Organization "essential medicine" that is crucial to "the priority health care needs of the population."

95.     Pyridostigmine has been the most commonly used and first-line treatment therapy for patients with myasthenia gravis for over 50 years.  Because pyridostigmine is generally considered safe, it is particularly suitable for patients requiring long term treatment of the disease.

96.     In addition to the fact that no effective substitute exists for some patients on digoxin and pyridostigmine, various barriers in the medical field also serve to promote the resistance to prescription changes.   These barriers include doctors' reluctance to change well-known prescriptions, insurance and Medicare's absorption of most of the price shock, lags in co-payment tiering changes, and the restriction on Medicare from negotiating drug prices with pharmaceutical companies.

1      97.     The lack of a viable substitute for digoxin and pyridostigmine enabled the collusive

2    price-fixing to be sustained over an extended period.

3                      **5.      Barriers to Entry**

4      98.     Collusion is more effective in markets with high barriers to entry because new

5    competitors cannot easily enter the market and undercut the agreed-upon price.

6      99.     A competitor attempting to enter the generic drug market faces the barrier of both

7    time and costs.  The generic drug approval process creates a significant barrier to entry for the

8    digoxin and pyridostigmine markets.  An ANDA approval by the FDA takes an average of 36

9    months.  Upon approval, the manufacturing facility is subject to regulatory oversight and compliance

10   expenses.  Indeed, Impax's non-compliance at the Hayward and Taiwan manufacturing facilities

11   demonstrates the high costs of regulatory compliance and the dire consequences of non-compliance.

12   Impax acknowledged in each of its annual reports that its products "are generally difficult to

13   formulate and manufacture, providing certain competitive advantages."

14     100.    A high barrier to entry to the digoxin and pyridostigmine markets enabled the

15   collusive price-fixing to be sustained over an extended period.

16                     **6.      Information Sharing**

17     101.    Information sharing is important in a conspiracy to enable the cartel to come to an

18   agreement and monitor pricing decisions and compliance.

19     102.    Impax and its co-conspirators were in constant contact prior to the collusive price

20   hikes through industry conferences and trade association meetings.  The 40 state attorneys general

21   stated that "these trade shows and customer conferences provide generic drug manufacturers,

22   including but not limited to the defendants, with ample opportunity to meet, discuss, devise and

23   implement a host of anticompetitive schemes that unreasonably restrain competition in the United

24   States' market for generic drugs."  As such, the DoJ is scrutinizing "'trade associations as part of

25   their investigation as having been one potential avenue for facilitating the collusion between

26   salespeople at different generic producers.'"[7]

27   _____

28   [7]    http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

103.    According to the GPhA's website, GPhA is "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The GPhA provides a forum for frequent in-person meetings and opportunities to collude:

| Meeting | Date & Location | Attendees |
|---|---|---|
| 2013 GPhA Annual Meeting | February 20-22, 2013 Orlando, Florida | Impax, Mylan, Par |
| 2013 GPhA CMC Workshop | June 4-5, 2013 Bethesda, Maryland | Impax, Lannett, Mylan, Par, Sun |
| 2013 GPhA Fall Technical Conference | October 28-30, 2013 Bethesda, Maryland | Impax, Lannett, Mylan, Par, Sun |
| 2014 GPhA Annual Meeting | February 19-21, 2014 Orlando, Florida | Impax, Mylan, Par, Sun |
| 2014 GPhA CMC Workshop | June 3-4, 2014 Bethesda, Maryland | Impax, Lannett, Mylan, Par, Sun, Valeant |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014 Bethesda, Maryland | Impax, Lannett, Mylan, Par, Sun, Valeant |
| 2015 GPhA Annual Meeting | February 9-11, 2015 Miami Beach, Florida | Impax, Mylan, Par, Valeant |

104.    Within a week after the 2013 GPhA Fall Technical Conference, Impax and Lannett implemented the lockstep and unprecedented massive price hike on digoxin.

105.    Similarly, less than two months after the 2014 GPhA Fall Technical Conference, Impax and Valeant began to implement the lockstep and unprecedented massive price hike on pyridostigmine.

106.    Impax has always occupied a leadership role at the GPhA.  Ben-Maimon, President of Global Pharmaceuticals, acted as a director of the GPhA board from 2012 to 2014, until her resignation from Impax.  Upon her resignation, another Impax employee – Marcy MacDonald – took the board seat.  Before Ben-Maimon, Impax's former CEO, President and Director Max Mendelsohn had the board seat.  In addition to acting as directors, Impax's employees have frequently hosted panels and served as speakers at the conferences.

107.    In addition to the GPhA, Impax and other drug manufacturers have opportunities to meet and collude at association meetings hosted by the National Association of Chain Drug Stores, Healthcare Distribution Alliance, and Efficient Collaborative Retail Marketing.

108.   Besides in-person meetings, pricing and market information were communicated through investor conference calls.  For example, Lannett's CEO frequently spoke for Impax and Par.  For instance, during an earnings call on November 3, 2014, Lannett's CEO Bedrosian stated, "everybody has accepted the fact that our costs are going up dramatically and less concerned about grabbing market share."  He continued, "since the companies we're looking at here are not irrational players, I don't see them just going out and trying to grab market share."

109.   In addition to issuing directives through investor calls, pricing and market information were shared through subscription-based databases.  The availability of market-sensitive information facilitates the coordination and collusion between manufacturers.  Impax and other manufacturers have the ability to share pricing, market share, quantities and sales information on a weekly basis through subscription-based data providers such as Symphony Health Solutions, IMS, and First Data Bank.

## H.   Impax and Its Co-Conspirators Are Under Multiple Governmental Investigations for Anticompetitive Price-Fixing

110.   In light of massive generic drug price increases, on January 8, 2014, the CEO of the National Community Pharmacist Association wrote a letter to Congress requesting an oversight hearing to determine the causes of the price jumps.  The State of Connecticut also found that:

> Prices for dozens of generic drugs have uncharacteristically risen – some have skyrocketed – for no apparent reason, sparking outrage from public officials, payers and consumers across the country whose costs have doubled, tripled or in some cases increased up to 1,000% or more.  The growing outrage and public reports of unexplained and suspicious price increases caused the State of Connecticut to commence an investigation in July of 2014, which was followed shortly thereafter by . . . the United States Department of Justice Antitrust Division.

111.   Impax and its co-conspirators were among the first generic manufacturers to be investigated by the Connecticut Attorney General, Congressional committees, and the DoJ.

112.   On July 15, 2014, Impax filed a Form 8-K with the SEC announcing that it had received a subpoena from the Attorney General of the State of Connecticut requesting documents and information concerning digoxin:

> On July 14, 2014, [the Company] received a subpoena and interrogatories (the "Subpoena") from the State of Connecticut Attorney General ("Connecticut AG") concerning its investigation into sales of the Company's generic product, digoxin.  According to the Connecticut AG, *the investigation is to determine*

*whether anyone engaged in a contract, combination or conspiracy in restraint of trade or commerce which has the effect of (i) fixing, controlling or maintaining prices or (ii) allocating or dividing customers or territories relating to the sale of digoxin in violation of Connecticut state antitrust law.* The Company intends to cooperate with the Connecticut AG in producing documents and information in response to the Subpoena. To the knowledge of the Company, no proceedings [by the Connecticut AG] have been initiated against the Company at this time, however no assurance can be given as to the timing or outcome of this investigation.

113.   Around the same time, the Connecticut AG served similar subpoenas on other members of the cartel. On July 16, 2014, Lannett announced that it had received a Connecticut AG subpoena concerning the pricing of digoxin. Less than three weeks later, on August 6, 2014, Par received a similar subpoena.

114.   On October 2, 2014, in a letter addressed to Ben-Maimon ("Sanders and Cummings Letter"), Senator Bernie Sanders and Representative Elijah E. Cummings informed Impax that "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses":

We are writing to your company to request information about the escalating prices it has been charging for the drug Digoxin, which is used to treat certain types of irregular heartbeats and heart failure. According to the National Average Drug Acquisition Cost Data provided by the Healthcare Supply Chain Association, the average price charged for Digoxin has increased by as much as 884 percent from October 2012 to June 2014.

| Drug | SKU | Average Market Price, October 2012 | Average Market Price, June 2014 | Cost Increase | Average Percentage Increase |
|------|-----|------------------------------------|----------------------------------|---------------|------------------------------|
| Digoxin | 125 mcg tablet | $.11 | $1.06 | $0.95 | 839% |
| Digoxin | 250 mcg tablet | $.11 | $1.10 | $0.99 | 884% |

This dramatic increase in generic drug prices results in decreased access for patients.

\*         \*         \*

In order to evaluate the underlying causes of recent increases in the price of your company's drug, we request that you provide the following documents and information for the time period covering January 1, 2012, to the present:

(1)   total gross revenues from the company's sales of this drug;

(2)   the dates, quantities, purchasers, and prices paid for all sales of this drug;

        (3)    total expenses relating to the sales of this drug, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;

        (4)    sales contracts or purchase agreements for active pharmaceutical ingredients for this drug, including any agreements relating to exclusivity, if applicable;

        (5)    a description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the price of this drug;

        (6)    any cost estimates, profit projections, or other analyses relating to the company's current and future sales of this drug;

        (7)    price of this drug in all foreign countries or markets, including price information for the countries paying the highest and lowest price; and

        (8)    the identity of company official(s) responsible for setting the price of the drug over the above time period.

115.    Simultaneously, Senator Bernie Sanders and Representative Elijah E. Cummings sent a similar letter to the CEO of Lannett.

116.    On October 22, 2014, shortly after her receipt of the Sanders and Cummings Letter, Ben-Maimon announced her resignation, effective November 3, 2014.

117.    On November 7, 2014, Impax filed a Form 8-K announcing that one of its sales representatives had received a grand jury subpoena from the DoJ's Antitrust Division concerning the sale of generic drugs:

        On November 3, 2014, a sales representative of Impax Laboratories Inc. received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the grand jury of the Eastern District of Pennsylvania.   The request relates to any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications.

118.    Lannett also announced that its Senior Vice President of Sales and Marketing received a similar subpoena from the DoJ on November 6, 2014.

119.    On December 5, 2014, the DoJ's Antitrust Division issued a grand jury subpoena to Par and requested documents relating to digoxin.  On the same day, Lannett was also served with a grand jury subpoena "regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products."

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:16-cv-06557-HSG        - 34 -

120.    On March 13, 2015, the DoJ issued a grand jury subpoena to Impax for four generic medications: digoxin, terbutaline sulfate, prilocaine/lidocaine cream, and calcipotriene topical solution.  Impax withheld the disclosure of the grand jury subpoena until May 11, 2015, when it filed its 1Q15 Form 10-Q, which stated:

> Previously on November 6, 2014, the Company disclosed that one of its sales representatives received a grand jury subpoena from the Antitrust Division of the United States Justice Department (the "Justice Department").  In connection with this same investigation, on March 13, 2015, the Company received a grand jury subpoena from the Justice Department requesting the production of information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.  In particular, the Justice Department's investigation currently focuses on four generic medications: digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution.  The Company has been cooperating and intends to continue cooperating with the investigation.  However, no assurance can be given as to the timing or outcome of the investigation.

121.    On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges by the end of 2016 against Impax and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  Bloomberg specifically named Impax as one of the manufacturers implicated through digoxin – its coordinated price increase caused Medicaid to spend 90% more on the drug from 2013 to 2014.  In the article, titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," Bloomberg reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> ***The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.***
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd.  Other companies include Actavis, which Teva bought from Allergan Plc in August, Lannett Co., ***Impax Laboratories Inc.***, Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.
>
> All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.

1                                    *      *      *

2          Allergan, Impax and Sun declined to comment beyond their filings.
     Representatives of Endo, Covis, Taro and Lannett didn't respond to requests for
3    comment.  A Justice Department spokesman declined to comment.

4          122.    On this news, Impax's share price fell $4.00, or 19.51%, to close at $16.50 on

5    November 3, 2016 – on almost three times the prior week's average trading volume.

6          123.    On December 14, 2016, the State of Connecticut and nineteen other states filed an

7    original complaint – amended on March 1, 2017 to include twenty additional states – against six

8    generic drug manufacturers for illegal schemes involving market share allocation and

9    anticompetitive price inflation.  At the same time, the DoJ unsealed criminal charges against the

10   CEO and the President of Heritage Pharmaceuticals, Inc. ("Heritage").  On January 9, 2017 and

11   January 10, 2017, Heritage's Jeffrey Glazer and Jason Malek pleaded guilty to price-fixing charges.

12         124.    Governmental investigations are ongoing.  According to the AG Complaint, "[i]n

13   July 2014, the State of Connecticut initiated a non-public investigation into suspicious price

14   increases for certain generic pharmaceuticals.  The information developed through that investigation,

15   which is still ongoing, uncovered evidence of a broad, well-coordinated and long-running series of

16   schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United

17   States."  The AG Complaint filed was only an "initial civil action" to be followed by additional

18   filings as the states "have uncovered a wide-ranging series of conspiracies implicating numerous

19   different drugs and competitors, which will be acted upon at the appropriate time."

20         125.    As reported by *The New York Times* on December 15, 2016, in an interview about the

21   AG Complaint, Connecticut's Attorney General George Jepsen stated that there was more to come:

22          "We believe that this is just the tip of the iceberg," George C. Jepsen,
     Connecticut's attorney general, whose office started the inquiry that led to the
23   charges, said in an interview on Thursday.  "I stress that our investigation is
     continuing, and it goes way beyond the two drugs in this lawsuit, and it involves
24   many more companies than are in this lawsuit."

25         126.    Similarly, the DoJ has stated that its investigations are ongoing.  In a motion to stay

26   discovery in a civil antitrust case concerning the drug propranolol, filed on February 24, 2017, the

27   DoJ emphasized the broad-ranging nature of its ongoing investigation, the "numerous corporations

28

1   and individuals" implicated, and the "plethora of evidence" amassed against these corporations and

2   individuals:

3      The Complaints refer to the United States' criminal investigation into the generic
       pharmaceutical industry as part of the factual basis for their antitrust claims. . . .

4

5          The United States unsealed the first criminal informations in that
       investigation on December 14, 2016. . . .   The two executives – Jeffrey Glazer and
       Jason Malek – pled guilty to these charges on January 9, 2017, and both are

6      cooperating with the United States' ongoing criminal investigation.

7          Although, to date, the United States has filed charges against only Glazer and
       Malek, as described in this Memorandum and detailed more fully in the Grundvig

8      Declaration, the criminal investigation into the generic pharmaceuticals industry is
       ongoing and broad-ranging, and it has already implicated numerous corporations and

9      individuals.   Additional corporations and individuals may be implicated as the
       investigation continues to develop.

10

11                        *       *       *

12     Thus, absent a stay, discovery in these cases would sweep up evidence related to
       other drugs that the United States is currently investigating.

13                        *       *       *

14         Broad civil discovery in these cases would threaten the United States'
       ongoing investigation because subjects of the investigation will gain access to a

15     plethora of evidence that they could not otherwise obtain.

16                        *       *       *

17     [T]he United States is conducting sensitive negotiations with potential criminal
       defendants and has a considerable interest in limiting sworn testimony given by its

18     cooperators.  (*See* Grundvig Decl., ¶13.)[8]

19         127.   The DoJ has intervened in numerous other civil actions involving different drugs and

20   generic manufacturers.  In particular, on January 5, 2017, the Antitrust Division's Washington

21   Criminal I Section submitted an Uncontested Motion of the United States to Intervene in the *In re*

22   *Generic Digoxin and Doxycycline Antitrust Litigation*, in which Impax, Jeffrey Glazer, Jason Malek,

23   Heritage, Lannett, Par, West-Ward, Sun, Actavis, Mayne, and Mylan are named as defendants.  In its

24   motion, the DoJ asserted that "this litigation shares common questions of law and fact with an

25   ongoing federal criminal investigation.  Continued litigation of this consolidated action is likely to

26   _____

27   [8]   Memorandum of Law in Support of the United States' Motion for Reconsideration of Its Motion
     for a Limited Stay of Certain Discovery, *Castillo v. Actavis Elizabeth, LLC, et. al.*, No. 1:17-cv-
     00078 (S.D.N.Y. Feb. 24, 2017), ECF No. 62.  The accompanying Grundvig Declaration was filed

28   under seal.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                              - 37 -

1  result in the disclosure of information that will harm the ongoing criminal antitrust investigation."

2  On January 6, 2017, Judge Cynthia Rufe granted the DoJ's uncontested motion to intervene.

3       128.    On January 6, 2017, when the DoJ's motion to intervene was granted, Impax's stock

4  price declined 2.8% on above average trading volume.  The S&P 500 traded up 0.4%.

5       129.    On January 9, 2017, when Jeffrey Glazer's guilty plea agreement was filed in the

6  District Court in the Eastern District of Pennsylvania, Impax's stock price declined 2.9% on above

7  average trading volume.  The S&P 500 closed slightly down by 0.4%.

8       130.    On January 10, 2017, when Jason Malek's guilty plea agreement was filed in the

9  District Court in the Eastern District of Pennsylvania, Impax's stock price dropped 5.2% on above

10  average trading volume.  The S&P 500 closed unchanged.

11      131.    On May 1, 2017, the DoJ filed a motion to stay discovery in the civil antitrust cases in

12  which Impax is a defendant.  *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 2:16-

13  MD-2724 (E.D. Pa.), ECF No. 279.  The filing in the MDL noted that there were "significant

14  overlaps between the criminal investigation and the cases that have been consolidated into [the]

15  MDL for pretrial proceedings."  One of the cases consolidated into the MDL was *In re Generic*

16  *Digoxin and Doxycycline Antitrust Litigation*, where Impax was a defendant and digoxin was one of

17  the generic drugs at issue.  The DoJ's filing stated that "[e]vidence uncovered during the criminal

18  investigation implicates other companies and individuals (***including a significant number of the***

19  ***Defendants here***) in collusion with respect to doxycycline hyclate, glyburide, and other drugs

20  (***including a significant number of the drugs at issue here***)."

21      132.    On May 24, 2017, Connecticut Attorney General Jepsen issued a press release

22  announcing that Glazer and Malek had entered into settlement agreements with 41 states and

23  territories.  As part of the settlement, Glazer and Malek agreed to cooperate with the Attorneys

24  General's investigations, including providing "all pre-existing information, documents or other

25  tangible evidence," market data and information, and all facts relating to the investigations without

26  the service of subpoena.

27      133.    According to the Attorneys General's motion for a separate government track filed on

28  November 14, 2017, based on the cooperation of Glazer and Malek and the review of "a legion of

1   documents, emails, phone records and text messages," the states developed the Amended AG

2   Complaint with allegations involving an expanded list of drugs and generic drug manufacturers and

3   are continuing to investigate "defendants and other generic manufacturers, regarding the sale of

4   other drugs not identified" in the complaint.[9]   The Attorneys General anticipate filing additional

5   complaints, and "such future actions will be based on evidence that does not focus as centrally on

6   Heritage as this complaint does."   *Id.* at 4 n.6.

7              **I.       Additional Scienter Allegations**

8              134.       The Individual Defendants each acted with scienter in that each knew or recklessly

9   disregarded the true facts in making the materially false and misleading statements identified herein.

10  The collusive price hikes could not have been made without the approval of one or more of the

11  Individual Defendants.  The Individual Defendants were given documents that tracked the financial

12  impact of Impax's collusive price hikes and Impax's generic drug pricing, market share and

13  competition before and after the price hikes.  They repeatedly told investors and analysts they had

14  accurate knowledge of the sources of Impax's profitability, and emphasized that digoxin fueled

15  Impax's turnaround during the Class Period.  They directly addressed recurrent analyst questions

16  concerning the digoxin price increase, digoxin competition, the government investigations generally,

17  and subpoenas issued on Impax in particular.  They offered false exculpatory explanations for the

18  digoxin price hike, and emphatically and unambiguously denied that Impax had engaged in collusive

19  activity.  In light of these facts, and as detailed below, the Individual Defendants knew or were

20  reckless in not knowing that Impax was engaged in collusive practices that drove a significant

21  portion of its revenues and profits.

22

23

24

25

26

27  _____
    [9]     Memorandum of Law in Support of Motion by Plaintiff States for a Separate Government Track,
    *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 2:16-MD-02724-CMR, ECF No.
28  525-2 (E.D. Pa. Nov. 14, 2017), at 4 n.6, 7.

1.   **The Individual Defendants Were Aware of and Responsible for the Anticompetitive Price Increases**

135.   The Individual Defendants were all members of Impax's five-member Executive Committee, internally recognized as the G5.[10]   The five members included the CEO (Hsu, until 2014, and Wilkinson, between April 2014 and December 2016), the CFO (Reasons), the President of the Generics Division (Ben-Maimon), the President of the Brand Division, and the Vice President of Manufacturing.   According to a former Impax Senior Director of New Product Planning & Portfolio Management (employed at Impax's Hayward facility from April 2008 to February 2015 to spearhead the Company's product planning and commercial strategy for branded products), the Executive Committee met on a weekly basis, while the Company's Generic Management Committee, responsible for management of the generic drug portfolio, met at least on a monthly basis.   The Senior Director of New Product Planning & Portfolio Management stated that generic drug pricing changes would have been discussed at Generic Management Committee meetings, that Wilkinson and Ben-Maimon were members of Generic Management Committee and that the two attended the meetings of both the Executive and Generic committees.   Although the Senior Director of New Product Planning & Portfolio Management worked on the branded side and was not a member of the Generic Management Committee, he recalled two occasions on which he attended Generic Management Committee meetings and that Wilkinson and Engel both called into these meetings.

136.   With regard to significant generic drug pricing decisions, including those relating to digoxin and pyridostigmine, the former Senior Director of New Product Planning & Portfolio Management stated that Todd Engle was involved in the initiation of the price change process, but

---

[10]   Unless otherwise noted, the allegations in this section of the Complaint (§IV. ) are based upon: (1) trial testimony by current and former Impax officers and employees ("Impax Testimony"); (2) admissions by Impax in Respondent Impax Laboratories, Inc.'s Replies to Complaint Counsel's Proposed Findings of Fact and Conclusions of Law, and Complaint Counsel's Post-Trial Reply Findings of Fact and Conclusions of Law ("Impax Admissions"); (3) descriptions of internal Impax documents identified as Complaint Counsel's trial exhibits and Respondent Impax Laboratories' trial exhibits ("Trial Exhibits") in *In the Matter of Impax Laboratories, Inc.*, ECF No. 9373, United States of America Federal Trade Commission; (4) Amended AG Complaint; (5) Exhibits to Memorandum of Law in Support of Defendant Impax Laboratories, Inc.'s Motion to Limit Discovery ("Impax Exhibits") in *In re: Digoxin Cases*, No. 16-DG-27240 (E.D. Pa. Aug. 28, 2018), ECF No. 228, and *In re: Lidocaine-Prilocaine Cases*, No. 16-LD-27240 (E.D. Pa. Aug. 28, 2018), ECF No. 152; (6) the Individual Defendants' public statements; and (7) interviews of former Impax employees.

1  that Engle did not have the authority to make significant pricing determinations on his own.  As

2  such, it was the former Senior Director of New Product Planning & Portfolio's understanding that

3  significant pricing changes relating to digoxin and pyridostigmine would have been made by

4  Wilkinson and/or delegated to Ben-Maimon.  According to the former Senior Director of New

5  Product Planning & Portfolio Management, these decisions were "definitely at the level of Carole

6  [Ben-Maimon]," and significant price changes at Impax would have required an endorsement by

7  someone who was at least a division president.  Finally, the former Senior Director of New Product

8  Planning & Portfolio Management stated that although Wilkinson may have delegated certain

9  pricing decisions to Ben-Maimon, it was his understanding that Wilkinson would have remained

10  aware of the Company's overall pricing strategy with regard to the aforementioned drugs throughout

11  his tenure as Chief Executive Officer.  Wilkinson admitted as much on the November 4, 2014

12  analyst conference call when he stated that "we'll continue to evaluate our line, product by product,

13  on probably a weekly and monthly basis to see if there are some opportunities to participate in that

14  practice."

15        137.  The Executive Committee Members[11] were responsible for, among other things,

16  reviewing sales and production forecasts (including an internal Impax document known as the five-

17  year plan), assembling the annual Company Key Goals to determine allocation of resources

18  necessary to achieve the goals, and using the goals to establish Management by Objectives

19  (quantitative targets for compensation and bonus calculations).  The Executive Committee Members

20  received copies of the five-year plan assembled annually and updated quarterly by the generics team

21  with oversight from Ben-Maimon (until her departure) and Wilkinson.  According to the Impax

22  Admissions, the five-year plan contained sales and financial forecasts for each of Impax's existing

23  and potential generic drugs. Generic drug prices were a key input used in driving forecasts in the

24  five-year plan.  The plan was the "main piece or main file that we [Impax] used for everything" and

25  a "critical" document the Executive Committee relied upon in forecasting, budgeting and

26  determining executive compensation.  The manufacturing operations group at Impax also relied on

27  ───────────────

[11]  "Executive Committee Members" refers to senior executives who were part of the Executive
28  Committee, and at all relevant times, includes the Individual Defendants.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                              - 41 -

1   the plan for production planning and purchasing of raw materials.  In particular, according to

2   Company annual reports, raw materials for digoxin and pyridostigmine were only available from a

3   few suppliers without long-term contracts.  As such, meticulous planning and forecasts were

4   necessary to ensure "uninterrupted or adequate supplies of such raw materials."  In addition, accurate

5   forecasts of generic drug pricing and demand were required to "minimize the chance that Impax

6   would have to throw away large amounts of manufactured product because the product expired

7   before being sold."

8       138.    Indeed, defendants frequently spoke to investors about their process in accounting for

9   price and competition in generic drugs sales modeling and forecasts.  In particular for digoxin,

10  during the November 4, 2014 earnings call, Wilkinson told investors that "on Digoxin . . . [w]e do

11  anticipate Mylan coming into the marketplace.  In fact, they are here now.  Have not seen much

12  impact from their introduction as of yet but are prepared for that process in our forecasting."  Again

13  during the February 24, 2015 earnings call, he spoke about the digoxin market and stated "our model

14  expects that they'll be competition and potentially some price erosion on that product."

15      139.    The Trial Exhibits confirm that Ben-Maimon, Todd Engle (Ben-Maimon's second-in-

16  command in the generics division), and Kevin Sica (senior manager of sales planning) prepared the

17  2014 five-year plan in mid-October 2013 for Executive Committee review, and exchanged an update

18  to the plan on October 15, 2013, just before the digoxin collusive price hike in November 2013.

19  According to Impax Testimony and Impax Admissions, the Company's five-year plan "projections

20  and forecasts were built off of the best information available to Impax at that time."  Digoxin was

21  among Impax's largest generic drugs, based on revenue, and the best digoxin pricing information

22  available when the plan was in preparation was the elevated collusive pricing that was 700% higher

23  than the stable and constant digoxin pricing since at least 2009.  Testimony in the FTC action

24  confirms that, as CEO, Wilkinson would have received copies, updates and revisions of the 2014

25  plan after he took over as Impax CEO in April 2014.

26      140.    In addition to the Executive Committee, the Board of Directors also received the five-

27  year plan.  According to Impax Testimony, Impax's Board met at least quarterly and defendants, as

28  CEO, CFO and division head, attended the meetings.  Each division head – such as Ben-Maimon and

1   Reasons – made presentations to the Board.  Board presentations included financial results, outlooks

2   for the next financial period and "performance against plan," which compared budgeted results to

3   actual results.  According to Impax's 2014 proxy, the Company held "16 board meetings" during the

4   year.  Trial Exhibits confirm that the Board met to discuss the generic businesses often – with the

5   generic team preparing "Board Slides" in February 2014, "Impax Generic Business Board of

6   Directors Meeting" taking place on May 13, 2014 and December 11, 2014, and Wilkinson and

7   Reason's preparation of a "Dec 14 BOD 2015 Plan" on November 19, 2014, and "Impax Board

8   Presentation, 2015 Preliminary Plan" taking place on December 11, 2014.  At the same time, for

9   2014, revenues and profits of Impax's generics division increased $150 million (38% y/y) and

10  $144 million (100% y/y) respectively.  Impax's collusive revenues from the 700% digoxin price hike

11  contributed $109 million to the division's bottom line, representing over 70% of the improved

12  financial performance – all without losing market share.

13        141.    As with the initial price increase, maintaining digoxin prices at these unprecedented

14  levels at a time when generic drug customers consolidated into three main wholesalers, without

15  collusive agreement with Lannett and the incoming competitor Par, would have caused Impax to lose

16  sales and market share – a red flag to defendants who were responsible for Impax's risk management

17  and performance.  Without collusion, the potential of losing sales and market share on digoxin alone

18  would have put Impax's financial guidance and performance goals at risk.  In addition, the

19  coordinated price hikes and the ongoing elevated digoxin prices put Impax at risk of drawing

20  regulatory scrutiny.  As such, the Individual Defendants knew of or recklessly disregarded the

21  collusive price increases that generated hundreds of millions in illicit profits when making the

22  misrepresentations and omissions alleged herein.

23        142.    In November 2014, while Wilkinson and Reasons were in the process of preparing

24  the 2015 plan for the Board, competition began to loom on digoxin and the executives focused

25  intensively on the product's pricing as part of the modeling and forecasting process.  During the

26  November 4, 2014 earnings call, Wilkinson told investors that, for digoxin, "[w]e do anticipate

27  Mylan coming into the marketplace.  In fact, they are there now.  Have not seen much impact from

28  their introduction as of yet but are prepared for that process in our forecasting."  Moreover, during

1    the February 24, 2015 earnings call, Wilkinson assured investors with respect to digoxin that "[w]e

2    have heard some rumors of additional competition coming although we've not seen them in the

3    marketplace yet.  But we do anticipate it and our model expects that they'll be competition and

4    potentially some price erosion on that product."

5        143.    Defendants were aware of the threat that new digoxin competition was to Impax's

6    market share, but rather than cut prices to save market share, defendants ceded market share to the

7    new market entrants pursuant to the "general rules of the road" that governed their conspiracy, while

8    maintaining Impax's collusive price levels.  The specific details of this market share impact, and the

9    reduced impact on pricing, would have been reflected in the five-year plan.  On November 4, 2014,

10   when new competitors were poised to enter the digoxin market, Wilkinson told investors that he was

11   preparing "for that process in our forecasting."   A few weeks later, on November 20, 2014,

12   Wilkinson, Reasons and Larry Kloss, an Impax Senior Director of Planning and Analysis, exchanged

13   copies, updates and drafts of the 2015 five-year plan by email, with the subject line "2015 Plan -

14   Executive Review 11-20-14 R1 (update)" which attached the document, "Dec 14 BOD 2015 Plan

15   11-20-14 R1.pdf."

16       144.    At all relevant times, the Individual Defendants also had access to Impax's SAP

17   Enterprise Resource Planning ("SAP") system, which Impax started using in 2011.  According to

18   Impax's former Senior Contract Analyst (who was employed at Impax's Fort Washington facility

19   between October 2015 and May 2017, and was responsible for documenting and entering

20   information relating to Impax's contracts with pharmaceutical wholesalers into Impax software

21   systems, including entering information relating to pricing schedules, rebates, and chargeback

22   agreements), the Company's senior executives had access to the internal SAP System, which was

23   Impax's overarching financial data system during the Class Period.  Indeed, according to Trial

24   Testimony and Impax Exhibits, the SAP contained a database where transactional sales data was

25   maintained.  The application and its database store direct pricing by drug, revenue collected from

26   customers in relation to specific drugs, price change trends, and customer sales invoicing.  The

27   system was also used to track raw material purchases, payment of suppliers, necessary materials, and

28   product production.

145.     According to Impax's former Senior Contract Analyst, Trial Testimony and Impax Exhibits, Impax also used Revitas CARS and d-RIVE systems.  These systems contained indirect pricing information such as chargebacks, rebates, and customer claims data.

146.     Through their access and review of internal generic pricing information contained in the quarterly updates of the five-year plan, the SAP and the Revitas systems, and frequent Executive Committee meetings to discuss financial planning and forecasting, the Individual Defendants kept abreast of generic drug pricing, market activities and competition – which played a key role in determining the Company's goals and objectives for executive compensation, forecasting, budgeting, allocating resources, production planning, and quarterly presentations to the Board.  The Individual Defendants possessed direct personal knowledge of Impax's generic drug pricing strategy and the pricing environment of other manufacturers, indicating that each of them would have inescapably learned of the highly unusual coordinated price hikes alleged herein.

147.     Moreover, the very nature of the price-fixing activities inflating the results of Impax's most profitable division supports an inference of scienter.  The price fixing at issue lasted for years and fundamentally transformed the revenues generated by some of Impax's most important generic drugs.  The successful execution of this scheme required systematic coordination and top-down command and control, which could not be done without the knowledge and approval of the Company's highest ranking executives.  Indeed, the significance of the corporate actions required to participate in any collusive behavior – which includes raising prices for key products to the same levels near simultaneously with multiple competitors pursuant to a collusive agreement – could not have been accomplished by low-level employees acting alone.

148.     Given the magnitude of Impax's 700% digoxin price-hike, the fact that the digoxin price-hike constituted ***70%*** of the generic division's massive year-over-year growth in 2014, and the Individual Defendants' receipt of specific and detailed information about Impax's generic drug pricing, market share and competition before and after the collusive price hikes in digoxin and pyridostigmine, each of the Individual Defendants knew or were reckless in not knowing that Impax was engaged in anticompetitive practices and that a significant portion of its revenues and profits resulted from such collusive practices.

1

2

### a.  Ben-Maimon Had Direct Personal Knowledge of Impax's Collusive Pricing Strategy

3

149.    Ben-Maimon was the President of Global Pharmaceuticals – Impax's generics

4

division – and part of Impax's five-member Executive Committee.  According to the Impax

5

Testimony, the responsibilities of the President of Impax's generics division included pricing

6

generics products, overseeing the sales and marketing team, and making quarterly presentations to

7

the Board.  Ben-Maimon's responsibilities as an Executive Committee Member included reviewing

8

sales and production forecasts, putting together the annual Company Key Goals to determine

9

allocation of resources necessary to achieve the goals and using the goals to establish quantitative

10

targets specific to each division to determine compensation and bonus calculations.

11

150.    Ben-Maimon worked closely with her sales and marketing team, and her team

12

frequently attended industry conferences and meetings as a group.  According to the Impax Exhibits,

13

Ben-Maimon, Wilkinson and Engle all shared one secretary – Susan Ostrander.  Ben-Maimon's sales

and marketing team consisted of only seven people:

14

15

- Todd Engle – Vice President of Sales and Marketing

16

- Gary Skalski – Senior Director of Sales

17

- Malcom (William) Ball  – National Account Managers

18

- Danny Darnell – National Account Managers

19

- Michael Grigsby – National Account Managers

20

- William Riker – Associate Director of Sales Operations

21

- Kevin Sica – Senior Manager of Sales Planning

22

151.    In its press releases, Impax asserted that Ben-Maimon was the key to the Company's

23

"finger on the pulse of the generics industry."  Through Ben-Maimon, Impax was actively involved

24

"with the Generic Pharmaceutical Association (GPhA). The organization focuses on a wide variety

25

of issues that affect the generic industry," including working with "stakeholders to ensure that

26

affordable, high-quality medicines are available to Americans."  During her tenure at Impax, Ben-

27

Maimon held numerous positions in the GPhA – including chairman of the board, executive

28

committee member and board member.  At the conferences, Impax hosted events and social

1 gatherings for attendees, including participants from other generic drug manufacturers such as

2 Lannett and Par.

3    152.    Ben-Maimon attended generic sales and marketing team meetings, and she received

4 various reports, presentations and updates concerning all aspects of Impax's current and expected

5 generic drug sales, pricing and competition.  For example, as shown in the Trial Exhibits, on

6 October 2, 2013, less than a month before Impax and its competitors hiked the price of digoxin by

7 more than 700%, Hsu, Reasons and Ben-Maimon all received the generics sales and marketing team

8 meeting materials from Engle entitled "Updated Materials for Today's Generic Sales and Marketing

9 Meeting w/Attach: Generic Sales and Marketing Meeting Sept 16 2013.pptx."

10    153.    The former Impax Senior Director of New Product Planning & Portfolio Management

11 stated that it was his understanding that significant price changes in generics, including digoxin and

12 pyridostigmine, were determined by the Generic Management Committee and senior level

13 executives, including Wilkinson and/or Ben-Maimon.  The former Senior Director of New Product

14 Planning & Portfolio Management further stated that Engle and other employees of the generics

15 division would initiate the process, but significant price changes would have to be approved and

16 endorsed by his superiors, Wilkinson and/or Ben-Maimon.  This account is corroborated by Impax

17 Testimony stating that the prior President of Impax's Generic Division (Ben-Maimon's predecessor)

18 "oversaw the sales and marketing of generic products at Impax" and was "involved in pricing of

19 generic products."  The strong inference of defendants' scienter is thus bolstered by the fact that the

20 execution of the price-fixing scheme required that these senior executives personally analyze and

21 approve each significant price increase pursuant to an established and formalized process that was

22 employed at Impax.

23    154.    As head of the generics division, Ben-Maimon was responsible for the generic

24 division's pricing, sales and financial forecasts used for business planning, management decisions,

25 and budgeting.  In particular, Ben-Maimon and her team created the five-year plan that included

26 forecasts for each of Impax's existing and potential generic products.  These forecasts were updated

27 quarterly and provided to defendants Hsu, Wilkinson, and Reasons as members of the Executive

28 Committee.  Generic drug prices were one of the key determinants of the forecasts.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                                    - 47 -

1    155.    The five-year forecasts were initially drafted and assembled by Engle and his

2    subordinate Kevin Sica.  Engle described these forecasts in testimony to the FTC as the "starting

3    point" for defendants' decision-making as "senior management may have other information I don't

4    have."

5    156.    Ben-Maimon, Engle and Sica prepared and exchanged drafts of the 2014 five-year

6    plan for Executive Committee review in mid-October 2013, just weeks before the 700% digoxin

7    collusive price hike in November 2013.

8    157.    In addition, as President of Impax's generics division, Ben-Maimon regularly

9    presented at the Company's Board of Directors meetings and provided the Board with copies of the

10   five-year plan.  At the meetings, the Board received sales and marketing results, outlook(s) for the

11   next financial period, and Impax's "performance against plan," which included a comparison of

12   actual versus budgeted results.  In order to make this presentation, Ben-Maimon would have been

13   required to know of material price changes and understand their impact on Impax's projected and

14   historical performance.

15   158.    Ben-Maimon's direct personal involvement in Impax's generic pricing scheme is also

16   demonstrated by her public statements to investors.  During the Class Period, Ben-Maimon admitted

17   that exploitation of digoxin pricing was a company focus and core strategy in the midst of a

18   company beset by a myriad of problems.

19   159.    During Impax's November 4, 2013 earnings call, shortly after the October 2013

20   industry conference and the coordinated 700% price hike that immediately followed, analysts

21   questioned Ben-Maimon about digoxin's "huge price increase."  Ben-Maimon responded: "The price

22   increase on dig[oxin] speaks for itself, but clearly, as a medically necessary drug, our focus there is

23   really just to make sure that a high-quality product is available to the customer."

24   160.    During the February 20, 2014 earnings call, an analyst asked "[a]re you following

25   what some of your competitors are doing with aggressive price increases, and how much will that

26   benefit you going forward?"  Defendant Ben-Maimon described her deliberate and "rational"

27   strategy for exploiting pricing and how that strategy was applied to digoxin:

28

Obviously, we can't really talk about – for competitive reasons – about specific products and specific prices.  But as you have seen across the industry, pricing has improved, and the ability to take some price increases have clearly been available.

Obviously, ***we are really careful, and we want to make sure that we do that in a very rational way, so that we make sure that the price – that what we are doing sticks, and that we actually do make more money in the long run***.  But we're pretty confident that what we did through – towards the end – throughout the end of last year and the beginning of this year will result in more profitability for many of the products that we have been able to take some price on.

*     *     *

I don't want to really specifically talk about pricing digoxin.  You know that the market has been pretty stable with [Lannett] and us, and as you suggested, [Par] launched an AG.  We're pretty comfortable that what we have done is rational, and will result in ongoing profitability for that product.  We continue, obviously, to do everything we can to maintain our own share.

161.    Similarly, during the August 6, 2014 earnings call, Ben-Maimon stated "we look at our portfolio regularly, not every single day, and [other] opportunities in the marketplace to take advantage of shortages or increased share or price."

**b.    Wilkinson Had Direct Personal Knowledge of Impax's Collusive Pricing Strategy**

162.    Wilkinson stepped in as CEO in April 2014 and proceeded to take over the generics division.  After announcing the termination of Ben-Maimon in October 2014, Wilkinson headed the generics division with the assistance of Engle.  As CEO and head of generics, Wilkinson approved or was informed about all significant price changes in generics.  Analysts from the Buckingham Research Group recognized Wilkinson's role as the de facto head of the generics division by stating in the October 23, 2014 report that "[p]ost-[Ben-Maimon] departure, the Global Pharmaceuticals business will be overseen by Impax' CEO Fred Wilkinson and Mr. Todd Engle, Vice President of Sales and Marketing who remains in place."   Indeed, Wilkinson had planned to take over the generics division since he joined Impax as the division comprised the vast bulk of the Company, even with the acquisition of CorePharma in 2015:

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:16-cv-06557-HSG

- 49




163.     Like Ben-Maimon before him, Wilkinson was responsible for digoxin's sales model and forecast while overseeing the generics division.  As an Executive Committee Member, he received quarterly updates of the 5-year plan with sales and production forecasts for all generic drugs, including digoxin with its pricing input based on the unprecedented 700% price hike. Wilkinson was also attuned to competition and market share for digoxin.  During the modeling and forecasting process for digoxin in November 2014, Wilkinson, Reasons and Kloss exchanged copies, updates and drafts of the 2015 five-year plan.  For example, Trial Exhibits showed that on November 19, 2014, Wilkinson and Reasons received an email from Kloss concerning the "2015 Plan – Executive Review 11-20-14 R1 (Update)" which attached the document, "Dec 14 BOD 2015 Plan 11-20-14 R1.pdf."  At this time, Impax anticipated Mylan's entry into the digoxin market.  The executive plan, which included information on each of Impax's generic drugs, would have reflected the impact of Mylan's entry into the digoxin market.[12]  In addition, the 2015 plan would have accounted for the anticipated 116% pyridostigmine price hike that was executed in December 2014.

164.     Wilkinson's intention to be actively involved in the generics division and his ultimate takeover of the business were readily apparent in his statements to investors.  During the May 1, 2014 earnings call, he addressed Ben-Maimon "Carole, you are right now in the trenches and I am

_____

[12]   As discussed above, when additional competitors entered the digoxin market in 2015, it was Impax's turn to cede share in order to maintain equilibrium under the "general rules of the road" that governed the conspiracy.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                                    - 50 -

1    about to jump in." After Ben-Maimon's termination, he responded to analyst questions of who

2    would run the generics business with: "[a]s far as the search, I've not put a formal search out."

3        165.    After Ben-Maimon left, Wilkinson was the sole head of the generics business for

4    more than 1.5 years before he hired Douglas Boothe for the position shortly before his termination.

5    Wilkinson repeatedly stressed hands-on management of the division and his intimate knowledge of

6    its customers, products, pricing strategy, models, and forecasts:

7    •    On November 4, 2014: "I spend a lot of time with our commercial team to make
          sure that we're staying ahead of or/and engaged in the discussions that are happening
8          with our key customers."

9    •    On November 4, 2014: "We look at where there may be some market movement that
          would allow us to take advantage of some price increases, and we've implement
10         those. And we'll continue to *evaluate our line, product by product*, on probably a
          *weekly and monthly basis* to see if there are some *opportunities to participate in*
11         *that practice*."

12   •    On November 11, 2014: "[S]ince we're not getting approval, we need to maximize
          all the opportunities that we have in our portfolio. So that means from the brand side
13         and the generic side, take advantage of each of the products we have, see if there are
          some opportunities through either growing market share or growing price . . . .

14                                    *      *      *

15        As far [as] maximizing opportunity on the generic side, we currently market 37
16        products. I think we have 61 approved ANDAs. So we've done some pruning of the
          products that we currently market based on market conditions."

17       166.    Defendant Wilkinson professed to have detailed knowledge of Impax's generic

18   pricing – as well as personal knowledge of the factors that dictated that pricing – and repeatedly

19   spoke on these subjects to investors. As then-CEO Wilkinson put it during a May 10, 2016 earnings

20   conference call:

21        There are spot pockets where there are multiple competitors that you would
22        expect some price degradation. But this is nothing new than what we have seen over
          the last 6, to 8, to 10, to 12 years in the generic industry. Is that competition
23        essentially causes prices challenges and as there is greater competition, then you're
          going to see more price degradation.

24       167.    In addition, Wilkinson's statements to investors show that he had specific knowledge

25   of and was focused acutely on the digoxin marketplace, including pricing, competition, and

26   customers. Indeed, Wilkinson was intimately familiar with the details of Impax's sales, production

27   and pricing models for digoxin:

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                      - 51 -

- On November 4, 2014:  "And then finally on Digoxin, this has been a healthy market, as you have recognized also.  We do anticipate Mylan coming into the marketplace.  In fact, they are here now.  Have not seen much impact from their introduction as of yet but are prepared for that process in our forecasting."

- On February 24, 2015: On digoxin, "[w]e've seen at least one new player come back into the marketplace, not taking great share today, but we do anticipate there'll probably be some evolution to that.  We have heard the same rumors of additional competition coming although we've not seen them in the marketplace yet.  But we do anticipate it and our model expects that they'll be competition and potentially some price erosion on that product."

168.   Moreover, during the May 15, 2014 Bank of America Merrill Lynch Health Care Conference, Wilkinson described the importance of increasing prices when possible:

Second, and I think this is a very important issue *because of the warning letter, is that we have to optimize each launch and each product opportunity that we have*.  Because we don't – we are not getting as many shots on goal as others because approvals are not coming at this particular point.  *So everything we have that's in the works, every opportunity in our hands, we need to make sure we maximize.*

And if you look at some of the recent launches and you look at share position we have with some of our older products, *pricing position with some of our older and existing products*, the in-line products, *the generics commercial team has done an absolutely magnificent job of making sure that we maintain and, in many cases, grow revenue*.  So they have done a really good job.

169.   Again, in discussing his "four pillars" at the May 20, 2014 UBS Global Healthcare Conference, Wilkinson emphasized that:

The commercial team on the generic side has done a marvelous job of making sure that they readdress and reassess each of the projects that are in their hands and the products that are on the marketplace and do the best they can with them.  In some cases that means price increases. . . .

But they've done a really good job of optimizing each opportunity.

170.   A UBS analyst noted the unprecedented price increases in the generic drug market were "kind of new relative to the way it was 5, 10 years ago."  The analyst asked Wilkinson for his thoughts and whether he saw "opportunities in this company to do more of that?"  Wilkinson responded that he did not believe the unprecedented massive price hikes were problematic to the marketplace:

Price increase that happens usually happens because there's nobody else in the marketplace or there's only one other player in the marketplace so there's the ability to move.  *And the move then usually happens in these wild percentages that could mean you're moving from $8 to $12 a bottle.  It's not these massive, massive increases that are probably problematic to the marketplace.*

There are opportunities like that. As people fall out of bed in the manufacturing process and people have that struggle with their ability to supply, there becomes opportunity for increasing price. It doesn't happen every day. It happens – I think in our line we've had three or four that we've been able to do that with. I think in even the bigger players' lines it's maybe a dozen products a year that they're able to touch with a price increase.

171. As described above, Wilkinson knew about the details of Impax's price increases, the particulars of how his generics team "optimiz[ed] each opportunity," that the digoxin price increase was in fact a "massive, massive increase," and that it was not caused by manufacturers "fall[ing] out of bed in the manufacturing process" or "struggl[ing] with their ability to supply" from a variety of regularly-circulated internal reports, among other sources.

172. Wilkinson repeatedly evidenced his close watch over every change in generic prices and competitive dynamics, including for digoxin. For instance, during a November 11, 2015 Credit Suisse Healthcare Conference, the following exchange occurred between Wilkinson and an analyst:

Unidentified Participant

\*       \*       \*

And then on generics, on how you guys factor in price increases as you sort of think about the rest of this year and 2016.

Fred Wilkinson – Impax Laboratories, Inc. – President and CEO

Sure. So I mean I think pricing may be one of the most over talked topics. You know, generics get the opportunity probably in 1 or 2 products out of every 30 or 40 that are in your portfolio.

We may be a poster child of that one in that we had a product called Digoxin that we were one of seven marketers about 2.5 years ago. It became one of two. *We took the price up fairly dramatically, made it so it was an interesting product, made some money on that. And then as normally happens in an open competitive marketplace, many players came back in, price fell back down.* It's still an interesting product but nowhere near as interesting as it was before. So those were those unique and rare opportunities that we may have to take price, but they generally correct themselves by competition coming back in, and that's exactly what happened with Digoxin.

173. Wilkinson also admitted that he closely monitored markets in an effort to "maximize the opportunities" to *increase* prices. The following exchange occurred during an August 6, 2014 earnings conference call:

Louise Chen – Guggenheim Securities LLC – Analyst

Good morning. . . .  Second question is that some of your competitors have been able to significantly raise prices for their generic drug and I'm just wondering if Impax sees any opportunities here?

\*       \*       \*

Carole Ben-Maimon – Impax Laboratories Inc. – President, Gene[r]ic Division

Of course, *we look at any opportunity to raise price when it's appropriate*. I can't say that – we don't talk specifically about specific products here, *but we look at our portfolio regularly*, not every single day, and [other] opportunities in the marketplace to take advantage of shortages or increased share or price.

\*       \*       \*

Fred Wilkinson – Impax Laboratories Inc. – President & CEO

It really has to be said also, we focused the team with the strategy that said, *if you don't get launches, how do you maximize the opportunities of the things in your hand*.  They did an exceptional job, both in the brand and the generic side of saying, *if nothing new is coming, what do I do*?

And so, digging in and maximizing both revenue and contribution out of the assets that you have in your hand has been a very successful strategy for us to date.  They've done a really marvelous job as the results here show.

174.    Throughout the Class Period, Wilkinson also sought to downplay the seriousness of the governmental investigations.  In each of its Form 10-K and Form 10-Q filings, signed and certified by Wilkinson, Impax assured investors that "[i]t is common for enforcement agencies to initiate investigations into sales and marketing practices, as well as pricing practices, regardless of merit."  During Impax's November 4, 2014 earnings call, an analyst questioned Wilkinson on the investigations into generic drug pricing, he responded:

I think there's always been an analysis ongoing for looking at pricing within the pharmaceutical industry.  Sometimes it focuses on brands, sometimes it focuses on generics, sometimes on transfer pricing, so we're constantly under scrutiny, and I think the most important thing is to make sure that *our practices and our approaches are well within all the guidelines and the rules and regulations, and we believe they are*.

175.    At the end of 2015 and into 2016, Wilkinson continued to reassure investors that no pricing collusion had taken place.  On Impax's November 9, 2015 earnings call, when an analyst raised questions about pricing scrutiny, Wilkinson assured investors that "in fact, *we've not done anything that we think would ever raise the scrutiny of any of the regulatory authorities*."  A year

1    later, at the November 9, 2016 earnings call, when pressed by analysts to clarify Impax's internal

2    review of its generic pricing at issue with the DoJ, Wilkinson stated: "I think we really don't want to

3    comment on where we've gone.  Obviously, we are taking our judicious efforts to make sure that

4    we've done what we need to appropriately.  We'll put our filings out in front of the market in our

5    filings."  However, to date, no filing has been made concerning Impax's "internal investigation

6    relating to the DoJ's inquiry into price collusion."

7         176.    Shortly thereafter, however, during a proprietary event hosted by investment bank

8    Leerink Partners LLC, Impax's management team told Leerink's analysts that they felt "good" after

9    conducting an "internal investigation relating to the DoJ's inquiry into price collusion."  After the

10   meeting with Impax's management – "including Fred Wilkinson (CEO), Bryan Reasons (CFO),

11   Doug Boothe (President, Impax Generics), and Mark Donohue (VP of IR)" – Leerink stated in its

12   December 5, 2016 analyst report that "updates on the DoJ sector probe were assuring, from an IPXL

13   perspective" because "mgmt commented that it has completed its own internal investigation relating

14   to the DoJ's inquiry into price collusion and feels good the company has not engaged in any

15   impropriety."

16        177.    In sum, although Wilkinson arrived after the collusive digoxin price-hike, the

17   conspiracy persisted throughout his tenure as CEO.  And, Wilkinson publicly repeated, and directly

18   addressed both the price-hike and the government's price-fixing investigation, falsely attributing the

19   price-hike to benign market factors and repeatedly denying that Impax was or had engaged in

20   collusion.  Wilkinson either had the available contradictory information, in which case his statements

21   were knowingly false, or he lacked the knowledge he claimed to have when he provided investors

22   with specific and detailed reasons for the digoxin price-hike and denied that Impax had fixed prices,

23   in which case his conduct was severely reckless.  Either way, Wilkinson and Impax are liable for

24   Wilkinson's false statements.

25            c.    **Hsu Had Direct Personal Knowledge of Impax's
                    Collusive Pricing Strategy**

26

27        178.    Hsu was CEO of Impax and a member of the Executive Committee until April 2014,

28   a member of the Board of Directors until July 2015.  As CEO, Hsu held Executive Committee

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                              - 55 -

meetings at least monthly, if not weekly and received the five-year plan and its quarterly updates from Ben-Maimon.  The plan contained sales and production forecasts for each current and potential generic drug, driven by individual drug prices.  Hsu relied on the plan for budgeting, resource allocation,  production planning and raw materials purchases.  In addition, according to Impax Testimony and Impax Admissions, together with Executive Committee Members, Hsu assembled the Company Key Goals and Management by Objectives annually to determine compensation and bonuses.  Hsu signed off on the goals and presented them to the Board.  These goals and objectives were based on revenues and profitability – and during the Class Period, both targets were substantially driven by collusive profits from digoxin and pyridostigmine as a result of their unprecedented and massive price hikes.

179.    Hsu set aggressive objectives for 2014 while the Company was under siege internally and externally.  Within Impax, the Company was slowed by the myriad of problems at the Hayward and the Taiwan facilities, which held up all new product approvals at the FDA.  Impax had only a small portfolio of 38 generic drugs in the market and needed new products to drive growth and earnings.  Digoxin was facing heightened competition, and customer consolidation concentrated generic drugs buyers into three main wholesalers.  As CEO, Hsu would have approved the 700% digoxin price hike, which was set out in the 2014 five-year plan.

180.    Hsu's strategy for the Company was to generate cash and drive up the stock price for an acquisition that was immediately accretive.  During the February 25, 2013 earnings call, Hsu recognized the difficulty given Impax's limited cash position and depressed stock price: "if you look at the availability within the price range we can have access to . . . there are opportunities out there, but when you go through the selection criteria, the target size becomes much smaller than that."  During the August 8, 2013 call,  Hsu acknowledged that the FDA's "warning letter has prevented us from receiving approval on a number of pending ANDAs."  So, the Company "continue[d] to target external strategic growth opportunities to generate future growth."  The quickest way to generate cash and bolster profitability to drive up the stock price for an acquisition was a massive and collusive price hike on one of the Company's key drugs, digoxin.  The price hike created no

1    immediate incremental cost increase and was designed to result in no material loss of market share

2    for the Company.

3          181.   The digoxin price hike occurred when the generic division was in the process of

4    preparing its 2014 5-year plan for the Executive Committee.  The Trial Exhibits show that Hsu, Ben-

5    Maimon and Reasons received generic sales and marketing meetings materials from Engle on

6    October 2, 2013:  "Email from Todd Engle to Larry Hsu, Carole Ben-Maimon, Bryan Reasons, and

7    George Hill re: Updated Materials for Today's Generic Sales and Marketing Meeting w/Attach:

8    Generic Sales and Marketing Meeting Sept 16 2013.pptx" – when the 2014 five-year plan was being

9    put together by Ben-Maimon for the Executive Committee.  Given this formalized process of

10   financial planning involving defendant Hsu, there is a strong inference that he was aware of, or at

11   least recklessly disregarded, Impax's collusive price increases.

               **d.     Reasons Had Direct Personal Knowledge of Impax's**
                       **Collusive Pricing Strategy**

12

13         182.   At all relevant times, Reasons was the CFO and an Executive Committee Member.

14   As CFO, he was directly responsible for Impax's risk management function.  According to each of

15   Impax's annual proxies to investors, "[i]n fulfilling his risk-management responsibilities,

16   Mr. Reasons works closely with members of our senior management and meets with the audit

17   committee to discuss the risks facing our company, highlighting any new risks that may have arisen

18   since the committee last met."  As an Executive Committee Member, he reviewed sales and

19   production forecasts, put together the annual Company Key Goals to determine allocation of

20   resources necessary to achieve the goals, and used the goals to establish quantitative targets specific

21   to each division to determine compensation and bonus calculations.

22         183.   Reasons received copies and updates of the 2014 five-year plan put together by Ben-

23   Maimon and her team, which contained digoxin sales and production forecasts based on the

24   unprecedented 700% pricing increase.  Further, as the Trial Exhibits demonstrate, immediately prior

25   to the massive digoxin price hike, Reasons also received the generic sales and marketing team

26   meeting materials on October 15, 2013, entitled "Updated Materials for Today's Generic Sales and

27   Marketing Meeting w/Attach: Generic Sales and Marketing Meeting Sept 16 2013.pptx."

28

184.    In his role as CFO, Reasons was also responsible for communicating with investors and analysts through quarterly earnings calls, where he delivered prepared remarks and fielded questions from the investment community concerning generic pricing.  In his testimony to the FTC, Reasons attested that he was "knowledgeable about the topics [he] presented" at the conference calls. During investor calls, he discussed the topic of generic drug prices.  In fact, during the 4Q13 earnings call on February 20, 2014, Reasons acknowledged that the "potential impact of additional competition on several generic products" should lead to lower revenues, but reported the opposite with respect to certain drugs.  When an analyst asked, "on digoxin.  Could you comment on the competitive dynamics there after [a product] launched in authorized generic.  Has everything been rational, or have you seen more than typical price pressure?"  Defendants declined to discuss the specifics of digoxin pricing but assured investors of "ongoing profitability for that product."

185.    During the modeling and forecasting process for digoxin, Wilkinson, Reasons and Kloss exchanged copies, updates and drafts of the 2015 five-year plan.  For example, on November 19, 2014, Wilkinson and Reasons received an email from Kloss concerning the "2015 Plan - Executive Review 11-20-14 R1 (update)" which attached the document, "Dec 14 BOD 2015 Plan 11-20-14 R1.pdf."  At this time, Impax anticipated Mylan's entry into the digoxin market.  The executive plan, which included information on each of Impax's generic drugs, would have reflected the impact of Mylan's entry into the digoxin market.  In addition, the 2015 plan would have accounted for the anticipated 116% pyridostigmine price hike that was executed in December 2014.[13]

186.    Reasons and Wilkinson also met with Leerink analysts on or around December 5, 2016 and represented that Impax "has completed its own internal investigation relating to the DoJ's inquiry into price collusion and feels good the company has not engaged in any impropriety."  In light of these reassuring statements to the market on a topic of immense importance to investors, it was incumbent on defendants Reasons and Wilkinson to ensure they each understood the true facts

---

[13]    As discussed above, when additional competitors entered the digoxin market in 2015, it was Impax's turn to cede share in order to maintain equilibrium under the "general rules of the road" that governed the conspiracy.

concerning the subjects on which they spoke.  Either Reasons possessed the knowledge of the Company's price-fixing scheme, in which case he knew that his representations were false and misleading, or he lacked the knowledge he claimed to have, in which case his conduct was severely reckless.

> ### 2.   Defendants' False Exculpatory Statements are Evidence of Scienter

187.   After the government scrutiny on generic drug price increases heightened, defendants addressed the digoxin price increase directly with investors and made several false exculpatory statements concerning the price hikes and collusive activities.  In particular, Wilkinson repeatedly sought to justify the unprecedented and coordinated price-fixing of digoxin that occurred at the end of 2013:

- August 10, 2015 Earnings Call:  "Obviously both the API supply and some of the other issues around the product resulted in a market disruption, at which there were two of us left out there, substantial price increase."

- September 18, 2015 Morgan Stanley Healthcare Conference:  "So, digoxin went from a seven player marketplace to a two player marketplace.  We took price, so became a very meaningful product to us.  We were very close to actually eliminating it out of our portfolio; the price has gotten so low."

- November 11, 2015 Credit Suisse Healthcare Conference:  "We may be a poster child of that one in that we had a product called Digoxin that we were one of seven marketers about 2.5 years ago.  It became one of two.  We took the price up fairly dramatically, made it so it was an interesting product, made some money on that."

- May 10, 2016 Bank of America Merrill Lynch Healthcare Conference:  "I mean, we had that experience with our digoxin, where there were nine competitors and then that went to two.  We raised price, and then now there are seven or eight competitors and price has come back down again."

188.   Based on evidence received during their investigation, the state attorneys general rejected the types of rationalizations used by Wilkinson and other generic manufacturers:

> Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures or elimination of unprofitable generic drug product lines.  What the Plaintiffs States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors.

189.   Wilkinson's justifications for the unprecedented price hike were false and do not explain the highly correlated and uniform price increase with Lannett that was sustained despite the

1    entrance of new competitors, such as Par, that sought to build up market share.  His pre-collusion

2    story was inconsistent, with the number of competitors changing from seven to nine.  The generic

3    digoxin market never had nine competitors, and there were only three competitors in 2012 and 2013.

4    *See* ¶45.  The average price of digoxin had always been consistent and stable at $0.16 per pill since

5    Impax entered the market, with Impax's market share growing steadily from 20% to 30% in the

6    years before the collusion – demonstrating the absurdity of the suggestion that Impax was about to

7    eliminate one of its key products from its portfolio precisely at the time when the Company was

8    under siege on all fronts.  Furthermore, no API shortage had occurred as no manufacturers reported

9    any potential drug shortages to the FDA as required by federal law.  The only shortage that occurred

10   at the end of 2013 was Impax's shortage of revenues due to additional competitive pressure on its

11   key drugs such as Adderall, Fenofibrate, Oxymorphone and the continued hold-up of pending

12   ANDAs with the indefinite regulatory compliance problems at the Hayward facility.

13         190.    Thus, contrary to Wilkinson's representations, the calculated digoxin price spike was

14   not caused by supply or production issues as Wilkinson insisted, but by collusion conceived of and

15   directed by defendants.  Wilkinson's false exculpatory statements are evidence of his consciousness

16   of wrongdoing.  If Impax's sudden 700% price hike for non-collusive, legitimate, and independent

17   reasons, Wilkinson would have had no reason to fabricate reasons for why it was done.

18              **3.    The Magnitude, Importance and Duration of the Fraud
                       Supports a Finding of Scienter**

19

20         191.    The fact that Impax's collusive activities and price-fixing scheme generated over

21   $270 million in illegal, collusive revenue supports a strong inference of scienter.  Indeed, the

22   collusive digoxin price hike drove Impax's rebound in 2014.  Between 2013 and 2016, Impax reaped

23   more than $224 million of illegal, collusive revenues from digoxin.  Between 2014 and 2016, Impax

24   reaped more than $47 million of illegal, collusive revenues from pyridostigmine.

25         192.    Digoxin was among Impax's largest generic drugs, based on revenue.  For fiscal

26   2014, Digoxin was the Company's 5th largest product.  Impax sold nearly $50 million of generic

27   Digoxin in FY 2014 which was over 8% of the Company's total reported revenue.  Digoxin

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                    - 60 -

1    remained one of the Company's top 10 products, by net revenue, in 2016.   There is a strong

2    inference that defendants knew of the source of this revenue.

3            193.    Likewise, as the elevated prices attracted new participants in the market, Impax began

4    to lose marketshare and as government scrutiny intensified, Impax was no longer able to implement

5    additional price hikes.  As a result Impax's generic drug profits plummeted and forced the Company

6    to report significant declines in revenue, gross margins, and earnings compared to the prior year, and

7    specifically named "additional competition on generic Digoxin" as a primary cause for each. There

8    is strong inference that defendants were aware of the true source of this decline, or were reckless in

9    not knowing.

10                **4.        Contemporaneous Red Flags Support a Finding of Scienter**

11            194.    Contemporaneous red flags alerted defendants to the possibility that their statements

12    were false and misleading.   At a minimum, defendants recklessly failed to review or check

13    information that they had a duty to monitor under these circumstances.

14            195.    Impax and its co-conspirators were among the first generic manufacturers to be

15    investigated by the Connecticut Attorney General, Congressional committees, and the DoJ.

16            196.    <u>Congressional Inquiry</u>:  On October 2, 2014, in a letter addressed to Ben-Maimon,

17    Senator Bernie Sanders and Representative Elijah E. Cummings informed Impax that "[w]e are

18    conducting an investigation into the recent staggering price increases for generic drugs used to treat

19    everything from common medical conditions to life-threatening illnesses."  Simultaneously, Senator

20    Bernie Sanders and Representative Elijah E. Cummings sent a similar letter to the CEO of Lannett.

21    On October 22, 2014, shortly after her receipt of the Sanders and Cummings Letter, Ben-Maimon

22    announced her resignation, effective November 3, 2014.  This should have placed defendants on

23    alert to investigate and discover whether Impax had taken price increases and to what extent.

24            197.    <u>The State AG and DoJ Investigations</u>:  The fact that the DoJ and State AGs began

25    investigations into Impax's competitors related to their pricing practices also supports a strong

26    inference of scienter.  The fact of those investigations should have triggered an internal inquiry at

27    Impax into the facts of its own pricing practices, including the many price increases that Impax made

28    in tandem with its competitors.

1   198.   <u>The Receipt of the Subpoenas</u>:  Impax's receipt of subpoenas from the Connecticut

2   AG and the DoJ on July 15, 2014 and March 3, 2015[14], respectively, supports a strong inference of

3   defendants' scienter.  Moreover, those subpoenas triggered a legally mandatory duty to inquire into

4   Impax's pricing practices.

5   199.   <u>Bloomberg Article</u>:  The November 3, 2016 *Bloomberg* article revealed that Impax

6   was the subject of the DoJ criminal inquiry, and that the DoJ and State AGs could likely bring

7   charges later in the year.  Despite this, approximately a month later, on December 5, 2016,

8   defendants told analysts (Leerink) that management had "completed its own internal investigation

9   relating to the DoJ's inquiry into price collusion and feels good the company has not engaged in any

10   impropriety."  The State AGs suit and the DoJ charges against Glazer and Malek soon followed and,

11   subsequently, those investigations have expanded massively.  The close proximity of Impax's

12   statement to the announcement of the charges diminishes the plausibility of innocent explanations or

13   denials from the defendants.

14   **5.   Corporate Scienter**

15   200.   Impax possessed scienter by virtue of the fact that the Individual Defendants, who

16   acted with scienter as set forth above had binding authority over the Company.  In addition, certain

17   allegations herein establish Impax's corporate scienter based on: (i) the state of mind of employees

18   whose intent can be imputed to the Company; and/or (ii) the knowledge of employees who approved

19   the statements alleged herein despite knowing the statements' false and misleading nature.

20   201.   It can be inferred that senior corporate executives at Impax possessed scienter such

21   that their intent can be imputed to the Company.  For instance, throughout the Class Period, Impax's

22   Global Pharmaceuticals business (*i.e.*, the Generics Division of Impax) was overseen by defendants

23   Wilkinson and Ben-Maimon (before she departed).  Both Wilkinson and Ben-Maimon repeatedly

24   spoke on investors calls concerning generics pricing and were sufficiently senior to impute their

25   scienter to Impax of the price-fixing scheme.

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[14]   Also on November 7, 2014, Impax filed a Form 8-K announcing that one of its sales
28   representatives had received a grand jury subpoena from the DoJ's Antitrust Division concerning the
sale of generic drugs.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                          - 62

202.     As yet unidentified employees also approved the false statements despite knowing of their false and misleading nature.  As discussed, Impax had in place extensive processes to track its financial performance on a daily, quarterly, and yearly basis.  From this, it can be inferred that someone at Impax approved of the false and misleading statements in Impax's financial statements concerning the source of its generics profits, while knowing that the true source of the profits were the collusive profits from the price-fixing scheme.  Indeed, it can also be inferred that someone approved the false and misleading statements that Impax was competing intensely on price, someone who knew of the price-fixing scheme, and that it was largely dependent on a lack of competition.

### 6.     Analysts' Focus on Generics Pricing Supports a Finding of Scienter

203.     The fact that analysts focused on Impax's generics business, and particularly digoxin, as a financial driver for the Company, further supports a strong inference of scienter:

| Date | Analyst | Author | Commentary |
|------|---------|--------|------------|
| 10/29/14 | BRG The Buckingham Research Group | David G. Buck/James B. Dawson | • "Risks . . . Generic pricing although strong currently remains an industry risk as well as pace of generic approvals at FDA." |
| 3/23/15 | Guggenheim | Louise Chen/ Swati Kumar | • "Multiple upside opportunities in generics business. . . . We believe further upside could come from additional pricing power in both these segments.  The company expects generic gross margins to be in the low 50s, but this does not include pricing opportunities or improved efficiencies in COGs as part of the company's capital plan and upgrade." |
| 4/7/15 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . .  5) greater than expected pricing pressure for generics . . . ." |
| 7/20/15 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "Where Could We be Wrong? – Like many of its peers, IPXL has benefitted from improved pricing on generics in the past few years.  IPXL has made progress diversifying its portfolio and bulking up its pipeline, but some key products could still be vulnerable if pricing gains don't hold.  If price erosion returns to traditional norms, that could pressure margins which are above historical levels."<br>• "The key risks to the stock include: . . . (6) the potential for past settlements to attract anti-trust scrutiny, (7) increased congressional/legal scrutiny of |

| Date | Analyst | Author | Commentary |
|---|---|---|---|
| | | | generics pricing . . . ." |
| 11/10/15 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "The key risks to the stock include: . . . (6) the potential for past settlements to attract anti-trust scrutiny, (7) increased congressional/legal scrutiny of generics pricing . . . ." |
| 11/10/15 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . . 5) greater than expected pricing pressure for generics . . . ." |
| 12/15/15 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "Risks . . . IPXL has been targeted in an ongoing investigation of generic price increases like a number of its competitors."<br><br>• "The key risks to the stock include: . . . (6) the potential for past settlements to attract anti-trust scrutiny, (7) increased congressional/legal scrutiny of generics pricing . . . ."<br><br>• "Key downside risks to our valuation include: . . . 4) any change in the ability to take regular price increases across most of the portfolio and maintain high prices for the HGT drugs . . . ." |
| 1/4/16 | RBC Capital Markets | Randall Stanicky, CFA/James C. Chen, CFA | • "Our view:  We do not think there is any change in Impax's pricing strategy on either the brand or generic side.   The company has previously participated in raising prices significantly on products following the removal of competitors with Digoxin where pricing ultimately came back down following the re-entry of competition. . . .   The broader industry pricing question is one that we think will get significantly more focus in 2016." |
| 2/23/16 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "Pricing – We continue to watch for signs of pricing pressure across the group despite most management teams downplaying the significance to recent results and outlooks.  IPXL noted mid single digit erosion in 2015 with some added pressure on certain immediate release products in 4Q." |
| 3/1/16 | RBC Capital Markets | Randall Stanicky, CFA | • "Pricing environment:   In response to Endo commentary around potential moderation in 2016E pricing, Impax does not see any change on its generic portfolio.  This is consistent with commentary at GPhA and what we have heard from generic peers in recent weeks." |
| 6/21/16 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . . 5) greater-than-expected pricing pressure for generics . . . ." |

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                         - 64 -

| Date | Analyst | Author | Commentary |
|------|---------|--------|------------|
| 7/27/16 | SIG Susquehanna Financial Group, LLLP | Andrew Finkelstein | • "The key risks to the stock include: . . . (7) increased congressional/legal scrutiny of generics pricing which has also led to government and private litigation . . . ." |
| 8/9/16 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . . 5) greater-than-expected pricing pressure for generics . . . ." |
| 11/9/16 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . . 5) fines related to the ongoing investigation into the pricing of certain generics . . . ." |
| 12/5/16 | Leerink | Jason M. Gerberry, JD/ Etzer Darout, Ph.D. | • "With generic pricing headwinds in the near-to-medium term, cost containment could be back in vogue. . . . The sector has seen gross margins reach all-time highs in the last three years in large part due to an inflationary price tailwind. . . . As mgmt looks at the rest of the industry – the squeeze on pricing will most likely drive pressure on competitors GMs . . . ."  • "Mgmt addresses DoJ investigation: At the meeting, mgmt commented that it has completed its own internal investigation relating to the DoJ's inquiry into price collusion and feels good the company has not engaged in any impropriety.  Mgmt commented that they haven't had conversations with the DoJ in over one year and noted that if any of the company's products implicated in the Bloomberg story are indicated, they'd expect broader investigation could linger, so investors should not expect this sector-level story to go away with the first indictment." |
| 12/22/16 | Deutsche Bank Markets Research | Gregg Gilbert/Greg Fraser | • "Downside risks include: . . . 2) increasing competitive intensity in generics, 3) greater-than-expected pricing pressure for generics . . . ." |

**7.     Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised Impax's Controls and Procedures**

204.   Throughout the Class Period, defendants Hsu, Wilkinson and Reasons repeatedly certified that they personally supervised and participated in the evaluation of Impax's financial controls and procedures, and that the Company's financial disclosures fairly and accurately presented its financial condition.  Further, in each 10-Q and 10-K report, Impax states that "[t]he Company's chief operating decision maker evaluates the financial performance of the Company's

segments based upon segment income (loss) before income taxes." Moreover, Impax's many misleading 10-Q and 10-K reports were always followed by earnings calls during which all of the Individual Defendants described the favorable, but inaccurate, financial results (several examples of such calls are set forth above).

### 8. Defendants and Company Insiders Engaged in Suspicious Insider Trading

205. The significant level of insider trading during the Class Period raises a strong inference that defendant Hsu and certain Company insiders knew that they were deceiving the public by inflating Impax revenues and were further motivated to engage in this course of conduct for personal financial gains. While defendants engaged in their scheme to defraud investors by materially overstating the Company's revenues through their collusion to fix prices in generic drugs, defendant Hsu and certain Company insiders suspiciously sold over a half million Impax shares for proceeds of approximately $15 million. The sales are summarized in the following chart:

| Insider Sales:  February 20, 2014 to January 11, 2017 (Class Period) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Insider | Title | Date | Shares | Price | Proceeds | End of Class Period Holdings | % Sold |
| Benet (Leslie Z) | Director | 08/31/15 | 20,000 | $40.92 | $818,400 | | |
| Benet (Leslie Z) | Director | 08/15/16 | 10,092 | $22.81 | $230,199 | | |
| **Benet Total:** | | | **30,092** | | **$1,048,599** | **147,525** | **16.94%** |
| | | | | | | | |
| Fleming (Nigel Ten) | Director | 05/06/14 | 4,000 | $26.34 | $105,360 | | |
| Fleming (Nigel Ten) | Director | 05/12/14 | 1,333 | $26.58 | $35,431 | | |
| Fleming (Nigel Ten) | Director | 05/16/14 | 1,900 | $25.72 | $48,868 | | |
| Fleming (Nigel Ten) | Director | 08/31/15 | 29,166 | $41.02 | $1,196,389 | | |
| **Fleming Total:** | | | **36,399** | | **$1,386,048** | **37,301** | **49.39%** |
| | | | | | | | |
| Hsu (Lawrence) | Director | 05/06/14 | 219,386 | $26.28 | $5,765,464 | | |
| Hsu (Lawrence) | Director | 05/21/14 | 3,800 | $26.53 | $100,814 | | |
| Hsu (Lawrence) | Director | 05/22/14 | 50,000 | $27.22 | $1,361,000 | | |
| Hsu (Lawrence) | Director | 06/05/14 | 50,000 | $28.25 | $1,412,500 | | |
| Hsu (Lawrence) | Director | 06/06/14 | 50,000 | $28.52 | $1,426,000 | | |
| **Hsu Total:** | | | **373,186** | | **$10,065,778** | **2,886,448** | **11.45%** |
| | | | | | | | |
| Markbreiter (Charles Michael) | Director | 03/11/14 | 4,000 | $27.54 | $110,160 | | |

| Insider Sales:  February 20, 2014 to January 11, 2017 (Class Period) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Insider | Title | Date | Shares | Price | Proceeds | End of Class Period Holdings | % Sold |
| Markbreiter (Charles Michael) | Director | 05/06/14 | 2,851 | $26.48 | $75,494 | | |
| Markbreiter (Charles Michael) | Director | 05/07/14 | 1,149 | $26.30 | $30,219 | | |
| Markbreiter (Charles Michael) | Director | 05/07/14 | 7,500 | $26.39 | $197,925 | | |
| Markbreiter (Charles Michael) | Director | 05/08/14 | 1,000 | $26.85 | $26,850 | | |
| Markbreiter (Charles Michael) | Director | 08/25/15 | 9,399 | $41.67 | $391,656 | | |
| Markbreiter (Charles Michael) | Director | 08/26/15 | 10,000 | $42.78 | $427,800 | | |
| Markbreiter (Charles Michael) | Director | 08/28/15 | 8,000 | $42.48 | $339,840 | | |
| Markbreiter (Charles Michael) | Director | 08/31/15 | 20,000 | $41.39 | $827,800 | | |
| **Markbreiter Total:** | | | **63,899** | | **$2,427,745** | **42,301** | **60.17%** |

206.    Further, the insider sales were unusual compared to the prior trading history for Leslie Benet, Nigel Fleming, Lawrence Hsu and Charles Markbreiter.  The following chart shows these same individuals' insider sales in the two years prior to the Class Period:

| Insider Sales:  January 1, 2012 to February 19, 2014 (Pre-Class Period) | | | | | |
|---|---|---|---|---|---|
| Insider | Title | Date | Shares | Price | Proceeds |
| Benet (Leslie Z) | Director | 08/13/12 | 1,300 | $23.96 | $31,148 |
| Benet (Leslie Z) | Director | 08/14/12 | 3,500 | $24.24 | $84,840 |
| **Benet Total:** | | | **4,800** | | **$115,988** |
| | | | | | |
| Fleming (Nigel Ten) | Director | 08/06/12 | 6,667 | $23.92 | $159,475 |
| Fleming (Nigel Ten) | Director | 08/13/12 | 6,000 | $23.91 | $143,460 |
| Fleming (Nigel Ten) | Director | 08/20/12 | 6,000 | $23.99 | $143,940 |
| Fleming (Nigel Ten) | Director | 08/27/12 | 6,000 | $23.92 | $143,520 |
| Fleming (Nigel Ten) | Director | 03/25/13 | 6,000 | $15.60 | $93,600 |
| Fleming (Nigel Ten) | Director | 04/01/13 | 6,000 | $15.31 | $91,860 |
| Fleming (Nigel Ten) | Director | 04/08/13 | 6,000 | $16.20 | $97,200 |
| **Fleming Total:** | | | **42,667** | | **$873,055** |
| | | | | | |
| Markbreiter (Charles Michael) | Director | 11/16/12 | **6,667** | **$19.73** | **$131,540** |

207.    During the two years prior to the Class Period, these same Company insiders sold only 54,134 shares of their Impax stock, resulting in proceeds of only $1.1 million.  Notably, defendant Hsu did not sell any shares during this time period.  During the Class Period, however, Leslie Benet, Nigel Fleming, Lawrence Hsu, and Charles Markbreiter engaged in a selling spree of 503,576 shares of their Impax stock for proceeds of almost $15 million.  The pre-Class Period sales by defendant Hsu and Company insiders highlight the suspicious nature of their Class Period trades.

|  | Pre-Class Period Sales | Class Period Sales | % Increase in Class Period Sales |
|---|---|---|---|
| Benet | $115,988 | $1,048,599 | 804% |
| Fleming | $873,055 | $1,386,048 | 59% |
| Hsu | $0 | $10,065,778 | $10,065,778 |
| Markbreiter | $131,540 | $2,427,745 | 1746% |

208.    The insider sales were also suspicious in timing.  As demonstrated above, the sales were predominantly made between May 2014 and August 2015, at times when defendants were materially overstating the Company's revenues through their collusion to fix prices in the generic drugs of digoxin and pyridostigmine.  Indeed, defendant Hsu sold all of his shares (for over $10 million in proceeds) at prices on and near a two-month high in Impax stock.  The suspiciousness of the insider stock sales and their proximity to Impax's collusion to fix generic prices raises a strong inference that these insiders knew of defendants' price-fixing scheme when they sold their shares and used that information in connection with the sales.

### 9.    Defendants' Compensation Structure Incentivized Fraud

209.    As a result of Impax's compensation structure, defendants had a direct incentive to manipulate Impax's generic revenues and income as part of their scheme to defraud.  Impax explained its compensation structure in annual Proxy Statements.  According to these statements, Impax based its incentive awards on both: (a) the Company's accomplishment of group goals, and (b) each executive's accomplishment of individual goals.  The goals were recommended by Impax senior management, including the Chief Executive Officer.  The executives' awards depended more heavily on group goals, but the exact percentages varied from year to year.  Importantly, if the

Company or an executive exceeded its goals, the executives could receive **well over 100%** of their allocated incentive awards.

210.    In this compensation structure, profitability in the form of earnings before interest and taxes (EBIT) outweighed revenues with weightings of 80% profitability vs. 20% revenues. Collusive price-fixing was the quickest way to drive profitability as all benefits immediately and directly bolstered the bottom-line.

### a.    2013

211.    In 2013, when the digoxin price-fixing scheme took effect, 95% of the CEO's award and 85% of the other executives' awards depended on group goals.  The group goals focused on revenue:

- "net sales target of $432.8 million and stretch target of $497.7 million[; and]
- "EBIT, target of a loss of $3.5 million and stretch target of a loss of $2.6 million."

212.    The 2013 Proxy Statement reported that Impax had met these benchmarks, which resulted in significant cash bonuses to defendants:

> For 2013, we achieved adjusted net sales of $511.5 million, representing 118% attainment of our revenue-based target goal and 103% attainment of our revenue-based stretch goal (weighted 20%) and a gain of $78.1 million in EBIT, representing over 150% attainment of our EBIT-based target and stretch goals (weighted 80%).  Because we achieved over 100% attainment of our net sales-based and EBIT-based target and stretch goals, our compensation committee determined that our overall 2013 performance exceeded our target and stretch level of performance and ***recommended that each named executive officer receive a cash incentive award payout equal to 150% of the named executive officer's corporate performance goal portion of his or her target bonus***.  The use of identical performance goals tied to the net sales-based and EBIT-based criteria for all of our named executive officers supports our stated compensation philosophies of rewarding named executive officers for positive performance, aligning the interests of our executives with those of our stockholders and maintaining executive cohesion and teamwork through the implementation of similar compensation for officers who are at similar executive levels.

213.    Defendants cashed in, due in part to inflated sales of digoxin in 4Q13 – totaling $25.1 million, and 32% of the entire Company's profitability for 2013.  In incentive awards alone, Hsu made $1.1 million, Reasons made $343,000, and Ben-Maimon took home $431,000.

214.    In justifying Ben-Maimon's 2013 annual compensation award, Impax noted that one of her contributions was achieving "specified financial goals for Global Pharmaceuticals Division."

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                                          - 69 -

As a result of digoxin's contribution, defendants were granted cash incentive compensations at or close to their maximum awardable amounts – in effect, close to doubling the salaries for defendants Reasons and Ben-Maimon and multiplying the salary for defendant Hsu 2.5 times:

| 2013 | Annual Cash Incentive Award Target (%) | Maximum Target for Annual Cash Incentive Award (%) | Actual Award ($) | Actual Award as Percentage of Salary (%) |
|---|---|---|---|---|
| Larry Hsu | 100 | 150 | 1,119,353 | 150 |
| Bryan Reasons | 60 | 90 | 343,035 | 88 |
| Carole Ben-Maimon | 60 | 90 | 431,246 | 88 |

| 2013 | Salary ($) | Stock Awards ($) | Option Awards ($) | Cash Incentive Award ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Larry Hsu | 746,235 | 1,671,271 | 1,470,281 | 1,119,353 | 72,371 | 5,079,511 |
| Bryan Reasons | 385,000 | 266,252 | 392,075 | 343,035 | 65,109 | 1,451,471 |
| Carole Ben-Maimon | 486,257 | 446,152 | 392,075 | 431,246 | 31,962 | 1,787,692 |

### b.    2014

215.    In 2014, during the height of the digoxin scheme and the beginning of the pyridostigmine scheme, 96% of the CEO's award and 85% of the other executives' awards depended on group goals.  These goals again focused on earnings and sales, including "EBIT, target of $30.6 million and stretch target of $91.4 million" and "net sales target of $443.9 million and stretch target of $518.9 million."   The Company indicated that the Individual Defendants received substantial awards based on their "strong" performance:

> For 2014, we achieved adjusted net sales of $596 million, representing over 150% attainment of our revenue-based target and stretch goals (weighted 20%) and $142.8 million in EBIT, representing over 150% attainment of our EBIT-based target and stretch goals (weighted 80%).  Because  we achieved over 100% attainment of our net sales-based and EBIT-based target and stretch goals, our compensation committee determined that our overall 2014 performance exceeded our target and stretch level of performance and ***determined that each named executive officers receive a cash incentive award payout equal to 150% of the named executive officer's corporate performance goal portion of his or her target bonus***.  The use of identical performance goals tied to the net sales-based and EBIT-based criteria for all of our named executive officers supports our stated compensation philosophies of rewarding named executive officers for positive performance, aligning the interests of our executives with those of our stockholders.

216.    Defendants achieved these benchmarks due to an entire year of inflated sales from digoxin and pyridostigmine – with collusive profits contributing to ***78%*** of the 2014 EBIT.  As a

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG
- 70

1  result, the incentive awards were substantial.  Although each worked for less than a full year,

2  Wilkinson made $862,000, Hsu made $340,000, and Ben-Maimon made $453,000.  Reasons worked

3  a full year, and took home $418,000 in incentive awards alone.

| 2014 | Annual Cash Incentive Award Target (%) | Maximum Target for Annual Cash Incentive Award (%) | Actual Award ($) | Actual Award as Percentage of Salary (%) |
|---|---|---|---|---|
| Frederick Wilkinson | 100 | 150 | 862,793 | 150 |
| Larry Hsu | 100 | 150 | 340,406 | 150 |
| Bryan Reasons | 60 | 90 | 418,500 | 90 |
| Carole Ben-Maimon | 60 | 90 | 453,248 | 90 |

9  217.    In addition, the bulk of Wilkinson's multi-million dollar stock award was

10  "performance-based" and pegged solely to Impax's stock price.  In order for his 375,000 shares to be

11  eligible for vesting, Impax's stock price had to rise to $30, $34, and $38 for 30 consecutive trading

12  days.  If the targeted stock price levels were achieved, 187,500 shares would vest on Wilkinson's

13  first anniversary with the Company and another 187,500 shares would vest on his second

14  anniversary.  These shares would be forfeited if stock prices did not achieve the targeted levels

15  within the fifth anniversary of his employment or if he was no longer employed at Impax prior to

16  their vesting.  As such, Wilkinson was especially incentivized to drive near-term inflation of

17  financial performance, whether or not such inflation was sustainable long term, as long as the stock

18  price held up at the targeted levels for at least 30 consecutive days.  By virtue of Impax's revenue

19  growth and profitability in 2014, which was driven by illegal digoxin price-fixing, all 375,000 shares

20  were eligible to be vested by March 19, 2015, and did vest on Wilkinson's first and second

21  anniversaries with the Company.

22              c.      2015

23  218.    In 2015, when Impax continued to earn artificially-inflated revenues due to the lasting

24  effects of the digoxin and pyridostigmine schemes, group awards determined 100% of the CEO's

25  award and 75% of other executives' awards.  Group goals again focused on financial performance,

26  including "net sales target of $860 million" and "adjusted EBITDA target of $269.1 million."  The

27  Company met these goals and credited the Individual Defendants for its success:

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                                    - 71 -

1
For 2015, we achieved net sales of $861.4 million, representing 100%
attainment of our internal net sales-based target (weighted 33%) and $284.4 million in
2
adjusted EBITDA, representing 106% attainment of our internal EBITDA-based target
(weighted 67%), representing a total weighted corporate financial performance
3
achievement of 104%. The 104% corporate financial performance achievement would
have resulted in funding the Short-Term Incentive pool at 110% in accordance with the
4
pay for performance funding threshold described above. In recognition of certain key
achievements of our company during 2015 including among other accomplishments,
5
resolution of the warning letter at our Hayward facility, *the compensation committee
exercised its discretion to increase funding of the Short-Term Incentive pool from*
6
*110% to 125% of the target funding amount*. The compensation committee
determined that such achievements reflected exemplary performance by our company,
7
including by members of our executive management team.

8
219. Defendants achieved these goals due to another year of inflated sales from digoxin

9
and pyridostigmine. As a result, Wilkinson made $972,000 and Reasons made $337,000 in incentive

10
awards alone.

11
### d.  2016

12
220. In addition to revenue-based goals, the Company also created goals designed to

13
incentivize its executives to acquire generic drugs from other pharmaceutical companies. In 2016,

14
group awards determined 100% of the CEO's award and 75% of other executives' awards. One of

15
the group goals was to "[d]evelop and bring to market new products." In addition, the President of

16
Generics had individual goals to "[e]xpand generics product portfolio through internal and external

17
opportunities," and "[d]eliver on new generic product opportunities." The prospect of high incentive

18
awards drove the Individual Defendants to complete deals that significantly added to Impax's

19
portfolio, such as the acquisition of 18 generic drugs from Teva, which the Company announced on

20
June 21, 2016.

21
221. The following table summarizes total compensation for several Impax executives

22
during the Class Period:

| Name (Position) | Year | Salary | Bonus | Stock | Options | Incentive | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Buchi (Interim CEO) | 2016 | $4,583 | $0 | $115,889 | $114,083 | $0 | $0 | **$234,555** |
| Wilkinson (CEO) | 2016 | $907,800 | $0 | $2,972,344 | $2,827,648 | $0 | $5,060,600 | **$11,768,392** |
| | 2015 | $882,692 | $132,600 | $2,767,600 | $2,747,660 | $972,400 | $94,924 | **$7,592,876** |
| | 2014 | $552,500 | $0 | $11,534,677 | $0 | $862,793 | $28,900 | **$12,978,870** |
| Hsu (CEO) | 2014 | $364,507 | $0 | $121,152 | $119,370 | $340,406 | $3,110,700 | **$4,055,689** |
| | 2013 | $746,235 | $0 | $1,671,271 | $1,470,281 | $1,119,353 | $72,371 | **$5,079,511** |
| Reasons | 2016 | $496,620 | $0 | $868,780 | $826,545 | $0 | $56,579 | **$2,248,524** |

| Name (Position) | Year | Salary | Bonus | Stock | Options | Incentive | Other | Total |
|---|---|---|---|---|---|---|---|---|
| (CFO) | 2015 | $482,885 | $32,643 | $814,000 | $804,175 | $337,311 | $544,346 | **$3,105,360** |
| | 2014 | $446,157 | $0 | $580,520 | $584,100 | $418,500 | $47,110 | **$2,076,387** |
| | 2013 | $385,000 | $0 | $266,252 | $392,075 | $343,035 | $65,109 | **$1,451,471** |
| Boothe (President, Generics) | 2016 | $207,692 | $250,000 | $1,528,692 | $503,485 | $0 | $9,512 | **$2,499,381** |
| Ben-Maimon (President, Generics) | 2014 | $458,022 | $0 | $580,520 | $584,100 | $453,248 | $1,351,249 | **$3,427,139** |
| | 2013 | $486,257 | $0 | $446,152 | $392,075 | $431,246 | $31,962 | **$1,787,692** |

### 10. Defendants Wilkinson and Ben-Maimon's Abrupt Departures from Impax Supports a Finding of Scienter

222. On October 22, 2014, just 20 days after receiving the Sanders and Cummings letter regarding generic drug price hikes requesting documents relating to digoxin, Impax announced that defendant Ben-Maimon had resigned. This departure was seen as abrupt and unexpected by analysts and industry insiders.

223. Analyst Michael Faerm, from Wells Fargo Securities, specifically noted in an October 23, 2014 report that Ben-Maimon's "[d]eparture comes as a surprise." Her departure was especially alarming considering the concerted ramp-up by the Company in its generic business during this time period, including the acquisition with Tower. Although Wilkinson claimed that Ben-Maimon left Impax for "family reasons," she subsequently became a board member of Teligent, worked with Deerfield Management in selecting pharmaceutical companies for investment, and signed on as CEO of Chondrial Therapeutics.

224. At year-end 2016, the Company again announced a significant abrupt departure by an executive. This time Wilkinson, the CEO, suddenly left after an eventful and turbulent year for Impax (as described above).

225. When asked by analysts about the departure at the January 11, 2017 JPMorgan Healthcare conference, the Company remained vague, simply stating that "*there were discussions between Fred and the Board and there was a decision made mutually that he would move on*."

1

**V.    PRICE FIXING FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

2

3

**A.    2014 Price Fixing False and Misleading Statements and Omissions**

4      226.    The Class Period begins on February 20, 2014, when Impax issued a press release and

5  filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain

6  of the Company's financial and operating results for the quarter and year ended December 31, 2013

7  (the "2013 8-K").  For the quarter, Impax reported a net loss of $9.62 million, or $0.14 per diluted

8  share, on revenue of $100.74 million compared to net income of $4.80 million, or $0.07 per diluted

9  share, on revenue of $141.08 million for the same period in the prior year.  For 2013, Impax reported

10  net income of $101.26 million, or $1.47 per diluted share, on revenue of $511.50 million, compared

11  to net income of $55.87 million, or $0.82 per diluted share, on revenue of $581.69 million for 2012.

12      227.    In the 2013 8-K, Impax stated, in part:

13          In the fourth quarter 2013, Global Product sales, net increased to
       $84.4 million, compared to $79.8 million in the prior year period.  The increase was
14      primarily due to sales of new generic products launched throughout 2013, partially
       offset by customer credits earned as noted above.

15                                    *          *          *

16          Global Product sales, net decreased to $383.7 million for the full year 2013,
       compared to $421.9 million in the prior year period.  The decrease was primarily due
17      to lower sales of authorized generic Adderall XR and fenofibrate products as a result
       of additional competition and customer credits earned as noted above, partially offset
18      by new generic products launched throughout 2013.

19      228.    During the February 20, 2014 analyst conference call discussing 4Q13 results,

20  Reasons acknowledged that the "***potential impact of additional competition on several generic***

21  ***products***" should lead to lower revenues, but reported the opposite with respect to certain drugs.  In

22  his opening remarks, he referenced "***higher contract pricing on certain generic products***" and

23  admitted "***we are currently realizing the higher pricing***, and expect an increase in product revenues

24  on these products in 2014 compared to last year."  During the question and answer session following

25  these remarks, Reasons and Ben-Maimon discussed price increases but failed to disclose Impax's

26  illegal activity:

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                              - 74 -

1    Gary Nachman – Goldman Sachs – Analyst

2         First, for Bryan.  Could you talk a little bit more about the $19 million of
3    customer credits from pricing activities in generics?  Are you following what some
     of your competitors are doing with aggressive price increases, and how much will
4    that benefit you going forward?  If you could talk a little bit more about which
     products were being impacted, if it's more like the controlled substances, or if it's
5    some others, as well?

6    Bryan Reasons – Impax Laboratories Inc. – CFO

7         Like I said in the prepared remarks, common in the industry when you take a
     price increase, the wholesalers have price protection.  As a result, in most instances
8    the accounting requires you to estimate an accrual – accrue that full amount up front.
     ***And then hopefully you enjoy the impact of that price increase going forward.***
9    ***That's kind of how the financials work.***

10        I am going to have Carole actually talk about some of the generic products.

11   Carole Ben-Maimon – Impax Laboratories Inc. – President, Global Pharmaceuticals

12        Hi, Gary.  Obviously, we can't really talk about – for competitive reasons –
     about specific products and specific prices.  But as you have seen across the industry,
13   ***pricing has improved, and the ability to take some price increases have clearly been***
     ***available***.

14        Obviously, we are really careful, and ***we want to make sure that we do that***
15   ***in a very rational way, so that we make sure that the price – that what we are doing***
     ***sticks***, and that we actually do make money in the long run.  But we're pretty
16   confident that what we did through – towards the end – throughout the end of last
     year and the beginning of this year will result in ***more profitability for many of the***
17   ***products that we have been able to take some price on***.

18        229.    Later in the call, Ben-Maimon responded to a pointed question about digoxin pricing,

19   but again failed to disclose the price-fixing scheme, instead falsely characterizing the price increase

20   as "rational":

21   Sumant Kulkarni – BofA Merrill Lynch – Analyst

22        Thanks for taking my questions.  The first one is a specific one on digoxin.
     Could you comment on the competitive dynamics there after [a product] [sic]
23   launched in authorized generic.  Has everything been rational, or have you seen more
     than typical price pressure?

24   Carole Ben-Maimon – Impax Laboratories Inc. – President, Global Pharmaceuticals

25        ***I don't want to really specifically talk about pricing on digoxin.  You know***
     ***that the market has been pretty stable with [Linette] [sic] and us, and as you***
26   ***suggested, [part of a] [sic] launched an AG.  We're pretty comfortable that what we***
     ***have done is rational, and will result in ongoing profitability for that product.  We***
27   ***continue, obviously, to do everything we can to maintain our own share.***

28

230.    By virtue of the facts alleged in §§IV.C.-E., G.-I.; VIII., the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In particular, defendants knew or recklessly disregarded that:

(a)    the statements referred to above about pricing in the marketplace for generic drugs were materially false and misleading because defendants failed to inform investors that pricing for digoxin was the product of illegal price-fixing;

(b)    the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were materially false and misleading because the market for digoxin was collusive and lacked true competition;

(c)    Impax's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities along with the attendant negative financial and reputational harm;

(d)    the statements referred to above about higher pricing realized by Impax, and that the price increase on digoxin was "rational," were materially false and misleading because defendants failed to disclose that the digoxin price increase was the result of illegal price-fixing; and

(e)    Impax's revenues and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for digoxin.

231.    On February 25, 2014, Impax filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2013 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K").

232.    In the 2013 10-K, Impax stated, in part:[15]

---

[15]    Instead of repeating Impax's substantially similar materially false and misleading statements in each of the 2014 and 2015 Form 10-Ks, Plaintiff attaches to the complaint and incorporates herein an

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe *present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements*.

\*        \*        \*

*The pharmaceutical industry is highly competitive* and is affected by new technologies, new developments, government regulations, health care legislation, availability of financing, and other factors.  Many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have.  *We compete with numerous other companies* that currently operate, or intend to operate, in the pharmaceutical industry, including companies that are engaged in the development of controlled-release drug delivery technologies and products, and other manufacturers that may decide to undertake development of such products.  *Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc. and Par Pharmaceutical Companies, Inc.*

Due to our focus on relatively hard to replicate controlled-release products, competition in the generic pharmaceutical market is sometimes limited to those competitors who possess the appropriate drug delivery technology.  *The principal competitive factors in the generic pharmaceutical market are*:

- the ability to introduce generic versions of products promptly after a patent expires;

- price;

- product quality;

- customer service (including maintenance of inventories for timely delivery); and

- the ability to identify and market niche products.

\*        \*        \*

*Our revenues and operating results may vary significantly from year-to-year and quarter to quarter as well as in comparison to the corresponding quarter of the preceding year.  Variations may result from, among other factors*:

\*        \*        \*

- the introduction of new products by others that render our products obsolete or noncompetitive;

---

exhibit that contains each false statement contained in each Form 10-K disseminated throughout the Class Period.  *See* Ex. 1.

- the ability to maintain selling prices and gross margins on our products;

\*       \*       \*

We derive a substantial portion of our revenue from sales of a limited number of products.  In 2013, our top five products in our Global Division accounted for 11%, 10%, 9%, 8% and 8%, or an aggregate of 46%, of Global product sales, net. . . .  The sale of our products can be significantly influenced by market conditions, as well as regulatory actions.  ***We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions***, or as a result of regulatory actions related to our products or to competing products, which could have a material impact on our results of operations.  ***Actions which could be taken by our competitors, which may materially and adversely affect our business, results of operations and financial condition, may include, without limitation, pricing changes*** and entering or exiting the market for specific products.

\*       \*       \*

***The pharmaceutical industry is highly competitive*** and many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. . . .

With respect to generic pharmaceutical products, the FDA approval process often results in the FDA granting final approval to a number of ANDAs for a given product at the time a patent claim for a corresponding brand product or other market exclusivity expires.  This often forces us to face immediate competition when we introduce a generic product into the market.  ***As competition from other generic pharmaceutical companies intensifies, selling prices and gross profit margins often decline, which has been our experience with our existing products***. . . .  Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product that we develop is generally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  Although we cannot assure, we strive to develop and introduce new products in a timely and cost effective manner to be competitive in our industry.  Additionally, ANDA approvals often continue to be granted for a given product subsequent to the initial launch of the generic product.  These circumstances generally result in significantly lower prices and reduced margins for generic products compared to brand products.  ***New generic market entrants generally cause continued price and margin erosion over the generic product life cycle***. . . .

***Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc. and Par Pharmaceutical Companies, Inc.***

\*       \*       \*

A significant proportion of our sales is made to relatively few retail drug chains, wholesalers, and managed care purchasing organizations.  These customers are continuing to undergo significant consolidation.  ***Such consolidation has provided and may continue to provide them with additional purchasing leverage, and consequently may increase the pricing pressures that we face.  Additionally, the emergence of large buying groups representing independent retail pharmacies,***

*and the prevalence and influence of managed care organizations and similar institutions, enable those groups to extract price discounts on our products*.

\*      \*      \*

Based on industry practice, generic drug manufacturers have liberal return policies and have been willing to give customers post-sale inventory allowances. Under these arrangements, from time to time, we give our customers credits on our generic products that our customers hold in inventory after we have decreased the market prices of the same generic products due to competitive pricing. *Therefore, if new competitors enter the marketplace and significantly lower the prices of any of their competing products, we would likely reduce the price of our product*. As a result, we would be obligated to provide credits to our customers who are then holding inventories of such products, which could reduce sales revenue and gross margin for the period the credit is provided.

\*      \*      \*

In addition, third-party payers are attempting to control costs by limiting the level of reimbursement for medical products, including pharmaceuticals, and *increasingly challenge the pricing of these products which may adversely affect the pricing of our products*.

\*      \*      \*

*Consolidated total revenues for 2013 decreased $70.2 million, or 12%, as compared to 2012*. New product launches increased revenues during the year ended December 31, 2013 by $97.1 million, or 17% compared to the prior year period, primarily related to our January 2013 launch of non-AB rated Oxymorphone Hydrochloride Extended-Release Tablets and our July 2013 launch of authorized generic Trilipix® delayed release capsules. Decreased product volumes (excluding new product launches) decreased revenues during the year ended December 31, 2013 by $85.5 million, or 15% compared to the prior year period, while *selling price and product mix decreased revenues by $81.8 million, or 14% compared to the prior year period. Revenues from our Global Division decreased $50.3 million during the year ended December 31, 2013, as compared to the prior year period, driven primarily by lower sales of our authorized generic Adderall XR® and fenofibrate products*, as discussed below. . . .

*Net income for the year ended December 31, 2013 was $101.3 million, an increase of $45.4 million as compared to $55.9 million for the year ended December 31, 2012*.

\*      \*      \*

*Total revenues for the Global Division for the year ended December 31, 2013, were $398.3 million, a decrease of 11% from 2012, resulting from decreases in Global Product sales, net, and Other Revenues*, as discussed below.

*Global Product sales, net, were $383.7 million for the year ended December 31, 2013, a decrease of 9% from the same period in 2012, primarily as a result of lower sales of our authorized generic Adderall XR® and our fenofibrate products*.

\*      \*      \*

1        *Gross profit for the year ended December 31, 2013 was $144.5 million, or*
*approximately 36% of total revenues, as compared to $219.3 million, or*
2   *approximately 49% of total revenues, in the prior year*.  Gross profit as a percent of
total revenues decreased in 2013 as compared to the prior year period primarily as
3   the result of the intangible asset impairment charge noted above and an increase in
expenses associated with new product launch delays caused by the warning letter
4   related to our Hayward, California manufacturing facility, including a $6.4 million
charge related to pre-launch inventory for products which will no longer be marketed
5   and $6.7 million of inventory reserves recorded in the three month period ended
March 31, 2013 for products discontinued by the Company during the period.

6                       \*       \*       \*

7
8        *Based upon competitive market conditions, the Company may reduce the*
*selling price of certain Global Division products.*

9        233.    The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of

10   2002 ("SOX") by defendants Hsu and Reasons, stating that the financial information contained in the

11   2013 10-K was accurate and disclosed any material changes to the Company's internal control over

12   financial reporting.

13        234.    By virtue of the facts alleged in §§IV.C.-E., G.-I.; VIII, the statements referenced

14   above were materially false and misleading.  Considered as a whole, defendants' representations

15   misled investors by presenting a materially false and misleading picture of Impax's business,

16   financials, operations and compliance policies by, among other things, failing to disclose and

17   actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In

18   particular, defendants knew or recklessly disregarded that:

19        (a)    the statements referred to above about pricing in the marketplace for generic

20   drugs were materially false and misleading because defendants failed to inform investors that pricing

21   for digoxin was the product of illegal price-fixing;

22        (b)    the statements referred to above about competition in the generic drug

23   marketplace, including that the marketplace for generic drugs was highly competitive, were

24   materially false and misleading because the market for digoxin was collusive and lacked true

25   competition;

26        (c)    the statements referred to above about Impax product pricing and pricing in

27   the generic drug marketplace were materially false and misleading because defendants failed to

28   disclose that digoxin prices were inflated by illegal price-fixing;

1        (d)      the statement referred to above that the "competitive advantages" the

2   Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

3   complex formulation, development characteristics, and special handling requirements, was

4   materially false and misleading because, in fact, Impax had illegally gained its competitive

5   advantage through fixing the price for digoxin;

6        (e)      the statement referred to above about Impax competing with Lannett and Par

7   as "principal competitors" was materially false and misleading because defendants were colluding

8   with Lannett and Par to fix the price of digoxin;

9        (f)      the statements referred to above concerning variation in revenues and

10  operating results were materially false and misleading because Impax's revenues and income

11  variations resulted, at least in part, from the artificial inflation of generic drug prices for digoxin and

12  carried the additional undisclosed risk of variation due to the inability to continue price-fixing;

13       (g)      the statements referred to above about new market entrants or new

14  competitors leading to price reduction were materially false and misleading because Impax engaged

15  in anticompetitive and collusive price-fixing activities with new entrants, such as Par;

16       (h)      Impax's inflation of sales through illegal price-fixing constituted a violation of

17  U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

18  antitrust authorities along with the attendant negative financial and reputational harm;

19       (i)      Impax's revenues and income, as stated above, were inflated in part as a result

20  of illegal price-fixing and artificially-inflated generic drug prices for digoxin; and

21       (j)      Impax failed to make required disclosures regarding the impact of artificial

22  price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

23  disclosure rules.

24       235.    On May 1, 2014, Impax issued a press release and filed a Current Report on Form

25  8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and

26  operating results for the quarter ended March 31, 2014 (the "1Q14 8-K").  For the quarter, Impax

27  reported net income of $6.43 million, or $0.09 per diluted share, on revenue of $118.72 million,

28

compared to net income of $105.44 million, or $1.55 per diluted share, on revenue of $148.49 million for the same period in the prior year.

236.    In the 1Q14 8-K, Impax stated, in part:

Total revenues for the first quarter 2014 were $118.7 million, compared to $148.5 million in the prior year period, as the $8.3 million increase in generic Global Product sales, net during the current period were more than offset by a $37.2 million decline in sales of Zomig products as noted above.

"Our generics business is benefitting from recent marketing initiatives, as well as consistent success in commercializing the existing portfolio of products and capitalizing on new product launches," said Fred Wilkinson, president and chief executive officer of Impax Laboratories Inc.   "These events resulted in a $21.7 million increase in sales of our Global labeled products since the fourth quarter of 2013.  In addition, we recently launched authorized generic RENVELA® and expect it to be a significant contributor to our 2014 results."

*        *        *

For the first quarter 2014, Global Product sales, net increased $8.3 million to $106.1 million, compared to $97.8 million in the prior year period.  The increase was primarily due to a favorable product mix and sales of new products launched in the second half of 2013 for which there were no comparable amounts in the prior year period.

Gross margin in the first quarter 2014 increased to 47.8%, compared to gross margin of 39.5% in the prior year period.  Adjusted gross margin in the first quarter 2014 increased to 60.4%, compared to adjusted gross margin of 54.7% in the prior year period.   The increase in gross margin and adjusted gross margin primarily reflects the favorable product mix and new product launches as noted above.

237.    During the May 1, 2014 analyst conference call discussing 1Q14 results, Reasons stated that the increased generic revenues were due in large part to "**_increased sales of our Digoxin product_**," but failed to attribute those sales to collusive activity.

Our generic products division had a solid first quarter as we benefited from the impact of marketing initiatives and product mix.  These events also had a positive impact on our gross profit margin.   However, compared to first quarter 2013, increased generic product sales only partially offset the expected decline in branded sales of our Zomig product.  This is due to a loss of exclusivity last May on the Zomig tablets and ODT.

*        *        *

Total generic revenues increased $7.5 million or 7% to $109 million.  This was primarily the result of increased sales of our Digoxin product and from sales of authorized generic Trilipix and generic Solaraze.  The increase was partially offset by a decrease in sales of authorized generic Adderall and fenofibrate products.

1   Ben-Maimon similarly acknowledged the effect of pricing increases, but withheld the whole story,

2   stating:

3       And then as Bryan said and you see throughout the industry, **we have been able to maximize our product mix and take some price on a couple of products in the portfolio which has helped obviously the gross margins and also helped in the top line**.

5       238.   On May 2, 2014, Impax filed a Quarterly Report on Form 10-Q with the SEC,

6

7   reiterating the financial and operating results previously announced in the 1Q14 8-K and reporting in

8   full the Company's financial and operating results for the quarter ended March 31, 2014 (the "1Q14

9   10-Q").

10       239.   In the 1Q14 10-Q, Impax stated, in part:

11       We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

13                \*        \*        \*

14       Total revenues for the three month period ended March 31, 2014 decreased $29.8 million, or 20%, as compared to the same period in 2013. . . . Revenues from our Global Division increased $7.5 million during the three month period ended March 31, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Trilipix® delayed release capsules. . . .

17       Net income for the three month period ended March 31, 2014 was $6.4 million, a decrease of $99.0 million as compared to net income of $105.4 million for the three month period ended March 31, 2013.

19                \*        \*        \*

20       Total revenues for the Global Division for the three month period ended March 31, 2014, were $109.1 million, an increase of 7% over the same period in 2013, principally resulting from the increase in Global Product sales, net, as discussed below.

22       Global Product sales, net, were $106.1 million for the three month period ended March 31, 2014, an increase of 9% over the same period in 2013, primarily due to favorable product mix and sales from new generic products launched in the second half of 2013 for which there were no comparable amounts in the prior year period, partially offset by lower revenues from Adderall XR and fenofibrate products.

26                \*        \*        \*

27       Gross profit for the three month period ended March 31, 2014 was $52.1 million, or approximately 48% of total revenues, as compared to $40.2 million, or approximately 40% of total revenues, in the prior year period. Gross profit in the

current year period increased, on a percentage basis, when compared to gross profit in the prior year period due primarily to the favorable product contribution from higher margin products and lower COGS variances described above.

\*      \*      \*

**Based upon competitive market conditions, the Company may reduce the selling price of certain Global [Generics] Division products**.

240.    In addition, the 1Q14 10-Q referred investors to the materially false and misleading statements in the Company's 2013 10-K as set forth in ¶¶232, 234 concerning: (1) the pharmaceutical industry's competitiveness, (2) its principal competitors, including Lannett and Par, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

241.    The 1Q14 10-Q contained signed certifications pursuant to SOX by defendant Wilkinson and Reasons, stating that the financial information contained in the 1Q14 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

242.    By virtue of the facts alleged in §§IV.C.-E., G.-I.; VIII, the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In particular, defendants knew or recklessly disregarded that:

(a)    the statements referred to above about Impax product pricing, digoxin pricing, and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that the digoxin price increase was the result of illegal price-fixing;

(b)    the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were materially false and misleading because the market for digoxin was collusive and lacked true competition;

1        (c)     the statement referred to above that the "competitive advantages" the

2  Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

3  complex formulation, development characteristics, and special handling requirements, was

4  materially false and misleading because, in fact, Impax had illegally gained its competitive

5  advantage through fixing the price for digoxin;

6        (d)     the statements referred to above about digoxin sales were materially false and

7  misleading because digoxin sales were artificially inflated by illegal price-fixing;

8        (e)     Impax's inflation of sales through illegal price-fixing constituted a violation of

9  U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

10  antitrust authorities along with the attendant negative financial and reputational harm;

11        (f)     Impax's revenues and income, as stated above, were inflated in part as a result

12  of illegal price-fixing and artificially-inflated generic drug prices for digoxin; and

13        (g)     Impax failed to make required disclosures regarding the impact of artificial

14  price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

15  disclosure rules.

16        243.    During the May 20, 2014 UBS Health Care Conference, Wilkinson commented on

17  the Company's use of price increases to counteract the lack of new approvals, but failed to mention

18  that the price increases came from collusion:

19        Second, and I think one of the real bright sides of the organization is really
the commercial piece of the Company.  If you think about the quarter that they put up

20        in first quarter of this year and fourth quarter of last year, there's ***still good growth
going on with no approvals for a couple of years***.  So they've been able to optimize

21        most of the activities they can from the assets in their hands.

22        The commercial team on the generic side has done a marvelous job of making
sure that they readdress and reassess each of the projects that are in their hands and

23        the products that are on the marketplace and do the best they can with them.  ***In some
cases that means price increases***.  Sometimes that means reenergizing some

24        marketing.  And sometimes it means some reintroduction of products that we've
taken off the market.

25        244.    During the question-and-answer session that followed, Wilkinson misleadingly

26  stressed the competition in the market and downplayed the significance of price increases:

27

28

1    Marc Goodman – UBS – Analyst

2         So it's been interesting to watch the customers consolidate quite a bit and get
     big.  And at your old shop, Actavis is one of the big players, and so big to big, it's
3    one kind of dynamic.  And now you're at a medium-size shop, and I was curious
     what you think about Impax and how it plays in this new role, in this new world as a
4    medium-size player with really large customers.

5                                  *        *        *

6    Fred Wilkinson – Impax Laboratories Inc. – President & CEO

7                                  *        *        *

8    Many of the products we have we will be first to file or in the first wave.  I mean,
     you've seen that out of the portfolio that we have.  So I just think that the market
9    consolidation at the customer base still is reliant on competition, and *I think we help
     to provide that competition*, as long as we can continue to grow with the big guys.
10
                                  *        *        *
11
     [Goodman:]
12
          *So there seems to be a theme going on in the generic space the past couple
13   of years of price increases*, which is obviously fantastic for the industry and kind of
     new relative to the way it was 5, 10 years ago.  What are your thoughts on that, and
14   do you see opportunities in this company to do more of that?

15   [Wilkinson:]

16        Yes, probably more written about than really actioned.  Price increase that
     happens usually happens because there's nobody else in the marketplace or there's
17   only one other player in the marketplace so there's the ability to move.  And the
     move then usually happens in these wild percentages that could mean you're moving
18   from $8 to $12 a bottle.  It's not these massive, massive increases that are probably
     problematic to the marketplace.
19
          There are opportunities like that.  As people fall out of bed in the
20   manufacturing process and people have that struggle with their ability to supply,
     there becomes opportunity for increasing price.  It doesn't happen every day.  It
21   happens – *I think in our line we've had three or four that we've been able to do
     that with*.  I think in even the bigger players' lines it's maybe a dozen products a year
22   that they're able to touch with a price increase.

23        245.    By virtue of the facts alleged in §§IV.C.-E., G.-I.; VIII, the statements referenced

24   above were materially false and misleading.  Considered as a whole, defendants' representations

25   misled investors by presenting a materially false and misleading picture of Impax's business,

26   financials, operations and compliance policies by, among other things, failing to disclose and

27   actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In

28   particular, defendants knew or recklessly disregarded that:

1        (a)     the statements referred to above about Impax product pricing and pricing in

2 the generic drug marketplace were materially false and misleading because defendants failed to

3 disclose that digoxin prices were inflated by illegal price-fixing; and

4        (b)     the statements referred to above about competition in the generic drug

5 marketplace were materially false and misleading because the market for digoxin was collusive and

6 lacked true competition.

7       246.    On August 6, 2014, Impax issued a press release and filed a Current Report on Form

8 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and

9 operating results for the quarter ended June 30, 2014 (the "2Q14 8-K").  For the quarter, Impax

10 reported net income of $35.07 million, or $0.50 per diluted share, on revenue of $188.12 million,

11 compared to net income of $5.62 million, or $0.08 per diluted share, on revenue of $129.63 million

12 for the same period in the prior year.

13       247.    In the 2Q14 8-K, Impax stated, in part:

14       "We delivered strong revenue growth of 45%, adjusted gross margins of
64%, and nearly tripled our adjusted net income this quarter, compared to last year's
15       second quarter" said Fred Wilkinson, president and chief executive officer of Impax
Laboratories.  "We experienced strong performance by several key generic products,
16       including the successful launch of authorized generic RENVELA®, as well as
continued growth of Zomig® nasal spray in our brand division."

17

18                  *      *      *

19       Global Product sales, net increased 82.7% to $164.0 million in the second
quarter 2014, compared to $89.8 million in the prior year period.  The increase was
20       driven by higher sales of several key generic products, including the mid-April
launch of the Company's allotment of a specified number of bottles of authorized
21       generic RENVELA®.

22                  *      *      *

23       Gross margin in the second quarter 2014 increased to 60.4%, compared to
gross margin of 41.8% in the prior year period.  Adjusted gross margin in the second
24       quarter 2014 increased to 66.5%, compared to adjusted gross margin of 49.6% in the
prior year period.  The increase in gross margin and adjusted gross margin was due to
25       the favorable contribution from several key generic products, including authorized
generic RENVELA®.

26       248.    On August 6, 2014, Impax also filed a Quarterly Report on Form 10-Q with the SEC,

27 reiterating the financial and operating results previously announced in the 2Q14 8-K and reporting in

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                 - 87 -

full the Company's financial and operating results for the quarter ended June 30, 2014 (the "2Q14 10-Q").

249.    In the 2Q14 10-Q, Impax also stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

\*          \*          \*

Total revenues for the three month period ended June 30, 2014 increased $58.5 million, or 45%, as compared to the same period in 2013. . . .  Decreased product volumes (excluding new product launches) decreased revenues during the three month period ended June 30, 2014 by $3.6 million, or 3%, compared to the prior year period, while selling price and product mix increased revenues by $0.5 million, or 0.4%, compared to the prior year period.  Revenues from our Global Division increased $82.4 million during the three month period ended June 30, 2014, as compared to the prior year period, ***driven primarily by sales of our authorized generic Renvela® tablets and Trilipix® delayed release capsules, in addition to our Digoxin and generic Solaraze® products***.

\*          \*          \*

Total revenues for the six month period ended June 30, 2014 increased $28.7 million, or 10%, as compared to the same period in 2013. . . .  Decreased product volumes (excluding new product launches) decreased revenues during the six month period ended June 30, 2014 by $41.9 million, or 15%, compared to the prior year period, while selling price and product mix also decreased revenues by $4.3 million, or 2%, compared to the prior year period.  Revenues from our Global Division increased $89.9 million during the six month period ended June 30, 2014, as compared to the prior year period, ***driven primarily by sales of our authorized generic Renvela® tablets and Trilipix® delayed release capsules, in addition to higher sales of our Digoxin and generic Solaraze® products***.

\*          \*          \*

Net income for the three month period ended June 30, 2014 was $35.1 million, an increase of $29.5 million as compared to net income of $5.6 million for the three month period ended June 30, 2013.  The increase was primarily attributable to the profit earned from the launch of our authorized generic Renvela® product during the current year period.

Net income for the six month period ended June 30, 2014 was $41.5 million, a decrease of $69.6 million as compared to net income of $111.1 million for the six month period ended June 30, 2013. . . .  Also contributing to the decrease in net income was a decline in sales of our Impax-labeled branded Zomig® products, as discussed above, that was partially offset by increased Global sales on several of our higher margin products.

\*          \*          \*

1

Total revenues for the Global Division for the three month period ended June 30, 2014, were $176.4 million, an increase of 88% over the same period in 2013, principally resulting from the increase in Global Product sales, net, as discussed below.

2

3

4

Global Product sales, net, were $164.0 million for the three month period ended June 30, 2014, an increase of 83% over the same period in 2013, primarily due to the launch of our authorized generic Renvela® tablets in the three month period ended June 30, 2014, in addition to the launch of our authorized generic Trilipix® delayed release capsules and generic Solaraze® during the second half of 2013, for which there were no comparable amounts in the prior year period, ***as well as higher sales of our Digoxin products***.  Any diminution in the consolidated revenue and/or gross profit of any of our products due to competition and/or product supply delays or disruptions or any other reasons in future periods may materially and adversely affect our consolidated results of operations in such future periods.

5

6

7

8

9

*     *     *

10

Total revenues for the Global Division for the six month period ended June 30, 2014, were $285.5 million, an increase of 46% over the same period in 2013, principally resulting from the increase in Global Product sales, net, as discussed below.

11

12

13

Global Product sales, net, were $270.1 million for the six month period ended June 30, 2014, an increase of $82.5 million over the same period in 2013, primarily due to sales of our authorized generic Renvela® tablets launched during the three month period ended June 30, 2014, in addition to the launch of our authorized generic Trilipix® delayed release capsules and generic Solaraze® during the second half of 2013, for which there were no comparable amounts in the prior year period, ***as well higher sales of our Digoxin products***.  Any diminution in the consolidated revenue and/or gross profit of any of our products, due to competition and/or product supply delays or disruptions or any other reasons in future periods may materially and adversely affect our consolidated results of operations in such future periods.

14

15

16

17

18

*     *     *

19

Gross profit for the three month period ended June 30, 2014 was $106.5 million, or approximately 60% of total revenues, as compared to $39.2 million, or approximately 42% of total revenues, in the prior year period. Gross profit in the current year period increased, on a percentage basis, when compared to gross profit in the prior year period due primarily to the favorable product contribution from higher margin products.

20

21

22

*     *     *

23

Gross profit for the six month period ended June 30, 2014 was $158.6 million, or approximately 56% of total revenues, as compared to $79.4 million, or approximately 41% of total revenues, in the prior year period. Gross profit in the current year period increased, on a percentage basis, when compared to gross profit in the prior year period due primarily to the favorable product contribution from higher margin products and lower COGS variances described above.

24

25

26

27

*     *     *

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:16-cv-06557-HSG                                                                              - 89 -

1

        Based upon competitive market conditions, the Company may reduce the selling price of certain Global [Generics] Division products.

2

250.    In addition, the 2Q14 10-Q referred investors to the materially false and misleading

3

statements in the Company's 2013 10-K as set forth in ¶¶232, 234 concerning: (1) the

4

pharmaceutical industry's competitiveness, (2) its principal competitors, including Lannett and Par,

5

(3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry

6

consolidation and third-party payers' price challenges, and (5) variation of revenues and operating

7

results.

8

251.    The 2Q14 10-Q contained signed certifications pursuant to SOX by defendants

9

Wilkinson and Reasons, stating that the financial information contained in the 2Q14 10-Q was

10

accurate and disclosed any material changes to the Company's internal control over financial

11

reporting.

12

252.    During the August 6, 2014 analyst conference call discussing 2Q14 results,

13

Wilkinson and Ben-Maimon discussed the Company's successful price increases but failed to

14

disclose the illegal scheme that made them possible:

15

Carole Ben-Maimon – Impax Laboratories Inc. – President, Gene[r]ic Division

16

        Of course, ***we look at any opportunity to raise price when it's appropriate***. I can't say that – we don't talk specifically about specific products here, but ***we look at our portfolio regularly***, not every single day, and [other] opportunities in the marketplace to take advantage of shortages or increased share or price.

17

18

19

                              *       *       *

20

        With regards to other launches, again, most of those coming out of Hayward are ***depending on the Hayward facility and resolution of the compliances issue***. . . .

21

Fred Wilkinson –Impax Laboratories Inc. – President & CEO

22

        It really has to be said also, we focused the team with the strategy that said, ***if you don't get launches, how do you maximize the opportunities of the things in your hand***.  They did an exceptional job, both in the brand and the generic side of saying, ***if nothing new is coming, what do I do***?

23

24

25

        And so, digging in and maximizing both revenue and contribution out of the assets that you have in your hand has been a very successful strategy for us to date. They've done a really marvelous job as the results here show.

26

27

253.    By virtue of the facts alleged in §§IV.C.-E., G.-I.; VIII, the statements referenced

28

above were materially false and misleading.  Considered as a whole, defendants' representations

1    misled investors by presenting a materially false and misleading picture of Impax's business,

2    financials, operations and compliance policies by, among other things, failing to disclose and

3    actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In

4    particular, defendants knew or recklessly disregarded that:

5          (a)    the statements referred to above about Impax product pricing and pricing in

6    the generic drug marketplace were materially false and misleading because defendants failed to

7    disclose that digoxin prices were inflated by illegal price-fixing;

8          (b)    the statements referred to above about competition in the generic drug

9    marketplace, including that the marketplace for generic drugs was highly competitive, were

10   materially false and misleading because the market for digoxin was collusive and lacked true

11   competition;

12         (c)    the statement referred to above that the "competitive advantages" the

13   Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

14   complex formulation, development characteristics, and special handling requirements, was

15   materially false and misleading because, in fact, Impax had illegally gained its competitive

16   advantage through fixing the price for digoxin;

17         (d)    the statements referred to above about digoxin sales were materially false and

18   misleading because digoxin sales were artificially inflated by illegal price-fixing;

19         (e)    Impax's inflation of sales through illegal price-fixing constituted a violation of

20   U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

21   antitrust authorities along with the attendant negative financial and reputational harm;

22         (f)    Impax's revenues and income, as stated above, were inflated in part as a result

23   of illegal price-fixing and artificially-inflated generic drug prices for digoxin; and

24         (g)    Impax failed to make required disclosures regarding the impact of artificial

25   price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

26   disclosure rules.

27         254.   On November 4, 2014, Impax issued a press release and filed a Current Report or

28   Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's

financial and operating results for the quarter ended September 30, 2014 (the "3Q14 8-K").  For the quarter, Impax reported net income of $15.74 million, or $0.22 per diluted share, on revenue of $158.0 million, compared to a net loss of $0.18 million, or zero per diluted share, on revenue of $132.64 million for the same 12 period in the prior year.

255.   In the 3Q14 8-K, Impax stated, in part:

"***The strong third quarter results were driven by higher sales from our key products in the generics business*** as well as continued growth of Zomig®nasal spray in our brand division," said Fred Wilkinson, president and chief executive officer of Impax Laboratories.  "The increased revenues are the direct result of our increased focus on commercialization strategies for our current line of assets."

*     *     *

Global Product sales, net increased 28.6% to $143.6 million in the third quarter 2014, compared to $111.7 million in the prior year period.  The increase was driven by higher sales of several key generic products, including the mid-April launch of the Company's allotment of a specified number of bottles of authorized generic RENVELA®.

Gross margin in the third quarter 2014 increased to 53.0%, compared to gross margin of 33.4% in the prior year period.  Adjusted gross margin in the third quarter 2014 increased to 56.6%, compared to adjusted gross margin of 54.3% in the prior year period.  The increase in gross margin and adjusted gross margin was due to the favorable contribution from several key generic products, including authorized generic RENVELA.

256.   On November 4, 2014, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 3Q14 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2014 (the "3Q14 10-Q").

257.   In the 3Q14 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

*     *     *

Total revenues for the three month period ended September 30, 2014 increased $25.4 million, or 19%, as compared to the same period in 2013. . . . Revenues from our Global Division increased $30.0 million during the three month period ended September 30, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to our Digoxin and generic Solaraze® products.

1                              *      *      *

2          Total revenues for the nine month period ended September 30, 2014
   increased $54.1 million, or 13%, as compared to the same period in 2013. . . .
3  Revenues from our Global Division increased $119.8 million during the nine
   month period ended September 30, 2014, as compared to the prior year period, driven
4  primarily by sales of our authorized generic Renvela® tablets, in addition to higher
   sales of our Digoxin and generic Solaraze® products.
5
                                *      *      *
6
7          Net income for the three month period ended September 30, 2014 was
   $15.7 million, an increase of $15.9 million as compared to a net loss of $0.2 million
   for the three month period ended September 30, 2013.
8
9                              *      *      *

10         Net income for the nine month period ended September 30, 2014 was
   $57.2 million, a decrease of $53.6 million as compared to net income of
11 $110.9 million for the nine month period ended September 30, 2013. . . .  Also
   contributing to the change in net income was an increase in Global Product sales
12 related to increased sales on several of our higher margin products, partially offset by
   a decline in sales of our Impax-labeled branded Zomig® products, as discussed
13 above.

14                             *      *      *

15         Total revenues for the Global Division for the three month period ended
   September 30, 2014, were $145.6 million, an increase of 26% over the same period
16 in 2013, principally resulting from the increase in Global Product sales, net, as
   discussed below.
17
           Global Product sales, net, were $143.6 million for the three month period
18 ended September 30, 2014, *an increase of 29% over the same period in 2013*,
   primarily due to the launch of our authorized generic Renvela® tablets in the three
19 month period ended June 30, 2014, *higher sales of our Digoxin products*, and the
   launch of our generic Solaraze® during the fourth quarter of 2013, for which there
20 were no comparable amounts in the prior year period.  Any diminution in the
   consolidated revenue and/or gross profit of any of our products due to competition
21 and/or product supply delays or disruptions or any other reasons in future periods
   may materially and adversely affect our consolidated results of operations in such
22 future periods.

23                             *      *      *

24         Total revenues for the Global Division for the nine month period ended
   September 30, 2014, were $431.2 million, an increase of 38% over the same period
25 in 2013, principally resulting from the increase in Global Product sales, net, as
   discussed below.
26
           Global Product sales, net, were $413.7 million for the nine month period
27 ended September 30, 2014, *an increase of $114.4 million over the same period in
   2013*, primarily due to sales of our authorized generic Renvela® tablets launched
28 during the three month period ended June 30, 2014 *as well as higher sales of our
   Digoxin products*, in addition to the launch of our generic Solaraze® during the

1   fourth quarter of 2013.  Any diminution in the consolidated revenue and/or gross
    profit of any of our products due to competition and/or product supply delays or
2   disruptions or any other reasons in future periods may materially and adversely affect
    our consolidated results of operations in such future periods.

3                              *       *       *

4           Gross profit for the three month period ended September 30, 2014 was
5   $77.1 million, or approximately 53% of total revenues, as compared to $38.7 million,
    or approximately 33% of total revenues, in the prior year period.  Gross profit in the
6   current year period increased, on a percentage basis, when compared to gross profit
    in the prior year period due primarily to an increased mix of higher margin products,
7   as well as the items noted above in Cost of Revenues.

8                              *       *       *

9           Gross profit for the nine month period ended September 30, 2014 was
10  $235.8 million, or approximately 55% of total revenues, as compared to
    $118.1 million, or approximately 38% of total revenues, in the prior year period.
11  Gross profit in the current year period increased, on a percentage basis, when
    compared to gross profit in the prior year period due primarily to an increased mix of
12  higher margin products as well as the items noted above in Cost of Revenues.

13                             *       *       *

14          Based upon competitive market conditions, the Company may reduce the
    selling price of certain Global [Generics] Division products.

15          258.    In addition, the 3Q14 10-Q referred investors to the materially false and misleading

16  statements in the Company's 2013 10-K as set forth in ¶¶232, 234 concerning: (1) the

17  pharmaceutical industry's competitiveness, (2) its principal competitors, including Lannett and Par,

18  (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry

19  consolidation and third-party payers' price challenges, and (5) variation of revenues and operating

20  results.

21          259.    The 3Q14 10-Q contained signed certifications pursuant to SOX by defendants

22  Wilkinson and Reasons, stating that the financial information contained in the 3Q14 10-Q was

23  accurate and disclosed any material changes to the Company's internal control over financial

24  reporting.

25          260.    During the November 4, 2014 analyst conference call discussing 3Q14 results,

26  Wilkinson discussed pricing increases, but falsely maintained that the market was legal and

27  competitive:

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                    - 94 -

1    Louise Chen – Guggenheim Securities LLC – Analyst

2         ***So some your competitors have been able to raise prices for generic drugs
      significantly.  Do you see any opportunities for Impax to do this as well?  Why or
3    why not?  Do you have any thoughts on the government investigation into rising
      price of generic drugs?***

4                                    *        *        *

5    [Wilkinson:]

6         Sure, let me address kind of pricing.  We really don't talk much about pricing
7    publicly on where we're going for competitive reasons, but suffice it to say, we've
      done what most of the other generic houses have done.  We look at opportunities.

8         ***We look at how competition shifts.  We look at where there may be some
9    market movement that would allow us to take advantage of some price increases,
      and we've implement those.  And we'll continue to evaluate our line, product by
10   product, on probably a weekly and monthly basis to see if there are some
      opportunities to participate in that practice***.

11        As far as the federal investigation or as the – look, I think there's always been
12   an analysis ongoing for looking at pricing within the pharmaceutical industry.
      Sometimes it focuses on brands, sometimes it focuses on generics, sometimes on
13   transfer pricing, so we're constantly under scrutiny, and I think the most important
      thing is ***to make sure that our practices and our approaches are well within all the
14   guidelines and the rules and regulations, and we believe they are***.

15        261.    By virtue of the facts alleged in §§IV.C.-E., G.-I.; VIII, the statements referenced

16   above were materially false and misleading.  Considered as a whole, defendants' representations

17   misled investors by presenting a materially false and misleading picture of Impax's business,

18   financials, operations and compliance policies by, among other things, failing to disclose and

19   actively concealing that Impax had colluded to fix the price of its generic digoxin product.  In

20   particular, defendants knew or recklessly disregarded that:

21             (a)    the statements referred to above about Impax product pricing, digoxin pricing,

22   and pricing in the generic drug marketplace were materially false and misleading because defendants

23   failed to disclose that digoxin prices were inflated by illegal price-fixing;

24             (b)    the statements referred to above about competition in the generic drug

25   marketplace were materially false and misleading because the market for digoxin was collusive and

26   lacked true competition;

27             (c)    the statement referred to above that the "competitive advantages" the

28   Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

complex formulation, development characteristics, and special handling requirements, was false and

misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

price for digoxin;

(d)      the statements referred to above concerning the governmental investigation

into generic drug pricing on the November 4, 2014 earnings call misled investors by denying any

wrongdoing – suggesting that no pricing collusion had taken place – and falsely attributing the

digoxin price hike to shifting competition and market movement when, in fact, the price hike was

collusive and unjustified with only three competitors for years before the massive price increase and

the market was consistently stable at $0.16 per pill since at least 2009;

(e)      the statements referred to above about digoxin sales were materially false and

misleading because digoxin sales were artificially inflated by illegal price-fixing;

(f)      Impax's inflation of sales through illegal price-fixing constituted a violation of

U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

antitrust authorities along with the attendant negative financial and reputational harm;

(g)      Impax's revenues and income, as stated above, were inflated in part as a result

of illegal price-fixing and artificially inflated generic drug prices for digoxin; and

(h)      Impax failed to make required disclosures regarding the impact of artificial

price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

disclosure rules.

**B.      2015 Price Fixing False and Misleading Statements and Omissions**

262.     On February 24, 2015, Impax filed a Current Report on Form 8-K with the SEC,

signed by defendant Reasons, announcing certain of the Company's financial and operating results

for the quarter and year ended December 31, 2014 (the "2014 8-K").  For the quarter, Impax

reported net income of $0.12 million or zero per diluted share, on revenue of $131.21 million,

compared to a net loss of $9.62 million or $0.14 per diluted share, on revenue of $21.49 billion for

the same period in the prior year.  For 2014, Impax reported net income of $57.35 million, or $0.81

per diluted share, on revenue of $596.05 million, compared to net income of $101.26 million, or

$1.47 per diluted share, on revenue of $511.5 million for 2013.

263.    In the 2014 8-K, Impax stated, in part:

Global Pharmaceuticals total revenues increased 35.5% to $117.9 million in the fourth quarter 2014, compared to $87.0 million in the prior year period.  The increase is due to higher sales of several key generic products as well as the impact of customer credits that were recorded in the prior year period of $19.2 million as a result of customer credits relating to certain pricing activities.

Gross margin in the fourth quarter 2014 increased to 44.8%, compared to gross margin of 30.4% in the prior year period.  Adjusted gross margin in the fourth quarter 2014 increased to 49.8%, compared to adjusted gross margin of 41.8% in the prior year period.  The increase in gross margin and adjusted gross margin was due to the favorable contribution from sale of several generic products.

*        *        *

For the full year 2014, total revenues increased 16.5% to $596.0 million, compared to $511.5 million for the full year 2013.

*        *        *

"In our generic business, our revenue growth in 2014 of more than 38% was driven by the successful launch of authorized generic RENVELA ® and continued success in maximizing our portfolio of solid oral and alternative dosage form products."

*        *        *

Global Pharmaceuticals total revenues increased 37.8% to $549.1 million for the full year 2014, compared to $398.3 million for the full year 2013.  The increase was driven by sales of authorized generic RENVELA tablets launched during the second quarter of 2014, as well as higher sales of several key generic products.

Gross margin for the full year 2014 increased to 52.6%, compared to gross margin of 36.3% for the full year 2013.  Adjusted gross margin for the full year 2014 increased to 59.0%, compared to adjusted gross margin of 50.6% for the full year 2013.  The increase in gross margin and adjusted gross margin was primarily due to the favorable contribution from sales of several generic products, including authorized generic RENVELA.

264.    During the February 24, 2015 analyst conference call discussing 4Q14 results, Reasons admitted that increased revenues derived from "higher generic sales of Adderall XR, *Digoxin,* and Solaraze gel," but failed to disclose any collusion.  Instead, Wilkinson stressed the opposite, describing an increasingly competitive generic market:

Gregg Gilbert – Deutsche Bank – Analyst

So Fred, what do you think as you look at three to five years are the elements of the impact strategy that most need to be either added or bulked up.  *I assume you agree that the US generic environment is going to become more competitive over time*.

1   [Wilkinson:]

2       *Sure*.

3   265.   Later in the call, Wilkinson falsely described competition in the digoxin market:

4   Elliot Wilbur – Needham & Company – Analyst

5       Okay.  And then if I could just ask two specific product questions as well.
    ***The first is on Digoxin.  There's been just some new competition in the market***
6   ***there with Mylan's relaunch and also have heard from trade sources that Sun via***
    ***Caraco may be relaunching in that market.***   And then I know one of your
7   competitors talked about some API issues as well, so maybe you could just provide a
    little bit of color on the current dynamics in that key product?

8                           *        *        *

9   [Wilkinson:]

10      ***Sure.  Sure.  Obviously, there's a key focus, as you know, Digoxin is a***
    ***product that you would have anticipated competition would reestablish itself.  With***
11  ***a different price point, there's an opportunity for people to come back in***.

12                          *        *        *

13      We've seen at least one new player come back into the marketplace, not
    taking great share today, but we do anticipate there'll probably be some evolution to
14  that.  We have heard the same rumors of additional competition coming although
    we've not seen them in the marketplace yet.  ***But we do anticipate it and our model***
15  ***expects that they'll be competition and potentially some press [sic] erosion on that***
    ***product***.

16

17  266.   On February 26, 2015, Impax filed an Annual Report on Form 10-K with the SEC,

18  reiterating the financial and operating results previously announced in the 2014 8-K and reporting in

19  full the Company's financial and operating results for the quarter and year ended December 31, 2014

20  (the "2014 10-K").  The 2014 10-K repeated each materially false and misleading statement in the

21  2013 10-K as set forth in ¶¶232, 234.  *See*. Ex. 1.

22  267.   Additionally, the 2014 10-K contained the following materially false and misleading

23  statements:

24      Consolidated total revenues for the year ended December 31, 2014 increased
    $84.5 million, or 17%, as compared to the year ended December 31, 2013. New
25  product launches increased revenues during the year ended December 31, 2014 by
    $84.4 million, or 17%, compared to the prior year period, primarily related to sales of
26  our authorized generic Renvela® tablets and generic Solaraze®. Decreased product
    volumes (excluding new product launches) decreased revenues during the year ended
27  December 31, 2014 by $20.3 million, or 4%, compared to the prior year period,
    while selling price and product mix increased revenues by $20.4 million, or 4%,
28  compared to the prior year period. ***Revenues from our Global Division increased***

*$150.7 million during the year ended December 31, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to higher sales of our Digoxin* and generic Solaraze® products.

\*          \*          \*

Global Product sales, net, were $528.5 million for the year ended December 31, 2014, *an increase of 38% from the same period in 2013, primarily as a result of sales of our authorized generic Renvela® tablets launched during the three month period ended June 30, 2014 as well as higher sales of our Digoxin products*, in addition to the launch of our generic Solaraze® during the fourth quarter of 2013.

268.    The 2014 10-K contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In addition, the 2014 10-K was signed by defendant Hsu as a director of Impax.

269.    By virtue of the facts alleged in §§ IV.C.-I.; VIII, the statements referenced above were materially false and misleading.  Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products.  In particular, defendants knew or recklessly disregarded that:

(a)    the statements referred to above about Impax product pricing, digoxin pricing, and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

(b)    the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were materially false and misleading because the markets for digoxin and pyridostigmine were collusive and lacked true competition;

(c)    the statement referred to above that the "competitive advantages" the Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials, complex formulation, development characteristics, and special handling requirements, was false and

misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the prices for digoxin and pyridostigmine;

(d)     the statements referred to above about digoxin sales were materially false and misleading because digoxin sales were artificially inflated by illegal price-fixing;

(e)     Impax's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal antitrust authorities along with the attendant negative financial and reputational harm;

(f)     Impax's revenues and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine; and

(g)     Impax failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

270.     On May 11, 2015, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2015 (the "1Q15 8-K").  For the quarter, Impax reported a net loss of $6.33 million, or $0.09 per diluted share, on revenue of $143.1 million, compared to net income of $6.43 million, or $0.09 per diluted share, on revenue of $ 118.72 million for the same period in the prior year.

271.     In the 1Q15 8-K, Impax stated, in part:

This increase [in total revenues] is the result of higher sales of the Company's existing products (up 9.1%) and revenue from approximately three weeks of sales of products acquired in the Company's acquisition of Tower Holdings, Inc. (including operating subsidiaries CorePharma LLC and Amedra Pharmaceuticals LLC), and Lineage Therapeutics Inc. (together, "Tower") on March 9, 2015.

*          *          *

Total revenues for the Impax Generics division increased 18.0% to $128.7 million in the first quarter 2015, compared to $109.1 million in the prior year period.  The increase is due to the addition of $12.3 million in product sales from the Tower acquisition and $7.3 million from higher sales in existing Impax products.

Gross margin in the first quarter 2015 decreased to 40.6%, compared to gross margin of 47.8% in the prior year period.  Adjusted gross margin in the first quarter

2015 decreased to 45.0%, compared to adjusted gross margin of 60.4% in the prior year period.  The decrease in gross margin and adjusted gross margin was primarily the result of higher sales of lower margin generic products, the impact of additional competition on generic digoxin, the later than anticipated close of the Tower acquisition and the delayed launch of certain products.

272.     On May 11, 2015, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 1Q15 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2015 (the "1Q15 10-Q").

273.     In the 1Q15 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

\*          \*          \*

Consolidated total revenues for the three month period ended March 31, 2015 increased by $24.4 million, or 21%, as compared to the same period in 2014. Consolidated total revenues for the three month period ended March 31, 2015 include $13.6 million in revenues from the Tower acquisition. . . . Increased product volumes (including product volumes from the acquisition) increased revenues during the three month period ended March 31, 2015 by $31.9 million, or 27%, compared to the prior year period, while selling price and product mix decreased revenues by $8.7 million, or 7%, compared to the prior year period.

Revenues from our Impax Generics division increased by $19.6 million during the three month period ended March 31, 2015, as compared to the prior year period, driven primarily by sales of volumes from the acquired companies and from sales of our authorized generic Adderall XR®. . . .

Net loss for the three month period ended March 31, 2015 was $6.3 million, a decrease of $12.8 million as compared to net income of $6.4 million for the three month period ended March 31, 2014.

\*          \*          \*

Total revenues for Impax Generics for the three month period ended March 31, 2015, were $128.7 million, an increase of 18% over the same period in 2014, principally resulting from the addition of $12.3 million in revenue from the Tower and Lineage acquisition and an increase in sales of our authorized generic Adderall XR®.

\*          \*          \*

Gross profit for the three month period ended March 31, 2015 was $52.3 million, or approximately 41% of total revenues, as compared to $52.1 million, or approximately 48% of total revenues, in the prior year period.

1

\*     \*     \*

2          Based upon competitive market conditions, the Company may reduce the
selling price of certain Global [Generics] Division products.

3

4          274.    In addition, the 1Q15 10-Q referred investors to the materially false and misleading

5   statements in the Company's 2014 10-K as set forth in ¶¶266-267, 269 concerning: (1) the

6   pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including

7   Lannett, Par, and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing

8   pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of

9   revenues and operating results.

10          275.    The 1Q15 10-Q contained signed certifications pursuant to SOX by defendants

11  Wilkinson and Reasons, stating that the financial information contained in the 1Q15 10-Q was

12  accurate and disclosed any material changes to the Company's internal control over financial

13  reporting.

14          276.    During the May 11, 2015 analyst conference call discussing 1Q15 results, Wilkinson

15  made the following materially false statements and omissions regarding Impax's competitive role in

16  the marketplace:

17  Michael Faerm – Wells Fargo Securities, LLC – Analyst

18          Hi.  Thanks for taking the question.  My questions on the sector M&A more
generally, as potentially some of the big are getting bigger here, how do you think
about the impact on smaller US generics players like yourselves, when it comes to
19  things like pricing, potential products becoming available, and other factors?
Thanks.

20

21  [Wilkinson:]

22          Yes.  So we're a rooter for something to happen with the big three that are in
discussions here, because we think that there will be opportunities for acquisitions,
with the some of the necessary divested products.  We've been at the table for those
23  before, most recently with the Actavis transaction before us.  And so, those are the
nice opportunities that come out of it.

24

25          *I'm a believer that a mid tier generic house is going to be required by the
customers, in order to keep pricing, and keep supply and keep competition
appropriate, so that they don't rely on one, on possibly two suppliers, but they have
26  a range of suppliers to come from*.  And what is most important for a Company our
size, is to make sure that we have a portfolio products that are coming that is unique
and diverse, and has some unique items in it, that we may be one of one, or one of
27  two, and so therefore, the customer is always going to need to have an interaction
with you.

28

277. By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above were materially false and misleading. Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products. In particular, defendants knew or recklessly disregarded that:

(a) the statements referred to above about Impax product pricing and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

(b) the statements referred to above about competition in the generic drug marketplace were materially false and misleading because the markets for digoxin and pyridostigmine were collusive and lacked true competition;

(c) the statement referred to above that the "competitive advantages" the Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials, complex formulation, development characteristics, and special handling requirements, was materially false and misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the prices for digoxin and pyridostigmine;

(d) Impax's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal antitrust authorities along with the attendant negative financial and reputational harm;

(e) Impax's revenues and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine; and

(f) Impax failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

278. On April 30, 2015, Impax released its Corporate Compliance Program Declaration and stated, in part:

Impax strives to conduct all aspects of our business in accordance with the highest standards of business ethics and to **comply with all laws and regulations that govern our industry**.

As part of this effort, Impax has adopted an enterprise-wide Comprehensive Compliance Program ("CCP") that is designed to **prevent, detect, and resolve potential compliance issues**. Our CCP seeks to **comply with all applicable federal and state laws, regulations, and industry guidance** including the "Compliance Program Guidance for Pharmaceutical Manufacturers" developed by the United States Department of Health and Human Services, Office of the Inspector General and the Pharmaceutical Research and Manufacturers of America's "Code on Interactions with Healthcare Professionals." The CCP **applies to our officers, directors and employees in their activities on behalf of Impax, including any of its subsidiaries or divisions**.

279.     During the May 14, 2015 Bank of America Merrill Lynch Health Care Conference, Mark Donohue, the Company's Vice President of Investor Relations and Corporate Communications misrepresented the nature of digoxin and pyridostigmine price increases, and did not disclose the Company's illegal scheme:

Sumant Kulkarni – BofA Merrill Lynch – Analyst

How do you think about pricing potential on your base business, given that we've seen some increases in the past there?

Mark Donohue – Impax Laboratories Inc. – VP, IR and Corporate Communications

Well, as you know, there's more price declines in our space than there are price increases. And we are experiencing low single digit price declines across the generic portfolio. **We look at opportunities to raise prices if something comes up in terms of our products, but right now I can't say that there is that many products to where we see a potential price increase**. But the business has been very stable for some of our larger products, especially. It's been a pretty stable market.

[Kulkarni:]

*          *          *

Sure. We have a few seconds here, so last question on the base business side of things. The fenofibrate, digoxin, and your version of OPANA ER – how should we think about the competitive scenarios there?

[Donohue:]

We've been expecting competition on fenofibrate for a number of years, and it remains a good market for us. **And obviously digoxin is – there's a couple of players who have entered the market recently. And now it's a five-player market. And we've discussed that we have seen competitive pressure in that market, but we are holding on to the majority of the customer base**.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:16-cv-06557-HSG                                                                                                                        - 104

1    280.    During the June 11, 2015 Goldman Sachs Health Care Conference, Wilkinson

2  specifically discussed the origins of digoxin price increases, but again failed to disclose illegal price-

3  fixing:

4       Gary Nachman – Goldman Sachs – Analyst

5            You're definitely one of the companies that have benefited from big price
     increases in certain parts of the generic space.  So where are you seeing most of those
6       opportunities and how sustainable are they?

7       [Wilkinson:]

8            *I think we are the poster child for price increase, that's Digoxin.  Digoxin
     was a product that had seven or eight competitors to it.  All but two fell out of the
9       marketplace, opportunity to raise price.  We did.  We gained share on price
     contribution from that.  And now I think there are five players and the price has
10      come down, not to the original point, but it's come down and we're spreading
     share out*.  So these are generally shorter-term opportunities that you take based on
11      market conditions and we'll continue to evaluate those.  We have not had a lot of
     price increase products within the Company, just because, if you look at our top 10
12      products, most of those there are – we're in a one, two, three competitor environment
     and they've stayed pretty stable into that environment, and you really wouldn't create
13      much value by raising price there.  It's reasonably stable and we would like it to stay
     that way.

14

15    281.    By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above

16  were materially false and misleading.  Considered as a whole, defendants' representations misled

17  investors by presenting a materially false and misleading picture of Impax's business, financials,

18  operations and compliance policies by, among other things, failing to disclose and actively

19  concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine

20  products.  In particular, defendants knew or recklessly disregarded that:

21            (a)    the statements referred to above about Impax product pricing, digoxin pricing,

22  and pricing in the generic drug marketplace were materially false and misleading because defendants

23  failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

24            (b)    the statements referred to above about competition in the generic drug

25  marketplace were materially false and misleading because the markets for digoxin and

26  pyridostigmine were collusive and lacked true competition;

27            (c)    the statements referred to above about compliance with laws and regulations

28  governing Impax's business, and the programs Impax had in place to ensure compliance with such

1  laws and regulations were materially false and misleading because defendants had engaged in an

2  illegal price-fixing scheme to inflate the prices of digoxin and pyridostigmine;

3         (d)     the statement referred to above about the existence of seven or eight

4  competitors in the digoxin market prior to the collusive and massive price hike was materially false

5  and misleading because the generic digoxin market never had seven or eight competitors and there

6  were only three competitors in 2012 and 2013; and

7         (e)     Impax's inflation of sales through illegal price-fixing constituted a violation of

8  U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

9  antitrust authorities along with the attendant negative financial and reputational harm.

10      282.   On August 10, 2015, Impax issued a press release and filed a Current Report on Form

11  8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and

12  operating results for the quarter ended June 30, 2015 (the "2Q15 8-K").  For the quarter, Impax

13  reported a net loss of $1.85 million, or $0.03 per diluted share, on revenue of $214.18 million,

14  compared to net income of $35.07 million, or $0.50 per diluted share, on revenue of $188.12 million

15  for the same period in the prior year.

16      283.   In the 2Q15 8-K, Impax stated, in part:

17      Total revenues for the second quarter 2015 increased 14% to $214.2 million,
18  compared to $188.1 million in the prior year period.  The increase was primarily due
to the addition of product revenues from the Company's acquisition on March 9,
19  2015 of Tower Holdings, Inc. and Lineage Therapeutics Inc. (together with its
subsidiaries, "Tower"), and sales from new brand and generic product launched in
20  2015.

             *      *      *

21
22      Fred Wilkinson, President and Chief Executive Officer of Impax, stated, "We
delivered strong revenue growth in the second quarter driven by the addition of
23  product sales from the Tower acquisition, as well as solid execution of recent product
launches.  The addition of the Tower generic product line coupled with the recent
launch of six products from the Generics division more than offset the lost sales of
24  authorized generic RENVELA during the quarter. . . .

25      "Although total Company revenues increased by almost 14% in the second
quarter, the overall gross margin declined primarily due to the addition of new
26  generic products with lower margins compared to the margin of authorized generic
RENVELA. . . .  While we currently expect our gross margin to improve during the
27  second half of 2015, we have revised our full year 2015 gross margin guidance from
the previously stated mid 50% range to the low 50% range as a result of the product
28  sales mix in the first half of this year."

*          *          *

Total revenues for the Impax Generics division decreased $1.7 million to $174.7 million in the second quarter 2015, compared to $176.4 million in the prior year period.  The decrease was primarily due to the absence of authorized generic RENVELA sales during the current period compared to revenues of $49.1 million in the second quarter 2014, and significantly lower sales of generic digoxin as a result of additional competition during the current period. . . .  The decrease in total revenues was partially offset by the addition of product sales from the Tower acquisition and sales from six generic products launched during the second quarter 2015.

Gross margin in the second quarter 2015 decreased to 36.6%, compared to gross margin of 60.4% in the prior year period.  Adjusted gross margin in the second quarter 2015 decreased to 43.1%, compared to adjusted gross margin of 66.5% in the prior year period. . . .  In addition, the lower gross margin and adjusted gross margin in the second quarter 2015 was due to the current year impact of higher sales of lower margin generic products, additional competition on generic digoxin, and the temporary supply disruption of the epinephrine auto-injector product as noted above.

284.    On August 10, 2015, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 2Q15 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2015 (the "2Q15 10-Q").

285.    In the 2Q15 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present one or more competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

*          *          *

Consolidated total revenues for the three month period ended June 30, 2015 increased by $26.1 million to $214.2 million, or 14%, as compared to the same period in 2014.  Of the $214.2 million in consolidated total revenues for the three month period ended June 30, 2015, $58.5 million in revenues were from the Tower acquisition.  The increase in revenues in the current year period from the Tower acquisition were largely offset by the loss of revenues from sales of our authorized generic Renvela® tablets during the current period. . . .  Increased product volumes (including product volumes from the acquisition) increased revenues during the three month period ended June 30, 2015 by $22.2 million, or 12%, compared to the prior year period.  The increase in consolidated total revenues from new product launches and product volumes were partially offset in the current period by decreased revenues of $20.7 million, or 11%, as compared to the prior year period, resulting from unfavorable product selling price and product mix.

Revenues from our Impax Generics division decreased by $1.7 million during the three month period ended June 30, 2015, as compared to the prior year period, driven primarily by the loss of sales of authorized generic Renvela® during the current period partially offset by revenues from the Tower acquisition.

1                                 *        *        *

2          Consolidated total revenues for the six month period ended June 30, 2015
   increased by $50.4 million to $357.3 million, or 16%, as compared to the same
3  period in 2014.  Of the $357.3 million in consolidated total revenues for the six
   month period ended June 30, 2015, $72.1 million in revenues were from the Tower
4  acquisition. . . .  Increased product volumes (including product volumes from the
   acquisition) increased revenues during the six month period ended June 30, 2015 by
5  $53.2 million, or 17%, compared to the prior year period, while selling price and
   product mix decreased revenues by $28.5 million, or 9%, compared to the prior year
6  period.

7          Revenues from our Impax Generics division increased by $17.9 million
   during the six month period ended June 30, 2015, as compared to the prior year
8  period, driven primarily by the increase in revenues from the Tower acquisition,
   offset by decreased sales of authorized generic Renvela® during the current period.

9                                 *        *        *

10

11         Net loss for the three month period ended June 30, 2015 was $1.9 million, a
   decrease of $37.0 million as compared to net income of $35.1 million for the three
12 month period ended June 30, 2014.  The decrease was primarily attributable to lower
   margins from product sales and higher operating expenses in each case compared to
13 the prior year period.

14                                 *        *        *

15         Net loss for the six month period ended June 30, 2015 was $8.2 million, a
   decrease of $49.7 million as compared to net income of $41.5 million for the six
16 month period ended June 30, 2014.  The decrease was primarily attributable to lower
   margins from product sales and higher operating expenses, in each case compared to
17 the prior year period.

18                                 *        *        *

19         Total revenues for Impax Generics for the three month period ended June 30,
   2015, were $174.7 million, a decrease of 1% over the same period in 2014,
20 principally resulting from the loss of sales of authorized generic Renvela® during the
   current period, largely offset by the addition of $44.3 million in revenue from the
21 Tower acquisition.

22         Total revenues for Impax Generics for the six month period ended June 30,
   2015, were $303.4 million, an increase of 6% over the same period in 2014,
23 principally resulting from the addition of $56.6 million in revenue from the Tower
   acquisition as well as increased sales from Diclofenac Sodium and Lamotrigine
24 ODT, offset by decreased revenues from sales of authorized generic Renvela®
   during the current period.

25                                 *        *        *

26         Gross profit for the three month period ended June 30, 2015 was
   $63.9 million, or approximately 37% of total revenues, as compared to
27 $106.5 million, or approximately 60% of total revenues, in the prior year period.

28                                 *        *        *

1    Gross profit for the six month period ended June 30, 2015 was
     $116.5 million, or approximately 38% of total revenues, as compared to
2    $158.6 million, or approximately 56% of total revenues, in the prior year period. The
     decrease in sales of authorized generic Renvela® during the current year period,
3    previously a high margin product, was the primary driver for the reduced gross profit
     compared to the prior year period, as well as unfavorable product mix.
4
                                    *        *        *
5
     Based upon competitive market conditions, the Company may reduce the
6    selling price of certain Impax Generics products.

7    286.   In addition, the 2Q15 10-Q referred investors to the materially false and misleading

8    statements in the Company's 2014 10-K as set forth in ¶¶266-267, 269 concerning: (1) the

9    pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including

10   Lannett, Par and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing

11   pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of

12   revenues and operating results.

13   287.   The 2Q15 10-Q contained signed certifications pursuant to SOX by defendants

14   Wilkinson and Reasons, stating that the financial information contained in the 2Q15 10-Q was

15   accurate and disclosed any material changes to the Company's internal control over financial

16   reporting.

17   288.   During the August 10, 2015 analyst conference call discussing 2Q15 results, the

18   Company made the following false statements and omissions regarding competition in the digoxin

19   market:

20   Fred Wilkinson – Impax Laboratories Inc. – President and CEO

21                                   *        *        *

22   Turning to the next slide, that outlines our highlights for the quarter. We had
     a solid second quarter, delivering approximately 14% growth on revenue over Q2
23   2014, and about 50% growth over the last quarter. We are up against a tough
     comparison for both revenue and gross margin from the prior year, primarily due to
24   the prior year's exclusive launch and strong sales of authorized generic Renvela.

25                                   *        *        *

26   **As most of you know, the generic, another generic competitor for Digoxin has
     entered the market, making this a six-player market. As previously disclosed and
27   expected, margin and pricing have been impacted, as is typical in a generic multi-
     player market**. This product is still more valuable than prior to the market disruption
28   that happened 18 to 20 months ago.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                              - 109

1                                  *        *        *

2        [Reasons:]

3              . . . Our adjusted gross profit declined, as well as our adjusted gross margin,
which decreased to 50% from approximately 64% last year.  The primary drivers of
4      this decline were the loss of sales of high-margin generic Renvela, the prior year
period receipt of more than $9 million from third-party profit share and milestone
5      payments, and the impact of ***additional competition on generic Digoxin***.

6                                  *        *        *

7              Adjusted earnings per diluted share decreased to $0.34 in the second quarter
of 2015, compared to $0.60 last year.  This decrease was primarily attributable to the
8      loss of $49 million of high-margin generic Renvela sales, the loss of approximately
$9 million of gross profit from third-party profit share and milestone payments, ***a
9      decline in gross profit earned on generic Digoxin due to additional competition***,
higher interest expense of $6 million, and a higher adjusted tax rate. . . .

10
               Turning to slide 13, within the generic division, revenues were down slightly
11     in the second quarter of 2015 compared to last year.  The main drivers of the decline
were the loss of authorized generic Renvela, ***lower sales of Digoxin***, and the loss of
12     the profit share and milestone payments.

13                                 *        *        *

14     [Wilkinson:]

15     ***A new competitor on Digoxin caused some incremental price reductions, and so
therefore some margin decline***.  We're seeing a little more aggressiveness on a
16     couple of our competitors on some of our other products that we have to respond to,
but there's nothing that is out of line from what we've seen in the last six quarters
17     sequentially.   So price declines are anticipated in the industry, and as more
competition comes in then as competitors sharpen their pencil, obviously, there's a
18     need to respond to pricing.  But nothing out of the ordinary.

19                                 *        *        *

20     ***Obviously both the API supply and some of the other issues around [digoxin]
resulted in a market disruption, at which there were two of us left out there,
21     substantial price increase***.  And then as competitors resolved both our API position
and reignited interest in the product, they came back in.  ***This is now probably the
22     poster child of a product that had few competitors, a lot of competitors, then a few
and then a lot***.  I think it's probably pretty well stabilized, although the new
23     competitor will need some share, and so we should anticipate there will be a slight
diminution [sic] of all of our share and price, as everybody makes room for a new
24     competitor.  Probably the last quarter we call it out too, because I think it's pretty
well stabilized into what's still an interesting product, but not as large a contributor
25     to the Company.

26             289.    By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above

27     were materially false and misleading.  Considered as a whole, defendants' representations misled

28     investors by presenting a materially false and misleading picture of Impax's business, financials,

1    operations and compliance policies by, among other things, failing to disclose and actively

2    concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine

3    products.  In particular, defendants knew or recklessly disregarded that:

4            (a)     the statements referred to above about Impax product pricing, digoxin pricing,

5    and pricing in the generic drug marketplace were materially false and misleading because defendants

6    failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

7            (b)     the statements referred to above about competition in the generic drug

8    marketplace, including that the marketplace for generic drugs was highly competitive, were

9    materially false and misleading because the markets for digoxin and pyridostigmine were collusive

10   and lacked true competition;

11           (c)     the statement referred to above that the "competitive advantages" the

12   Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

13   complex formulation, development characteristics, and special handling requirements, was false and

14   misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

15   prices for digoxin and pyridostigmine;

16           (d)     the statements referred to above concerning API supply in the digoxin market

17   on the August 10, 2015 earnings call misled investors because no API shortage had in fact occurred

18   as no manufacturers reported any potential drug shortages to the FDA as required by federal law;

19           (e)     the statement referred to above that there were a lot of competitors in the

20   digoxin market prior to the collusive and massive price hike was materially false and misleading

21   because the generic digoxin market had only three competitors in 2012 and 2013;

22           (f)     the statements referred to above about digoxin sales were materially false and

23   misleading because digoxin sales were artificially inflated by illegal price-fixing;

24           (g)     Impax's inflation of sales through illegal price-fixing constituted a violation of

25   U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

26   antitrust authorities along with the attendant negative financial and reputational harm;

27

28

1    (h) Impax's revenues and income, as stated above, were inflated in part as a result

2 of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

3 and

4    (i) Impax failed to make required disclosures regarding the impact of artificial

5 price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

6 disclosure rules.

7   290. During the September 18, 2015 Morgan Stanley Health Care Conference, Wilkinson

8 falsely attributed digoxin and pyridostigmine price increases to market opportunities rather than

9 illegal price collusion:

10  Emil Chen – Morgan Stanley – Analyst

11   . . . So just to quickly wrap up our discussion on generic, can you also briefly talk about the pricing environment you're seeing? That's been a very popular theme

12 throughout this conference. So just from your perspective, what you're seeing in the US market?

13  [Wilkinson:]

14

15   *So we have an example of, it was probably a textbook case of how price effects the market and that's our digoxin. So, digoxin went from a seven player*

16 *marketplace to a two player marketplace. We took price, so became a very meaningful product to us. We were very close to actually eliminating it out of our*

17 *portfolio; the price has gotten so low. Price escalated very nicely, others came back into the marketplace and now the price has come back down. So it's a five or six player marketplace, fairly competitive in nature, still a good product for us and*

18 *still nice revenue generator, profit generator, but I think those opportunities will come and go as different market conditions evolve. And I think the market will*

19 *take price increases as you can and we'll also have to deal with price declines as they occur from the competitive environments.*

20

21   We have seen, I think probably almost everybody here has seen the 3% to 5% to 7% price decline on different, more commoditized products and those that have

22 gotten competitive. We've also seen those few opportunities that there are to take price increase. But I think that's just the nature of our business that's nothing

23 different in my mind that it looked two years ago and four years ago. *So I think there are still pricing pressures that will hit our marketplace. But those are*

24 *generally competitive driven. So as markets become more crowded, there will be price reductions.*

25   291. By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above

26 were materially false and misleading. Considered as a whole, defendants' representations misled

27 investors by presenting a materially false and misleading picture of Impax's business, financials,

28 operations and compliance policies by, among other things, failing to disclose and actively

1  concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine

2  products.  In particular, defendants knew or recklessly disregarded that:

3          (a)     the statements referred to above about Impax product pricing, digoxin pricing,

4  and pricing in the generic drug marketplace were materially false and misleading because defendants

5  failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

6          (b)     the statements referred to above about competition in the generic drug

7  marketplace, including that the marketplace for generic drugs was highly competitive, were

8  materially false and misleading because the markets for digoxin and pyridostigmine were collusive

9  and lacked true competition; and

10          (c)     the statement referred to above about competitors in the digoxin market prior

11  to the collusive and massive price hike was materially false and misleading because the generic

12  digoxin market had only three competitors in 2012 and 2013.

13          292.    On November 9, 2015, Impax issued a press release and filed a Current Report on

14  Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's

15  financial and operating results for the quarter ended September 30, 2015 (the "3Q15 8-K").  For the

16  quarter, Impax reported net income of $35.76 million, or $0.49 per diluted share, on revenue of

17  $221.1 million, compared to net income of $15.74 billion, or $0.22 per diluted share, on revenue of

18  $158 million, for the same period in the prior year.

19          293.    In the 3Q15 8-K, Impax stated, in part:

20      "We delivered strong top-line growth during the third quarter driven by the
addition of product revenues from all four areas of focus: the successful integration

21  of brand and generic products following the strategic acquisition of Tower, increased
sales from several key generic products, the addition of sales from continued growth

22  of RYTARY ® and Zomig ® nasal spray, and additional revenue from generic
products launched in 2015," said Fred Wilkinson, President and Chief Executive

23  Officer of Impax.  "We also achieved 21% earnings growth despite quarter over
quarter margin pressure created by the absence of sales of authorized generic

24  RENVELA® in the current quarter."

25                           *      *      *

26      Total revenues for the Impax Generics division increased $35.0 million to
$180.7 million in the third quarter 2015, compared to $145.6 million in the prior year

27  period.  The increase was primarily due to the addition of product sales from the
Tower acquisition, increased sales from diclofenac sodium gel 3% (a product

28

1    licensed under the Company's agreement with Tolmar, Inc.), and sales from seven
2    generic products launched during the current period and earlier in the year. . . .

3    Gross margin in the third quarter 2015 decreased to 37.6%, compared to gross
     margin of 53.0% in the prior year period.  Adjusted gross margin in the third quarter
4    2015 decreased to 42.8%, compared to adjusted gross margin of 56.6% in the prior
     year period. . . .  In addition, the lower gross margin and adjusted gross margin in the
5    third quarter 2015 compared to the prior year period was due to the current year
     impact of higher sales of lower margin generic products.

6    294.    Also on November 9, 2015, Impax filed a Quarterly Report on Form 10-Q with the

7    SEC, reiterating the financial and operating results previously announced in the 3Q15 8-K and

8    reporting in full the Company's financial and operating results for the quarter ended September 30,

9    2015 (the "3Q15 10-Q").

10   295.    In the 3Q15 10-Q, Impax stated, in part:

11   We also develop, manufacture, sell and distribute specialty generic pharmaceuticals
     that we believe present one or more competitive advantages, such as difficulty in raw
12   materials sourcing, complex formulation or development characteristics or special
     handling requirements.

13                                      *        *        *

14   Consolidated total revenues for the three month period ended September 30,
15   2015 increased by 40% or $63.1 million to $221.1 million, compared to
     $158.0 million in the prior year period.  The increase was primarily due to the
16   addition of product revenues from the Tower acquisition, increased sales of
     diclofenac sodium gel, a product licensed under the Company's agreement with
17   Tolmar, and the addition of sales from RYTARY® and seven generic products
     launched in the second and third quarters of 2015. . . .  Product volumes (including
18   acquisitions) increased revenues by approximately 31.5%, while product selling price
     decreased revenues by approximately 1.6%, in each case compared to the prior year
19   period. . . .

20   Revenues from our Impax Generics division increased by $35.0 million
21   during the three month period ended September 30, 2015, as compared to the prior
     year period, driven primarily by revenues from the Tower acquisition and increased
22   sales volume from diclofenac sodium gel 3%, partially offset by reduced sales from
     our other existing products, and by the loss of authorized generic Renvela® during
     the current year period.

23                                      *        *        *

24   Consolidated total revenues for the nine month period ended September 30,
25   2015 increased by $113.5 million to $578.4 million, or 24%, as compared to the
     same period in 2014.  The increase in consolidated total revenues during the current
26   year period was primarily due to the addition of product revenues from our
     acquisition of Tower, increased sales of diclofenac sodium gel, the addition of sales
27   from RYTARY® and seven generic products launched in the second and third
     quarters of 2015. . . .  Year to date product volumes (including from acquisitions)

28

1    increased revenues by approximately 22.4%, while product selling price decreased
2    revenues by approximately 6.3%, in each case compared to the prior year period. . . .

3    Revenues from our Impax Generics division increased by $52.9 million
     during the nine month period ended September 30, 2015, as compared to the prior
     year period, driven primarily by the increase in revenues from the Tower acquisition
4    and increased sales volume from diclofenac sodium gel, partially offset by the
     absence of sales of authorized generic Renvela® during the current period, for which
5    there were sales during the prior year period.

6                                  *        *        *

7    Net income for the three month period ended September 30, 2015 was
     $35.8 million, an increase of $20.0 million as compared to net income of
8    $15.7 million for the three month period ended September 30, 2014.

9                                  *        *        *

10   Net income for the nine month period ended September 30, 2015 was
     $27.6 million, a decrease of $29.6 million as compared to net income of
11   $57.2 million for the nine month period ended September 30, 2014.  The decrease
     was primarily attributable to lower margins from product sales and higher operating
12   expenses, in each case compared to the prior year period.  We also experienced
     higher amortization charges related to intangible assets and costs related to the fair
13   value of inventory, resulting from the Tower acquisition.

14                                 *        *        *

15   Total revenues for Impax Generics for the three month period ended
     September 30, 2015, were $180.7 million, an increase of 24% over the same period
16   in 2014, principally resulting from the addition of revenue from the Tower
     acquisition as well as increased sales volumes from diclofenac sodium gel partially
17   offset by the loss of sales of authorized generic Renvela® during the current period.

18                                 *        *        *

19   Total revenues for Impax Generics for the nine month period ended
     September 30, 2015, were $484.1 million, an increase of 12% over the same period
20   in 2014, principally resulting from the addition of product revenue from the Tower
     acquisition as well as increased sales from diclofenac sodium gel and seven generic
21   products including Lamotrigine ODT, partially offset by the absence of revenues
     from sales of authorized generic Renvela® during the current year period, for which
22   there were sales during the prior year period.

23                                 *        *        *

24   Gross profit for the three month period ended September 30, 2015 was
     $67.9 million, or approximately 38% of total revenues, as compared to $77.1 million,
25   or approximately 53% of total revenues, in the prior year period.  The decline in
     gross profit and gross margin was primarily driven by product mix.
26
27                                 *        *        *

28   Gross profit for the nine month period ended September 30, 2015 was
     $184.5 million, or approximately 38% of total revenues, as compared to

1    $235.8 million, or approximately 55% of total revenues, in the prior year period.  The
2    decline in gross profit and gross margin was primarily driven by product mix.  The
     loss of sales during the current year period of authorized generic Renvela®, a high
3    margin product, was replaced by lower margin products from the Tower acquisition
     and sales of diclofenac sodium gel.

4                                        *       *       *

5            Based upon competitive market conditions, the Company may reduce the
     selling price of certain Impax Generics products.

6
7    296.    In addition, the 3Q15 10-Q referred investors to the materially false and misleading

8    statements in the Company's 2014 10-K as set forth in ¶¶266-267, 269 concerning: (1) the

9    pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including

10   Lannett, Par and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing

11   pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of

12   revenues and operating results.

13   297.    The 3Q15 10-Q contained signed certifications pursuant to SOX by defendants

14   Wilkinson and Reasons, stating that the financial information contained in the 3Q15 10-Q was

15   accurate and disclosed any material changes to the Company's internal control over financial

16   reporting.

17   298.    During the November 9, 2015 analyst conference call discussing 3Q15 results,

18   Wilkinson discussed competition in the generic market, but failed to disclose Impax's

19   anticompetitive behavior:

20        Tim Chiang – BTIG – Analyst

21            Fred, I wanted to ask you about your generic business.  It seems like your
          generic business is growing.  I wanted to dig down a little bit with some of the new
22        products that you've gotten approval on.

23            How much share are you getting on average with these new products that
          you've launched?

24        [Wilkinson:]

25                                        *       *       *

26            I would say that we've been kind of functioning as most companies would
          **depending on the number of competitors**.  Some of these products have been
27        introduced into two and three competitor marketplaces.  Others have gone into five
          and six, so you have very different share position based on the amount of
28        competition out there.  There is still room for these products.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                    - 116 -

So as you've seen in most of them, we've prepared for launch. We've got ourselves out in the marketplace and almost all of them achieving 10%-plus share in places where there is, we're one of two and one of three, we're in the 40% or 50% share position. So it really just **depends on the competitive environment**. There will inevitably be an approval or two that we'll take and may not much because **the market is far too competitive**.

Therefore, we'll just have it in our backdrop for taking advantage of the opportunity should the market shift.

299.    Later in the call, Wilkinson falsely and misleadingly attributed price increases to market opportunity and continued to withhold information about Impax's illegal scheme:

Divya Harikesh – Goldman Sachs – Analyst

This is Divya Harikesh on behalf of Gary. I just had a question on – broadly on pricing, given the scrutiny pricing has come under, can you comment on the pricing environment as you see it? And your ability to take price within the branded as well as gene[r]ic portfolio?

Fred Wilkinson – Impax Laboratories Inc. – President & CEO

Sure. Obviously, there's a lot of noise on pricing going on right now. As we mentioned in the prepared remarks, our growth in third quarter – actually our growth over the whole year has been generated by volume and new product launches. In fact, in third quarter, we had an overall price decline of around 1%. So we had greater volume increases that we did on price. That's driven primarily by the generic – just the general diminution of the generic marketplace, which is very slow kind of reduction in some of the prices of some of the older products.

**We have taken price from time to time. We generally do that based on market conditions. We do that based on what we see in the competitive environment. So we will avail ourselves as the opportunity to take price – in fact, we've not done anything that we think would ever raise the scrutiny of any of the regulatory authorities.**

300.    By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above were materially false and misleading. Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products. In particular, defendants knew or recklessly disregarded that:

(a)    the statements referred to above about Impax product pricing and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

(b)     the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were materially false and misleading because the markets for digoxin and pyridostigmine were collusive and lacked true competition;

(c)     the statement referred to above that the "competitive advantages" the Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials, complex formulation, development characteristics, and special handling requirements, was false and misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the prices for digoxin and pyridostigmine;

(d)     the statements referred to above concerning the governmental investigation into generic drugs pricing on the November 9, 2015 earnings call misled investors by denying any wrongdoing – stating that no pricing collusion had taken place – and falsely attributing price increases to market conditions when, in fact, the digoxin and pyridostigmine price hikes were collusive and unjustified with no change in market conditions before the massive price increase, no supply or production issues, no change in competitive landscape, and pricing was consistently stable pricing for years before the hike;

(e)     Impax's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal antitrust authorities along with the attendant negative financial and reputational harm;

(f)     Impax's revenues and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine; and

(g)     Impax failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

301.     During the November 11, 2015 Credit Suisse Health Care Conference, Wilkinson made the following false statements and omissions:

1        Unidentified Participant

2                                    *        *        *

3        *And then on generics, on how you guys factor in price increases as you sort of*
         *think about the rest of this year and 2016.*

4

5        [Wilkinson:]

6                *Sure.  So I mean I think pricing may be one of the most over talked topics.*
         *You know, generics get the opportunity probably in 1 or 2 products out of every 30*
         *or 40 that are in your portfolio.*

7

8                *We may be a poster child of that one in that we had a product called*
         *Digoxin that we were one of seven marketers about 2.5 years ago.  It became one*
         *of two.  We took the price up fairly dramatically, made it so it was an interesting*

9        *product, made some money on that.  And then as normally happens in an open*
         *competitive marketplace, many players came back in, price fell back down.  It's*

10       *still an interesting product but nowhere near as interesting as it was before.  So*
         *those were those unique and rare opportunities that we may have to take price, but*

11       *they generally correct themselves by competition coming back in, and that's exactly*
         *what happened with Digoxin.*

12

13               Our growth that we reported in third quarter, third quarter 2015 over third
         quarter 2014 was about 40% in revenue.  As it turns out, there was about 45% of that

14       growth was unit volume, so just simply adding more products to the portfolio and
         growing share of what we had.  That was matched up with a price degradation of

15       around 3%.  So, you know, we're a typically – typical generic house in that it's not
         often that price becomes an opportunity, *it's more that there's the opportunity to try*

16       *to manage the price as more competition comes and it kind of evolves*.

17               Pricing will be an opportunity for all of us.  We'll take it as we can.  I think
         there have been some interesting moves in the pricing environment that most people

18       will have gotten either offended by or there's been a lot of noise around.  But I think
         generally our view is that price following, *where you're following competition*

19       *and/or pricing where you're taking an opportunistic picture based on market*
         *provision is still within the purview and should not be an issue for an organization*

20       *like us*.  But that pricing as a general opportunity to increase your generic products
         just is – I don't think any company's really seen that.

21               302.     By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above

22       were materially false and misleading.  Considered as a whole, defendants' representations misled

23       investors by presenting a materially false and misleading picture of Impax's business, financials,

24       operations and compliance policies by, among other things, failing to disclose and actively

25       concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine

26       products.  In particular, defendants knew or recklessly disregarded that:

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
         4:16-cv-06557-HSG                                                                          - 119 -

1          (a)      the statements referred to above about Impax product pricing, digoxin pricing,

2  and pricing in the generic drug marketplace were materially false and misleading because defendants

3  failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

4          (b)      the statements referred to above about competition in the generic drug

5  marketplace, including that the marketplace for generic drugs was highly competitive, were

6  materially false and misleading because the markets for digoxin and pyridostigmine were collusive

7  and lacked true competition;

8          (c)      the statement referred to above about the existence of seven competitors in the

9  digoxin market prior to the collusive and massive price hike was materially false and misleading

10  because the generic digoxin market never had seven competitors and there were only three

11  competitors in 2012 and 2013; and

12          (d)      Impax's inflation of sales through illegal price-fixing constituted a violation of

13  U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

14  antitrust authorities along with the attendant negative financial and reputational harm.

15  **C.**     **2016 Price Fixing False and Misleading Statements and Omissions**

16      303.    In January 2016, Impax released its updated Code of Conduct Policy ("CCP") and

17  stated that the Corporate Compliance Program is led by the Chief Compliance Officer, who reports

18  directly to the CEO, with responsibility to implement the CCP and:

19        Oversight of Impax's compliance activities is provided at both the executive

20        and Board level.

                        *       *       *

21

22        It is Impax's policy to follow all laws and regulations in the countries and

        communities where we conduct business.  There are no exceptions.

23                      *       *       *

24        At Impax, we follow both the letter and the spirit of the laws that affect us.

25                      *       *       *

26        It is our policy that information provided in public communications,

27        including our filings with the United States Securities and Exchange Commission

        and other regulatory authorities in the countries where we do business, be

28        comprehensive, fair, accurate, timely and understandable.

All colleagues, including those involved in the financial disclosure process or who otherwise have access to sensitive and/or confidential Company information, including the Chief Executive Officer and Chief Financial Officer, are responsible for assuring compliance with this policy.

All such colleagues are required to be familiar with the disclosure requirements that apply to Impax in accordance with local laws and regulations. You are prohibited from knowingly misrepresenting, omitting, or causing others to mispresent or omit, material facts about Impax to others, whether within or outside Impax . . . .

\*       \*       \*

Antitrust, Unfair Competition and Restraint of Trade

Impax is committed to free and open competition in the marketplace, and requires employees to strictly adhere to the antitrust laws in the countries where we do business.

Antitrust laws are often complex, difficult to interpret, and apply to a wide range of business activities. The following examples provide a general guide to antitrust compliance:

• No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns Impax or its suppliers, distributors, wholesalers or customers.

• No employee may agree with a customer on resale price; imply that such resale price is a condition of sale, contract renewal, or advertising allowance; or discuss with or imply to a customer that the Company will attempt to influence the pricing of another customer or competitor.

• No employee shall engage in group boycotts, or allocate or divide customers, territories or production with a competitor.

\*       \*       \*

Examples of conduct that violates Impax policy include:

• Agreements or understandings with competitors on price.

• Agreements or understandings with competitors to "divide up" customers, products, services or territories.

• "Bid-rigging" (for example, reaching a prior agreement with competitors to govern conduct in the bidding process) or making agreements or reaching understandings with competitors not to bid in public or private procurements.

• Agreements or understandings with competitors to disadvantage other competitors.

• Parties entering into these types of agreements can be prosecuted under criminal law, resulting in significant fines for corporations and fines and imprisonment for the employees involved.

An unlawful agreement on "price" can cover a broad range of agreements among competitors that directly or indirectly affect the price of goods or services. This includes, for example, agreements on price ranges, minimum prices, list prices, advertised prices, pricing formulas, discounts, rebates, profit margins, credit and warranty terms or other terms of sale.

An "agreement" or "understanding" need not be in writing for it to be unlawful. It can be oral or inferred from the conduct of the parties, as in the following examples:

• An informal observation to a competitor about a company's likely future prices;

• Comments to a competitor about the desirability of an entire industry following a price increase; or

• Comments to a competitor about the desirability of ceasing discounts to certain customers.

These kinds of situations have each been used (along with other circumstantial evidence) to charge companies and individuals with criminal price-fixing. It is for this reason that you should avoid any conduct or activity, formal or informal, from which even an appearance of improper conduct could be drawn.

The obligation to scrupulously avoid even an appearance of impropriety applies in business settings, as well as to communications with competitors in casual social settings (golf games, civic events, etc.). In addition, a supplier in one market may be a competitor in another.

304.    On February 22, 2016, Impax filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 8-K").  For the quarter, Impax reported net income of $11.43 million, or $0.16 per diluted share, on revenue of $282.09 million, compared to net income of $0.12 million, or zero per diluted share, on revenue of $131.21 million for the same period in the prior year.  For 2015, Impax reported net income of $39 million, or $0.54 per diluted share, on revenue of $860.47 million, compared to net income of $57.35 million, or $2.21 per diluted share on revenue of $596.05 million for 2014.

305.    In the 2015 8-K, Impax stated, in part:

"Our strong 2015 financial performance is a direct result of the successful implementation of our four pillar strategy.  We are a stronger and more diversified company today than we were a year ago," said Fred Wilkinson, President and Chief Executive Officer of Impax.  "We established a positive compliance position across our global network and as a result, received 11 new generic product approvals.  We achieved our goal of launching 14 generic products, while our Specialty Pharma division benefited from the approval and successful launch of RYTARY™ and the continued growth of Zomig® Nasal Spray.  In addition, we accelerated our business

development efforts with the strategic acquisition and integration of Tower Holdings, Inc., while also strengthening our capital structure."

\*       \*       \*

Total revenues for the Impax Generics division increased $108.9 million to $226.8 million in the fourth quarter 2015, compared to $117.9 million in the prior year period. The increase was primarily due to higher sales from diclofenac sodium gel, the addition of product sales from the Tower acquisition, and sales from 14 generic products launched throughout 2015, including seven products launched during the fourth quarter 2015.

Gross margin in the fourth quarter 2015 decreased to 33.7%, compared to gross margin of 44.8% in the prior year period. Adjusted gross margin in the fourth quarter 2015 decreased to 40.5%, compared to adjusted gross margin of 49.8% in the prior year period. The decrease in gross margin and adjusted gross margin was primarily due to the impact of higher sales of lower margin generic products during 2015 compared to the prior year.

\*       \*       \*

Total revenues for the Impax Generics division increased $161.9 million to $710.9 million for the full year 2015, compared to $549.1 million for the full year 2014. The increase was primarily due to the addition of product sales from the Tower acquisition as well as increased sales from diclofenac sodium gel and from 14 generic products launched during 2015. The increase in full year 2015 revenues was partially offset by the absence of revenues from sales of authorized generic Renvela® during 2015, for which there were sales during the prior year.

Gross margin for the full year 2015 decreased to 36.7%, compared to gross margin of 52.6% for the full year 2014. Adjusted gross margin for the full year 2015 decreased to 42.6%, compared to adjusted gross margin of 59.0% for the full year 2014. The decrease in gross margin and adjusted gross margin was primarily due to the loss of sales of authorized generic Renvela during 2015, which was replaced by lower margin generic products from the Tower acquisition and sales of diclofenac sodium gel.

\*       \*       \*

The Company's full year 2016 estimates are based on management's current expectations, including with respect to prescription trends, pricing levels, inventory levels, and the anticipated timing of future product launches and events. The 2016 guidance assumes 12 to 14 generic product launches including six to eight new generic product approvals. . . .

- Total Company revenues to increase at least 15% over full year 2015.

- Adjusted gross margins as a percent of total revenue are expected to be approximately 50%.

306.     On February 22, 2016, Impax also filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2015 8-K and reporting in full the Company's financial and operating results for the quarter and year ended

December 31, 2015 (the "2015 10-K").   The 2015 10-K repeated each materially false and misleading statement in the 2013 10-K as set forth in ¶¶232, 234.  *See* Ex. 1.

307.    Additionally, the 2015 10-K contained the following materially false and misleading statements:

> Consolidated total revenues for the year ended December 31, 2014 increased $84.5 million, or 17%, as compared to the year ended December 31, 2013. New product launches increased revenues during the year ended December 31, 2014 by $84.4 million, or 17%, compared to 2013, primarily related to sales of our authorized generic Renvela® tablets and generic Solaraze®. Decreased product volumes (excluding new product launches) decreased revenues during the year ended December 31, 2014 by $20.3 million, or 4%, compared to 2013, while selling price and product mix increased revenues by $20.4 million, or 4%, compared to 2013. Revenues from our Impax Generics division increased $150.7 million during the year ended December 31, 2014, as compared to 2013, driven primarily by sales of our authorized generic Renvela® tablets, ***in addition to higher sales of our Digoxin*** and generic Solaraze® products.

> \*       \*       \*

> Impax Generics sales, net, were $528.5 million for the year ended December 31, 2014, an increase of 38% from 2013, primarily as a result of sales of our authorized generic Renvela® tablets launched during the three month period ended June 30, 2014, ***higher sales of our Digoxin products*** and the launch of our generic Solaraze® during the fourth quarter of 2013.

308.    The 2015 10-K contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

309.    During the February 22, 2016 analyst conference call discussing 4Q15 results, Wilkinson made the following false statements and omissions in response to an analyst's question about competition:

Louise Chen – Guggenheim Securities LLC – Analyst

> \*       \*       \*

> ***And then, secondly, some of your competitors have talked about pricing pressure for generic drugs increasing.  Curious if you saw this, and even if you haven't, what might be causing this?  Thanks.***

[Wilkinson:]

> \*       \*       \*

On pricing, we've heard all the noise. At JPMorgan it was pretty noisy there about people prognosticating some price declines. ***We've really seen nothing out of the ordinary on our product portfolio***. Our product portfolio, we lasted through 2014 and 2015 with no introductions. So we've managed our portfolio fairly efficiently without reduction in price, and in many cases some improvement in our share position.

***Our anticipation is always that new competition will drive reduction in price, and that if the FDA continues on their efficiency mode, and continues to approve more ANDAs, that will put more pricing pressure on those products where competition could be driven***. But we don't see any external factor that should have a fundamental shift in pricing in generics. ***It's primarily just the traditional competition that comes and the need to then decide whether you're going to meet competition by reducing price or give up the share***.

310.    By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above were materially false and misleading. Considered as a whole, defendants' representations misled investors by presenting a materially false and misleading picture of Impax's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine products. In particular, defendants knew or recklessly disregarded that:

(a)    the statements referred to above about Impax product pricing and pricing in the generic drug marketplace were materially false and misleading because defendants failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

(b)    the statements referred to above about competition in the generic drug marketplace, including that the marketplace for generic drugs was highly competitive, were materially false and misleading because the markets for digoxin and pyridostigmine were collusive and lacked true competition;

(c)    the statement referred to above that the "competitive advantages" the Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials, complex formulation, development characteristics, and special handling requirements, was false and misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the prices for digoxin and pyridostigmine;

(d)    the statements referred to above about compliance with laws and regulations governing Impax's business, and the programs Impax had in place to ensure compliance with such

1  laws and regulations were materially false and misleading because defendants had engaged in an

2  illegal price-fixing scheme to inflate the prices of digoxin and pyridostigmine;

3           (e)     the statements referred to above about digoxin sales were materially false and

4  misleading because digoxin sales were artificially inflated by illegal price-fixing;

5           (f)     Impax's inflation of sales through illegal price-fixing constituted a violation of

6  U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

7  antitrust authorities along with the attendant negative financial and reputational harm;

8           (g)     Impax's revenues and income, as stated above, were inflated in part as a result

9  of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

10  and

11           (h)     Impax failed to make required disclosures regarding the impact of artificial

12  price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

13  disclosure rules.

14       311.   On May 10, 2016, Impax issued a press release and filed a Current Report on Form

15  8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and

16  operating results for the quarter ended March 31, 2016 (the "1Q16 8-K").  For the quarter, Impax

17  reported a net loss of $10.41 million, or $0.15 per diluted share, on revenue of $225.51 million,

18  compared to a net loss of $6.33 million, or $0.09 per diluted share, on revenue of $143.1 million for

19  the same period in the prior year.

20       312.   In the 1Q16 8-K, Impax stated, in part:

21       "We reported solid financial results for the first quarter and made progress
         towards achieving a number of our 2016 strategic priorities," said Fred Wilkinson,
22       President and Chief Executive Officer of Impax.  "Our generic and specialty pharma
         business segments delivered double digit revenue and operating income growth.
23       This positive performance was driven by last year's acquisition of Tower Holdings,
         Inc., from the addition of more than a dozen generic and specialty products launched
24       over the prior twelve months and from continued growth of our specialty pharma
         products."
25                              *       *       *
26       "We continue to remain confident in our financial outlook for 2016.  The
27       combination of new product launches and increased sales from several of our
         existing generic and specialty pharma products are expected to drive growth in
28       2016."

\*     \*     \*

Total revenues for the Impax Generics division increased $41.3 million to $170.1 million in the first quarter 2016, compared to $128.7 million in the prior year period. The increase was primarily due to higher sales volumes from diclofenac sodium gel, increased product sales from the Tower acquisition which the Company completed in early March 2015, and sales resulting from more than a dozen generic products launched over the past twelve months.

Gross margin in the first quarter 2016 decreased to 35.3%, compared to gross margin of 40.6% in the prior year period. Adjusted gross margin in the first quarter 2016 decreased to 39.3%, compared to adjusted gross margin of 45.0% in the prior year period.

\*     \*     \*

The Company's full year 2016 financial guidance remains unchanged from when it was issued on February 22, 2016. The Company's full year 2016 estimates are based on management's current expectations, including with respect to prescription trends, pricing levels, inventory levels, and the anticipated timing of future product launches and events. The 2016 guidance assumes 12 to 14 generic product launches including six to eight new generic product approvals. . . .

- Total Company revenues to increase at least 15% over full year 2015.

- Adjusted gross margins as a percent of total revenue are expected to be approximately 50%.

313. Also on May 10, 2016, Impax filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 1Q16 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2016 (the "1Q16 10-Q").

314. In the 1Q16 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

\*     \*     \*

Consolidated total revenues for the three month period ended March 31, 2016 increased by 58% or $82.4 million to $225.5 million, compared to $143.1 million in the prior year period. The increase was primarily due to the addition of product revenues from the Tower acquisition that closed in March 2015, increased sales of diclofenac sodium gel, a product licensed under our agreement with Tolmar, and the addition of sales from Rytary®, which we launched in April 2015. Product volumes (including acquisitions) and new product launches increased total revenues by 44.3% and 23.8%, respectively, while product selling price decreased total revenues by 10.6%, in each case compared to the prior year period.

Revenues from our Impax Generics division increased by $41.3 million during the three month period ended March 31, 2016, as compared to the prior year period, driven primarily by revenues resulting from the Tower acquisition and increased sales volume from diclofenac sodium gel, partially offset by reduced sales from our other existing products, in each case compared to the prior year period. . . .

Net loss for the three month period ended March 31, 2016 was $10.4 million, an increase of $4.1 million as compared to a net loss of $6.3 million for the three month period ended March 31, 2015.

\* \* \*

Total revenues for Impax Generics for the three month period ended March 31, 2016, were $170.1 million, an increase of 32% over the same period in 2015, principally resulting from the increased sales volumes of diclofenac sodium gel as well as the addition of revenue resulting from the Tower acquisition partially offset by the decrease in sales from our other existing products.

\* \* \*

Gross profit for the three month period ended March 31, 2016 was $60.0 million, or 35% of total revenues, as compared to $52.3 million, or 41% of total revenues, in the prior year period. The increase in gross profit was primarily driven by the increase in sales from diclofenac sodium gel and the decrease in gross margin was attributable to higher sales from our lower margin products in each case compared to the prior year period.

\* \* \*

Based upon competitive market conditions, the Company may reduce the selling price of certain Impax Generics division products.

315.   In addition, the 1Q16 10-Q referred investors to the materially false and misleading statements in the Company's 2015 10-K as set forth in ¶¶306-307, 310 concerning: (1) the pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including Lannett, Par, and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

316.   The 1Q16 10-Q contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 1Q16 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

317.   During the May 10, 2016 analyst conference call discussing 1Q15 results, Wilkinson made the following false statements and omissions regarding pricing:

1    ***There has been significant commentary this year regarding pricing in the
     generic industry.  So before we hit that as our first question, I'm going to go ahead
2    and take this on now.***  I want to address what we see in our business model as it's
     positioned to operate in the market.

3
     We are a top-15 US generic company in terms of gross sales and currently
4    market approximately 55 products.  Our diversified portfolio includes a mix of
     controlled release, immediate release and alternative dose forms including controlled
5    substances.  The portfolio is not heavily concentrated in any therapeutic area and we
     largely don't operate in the commodity generic space.  The majority of our products,
6    therefore, compete in markets with only a few competitors.

7                                    *         *         *

8    I think we've kind of hammered on the pricing piece pretty well.  We had
     anticipated price in the mid-single-digit range price degradation.  That is what we are
9    seeing essentially in the first quarter.  That is what we experienced during the second
     half, and actually all of 2015.

10
     ***We see pricing pressures on individual products as more competition
11   comes.***  But that's offset generally by product launches.  We don't really see
     anything in the winds that have dramatically changed any pricing pressures in the
12   environment.  We have said that probably for two quarters now.  And we have now
     heard other people starting to step up and say many of the same things Taro and
13   Mylan and others describe the scenario fairly similarly on their calls.

14        318.   By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above

15   were materially false and misleading.  Considered as a whole, defendants' representations misled

16   investors by presenting a materially false and misleading picture of Impax's business, financials,

17   operations and compliance policies by, among other things, failing to disclose and actively

18   concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine

19   products.  In particular, defendants knew or recklessly disregarded that:

20             (a)     the statements referred to above about Impax product pricing and pricing in

21   the generic drug marketplace were materially false and misleading because defendants failed to

22   disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

23             (b)     the statements referred to above about competition in the generic drug

24   marketplace, including that the marketplace for generic drugs was highly competitive, were

25   materially false and misleading because the markets for digoxin and pyridostigmine were collusive

26   and lacked true competition;

27             (c)     the statement referred to above that the "competitive advantages" the

28   Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                    - 129

1    complex formulation, development characteristics, and special handling requirements, was false and

2    misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

3    prices for digoxin and pyridostigmine;

4            (d)     Impax's inflation of sales through illegal price-fixing constituted a violation of

5    U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

6    antitrust authorities along with the attendant negative financial and reputational harm;

7            (e)     Impax's revenues and income, as stated above, were inflated in part as a result

8    of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

9    and

10           (f)     Impax failed to make required disclosures regarding the impact of artificial

11   price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

12   disclosure rules.

13       319.    During the May 11, 2016 Bank of America Merrill Lynch Health Care Conference,

14   Wilkinson made the following false statements and omissions:

15   Sumant Kulkarni – Bank of America Merrill Lynch – Analyst

16       Continuing on the theme of pricing erosion, how much of that would you say
     is attributable to customer consolidation, them getting stronger, versus FDA
17   approving more things under the GDUFA scheme now or just irrational participants
     in the market?

18   [Wilkinson:]

19

20       *Okay.  Well, I think the irrational participants in the marketplace is always
     what drives the bizarre price changes.  When you see something that drops from
21   being 60% of the brand price to 10% of the brand price that's usually not the
     customers.  That's usually not the number of competitors.  It's a single competitor
22   or two competitors that decide to do something.  Very strange, because they're
     simply going after share, and share really has never been the modulator for how
23   you win and lose in a generic marketplace.  It's how well you do in keeping your
     gross margin up and your profitability up.*

24                           *       *       *

25   So the customer consolidation I think is probably third on that list.  I think number of
     competitors and the number of approvals from FDA might be second, *but the bizarre
26   pricing events happen when somebody really drops a price and a competitor does
     something abnormal*.

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                    - 130 -

1    [Kulkarni:]

2        In this environment do you see any opportunities to take price increases on generics, or is that a thing of the past?

3    [Wilkinson:]

4

5        *I think there's still the opportunity.  Last I looked, it's still a free market. So if you are in a marketplace – I mean, we had that experience with our digoxin, where there were nine competitors and then that went to two.  We raised price, and*

6    *then now there are seven or eight competitors and price has come back down again*.

7

8        So I think you'll take the opportunity as it comes along.  Should there be a shortage in any of the environments I think everybody would take a look at that.  It's harder to raise price because the customers do have some contracts in place that

9    make you work harder to do it, but you can still take price, because both parties do very well with that one.

10

11        320.    During the June 8, 2016 Goldman Sachs Global Health Care Conference, Wilkinson

12    made the following false statements and omissions about competition in the generic market:

13    Gary Nachman – Goldman Sachs – Analyst

14        . . . *The big focus right now, guys, in the generic market is price (multiple speakers) competition*. . . .  What do you guys see from that perspective on a macro level?  What do you think is really driving this pressure, if you had to rank some of

15    these reasons? . . . .

16    Fred Wilkinson – Impax Laboratories Inc. – CEO

17               *        *        *

18        We did come through an era where, without the number of approvals, you started to see some long life of generics that was unusual.  In fact, *Impax benefited*

19    *dramatically from that, because it was during that time we were in warning letter, and we were not getting approvals, and many of our products were lasting much*

20    *longer than what is a typical lifecycle*.

21               *        *        *

22    [Nachman:]

23        It's still a dynamic generic market.

24    [Wilkinson:]

25        Very dynamic.  You've got to stay very close to the customer and a very strong understanding of your competition.

26

27

28

1     [Nachman:]

2          Well, in that sense, on a more – well, potentially positive side, price
increases.  Is it still something that you guys can easily do as a generic manufacturer

3     whenever there's competitive scenarios to do so?

4     [Wilkinson:]

5          ***I think price increases in the generic business has never been easy to do.
You usually need some kind of market dynamic to happen***.  The ability to go do

6     general across-the-board price increases have, in my opinion, again, have slowed a
little bit, and that's because of some of the contractual relationships [that you have

7     with your] partners.

8          321.   By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above

9     were materially false and misleading.  Considered as a whole, defendants' representations misled

10    investors by presenting a materially false and misleading picture of Impax's business, financials,

11    operations and compliance policies by, among other things, failing to disclose and actively

12    concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine

13    products.  In particular, defendants knew or recklessly disregarded that:

14          (a)   the statements referred to above about Impax product pricing, digoxin pricing,

15    and pricing in the generic drug marketplace were materially false and misleading because defendants

16    failed to disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

17          (b)   the statements referred to above about competition in the generic drug

18    marketplace, including that the marketplace for generic drugs was highly competitive, were

19    materially false and misleading because the markets for digoxin and pyridostigmine were collusive

20    and lacked true competition;

21          (c)   the statement referred to above about the existence of nine competitors in the

22    digoxin market prior to the collusive and massive price hike was materially false and misleading

23    because the generic digoxin market never had nine competitors and there were only three

24    competitors in 2012 and 2013; and

25          (d)   Impax's inflation of sales through illegal price-fixing constituted a violation of

26    U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

27    antitrust authorities along with the attendant negative financial and reputational harm.

28

322.    On August 9, 2016, Impax issued a press release and filed a Current Report on Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2016 (the "2Q16 8-K").  For the quarter, Impax reported a net loss of $2.7 million, or $0.04 per diluted share, on revenue of $172.59 million, compared to a net loss of $1.85 million, or $0.03 per diluted share, on revenue of $214.18 million for the same period in the prior year.

323.    In the 2Q16 8-K, Impax stated, in part:

The decrease [in total revenues] was primarily due to a 30% reduction in Generics division revenues which includes the impact of an approximate $15.0 million shelf-stock adjustment as a result of competition on diclofenac sodium gel 3% (Solaraze®) and metaxalone (Skelaxin®), as well as lower sales of mixed amphetamine salts (Adderall XR®) partially offset by a 29% increase in Specialty Pharma division revenues.

*     *     *

Total revenues for the Impax Generics division decreased 30.3% to $121.7 million in the second quarter 2016, compared to $174.7 million in the prior year period. . . .

Gross margin in the second quarter 2016 decreased to 30.7%, compared to gross margin of 36.6% in the prior year period.  Adjusted gross margin in the second quarter 2016 decreased to 40.2%, compared to adjusted gross margin of 43.1% in the prior year period.

*     *     *

The Company's full year 2016 financial guidance has been updated as of August 9, 2016, as noted below.  The Company's full year 2016 estimates are based on management's current expectations, including with respect to prescription trends, pricing levels, inventory levels, and the anticipated timing of future product launches and events.  The 2016 guidance assumes 12 to 14 generic product launches including six to eight new generic product approvals.

*     *     *

• UPDATED – Total Company revenues of approximately $900 million to $940 million (previously an increase of at least 15% over full year 2015 total revenue of $860 million).

• Adjusted gross margins as a percent of total revenue are expected to be in the low 50% range.

324.    On August 9, 2016, Impax also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 2Q16 8-K and reporting in

full the Company's financial and operating results for the quarter ended June 30, 2016 (the "2Q16 10-Q").

325.    In the 2Q16 10-Q, Impax stated, in part:

We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present one or more competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements.

*        *        *

Consolidated total revenues for the three month period ended June 30, 2016 decreased by 19% or $41.6 million to $172.6 million, compared to $214.2 million in the prior year period.  The decrease was primarily due to lower Impax Generics division product sales partially offset by an increase in sales of Impax Specialty Pharma division products. Existing product selling price decreased total revenues by 14.2% and product volumes decreased total revenues by 7.0%, while volumes from new product launches increased total revenues by 1.9%.

Revenues from our Impax Generics division decreased by $53.0 million during the three month period ended June 30, 2016, as compared to the prior year period, driven primarily by increased competition in diclofenac sodium gel and metaxalone as well as lower market share of generic Adderall XR®, in each case compared to the prior year period.

*        *        *

Consolidated total revenues for the six month period ended June 30, 2016 increased by 11% or $40.8 million to $398.1 million, compared to $357.3 million in the prior year period.  The increase was primarily due to the addition of product revenues from the Tower acquisition that closed in March 2015, increased sales of diclofenac sodium gel, a product licensed under our agreement with Tolmar, the addition of sales from Rytary®, which we launched in April 2015, and the addition of sales from Emverm®, which we launched in March 2016.  Product volumes (including acquisitions) and new product launches increased total revenues by 20.5% and 5.4%, respectively, while product selling price decreased total revenues by 14.5%, in each case compared to the prior year period.

Revenues from our Impax Generics division decreased by $11.6 million during the six month period ended June 30, 2016, as compared to the prior year period, driven primarily by lower revenues due to mixed results from both price and volume from products acquired in the Tower acquisition as well as from our legacy products.

*        *        *

Net loss for the three month period ended June 30, 2016 was $2.7 million, an increase of $0.8 million as compared to a net loss of $1.9 million for the three month period ended June 30, 2015.  The increase in net loss compared to the prior year period was primarily attributable to lower gross profit as a result of lower Impax Generics division sales combined with higher operating expenses, which were partially offset by the absence of a loss on debt extinguishment in the current period compared to a loss of $16.9 million incurred in the second quarter 2015.

1

Net loss for the six month period ended June 30, 2016 was $13.1 million, an increase of $4.9 million as compared to a net loss of $8.2 million for the six month period ended June 30, 2015.

2

3

\*        \*        \*

4

Total revenues for Impax Generics for the three month period ended June 30, 2016, were $121.7 million, a decrease of 30% over the same period in 2015, driven primarily by increased competition in diclofenac sodium gel and metaxalone as well as lower market share of generic Adderall XR®, in each case compared to the prior year period.

5

6

7

\*        \*        \*

8

Total revenues for Impax Generics for the six month period ended June 30, 2016, were $291.8 million, a decrease of 4% over the same period in 2015, principally driven by increased competition in metaxalone as well as lower market share of generic Adderall XR®, partially offset by the increased sales of diclofenac sodium gel and Epinephrine Auto-Injector, both acquired in the Tower acquisition in March 2015.

9

10

11

\*        \*        \*

12

13

Gross profit for the three month period ended June 30, 2016 was $37.4 million, or 31% of total revenues, as compared to $63.9 million, or 37% of total revenues, in the prior year period. The decrease in gross profit was primarily driven by the decrease in sales of certain products as described above. The decrease in gross margin in the current period compared to the prior year period was primarily attributable to lower sales from our higher margin products versus the product sales mix for the prior year period as well as the impact of the $15.0 million in shelf-stock adjustments.

14

15

16

17

\*        \*        \*

18

Gross profit for the six month period ended June 30, 2016 was $97.3 million, or 33% of total revenues, as compared to $116.5 million, or 38% of total revenues, in the prior year period. The decrease in gross profit was primarily driven by the decrease in sales of certain products as described above including the shelf-stock adjustments partially offset by an increase in sales of diclofenac sodium gel and Epinephrine Auto-Injector, compared to the prior year period. The decrease in gross margin in the current period compared to the prior year period was primarily attributable to lower sales from our higher margin products versus the product sales mix for the prior year period.

19

20

21

22

23

\*        \*        \*

24

Based upon competitive market conditions, the Company may reduce the selling price of certain Impax Generics division products.

25

26

326.    Additionally, the 2Q16 10-Q contained a Restatement Agreement to Credit Agreement dated as of August 3, 2016 by and among Impax and Royal Bank of Canada. In the

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:16-cv-06557-HSG

- 135

1    Amended and Restated Credit Agreement, as Exhibit I to the Restatement Agreement, Impax stated,

2    in part:

3                                          ARTICLE VI

4                                     Affirmative Covenants

5            So long as the Termination Conditions have not been satisfied, the Borrower
     [Impax] will, and will (except in the case of the covenants set forth in Sections 6.01,
6    6.02 and 6.03) cause each of the Restricted Subsidiaries to:

7                             *          *          *

8            SECTION 6.08    Compliance with Material Laws.  Comply in all material
     respects with its Organization Documents and the requirements of all Laws
9    (including Environmental Laws) and all orders, writs, injunctions and decrees of any
     Governmental Authority applicable to it or to its business or property, except if the
10   failure to comply therewith would not reasonably be expected individually or in the
     aggregate to have a Material Adverse Effect.

11

12           327.    In addition, the 2Q16 10-Q referred investors to the materially false and misleading

13   statements in the Company's 2015 10-K as set forth in ¶¶306-307, 310 concerning: (1) the

14   pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including

15   Lannett, Par, and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing

16   pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of

17   revenues and operating results.

18           328.    The 2Q16 10-Q contained signed certifications pursuant to SOX by defendants

19   Wilkinson and Reasons, stating that the financial information contained in the 2Q16 10-Q was

20   accurate and disclosed any material changes to the Company's internal control over financial

21   reporting.

22           329.    By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above

23   were materially false and misleading.  Considered as a whole, defendants' representations misled

24   investors by presenting a materially false and misleading picture of Impax's business, financials,

25   operations and compliance policies by, among other things, failing to disclose and actively

26   concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine

27   products.  In particular, defendants knew or recklessly disregarded that:

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                              - 136 -

1            (a)      the statements referred to above about Impax product pricing and pricing in

2    the generic drug marketplace were materially false and misleading because defendants failed to

3    disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

4            (b)      the statements referred to above about competition in the generic drug

5    marketplace were materially false and misleading because the markets for digoxin and

6    pyridostigmine were collusive and lacked true competition;

7            (c)      the statement referred to above that the "competitive advantages" the

8    Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

9    complex formulation, development characteristics, and special handling requirements, was false and

10   misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

11   prices for digoxin and pyridostigmine;

12           (d)      the statements referred to above about compliance with laws and regulations

13   governing Impax's business, and the programs Impax had in place to ensure compliance with such

14   laws and regulations were materially false and misleading because defendants had engaged in an

15   illegal price-fixing scheme to inflate the prices of digoxin and pyridostigmine;

16           (e)      Impax's inflation of sales through illegal price-fixing constituted a violation of

17   U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

18   antitrust authorities along with the attendant negative financial and reputational harm;

19           (f)      Impax's revenues and income, as stated above, were inflated in part as a result

20   of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

21   and

22           (g)      Impax failed to make required disclosures regarding the impact of artificial

23   price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

24   disclosure rules.

25           330.    On November 9, 2016, Impax issued a press release and filed a Current Report on

26   Form 8-K with the SEC, signed by defendant Reasons, announcing certain of the Company's

27   financial and operating results for the quarter ended September 30, 2016 (the "3Q16 8-K").  For the

28   quarter, Impax reported adjusted diluted earnings per share of $0.37, on revenue of $227.9 million,

1   compared to adjusted diluted earnings per share of $0.40, on revenue of $221.1 million, for the same

2   period in the prior year.

3       331.   In the 3Q16 8-K, Impax stated, in part:

4       Generic division revenues declined 3% in the third quarter 2016 compared to
        the prior year period as strong sales of epinephrine auto-injector (authorized generic

5       Adrenaclick®) and oxymorphone, sales from the successful launch of three new
        generic products and the recent addition of products acquired from Teva

6       Pharmaceuticals Industries Ltd. and affiliates of Allergan plc (the "Teva
        Transaction"), were more than offset by lower sales of diclofenac sodium gel 3%

7       (Solaraze®), mixed amphetamine salts (Adderall XR®) and metaxalone
        (Skelaxin®).

8                                   *        *        *

9

10      "Our third quarter 2016 results reflect the volatility we have experienced as a
        result of additional competition on a few of our largest generic products," said Fred

11      Wilkinson, President and Chief Executive Officer of Impax. "Successful marketing
        and operational strategies are helping us to capitalize on several generic

12      opportunities, including epinephrine auto-injector and oxymorphone, and we
        defended our share position across the majority of our generic portfolio.  That said,

13      the ongoing impact of an increasingly challenging market environment continues to
        weigh on our results and consequently we are revising our outlook for fiscal 2016 to

14      reflect the impact of lower pricing across an increased number of products in our
        generic portfolio."

15      "Despite the current industry headwinds, we remain confident that the actions
        we are taking will position Impax for long-term, organic growth.  Within our

16      Generics division, we intend to defend and aggressively pursue share growth of
        existing products, focus on maximizing new product launches, and invest in future

17      R&D opportunities and supply chain optimization."

18                                  *        *        *

19      Total revenues for the Impax Generics division decreased 3.0% to
        $175.3 million in the third quarter 2016, compared to $180.7 million in the prior year

20      period.  The decrease was primarily due to the continued impact of competition on
        diclofenac and metaxalone, as well as lower revenue from sales of mixed

21      amphetamine salts.

22      Gross margin in the third quarter 2016 was a loss of 111.9% compared to
        gross margin of 37.6% in the prior year period.  Adjusted gross margin in the third

23      quarter 2016 increased to 43.8%, compared to adjusted gross margin of 42.8% in the
        prior year period.

24                                  *        *        *

25      The Company's full year 2016 financial guidance has been updated as of

26      November 9, 2016, as noted below.  The Company's full year 2016 estimates are
        based on management's current expectations, including with respect to prescription

27      trends, pricing levels, inventory levels, and the anticipated timing of future product
        launches and events.

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                          - 138 -

1                                   *        *        *

2           • UPDATED – Total Company revenues of approximately $840 million to
    $855 million (previously $900 million to $940 million).

3

4           • UPDATED – Adjusted gross margins as a percent of total revenue are
    expected to be 48% to 50% (previously low 50% range).

5       332.    On November 9, 2016, Impax also filed a Quarterly Report on Form 10-Q with the

6   SEC, reiterating the financial and operating results previously announced in the 3Q16 8-K and

7   reporting in full the Company's financial and operating results for the quarter ended September 30,

8   2016 (the "3Q16 10-Q").

9       333.    In the 3Q16 10-Q, Impax stated, in part:

10      We also develop, manufacture, sell and distribute specialty generic pharmaceuticals
    that we believe present one or more competitive advantages, such as difficulty in raw

11   materials sourcing, complex formulation or development characteristics or special
    handling requirements.

12                                  *        *        *

13

14      Consolidated total revenues for the three month period ended September 30,
    2016 increased by 3%, or $6.8 million, to $227.9 million, compared to

15   $221.1 million in the prior year period.  The increase was primarily due to lower
    Impax Generics division product sales which were more than offset by an increase in

16   sales of Impax Specialty Pharma division products.  Existing product selling price
    decreased total revenues by 9.1% while product volumes remained relatively

17   unchanged and volumes from new product launches, including those resulting from
    acquisitions increased our total revenues by 12.2% compared to the prior year period.

18      Revenues from our Impax Generics division decreased by $5.3 million during
    the three month period ended September 30, 2016, as compared to the prior year

19   period, driven primarily by increased competition for diclofenac sodium gel and
    metaxalone as well as lower market share of generic Adderall XR®, in each case

20   compared to the prior year period.

21                                  *        *        *

22      Consolidated total revenues for the nine month period ended September 30,
    2016 increased by 8%, or $47.6 million, to $626.0 million, compared to

23   $578.4 million in the prior year period.  The increase was primarily due to new
    product launches (including acquisitions) as existing product volume increases were

24   offset by price declines.  Existing product volumes and new product launches
    (including acquisitions) increased total revenues by 12.8% and 7.8%, respectively,

25   while product selling price decreased total revenues by 12.4%, in each case
    compared to the prior year period.

26

27      Revenues from our Impax Generics division decreased by $17.0 million
    during the nine month period ended September 30, 2016, as compared to the prior

28   year period, driven primarily by lower pricing across most of the product portfolio,

1    partially offset by increased volumes, including those resulting from product
2    acquisitions.

                              *        *        *

3
4    Net loss for the three month period ended September 30, 2016 was
     $179.3 million, a decrease of $215.1 million as compared to net income of
5    $35.8 million for the three month period ended September 30, 2015.

                              *        *        *

6
7    Net loss for the nine month period ended September 30, 2016 was
     $192.4 million, a decrease of $220.0 million as compared to net income of
8    $27.6 million for the nine month period ended September 30, 2015.

                              *        *        *

9
10   Total revenues for Impax Generics for the three month period ended
     September 30, 2016 were $175.3 million, a decrease of 3% over the same period in
11   2015, driven primarily by increased competition for diclofenac sodium gel and
     metaxalone as well as lower market share of generic Adderall XR®.

12                            *        *        *

13   Total revenues for Impax Generics for the nine month period ended
     September 30, 2016 were $467.1 million, a decrease of 4% over the same period in
14   2015, principally driven by increased competition for metaxalone as well as
     competition for fenofibrate and lower market share of generic Adderall XR®,
15   partially offset by the increased sales of Epinephrine Auto-Injector acquired in the
     Tower Acquisition in March 2015.
16
                              *        *        *

17
18   Gross loss for the three month period ended September 30, 2016 was
     $196.2 million, or 112% of total revenues, as compared to gross profit of
19   $68.0 million, or 38% of total revenues, in the prior year period.  The decrease in
     gross profit and margin was primarily driven by the impairment charges and higher
20   amortization noted above as well as the decrease in sales of certain products as
     described above.

21                            *        *        *

22   Gross loss for the nine month period ended September 30, 2016 was
     $98.8 million, or 21% of total revenues, as compared to gross profit of
23   $184.5 million, or 38% of total revenues, in the prior year period.  The decrease in
     gross profit and margin compared to the prior year period was primarily driven by
24   the intangible asset impairment charges, increased amortization, and restructuring
     costs noted above.
25
                              *        *        *

26
27   Based upon competitive market conditions, the Company may reduce the
     selling price of certain Impax Generics division products.
28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                              - 140 -

334.    In addition, the 3Q16 10-Q referred investors to the materially false and misleading statements in the Company's 2015 10-K as set forth in ¶¶306-307, 310 concerning: (1) the pharmaceutical industry's competitiveness, (2) its numerous and principal competitors, including Lannett, Par, and Valeant, (3) price reductions due to competitor actions and entry, (4) pricing pressures due to industry consolidation and third-party payers' price challenges, and (5) variation of revenues and operating results.

335.    The 3Q16 10-Q contained signed certifications pursuant to SOX by defendants Wilkinson and Reasons, stating that the financial information contained in the 3Q16 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

336.    During the November 9, 2016 analyst conference call discussing 3Q16 results, Wilkinson made the following false statements and omissions regarding the reason for its disappointing results:

> Thank you, Mark, and good morning to everyone.  Thanks for joining us.  As is evidenced by the quarter's earnings season, it's clearly been a very difficult and challenging year for most of the pharmaceutical segment, and obviously Impax was not immune to this.  The impact of pricing activities is being felt up and down the entire distribution channel.
>
> For us, it started earlier this year as *we encountered aggressive competition*, and lower pricing on a couple of limited-competition generic products.

337.    During the question-and-answer session, analysts asked Wilkinson pointed questions about the DoJ investigation, but he failed to disclose the price-fixing scheme:

> Andrew Finklestein – SSG – Analyst
>
> >          \*        \*        \*
>
> Then also something that's certainly been a concern, if you could address the DoJ issues with regard to generic pricing, and whether your views on that evolved since yesterday?  Thanks very much.
>
> Fred Wilkinson – Impax Laboratories Inc. – President and CEO
>
> >          \*        \*        \*
>
> Then the last question, the DoJ question.  We've seen many people responding to this question, and obviously this is – you've seen in our filings we've disclosed what's gone on with the DoJ.  This is more than two years old as far as the subpoena.  We've cooperated with the DoJ.  I think at this particular point we're not

1   in a position to either pontificate on when any kind of conclusion will happen and
    any impact on the business.  I think we've got the information that's appropriate on
2   our filings.  We do continue to work with the DoJ, although not much conversation
    as of recent.  We'll see where they go.
3
    [Finklestein:]
4
         Could you clarify what review you've done internally?
5
    [Wilkinson:]
6
         I think we really don't want to comment on where we've gone.  Obviously,
7   we are taking our judicious efforts to make sure that we've done what we need to
    appropriately.  We'll put our filings out in front of the market in our filings.
8
9        338.    Following the call, during a proprietary event hosted by investment bank Leerink

10   Partners LLC, Impax's management team told Leerink's analysts that they felt "good" after

11   conducting an "internal investigation relating to the DoJ's inquiry into price collusion."  Leerink

12   reported that it met with Impax management "including Fred Wilkinson (CEO), Bryan Reasons

13   (CFO), Doug Boothe (President, Impax Generics), and Mark Donohue (VP of IR)."  In its report

14   following the meeting, Leerink stated in its December 5, 2016 analyst report that "updates on the

15   DoJ sector probe were assuring, from an IPXL perspective" because "mgmt commented that it has

16   completed its own internal investigation relating to the DoJ's inquiry into price collusion and feels

17   good the company has not engaged in any impropriety."

18       339.    By virtue of the facts alleged in §§IV.C.-I.; VIII, the statements referenced above

19   were materially false and misleading.  Considered as a whole, defendants' representations misled

20   investors by presenting a materially false and misleading picture of Impax's business, financials,

21   operations and compliance policies by, among other things, failing to disclose and actively

22   concealing that Impax had colluded to fix the prices of its generic digoxin and pyridostigmine

23   products.  In particular, defendants knew or recklessly disregarded that:

24       (a)    the statements referred to above about Impax product pricing and pricing in

25   the generic drug marketplace were materially false and misleading because defendants failed to

26   disclose that digoxin and pyridostigmine prices were inflated by illegal price-fixing;

27       (b)    the statements referred to above about competition in the generic drug

28   marketplace, including that the marketplace for generic drugs was highly competitive, were

1   materially false and misleading because the markets for digoxin and pyridostigmine were collusive

2   and lacked true competition;

3          (c)     the statement referred to above that the "competitive advantages" the

4   Company had in its generic pharmaceuticals arose from difficulty in sourcing raw materials,

5   complex formulation, development characteristics, and special handling requirements, was false and

6   misleading because, in fact, Impax had illegally gained its competitive advantage through fixing the

7   prices for digoxin and pyridostigmine;

8          (d)     the statements referred to above concerning the governmental investigation

9   into generic drug pricing on the November 9, 2016 earnings call were materially false and

10  misleading because defendants were colluding with other generic drug manufacturers to fix the

11  prices of digoxin and pyridostigmine;

12         (e)     Impax's inflation of sales through illegal price-fixing constituted a violation of

13  U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal

14  antitrust authorities along with the attendant negative financial and reputational harm;

15         (f)     Impax's revenues and income, as stated above, were inflated in part as a result

16  of illegal price-fixing and artificially-inflated generic drug prices for digoxin and pyridostigmine;

17  and

18         (g)     Impax failed to make required disclosures regarding the impact of artificial

19  price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

20  disclosure rules.

21      **D.     Impax Failed to Disclose the Impact of Illegal Price-Fixing Activity on
                Reported Revenues**

22
23      340.    Throughout the Class Period, Impax failed to disclose the impact of its illegal price-

24  fixing activity on reported revenues in its financial statements.  Defendants' failure to disclose these

25  issues rendered Impax's Class Period financial statements materially misstated.  In particular, in each

26  of Impax's Class Period Form 10-K and 10-Q SEC filings Impax failed to make required disclosures

27  regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported

28  revenue, in violation of SEC disclosure rules.

1        341.    SEC MD&A disclosure rules[16] required defendants to disclose the impact of the

2   artificial digoxin and pyridostigmine price increases on Impax's reported revenues.

3        342.    The SEC explicitly requires disclosures detailing ***changes in price that impact***

4   ***reported revenues***.  Item 303 of Reg S-K states:

> To the extent that the financial statements disclose material increases in net sales or
> ***revenues, provide a narrative discussion of the extent to which such increases are***
> ***attributable to increases in prices*** or to increases in the volume or amount of goods
> or services being sold or to the introduction of new products or services . . . ***discuss***
> ***the impact of . . . changing prices on the registrant's net sales and revenues*** and on
> income from continuing operations.[17]

8        343.    SEC Staff Accounting Bulletin No. 104 ("SAB 104") required additional MD&A

9   disclosures regarding the impact of the artificial digoxin and pyridostigmine price increases,

10  including the origin of the price increases (*i.e.*, illegal price-fixing activity), on Impax's reported

11  revenues during the Class Period.  SAB 104 states:

> ***Changes in revenue*** should not be evaluated solely in terms of volume and price
> changes, but ***should also include an analysis of the reasons and factors***
> ***contributing to the increase or decrease***.

---

[16]   SEC Financial Reporting Release No. 72, *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent. . . .
>
>     The purpose of MD&A is not complicated.  It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations."  The MD&A requirements are intended to satisfy three principal objectives:
>
> •      to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;
>
> •      to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and
>
> •      to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

[17]   SEC Rules and Regulations, Item 303 of Regulation S-K, Management's Discussion and Analysis of Financial Condition and Results of Operations, ¶¶(a)(3)(ii), (iii), and (iv).

344.    Likewise, SEC Release No. 33-8350 provides the following analogous disclosure guidance requiring an analysis of volume *and price changes* affecting the Company's revenues:

> For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should *analyze the reasons underlying the decline in sales when the reasons are also material and determinable*. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in *competitive position and market share*, or a combination of conditions.[18]

345.    As alleged herein, Impax's reported revenues were significantly impacted by illegal price-fixing activity. For example, as detailed at §IV.C., defendants aggressively increased prices on its generic digoxin product at the end of fiscal 2013. The price of a pill of digoxin rose to $1.07 in 2014 from $0.16 in 2012. Immediately following these artificial price hikes, digoxin became a major driver of Impax's generics revenue. For example, on the 1Q14 earnings call, defendant Reasons stated: "Total *generic revenues increased $7.5 million or 7%* to $109 million. This was *primarily the result of increased sales of our Digoxin product* and from sales of authorized generic Trilipix and generic Solaraze." As detailed in §IV.D., the price-fixing activity continued, defendants continued to highlight digoxin's role in driving generics revenue growth.

346.    Starting in 2015, the grossly inflated prices attracted new participants to the generic digoxin market. As new competitors entered the market, existing digoxin sellers, including Impax, were forced to make room for the new market participants. As a result, Impax ceded market share and the impact of the collusive price-fixing was diminished. *See* §IV.E. However, revenues remained severely inflated – with the digoxin price per unit still far exceeding the pre-collusive pricing environment.

347.    As set forth in §IV.F., defendants also materially increased generic revenues by artificially hiking the prices of pyridostigmine, as a result of illegal price-fixing activity, beginning in 4Q14.

348.    Defendants' failure to disclose the true cause of the artificial digoxin and pyridostigmine price increases on its reported revenues was in clear violation of the SEC disclosure

---

[18]    SEC Release Nos. 33-8350; 34-48960; FR-72.

1    rules described above.  By failing to make the required SEC disclosures regarding price increases,

2    defendants were able to conceal the impact of illegal price-fixing activity on the Company's future

3    performance.  The SEC has explicitly stated that "[o]ne of the principal objectives of MD&A is to

4    provide information about the quality and potential variability of a company's earnings and cash

5    flow, so that *readers can ascertain the likelihood that past performance is indicative of future*

6    *performance*."[19]

7         349.    Likewise, SAB 104 states:

8         The Commission stated in FRR 36 that MD&A should "give investors an opportunity
          to look at the registrant through the eyes of management by providing a historical
9         and *prospective analysis* of the registrant's financial condition and results of
          operations, *with a particular emphasis on the registrant's prospects for the future*."
10

11        350.    As alleged herein, the illegal price-fixing activity: (1) was not a sustainable business

12   practice, *and* (2) subjected the Company to material legal, regulatory, and financial risks.  Both of

13   these factors had material consequences on the Company's future performance.  As such, defendants

14   were required to disclose the true cause of artificial digoxin and pyridostigmine price increases, tied

15   to illegal price-fixing activity, so that *investors could "ascertain the likelihood that past*

16   *performance was indicative of future performance*."  By failing to do so, Impax's Class Period

17   financial statements were materially misstated and in violation of SEC disclosure rules.

18   **VI.   IMPAX MISLED INVESTORS BY MISREPRESENTING AND**
          **CONCEALING THE IMPACT OF COMPETITION AND PRICE**
19        **EROSION ON DICLOFENAC**

20        351.    In addition to colluding with Valeant to artificially raise prices of pyridostigmine,

21   Impax partially offset the diminishing returns on its digoxin scheme in 2015 through sales of

22   diclofenac.[20]  Throughout 2015 and during 1Q16 defendants highlighted to investors significant

23   year-over-year increases in diclofenac revenue.  But in the summer of 2016 defendants abruptly

24   changed course and cited rapid deterioration in diclofenac sales as the cause of a significant

25   reduction in 2016 revenue guidance (disclosed on a June 21, 2016 conference call) and also a

26   ---
     [19]   SEC Release Nos. 33-8350; 34-48960; FR-72.

27   [20]   Diclofenac is the generic name of the branded drug Solaraze.  In its market communications,
     defendants used both diclofenac and Solaraze to refer to the product.
28

1  significant revenue shortfall and inventory write-down in 2Q16 (disclosed on an August 9, 2016

2  earnings call).  Defendants blamed the rapid deterioration in diclofenac revenue on increased

3  competition and price degradation during the second half of 2Q16.  However, as set forth below, the

4  market share and price erosion had begun much earlier.  By February 22, 2016, when Impax

5  announced its 4Q15 results, defendants were already aware that increased competition had eroded

6  the Company's market share and pricing.  Rather than disclose this adverse trend, defendants

7  misrepresented and concealed the extent, true cause, and speed of the rapid erosion through

8  materially false and misleading statements and omissions.

9      **A.    Diclofenac False and Misleading Statements on February 22, 2016**

10     352.    Diclofenac was the Company's largest product, by revenue, in 2015.  Fiscal year

11 2015 sales exceeded $148 million, more than 17% of the Company's total reported revenue.  As late

12 as January 31, 2016, Impax held a near monopoly on the generic diclofenac market, with a 93%

13 market share.

14     353.    On the Company's 4Q15 earnings conference call, held on February 22, 2016, a

15 Raymond James analyst observed that diclofenac "obviously . . . was a strong contributor in the

16 quarter" and that "[i]t just seems like underlying demand . . . was exceptionally strong in the fourth

17 quarter."  The analyst continued: "I'm not sure what you think is the sustainability of that uptake, but

18 maybe some commentary on some of the additional dynamics there."  Wilkinson responded that

19 although Impax expected a competitor would appear sometime in the first half of 2016, "***we expect***

20 ***that growth to be maintained***."  On the same call, defendants stated that Impax expected to grow

21 revenue "at least 15%" over 2016, which translated into $990 million of revenue in 2016.  With

22 respect to pricing erosion, a Guggenheim Securities analyst asked: "some of your competitors have

23 talked about pricing pressure for generic drugs increasing.  Curious if you saw this, and even if you

24 haven't, what might be causing this?"  Wilkinson falsely represented that "[o]n pricing, we've heard

25 all the noise. At JPMorgan it was pretty noisy there about people prognosticating some price

26 declines.  We've really seen nothing out of the ordinary on our product portfolio. Our product

27 portfolio, we lasted through 2014 and 2015 with no introductions. ***So we've managed our portfolio***

28 ***fairly efficiently without reduction in price***."

354.    Wilkinson's statements above that "we expect that growth to be maintained" and "we've managed our portfolio fairly efficiently without [a] reduction in price" were materially false when made; Impax's portfolio already had experienced a 13% price decline in 4Q15 and was on its way to a 21% decline in 1Q16.

### B.    Diclofenac False and Misleading Statements and Omissions on May 10, 2016

355.    On May 10, 2016, Impax filed its 1Q16 Form 10-Q with the SEC, signed and certified by Wilkinson and Reasons.  The Form 10-Q financial statement was materially false and misleading because Impax failed to disclose adverse revenue trends regarding diclofenac, in violation of SEC disclosure rules, as described at §VI.B.4.

356.    On the same day, Impax also conducted its 1Q16 earnings call, took part in the Bank of America Merrill Lynch Health Care Conference immediately after the call, and filed a Form 8-K with an earnings press release.  Reasons and Wilkinson participated at both the earnings call and the healthcare conference.  Reasons signed the Form 8-K filed with the SEC.

### 1.    May 10, 2016 False and Misleading Statements Relating to Price Erosion and Market Share

357.    During the earnings call and the healthcare conference, Reasons and Wilkinson materially misled investors about the true extent of the diclofenac and Impax's overall portfolio price declines and market share erosion:

(a)    On the earnings call, Reasons stated:

Regarding pricing, we did experience downward pressure on a few high-volume generic products during the first quarter due to additional competition, primarily diclofenac gel, which we anticipated and metaxalone. *As you know, this is typical of generic markets. Additional competitors usually result in price [declines]. These two products contributed more than 50% to a decline in pricing in the first quarter. Excluding these two products, generic pricing for the combined portfolio declined approximately 5.5%, in line with our previous comments of mid single-digit price decline in 2016.*

(b)    During the earnings conference call, Impax also announced that in 1Q16: "Total revenue for the Company increased $82 million, or 58%, over first quarter 2015."

(c)    Shortly after the earnings call, Wilkinson stated at the healthcare conference:

The number one set of discussions this morning on the call for most of you who maybe weren't on was around pricing, because that seems to be the focus of our

wonderful generic industry at this particular point. ***And for us what we have is if you take out kind of two items where we were sole items, or sole suppliers in the industry or in the marketplace, or one of two where we did see some new competition, we actually had about a 5.5% decrease in price.*** That's right in our guidance. That's what we expected.

When we guided earlier this year, we did expect that both Solaraze and metaxalone would both meet new competition sometime in the first half of this year. They both did, and both of them have – ***we've defended share but had to give up a bit of price.  So our overall price decline was around 10%.***

358.    Wilkinson made several statements during the May 10, 2016 earnings conference call that were materially false and misleading to investors.  These materially false and misleading statements painted a false picture of Impax's pricing and market share performance and concealed from investors price declines and market share erosion that had already negatively impacted both Impax's overall portfolio and diclofenac in particular.

359.    ***First***, Wilkinson's statement that the portfolio's "overall price decline was around 10%" was materially false and misleading because as defendants ultimately admitted on August 9, 2016, (1) Impax's overall portfolio had experienced price decline of 21% in 1Q16; and (2) the portfolio had declined by 6% in 1Q16 when diclofenac and metaxalone were excluded:

## Impax Year Over Year Change in Generic Volume and Price

| Total Generics | 3Q15 | 4Q15 | 1Q16 | 2Q16 |
|---|---|---|---|---|
| Volume | 27% | 106% | 53% | (11%) |
| Price | (3%) | (13%) | (21%) | (19%) |

| Excluding generic Solaraze® and generic Skelaxin® | 3Q15 | 4Q15 | 1Q16 | 2Q16 |
|---|---|---|---|---|
| Volume | (4%) | 12% | 4% | (11%) |
| Price | (4%) | (3%) | (6%) | (4%) |

360.    Indeed, when the chart was presented to investors on August 9, 2016, an analyst from Raymond James called out defendants' prior representation that Impax's overall portfolio price decline was only 10%:  "But in going back to commentary from [the] first-quarter conference call, I thought the negative impact of pricing was roughly 10%, around 10.5%."

361.    By misrepresenting to investors that (1) the pricing erosion on Impax's overall portfolio was only around 10% and (2) approximately 5.5% when diclofenac and metaxalone were

1   excluded, Reasons and Wilkinson misled investors as to the true extent of the price declines on

2   diclofenac and metaxolone. Given 100% of the portfolio had price decline of 10%, assuming 50%[21]

3   of the portfolio experienced a 5.5% price decline, simple arithmetic shows that diclofenac and

4   metaxolone price declines would be 14.5%.[22] However, because the overall portfolio (or 100% of

5   portfolio) actually declined 21% instead of 10%, the same calculation shows that diclofenac and

6   metaxolone price declines were 36%[23] – 2.5 times higher than the 14.5% defendants misrepresented

7   to investors.

8        362.   **Second**, Wilkinson's statement above that Impax had "defended share but had to give

9   up a bit of price" was also materially false and misleading. Despite making pricing concessions,

10  Impax had not "defended share." In fact, Impax had lost significant market share by April 30, 2016.

11  After remaining at or above 95% market share during 4Q15 and 1Q16, Impax's share sank to 88%

12  by April 30, 2016 – a decline of over 7%. By May 10, 2016, the trajectory of Impax's market share

13  decline had accelerated. In fact, Impax's share sank to 73% during May – a further decline of over

14  17%.

15       363.   **Third**, the statement in ¶357(a) above, that Impax had experienced downward

16  pressure on "pricing" which was "typical of generic markets" because "[a]dditional competitors

17  usually results in price [declines]" was materially misleading to investors because although

18  defendants briefly discussed the impact of price erosion on the decline in diclofenac revenues, they

19  omitted to disclose the larger driver of the decline in diclofenac sales – lower sales **volume**. Three

20  months later on August 9, 2016, defendants revealed that in 1Q16, the $38 million diclofenac

---

21  [21]   Reasons stated during the May 10, 2016 conference call that "the two products [diclofenac and
22  metaxolone] contributed more than 50% to a decline in pricing in the first quarter." As such, the
    5.5% decline on the portfolio (excluding diclofenac and metaxolone) would have contributed less
23  than 50% to the decline.

24  [22]   To reach the total decline of 10% with 50% of the overall portfolio (excluding diclofenac and
    metaxolone) experiencing a 5.5% price decline and the remaining 50% of the portfolio consisting of
25  diclofenac and metaxolone, the combined diclofenac and metaxolone price decline would be
    approximately 14.5%: (50% x 14.5%) + (50% x 5.5%) = 10%.

26  [23]   Given that the total decline was actually 21%, with 50% of the overall portfolio (excluding
    diclofenac and metaxolone) experiencing a 6% price decline and the remaining 50% of the portfolio
27  consisting of diclofenac and metaxolone, the actual combined diclofenac and metaxolone decline
28  was at least 36%: (50% x 36%) + (50% x 6%) = 21%.

1   revenue decline was primarily due to a $29 million impact of lower volume tied to increased

2   competition.  At that time, defendants admitted that the diclofenac revenue trend had "significantly

3   impacted [Impax's] first . . . quarter results due to double-digit decline in ***both volume and price***."

4   Reasons' explanation for the price decline was particularly misleading; although it may be "typical

5   of generic markets" for prices to decline with the entrance of additional competitors, Reasons'

6   invocation of that maxim combined with Wilkinson's assurance that Impax had "defended share but

7   had to give up a bit of price" left investors with the false impression that Impax had sacrificed price

8   to maintain volume, which also would be typical with the entrance of additional competitors.

9           **2.     May 10, 2016 False and Misleading Statements Regarding**
                    **Diclofenac's Historical Sales Performance**
10

11  364.    When an analyst specifically asked about diclofenac's performance during the

12  May 10, 2016 earnings call, Wilkinson withheld information about its double digit price and volume

13  declines and instead falsely claimed that revenues had stabilized:

    Andrew Finklestein – Susquehanna Capital – Analyst
14

15          Good morning. Thanks very much for taking the question. I was hoping you
        could say a little bit more about what the contribution was from some of the key
16      generic products in the quarter? I know you don't like to give a lot of specific
        number for those. ***But given Solaraze in particular was a big contributor in the***
17      ***dynamics, can you talk a little bit, maybe, how the contribution in Q1 compared the***
        ***Q4 numbers?*** . . . .

18  Fred Wilkinson – Impax Laboratories Inc. – President & CEO

19          I think the way to look at Solaraze is fourth quarter, we were probably a good
        35% to 40% higher in revenue than first quarter. But if you go back and look
20      sequentially, our first quarter looked very much like third quarter of 2015.

21          Fourth quarter of 2015 was a quarter where Sandoz was out both brand and
        generic. You had activists [sic] announcing that they were approved but didn't come.
22      You had the dynamics of the marketplace, everybody kind of looking for product.

23          And there was a lot of product that was moved into the marketplace during
        that quarter to fulfill all the gaps that were out there. ***First quarter probably more***
24      ***normalized.*** And I think if you're a diligent reader of the Q, you should figure out
        that those sales of Solaraze. It was a good contributor for us but down sequentially
25      from fourth quarter ***about on target to what third quarter look like.***

26  365.    The statement above was materially false and misleading because diclofenac revenue

27  had not "normalized." As Impax admitted on August 9, 2016, Q1 diclofenac revenues had declined

28  by $38 million in the first quarter, of which over $9 million was due to pricing declines and

$29 million was due to lower volume tied to increased competition.  This marked a material change in the diclofenac sales trend in which revenue had increased over the previous four quarters and prices had remained stable.  On the Company's August 9, 2016 earnings call, defendants described the material reversal in the diclofenac revenue trend: "While we enjoyed the short-term benefits of [being] the exclusive supplier [during 2015] we are now feeling the effects of an extremely competitive marketplace."  Defendants confirmed that this material adverse trend in diclofenac revenue existed as of the end of 1Q16 and certainly by May 10, 2016, 40 days into 2Q16: "the recent shift in market dynamics significantly impacted *our first and second quarter results due to double-digit decline in both volume and price*."  Indeed, the adverse trend that "significantly impacted" 1Q16 results accelerated into 2Q16.  Diclofenac revenue declined by *90%* in 2Q16, from $50 million to just $5 million in total sales.  Of the massive 2Q16 decline, $18 million was due to pricing declines and $27 million was due to lower volume tied to increased competition.

### 3.      May 10, 2016 False and Misleading Revenue Guidance Statements

366.      During the May 10, 2016 earnings call, Wilkinson also reaffirmed FY 2016 revenue guidance, stating: "This morning we are reaffirming our full-year guidance since we continue to expect that growth in 2016 will be driven by this year's new generic product launches, continued growth from last year's generic product launches, steady growth from the majority of our existing generic line and then growth from our branded portfolio."  Wilkinson further stated, "*[w]e expect revenue growth quarter-over-quarter in order for us to hit . . . our annual guidance*."

367.      Similarly, in the Company's Form 8-K press release filed on the same day, defendants stated, in part:

The Company's full year 2016 financial guidance remains unchanged from when it was issued on February 22, 2016.

\*          \*          \*

- •      Total Company revenues to increase at least 15% over full year 2015.

- •      Adjusted gross margins as a percent of total revenue are expected to be approximately 50%.

368.    In the same Form 8-K press release, Wilkinson stated:  "'We continue to remain confident in our financial outlook for 2016.  The combination of new product launches and increased sales from several of our existing generic and specialty pharma products are expected to drive growth in 2016.'"

369.    The guidance statements above were materially false and misleading because diclofenac was the Company's largest revenue generating product in 2015 and 1Q16, and defendants' statements about projected company-wide revenue growth in 2Q through 4Q16 concealed the extent to which diclofenac revenue was declining.  Impax's diclofenac market share continued to steadily drop throughout 2Q16, eventually reaching 33% by August 2016.  The continued decline could reasonably have been anticipated by defendants as of May 10, 2016.  The lost market share went to new competitors entering the generic diclofenac market, namely Sandoz, Taro, and Actavis. As defendants later admitted during a conference call on August 9, 2016, they were aware of significant competition starting in January 2016:

> *As we entered 2016*, we expected that the authorized generic and the brand would reestablish itself fully during the year and assumed that Allergan would enter the market in the first half of the as the year [sic], as their ANDA had been approved in December.  In mid-to-late May, Sandoz had reentered, Allergan had launched, and Taro had won approval and was entering the market.

370.    By May 10, 2016, defendants had even more evidence confirming their expectations. On the May 10, 2016 earnings call, defendants stated: "We saw Actavis approved but have not seen them in the marketplace.  Taro has now been approved and they are out pre selling.  So, there is some pressure on the product as Sandoz also came back."  Still, defendants falsely assured investors that their guidance accounted for the new competition.

371.    Furthermore, by reaffirming guidance given the 1Q16 financial results, defendants in effect increased guidance for the rest of the year.  The chart below reflects Impax's guidance for 2016 on February 22, 2016, May 10, 2016 and June 21, 2016 and analysts' estimates of quarterly guidance.[24]

---

[24]  Although Impax did not provide express quarterly revenue guidance, analysts calculated quarterly estimates based on defendants' commentary on earnings calls and investor presentations.

|  | 2/22/16 | 5/10/16 | 6/21/16[25] |
|---|---|---|---|
| 2016 revenue guidance ($) | ~$990 million | ~$990 million | $910 million |
| 2016 revenue guidance  (% growth over prior year) | "at least 15%" | "at least 15%" | 6% |
| 2Q-4Q16 revenue guidance/estimate ($) | ~$743 million | ~$764 million | ~$684 million |
| 2Q-4Q16 revenue guidance/estimate (% growth over prior year) | 4% | 7% | **-5%** |
| *Change to guidance*: increase/decrease over previously issued 2Q-4Q16 revenue guidance | N/A | **Guidance raised by 3%** | **Guidance cut by 11%** |

372.    Because of the significant deterioration in diclofenac market share and pricing, the increase in revenue guidance on May 10, 2016 was unrealistic and defendants lacked a reasonable basis for providing it.

373.    Just 42 days later, defendants were forced to admit that diclofenac revenue had not, in fact, "normalized," and that Impax would not meet its increased revenue guidance.  On June 21, 2016, defendants slashed their previously issued 2Q through 4Q16 revenue guidance by $80 million – a decrease of 11% in just six weeks.  In fact, rather than defendants' previous forecast of 7% revenue growth in 2Q-4Q16 (over the same period in 2015), defendants were now forecasting a year over year revenue *decline* of more than 5%.  A June 21, 2016 Leerink Partners LLC analyst report noted the sharp reversal: "*new guidance implies ~8% downside* relative to the current FactSet consensus sales forecast."

374.    The guidance cut was blamed entirely on expected "lower revenues on diclofenac gel and metaxalone as a result of the impact of additional competition occurring during the second quarter."   In fact, the anticipated decline in diclofenac and metaxalone revenue exceeded the $80 million cut from revenue guidance.[26]  Due to its relative size and importance, it was clear to

---

[25]    Impax announced the Teva acquisition on June 21, 2016.  Defendants forecasted that the acquired products would generate $80 million of revenue in 2016 which would offset the $80+ million cut to 2016 revenue guidance due to diclofenac and metaxalone.  For comparison to prior periods, the revenue guidance numbers at June 21, 2016 do not include the impact of the Teva acquisition.

[26]    Defendants attributed the $80 million cut to "[i]mpact of additional competition on diclofenac and metaxalone, partially offset by potential upside on a few base business products."

analysts that the guidance cut was focused on diclofenac.[27] Defendants also emphasized diclofenac as the primary cause, stating "we're obviously disappointed in the recent and rapid change in the diclofenac gel segment as a result of a greater number of competitors."  As described above, however, the same factors affecting diclofenac had already occurred by the end of 1Q16, and certainly no later than May 10, 2016, when defendants raised revenue guidance for the rest of the year.  Indeed, defendants later admitted that the dynamic shift in competition and pricing in the diclofenac market had "significantly impacted" the Company's performance in the first quarter.

375.    The severity of Impax's massive guidance cut, and its timing – just 42 days after Impax raised guidance on May 10, 2016 – provides additional strong evidence that the original guidance statements were knowingly false and misleading and/or made without any reasonable basis.

376.    Analysts expressed their disappointment that defendants had concealed the true picture of the diclofenac market, and its impact on the Company's FY 2016 revenue guidance, just 42 days earlier.  For example, on the June 21, 2016 conference call, a Deutsche Bank analyst stated to defendants: "I think some folks are going to be a little *disappointed* that things on the base [*i.e.*, the company's existing portfolio] are essentially being patched by this [Teva] deal, at least as it relates to 2016.  *You knew the accelerated competitors last call* . . . ."  A JPMorgan analyst questioned why the Company had not already captured the diclofenac competition in the guidance issued on May 10, 2016: "My first one is on guidance, coming back to that.  *Sounds like you knew or had factored in some competition coming in* on some of those key products, trying to understand that."  A JPMorgan analyst report issued the same day noted:  "*Attractive Generics Deal But Underlying Guidance Cut Disappointing*."

4.    **Impax Failed to Disclose Adverse Revenue Trends Regarding Generic Diclofenac in the May 10, 2016 Form 10-Q Financial Statement**

377.    SEC disclosure rules required defendants to disclose these  material adverse trends in Impax's Class Period financials statements.  Importantly, the SEC requires disclosure of material

---

[27]    June 22, 2016 UBS analyst report: "the Teva deal was offset by increased competition for generic Solaraze."  June 27, 2016 Susquehanna analyst report: "Near-term accretion was largely offset by deeper declines in generic Solaraze."

trends and uncertainties to warn investors that past reported financial results are not indicative of future results.  In particular, SEC Release 33-8350 states:

> One of the most important elements necessary to an understanding of a company's performance, and *the extent to which reported financial information is indicative of future results*, is the discussion and analysis of known trends, demands, commitments, events and uncertainties.  Disclosure decisions concerning trends, demands, commitments, events, and uncertainties generally should involve the:
>
> - consideration of financial, operational and other information known to the company;
>
> - identification, based on this information, of *known trends* and uncertainties; and
>
> - assessment of whether these trends and uncertainties will have, or are reasonably likely to have, a material impact on the company's liquidity, capital resources or results of operations.
>
> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.
>
> *          *          *
>
> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain *the likelihood that past performance is indicative of future performance.  Ascertaining this indicative value depends to a significant degree on the quality of disclosure about the facts and circumstances surrounding known material trends and uncertainties* in MD&A.

378.    Likewise, SAB 104 states:

> MD&A requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.  This includes unusual or infrequent transactions, *known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue,* operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.  The Commission stated in FRR 36 that MD&A should "*give investors an opportunity to look at the registrant through the eyes of management* by providing a historical and prospective analysis of the registrant's financial condition and results of operations, *with a particular emphasis on the registrant's prospects for the future*."

379.    In describing adverse trends in revenue, the SEC also explicitly requires disclosures detailing *changes in price and volume that impact reported revenues*.  Item 303 of Reg S-K states:

To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to ***increases in prices or to increases in the volume or amount of goods or services being sold*** or to the introduction of new products or services.

380.    Defendants have acknowledged, in direct correspondence to the SEC, that Impax was required to disclose ***known or anticipated*** trends related specifically to its generic drug pricing and competition.  In late 2016, the SEC reminded the Company that "***recent competitor and pricing activities***" must be considered for disclosure "***as a known trend or uncertainty***" in accordance with Item 303(a) of Regulation S-K.  In the Company's response, defendants acknowledged that future pricing reductions consistent with an "***anticipated or known trend or uncertainty affecting its future operations***" were required to be disclosed.

381.    As alleged herein (*see* §VI.A.-B.1.-3.), after highlighting significant year-over-year increases in diclofenac revenue throughout 2015 and during 1Q16, defendants abruptly changed course and cited rapid deterioration in diclofenac sales as the cause for a significant reduction in 2016 revenue guidance (disclosed on a June 21, 2016 conference call) and also a significant revenue shortfall and inventory write-down in 2Q16 (disclosed on the August 9, 2016 earnings call).  The rapid deterioration in diclofenac revenue was blamed on increased competition and price degradation during the second half of 2Q16.  However, as of May 10, 2016 when Impax issued its Form 10-Q for 1Q16, defendants were already aware of an adverse trend in diclofenac revenue.  This trend reflected current and anticipated increases in competition and price degradation in the generic diclofenac market that could reasonably have been expected to significantly impact the Company's 2Q16 results.  Evidence indicating defendants' awareness of an adverse trend in diclofenac revenue as of May 10, 2016 includes the following:

(a)    Diclofenac was the Company's largest  product, by revenue, in 2015.  FY 2015 sales exceeded $148 million, more than 17% of the Company's total reported revenue.  This spike in revenue was due to a period of market exclusivity.  As the Company subsequently acknowledged, this revenue was unsustainable and, by the beginning of 2016, defendants expected new competitors to enter the market:  "***As we entered 2016***, we expected that the authorized generic and the brand would reestablish itself fully during the year and assumed that Allergan would enter

1    the market in the first half of the as the year [sic], as their ANDA had been approved in December.

2    In mid-to-late May, Sandoz had reentered, Allergan had launched, and Taro had won approval and

3    was entering the market."

4            (b)     Impax had already begun losing significant market share by April 30, 2016

5    and by the time the 1Q Form 10-Q was issued on May 10, 2016, the trajectory of Impax's market

6    share decline had rapidly accelerated.  Diclofenac revenue declined by 90% in 2Q16, from

7    $50 million to just $5 million in total sales.  Of the massive decline, $18 million was due to pricing

8    declines and $27 million was due to lower volume tied to increased competition.  The 1Q16 10-Q

9    was issued on May 10, 2016, 40 days into 2Q16.

10           (c)     Impax's market share continued to steadily drop throughout 2Q, eventually

11   reaching 33% by August 2016.  The continued decline could reasonably have been anticipated by

12   defendants as of May 10, 2016.

13           (d)     The Company subsequently admitted that 1Q diclofenac revenues had

14   declined by $38 million, of which over $9 million was due to pricing declines and $29 million was

15   due to lower volume tied to increased competition.  This marked a material change in the diclofenac

16   sales trend in which revenue had increased over the previous four quarters and prices had remained

17   stable.  Defendants subsequently confirmed that this material adverse trend in diclofenac revenue

18   existed as of the end of 1Q16 and certainly by May 10, 2016, 40 days into 2Q16:  "*the recent shift*

19   *in market dynamics significantly impacted our first* and second *quarter results due to double-digit*

20   *decline in both volume and price*."

21           382.    As described above, SEC disclosure rules required Impax to disclose the adverse

22   diclofenac revenue trend that existed as of May 10, 2016 as an "*anticipated or known trend*

23   *affecting its future operations*" in its 1Q16 Form 10-Q.  In particular, defendants were required to

24   disclose to investors how *past diclofenac performance* (*i.e.*, revenue in FY 2015 and 1Q16) *was not*

25   *indicative of future performance* (*i.e.*, revenue in 2Q16).  Defendants did almost exactly the

26   opposite – misleading investors by indicating that diclofenac revenue had "normalized" in 1Q16.  To

27   further conceal the adverse trend, defendants also made the following misrepresentations as of

28   May 10, 2016:

(a)    Defendants represented to investors that "*[w]e expect revenue growth quarter-over-quarter in order for us to hit . . . our annual guidance*" (*i.e.*, revenue growth of 15%). The fact that 2016 revenue guidance was reaffirmed despite an approximate $22 million revenue shortfall in 1Q16 indicated that revenue growth would significantly accelerate over the remainder of FY 2016.  Because diclofenac was the Company's largest revenue generating product in FY 2015 and among the largest in 1Q16, defendants' statements about projected Company-wide revenue growth in 2Q and FY 2016 concealed the extent to which diclofenac revenue was declining.

(b)    Defendants concealed the decline in  diclofenac sales volume.  Defendants briefly discussed the impact of price declines on the decline in diclofenac sales, but concealed the larger driver of the decline in diclofenac sales – lower sales *volume*.  In doing so, defendants explicitly violated SEC disclosure rules requiring a "discussion of the extent to which [revenue decreases] are attributable to *[decreases] in the volume or amount of goods or services being sold*."  Three months later, defendants revealed that in 1Q16, the $38 million diclofenac revenue decline was primarily due to a $29 million impact of lower volume tied to increased competition. Defendants admitted for the first time that diclofenac revenue trend "significantly impacted our first quarter results due to *double-digit decline in both volume and price*."

383.    Based on defendants' numerous misrepresentations, analysts were misled as to the adverse trends in diclofenac revenue, volume, and pricing that existed as of May 10, 2016.  For example, a May 11, 2016 Susquehanna report stated: "Solaraze [diclofenac] Declines Manageable . . .  We now forecast $130mln this year and $50mln next year.*"* Likewise a May 10, 2016 UBS report maintained a 2Q16 estimate for diclofenac revenue of $35 million.  Dozens of other analysts highlighted the fact that the Company reaffirmed its FY 2016 guidance of  at least 15% revenue growth over FY 2015.

384.    On June 21, 2016, however, defendants belatedly told investors that diclofenac revenue had not, in fact, normalized.  The Company adjusted its FY 2016 revenue guidance and blamed it on the expected impact of new competition on diclofenac.  As described above, defendants were aware of current and anticipated increases in competition in the diclofenac market on May 10, 2016.  Thus, the exact same adverse trend in diclofenac revenue that triggered the significant

1    reduction to FY 2016 revenue guidance on June 21, 2016 already existed and was known by

2    defendants 22 days earlier on May 10, 2016.  Defendants failed to disclose this adverse trend to

3    investors, in violation of SEC disclosure rules.

### 5.    Defendants Sought Financing for an Acquisition

5        385.    Defendants understated the true state of pricing erosion and concealed the volume

6    decline on May 10, 2016 in order to inflate revenue and earnings in the first quarter.  Defendants

7    needed to delay the announcement of any negative news or trends affecting earnings until after the

8    second quarter because Impax was in the midst of negotiating a $580 million acquisition of Teva and

9    Allergan's generic products portfolio and the necessary financing for the deal.  On June 21, 2016,

10   Impax announced the acquisition and the Company's plan to borrow $400 million to finance the

11   purchase.  In its announcement presentation, Impax represented to its lenders and investors that net

12   debt level after taking the Company's overall debt level to $1 billion was 2.1 times the last twelve

13   months' earnings (EBITDA):

## Well-Positioned Capital Structure Post-Acquisition

**Significant Financial Resources and Flexibility to Support Growth**

| Estimated Capitalization | | Leverage | |
|---|---|---|---|
| ($ millions) | | Net Debt | $ 774 |
| Cash and Cash Equivalents – March 31, 2016 | $ 412 | Net Debt / LTM Adjusted EBITDA | 2.1x |
| Less cash used for acquisition | $ 186 | | |

| | |
|---|---|
| Revolver ($100) | $ 0 |
| 2022 Convertible Senior Notes | $ 600 |
| Term Loan | $ 400 |
| Total Debt | $ 1,000 |

23       386.    As such, Impax had to delay the announcement of the true severity of the effects of

24   price erosion on its portfolio and diclofenac/metaxolone until August 9, 2016 – after the closing of

25   the acquisition.  On August 9, 2016, a week after the acquisition's closing, Impax revealed that the

26   steep negative price trends of diclofenac and metaxolone led to a $15 million shelf-stock adjustments

27   hit to earnings, which was taken to reimburse customers for products that were bought at higher

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                    - 160 -

1    prices but were still on their shelves.  The Company also disclosed for the first time that its overall

2    generic portfolio suffered price declines of 13% in 4Q15, 21% in 1Q16, and 19% in 2Q16.  The

3    earnings hit, along with the continual adverse revenues and pricing trends could have jeopardized the

4    debt financing and/or negatively affected its terms if announced prior to the consummation of the

5    transaction.

6        **C.    Diclofenac False and Misleading Statements and Omissions on
                  June 21, 2016**

7

8        387.    On June 21, 2016, Impax hosted a conference call announcing the acquisition of

9    generic products from Teva and Allergan.  Wilkinson and Reasons participated in the call.

10       388.    During the call, the Company adjusted its 2016 revenue guidance.  Reasons blamed it

11   on expected "lower revenues on diclofenac gel and metaxalone as a result of the impact of additional

12   competition occurring during the second quarter."  He further added:  "we're obviously disappointed

13   in the recent and rapid change in the diclofenac gel segment as a result of a greater number of

14   competitors."

15       389.    ***First***, the statements were materially misleading and incomplete because, despite the

16   adjustment to the 2016 annual revenue guidance on June 21, 2016, defendants continued to conceal

17   the true extent that erosion of diclofenac pricing and market share loss had on Impax's second

18   quarter which ended just nine days later.  As a result of defendants' omission, the market was

19   unaware of the full extent of deterioration and also was led to believe that deterioration of diclofenac

20   revenue had been fully accounted for in the Company's revised guidance.  On August 9, 2016,

21   Impax announced revenue that fell far short of its projections: generic division revenues were down

22   $53 million, primarily due to diclofenac.  The Company also took a significant writedown on the

23   value of existing diclofenac inventory on its customers' shelves. This writedown, known as a "shelf-

24   stock adjustment" credited customers for the difference between the original sales price and the

25   revised lower sales price.  Defendants also presented significant details on the adverse diclofenac

26   revenue trend for the first time, revealing that the revenue and pricing trends had markedly declined

27   beginning in 1Q16.

28

390.   **Second**, the statements above were materially false and misleading because, despite the fact that 2Q16 was 90% complete, with the quarter ending just nine days later, defendants concealed that the Company would be forced to record a massive $15 million charge in 2Q16 to compensate Impax customers who had purchased diclofenac during the quarter at inflated prices that had since collapsed by as much as 60%.  As a result of the charge, which reversed out revenue previously booked during the quarter, Impax's 2Q revenue fell materially short of  projections.  Defendants' failure to disclose the diclofenac charge was a blatant omission of material fact on June 21, 2016.   The impact of the omission was clear: analysts had been led to believe the deterioration in generic revenue, and diclofenac revenue in particular, had been appropriately accounted for in the Company's revised guidance on June 21, 2016.  For example, a June 21, 2016 Leerink report  noted the base business (*i.e.*, Impax's existing portfolio of generic and branded drugs) had stabilized:  "[Teva] Deal offsets erosion of base biz, which mgmt believes has *stabilized*."

391.   The following evidence creates a strong inference that defendants were aware of or recklessly disregarded the $15 million diclofenac shelf stock adjustment on June 21, 2016 but concealed it from investors:

392.   **First**, the pricing erosion that led to the shelf stock adjustment occurred prior to June 30, 2016.  Defendants have admitted "during the second quarter of 2016, the Company recorded shelf-stock adjustments totaling $15.0 million on diclofenac sodium gel and metaxalone as a result of a *decline in price during the current year [three month period ended June 30]*."  The fact that the second quarter was 90% complete as of June 21, 2016 is strong evidence that the pricing erosion had already occurred and was known by defendants on June 21, 2016.

393.   **Second**, the competition that led to the pricing decline was absolutely known prior to June 21, 2016.  Defendants subsequently acknowledged, during Impax's 2Q16 earnings call on August 9, 2016, "*the rapid . . . decrease in sales, volume, price, and share for this product*," and presented the following slide which shows that the significant loss in market share, due to competition, began well before June 21, 2016.



394.  **Third**, defendants were aware that Impax customers were holding significant inventory of diclofenac as of June 21, 2016.  Defendants later claimed: "*We got caught with this one on Solaraze* simply because of the choppiness of the market."  Defendants further explained the excess customer inventory:

> [T]he dynamics on that one is that we *did see* the customers acquiring product, because they were unsure of supply.  And I think that's their process that they generally do when they look at a marketplace that has been fairly turbulent.  So making sure that they have got supply for their customers is a critical piece. . . . [The wholesaler customers] had prepared for kind of choppy supply position and end up resulting with a little excess supply out there.

395.  **Fourth**, defendants were aware that, because of the factors above, Impax was "obligated" to provide the shelf stock adjustment to its customers.  In its SEC filings defendants acknowledge:

> [W]e give our customers credits on our generic products that our customers hold in inventory after we have decreased the market prices of the same generic products due to competitive pricing.  Therefore, if new competitors enter the marketplace and significantly lower the prices of any of their competing products, we would likely reduce the price of our product.  *As a result, we would be obligated to provide credits to our customers who are then holding inventories of such products,* which could reduce sales revenue and gross margin for the period the credit is provided.

396.  Analysts were shocked that defendants had concealed the extent of the deterioration in diclofenac just weeks earlier.  For example, an August 9, 2016 Piper Jaffray analyst report noted: "Given that IPXL provided guidance following the announcement of the acquisition of Teva/Actavis generic assets [on June 21, 2016], *we find it hard to fathom how it could not have foreseen or known how conditions surrounding key products would further deteriorate*."  The Piper Jaffray



1   report also noted: "*We are deeply disappointed that [Impax] was slow in recognizing and*

2   *communicating the extent of the competitive pressures on its key assets, at a minimum because it*

3   *damages the credibility of a senior management team* . . . ."

4       397.    On August 9, 2016, Impax's stock price fell $7.16, or 23.4%, on nearly 12 times the

5   prior week's average trading volume.  In contrast, the S&P 500 was flat.

6   **VII.    IMPAX MISLED INVESTORS BY CONCEALING THE IMPACT OF
        COMPETITION AND PRICE EROSION ON BUDESONIDE AND**

7   **        FAILING TO TIMELY WRITE DOWN THE RESULTING IMPAIRMENT
        ON THE BASKET OF DRUGS IMPAX PURCHASED FROM TEVA AND**

8   **        ALLERGAN**

9       398.    On June 21, 2016, Impax announced that the Company had "agreed to acquire a

10   portfolio of 18 marketed and pipeline products across multiple dosage forms" that Teva was

11   divesting as part of its acquisition of Allergan's subsidiary, Actavis Generics.  Impax agreed to pay

12   $586 million for the portfolio.  Prior to Teva's acquisition of Actavis, the generic drugs Impax

13   agreed to buy, and a number of others, were sold by both Allergan and Teva.  The FTC ruled that

14   "[t]he effects of the Acquisition, if consummated, may be to substantially lessen competition in

15   violation of Section 7 of the Clayton Act," for a number of drugs, by, among other things,

16   "eliminating actual, direct, and substantial competition between Teva and Allergan and reducing the

17   number of independent, significant competitors in the markets," and "eliminating future competition

18   between Teva and Allergan and reducing the number of likely future competitors in the markets."

19   Thus, Teva was required by the FTC to divest the drugs Impax (and others) ultimately purchased in

20   connection with Teva's $40.5 billion acquisition of Allergan's generic pharmaceutical business.

21       399.    Both Teva and Allergan manufactured budesonide.[28]  Impax purchased the

22   budesonide manufactured by Allergan during Teva's divestiture.

23       **A.    Budesonide False and Misleading Statements and Omissions on
        June 21, 2016**

24

25       400.    On June 21, 2016, Impax did not identify the drugs it was buying from Teva and

26   Allergan, but Wilkinson told investors that the basket of drugs Impax had agreed to acquire was

27   "made up primarily of difficult-to-manufacture or *limited-competition products*."  Wilkinson also

---

28   [28]  Budesonide is the generic name of the branded drug Pulmicort.

1  told investors, "[t]his transaction is immediately accretive to earnings per share and diversifies our

2  revenue base with minimal incremental operational expenses."  According to Wilkinson: "The 15

3  marketed products generated approximately $150 million in revenue and approximately $100 million

4  in gross profit in 2015 for Teva or Allergan.  Once incorporated into our commercial product line,

5  we expect the addition of these products will fully offset the revenue decline from the increased

6  competition we are now facing on our diclofenac sodium gel and metaxalone products."  Reasons

7  was similarly bullish: "This transaction is immediately accretive and provides a significant boost to

8  our 2016 earnings."

9       401.   During the question and answer portion of the call, Wilkinson doubled down on his

10  assertion that the drugs Impax agreed to buy were uniquely resistant to competitive forces:

11       Jason Gerberry – Leerink Partners – Analyst

12           . . . Are those products limited competition because of some IP barrier,
        manufacturing or difficult to demonstrate bio-equivalence?
13

14       Fred Wilkinson – Impax Laboratories Inc. – President & CEO

15           I think the answer to that is yes.  It's all of those.

16                                    *       *       *

17           Probably each of them has their own story.  Some of them it's IP, some of it,
        it's just limited supply position, some of it hard to make, some of it some bio-
18       equivalence guide.

19       402.   Later in the call, Wilkinson reiterated, "[s]o these products are by nature low-

20  competition products."  One analyst asked whether there were "any material changes with this

21  product portfolio from last year to this year at all?"  Wilkinson responded: "*No*. . . .  There's been

22  some shift in share and some other things that have gone on but ***nothing that's substantial***.  That's

23  why we guided to this; that's why we showed you those numbers."

24       403.   The statements above were materially false and misleading for several reasons:

25           (a)    First, the purchase was not a diverse mix of generic drugs.  Instead,

26  budesonide made up approximately ***67%*** of the "$150 million in revenue and approximately

27  $100 million in gross profit in 2015 for Teva or Allergan."

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                      - 165 -

1    (b)    Second, contrary to defendants' repeated representations, budesonide was not

2  a "low-competition product[]" or "limited-competition product[]."  Indeed, on November 9, 2016,

3  just one quarter after the acquisition, defendants were forced to take a massive $251 million

4  intangible asset impairment charge – nearly half the total purchase price.  The charge was triggered

5  primarily by increased competition, key customer pricing concessions, and significant price

6  degradation on budesonide.[29]

7    (c)    Third, Wilkinson's response of "no" and "nothing that's substantial" to

8  analyst's question on whether there were "any material changes with this product portfolio from last

9  year to this year at all" was materially false and misleading as defendants later admitted that they had

10  seen a new competitor's entry at the "end of May, early June."  On June 14, 2016 – days before the

11  June 21, 2016 earnings call – Nephron announced that it had entered the generic budesonide

12  market.[30]  Defendants later cited Nephron's entry as a key factor in the budesonide impairment.  At a

13  November 2016 investor presentation, defendants acknowledged that Nephron's entry as a new

14  competitor was so significant that Impax had to reprice the entire Teva/Allergan acquisition.

15  Defendants stated: "When we looked at it, if you remember, the competitor for budesonide, ***the***

16  ***fourth competitor that came into the marketplace, happened in the end of May, early June***.  ***We***

17  ***actually repriced the deal with Teva***.  So we had a price that had Pulmicort [budesonide] with 'x'

18  number of competitors who is now x+1.  And so we repriced what our acquisition price for that

19  product would be and brought it down a little bit."

20

21

22

23  [29]  On the 3Q earnings call, defendants attributed the majority of the impairment to budesonide:
    "The impairment charge was driven by higher value applied to a few of the large revenue products

24  such as budesonide, inhalation suspension, and propranolol tablets"; "[t]he impairment charge was
    driven by . . . a few of the large revenue products such as ***budesonide***, inhalation suspension, and

25  propranolol tablets"; "[h]eavily concentrated on a handful [of acquired drugs].  It was not all 15
    [acquired drugs]. . . .  I think it was really focused on ***budesonide***."

26  [30]  Press Release, Nephron Pharmaceuticals Corp., *Nephron Pharmaceuticals Corporation*

27  *Launches Generic Budesonide Inhalation Suspension* (June 14, 2016), http://www.prnewswire.com/
    news-releases/nephron-pharmaceuticals-corporation-launches-generic-budesonide-inhalation-

28  suspension-300284345.html.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                    - 166 -

**B.    Budesonide False and Misleading Statements and Omissions on August 9, 2016 and September 14, 2016**

404.    On August 9, 2016, defendants held a conference call to address, *inter alia*, the Teva transaction involving Budesonide.  During the call, Wilkinson and Reasons again painted a bullish picture of the transaction:

Fred Wilkinson – Impax laboratories Inc. – President & CEO

\*        \*        \*

***Many of these products have growth potential, and we're especially pleased to be adding Budesonide***, Desmopressin, Dexmethylphenidate, and Propranolol to our generic offerings.  This portfolio has an attractive margin profile and complements our current product line.

\*        \*        \*

***We're approximately a 20% share position in the market and are obviously looking to build on that share*** and work this market as if it's a new product launch for us.  Excited about this space and excited about the product.  The patents do go out to 2019.  We've seen no other people or filers, so we think that the market is pretty well-established, but we will be paying close attention to that.

\*        \*        \*

Sumant Kulkarni – BofA Merrill Lynch – Analyst

\*        \*        \*

First on generic side assuming you have the revenue Outlook range right now, how derisked is your gross margin profile especially given that Pulmacort [respules] generic is facing more competition and Adderall XR you're trying to get more share, which I assume means taking some price?

[Wilkinson:] Yes, great question, obviously that mix between share and price that you're always evaluate as you entertain opportunities with customers.  We believe that ***both of those products have significant room to be able to absorb any kind of price alteration and adjustments***.

***It was built into our model as we did the acquisition – final acquisition process from Teva.***

\*        \*        \*

Bryan Reasons – Impax Laboratories Inc. – CFO

. . . [W]e typically don't give projected operating cash flows.  But clearly bringing the Teva products in ***really helps not only the margin, but the operating cash flows as well***.

405.     Also on the call, Wilkinson identified budesonide as "the largest product in the mix" and acknowledged that a new competitor had recently joined the budesonide market, but assured investors that Impax had anticipated the change and accounted for it with an adjustment to the purchase price:

> It actually is one of the more interesting ones to us. ***It is moving from a three-competitor markets to a four-competitor market, one that we anticipated as we went through the acquisition process.***
>
> ***And it was actually an adjustment in the economics related the acquisition as a result of that***. Nephron did just introduce a product into the marketplace, and that product came from the Apotex file that was in the marketplace years ago, was removed and between the two of them they spent years trying to fix that file and make sure they could get it there.

406.     Wilkinson continued to tout the Teva purchase on September 14, 2016, assuring investors that "***[t]he integration of it went extremely well*** because it's products, not people.  Things usually go easier when you do that."

407.     The statements above were material false and misleading for several reasons.

408.     ***First***, defendants knew when they spoke on August 9, 2016 and September 14, 2016, that the budesonide product it had purchased was already subject to increased competition, key customer pricing concessions, and severe price degradation.  These exact same factors led to the $251 million intangible asset impairment charge within one quarter after the acquisition, despite Wilkinson's assurance that budesonide has "significant room to be able to absorb any kind of price alteration and adjustments.  It was built into our model as we did the acquisition – final acquisition process from Teva."

409.     ***Second***, defendants assurance to investors that Nephron's entry had been "anticipated" by Impax and accounted for through "an adjustment in the economics related to the acquisition," was false and misleading when made.  As defendants later admitted on the November 9, 2016 earnings call the impact of Nephron's entry into the market – which defendants later blamed for wiping out nearly all of budesonide's value – was apparent at the time of acquisition: "budesonide . . . had a new competitor.  If you've watched almost all of the competitors in there, share has not shifted, so we did not give up much to the new competitor; but ***all of us had to***

1  *defend with price.  **That was happening to us at the time that the product was acquired**.*"[31]

2  Defendants again admitted during a November 29, 2016 investor presentation that Nephron's

3  presence impacted sales from the start:  "***When the deal closed***, you're in the process of converting

4  all of the business that we acquired from Teva Allergan over to, now, an Impax contract.  That

5  provided the opportunity for two things to happen – customers to work us a little bit and for

6  competitors to try to steal some share.  And in this case, ***you had a brand-new competitor coming***

7  ***into the marketplace that had no share position at all***."

8       410.  ***Third***, on August 3, 2016, Teva announced that it had agreed to acquire Anda, Inc.

9  ("Anda") from Allergan.[32]  Anda was the 4th largest distributor of generic pharmaceuticals in the

10  U.S.   And, as Allergan disclosed in SEC filings, "[t]he Anda Distribution segment includes

11  distribution of generic and branded pharmaceutical products manufactured by third parties, as well

12  as by [Allergan]."  Indeed, when budesonide was launched around February 18, 2015, Actavis' chief

13  operations officer stated that Anda was the wholesale distributor for the drug: "I will use the

14  Pulmicort example . . . one of the values of Anda is that we can rapidly launch products.  We can get

15  product to store door next day and that matters when you are in a competitive generic market like we

16  are in."  Because Teva also manufactured a generic budesonide product, the sale of Anda to Teva

17  was a major event – it meant that one of Impax's largest potential customers was captive to its

18  largest competitor.  In fact, on September 9, 2016, Olafsson – Teva's President and CEO of Global

19  Generics – stated that he will use Anda to provide pharmacies with "better access to the Teva

20  medicines."

21       411.  The timing of Teva's acquisition of Anda was material.  The terms of the Impax

22  acquisition transaction gave Impax the right to contact Actavis's budesonide customers and any

23  prospective customers prior to the close of the acquisition to promote its budesonide product:

24  Specifically, the Asset Purchase Agreement (executed on 6/20/2016 and filed with the SEC on

25  8/9/2016) stated:  SECTION 7.6(d)  "On or after the date that is [****] prior to the Closing

26  ――――――――――――――――――――
[31]  The $586 million purchase price never changed between June 21, 2016 and August 9, 2016.

27  [32]  Press Release, Teva Pharmaceuticals Indus. Ltd., *Teva Announces Acquisition of Anda Inc.* (Aug. 3,

28  2016), http://www.tevapharm.com/news/teva_announces_acquisition_of_anda_inc_08_16.aspx.

1    Date . . . .Buyer may contact the Customers and prospective customers to promote the Products and

2    the distribution thereof."[33]  Thus, it is reasonable to infer that Impax had contacted Anda, a major

3    budesonide customer, prior to the acquisition.  Budesonide projections based on those contacts

4    would have been significantly and negatively affected by Teva's acquisition of Anda immediately

5    after Impax closed on its acquisition of budesonide.

6        412.    Notably, the terms of the acquisition transaction expressly allowed Teva to compete

7    directly with Impax on the generic drugs Impax was purchasing.  Specifically, the Asset Purchase

8    Agreement stated:

9        SECTION 7.5.  Competition (a) The parties hereto agree and acknowledge that the
         provisions of this Agreement will not be construed to limit or restrict in any manner
10       the right of Seller or any of its Affiliates to develop, manufacture, use, sell or
         commercialize in any manner any pharmaceutical product, including any product
11       competitive with the Products [*i.e.*, including budesonide] if sold under a Product
         ANDA or other filing that is not being purchased by Buyer as part of the Transferred
12       Assets hereunder, either in the Territory or outside of the Territory.

13   Thus, after the deal closed, Teva was free to market its own budesonide to Anda – a company it

14   owned.

15       413.    Defendants later cited customer (*i.e.*, distributor) action as a key factor in the

16   budesonide impairment.  In the 3Q16 Form 10-Q, defendants blamed the impairment charge

17   primarily on "price concessions . . . in order to retain **key customers**."  On the 3Q earnings call,

18   defendants stated: "In order to maintain our share position, ***significant price concessions were***

19   ***necessary on certain products in order to retain the business with a few of our key customers***."

20   Likewise, at a November 2016 investor presentation, when asked about the budesonide impairment

21   charge, defendants acknowledged  "[w]hen the deal closed, you're in the process of converting all of

22   the business that we acquired from Teva Allergan over to, now, an Impax contract.  That provided

23   the opportunity for two things to happen – ***customers to work us a little bit*** and for competitors to try

24   to steal some share."

25

26

27   _____
     [33]   The precise date on which Impax was allowed to contact the customers is redacted in the
     publicly-filed agreement; however, that date was "prior to the Closing Date," which was August 3,
28   2016.

414.     Given Wilkinson's prior role as President of Actavis' Specialty Brand Division, he knew of the severe impact that Teva's acquisition of Anda would have on his acquired drug portfolio.  During Wilkinson's tenure at Actavis, Anda served as the wholesale distributor for his Specialty Brand Division.  Also, immediately prior to his move to Impax, Wilkinson participated in Actavis conference calls where his boss and colleagues touted Anda's client reach, capabilities, and value in the wholesale distribution of Actavis' generic drugs:

- May 20, 2013, Bisaro (Actavis CEO):  "And we will continue to use our Anda Distribution business as a strategic asset to support both our Actavis Pharma and our Actavis Specialty Brands business."

- January 31, 2014, Olafsson (President of Actavis Pharma):  "So CVS/Cardinal, Walgreens/ABC and the Econdisc are roughly the same size. McKesson comes then number four, Wal-Mart, Rite Aid, Anda and others. So those are overall the top seven companies are about 85% of our business."

- January 31, 2014, Stewart (President of Global Operations):  "This may look like your cell phone coverage map, but it's not. It's our Anda distribution network. . . . Anda has shipped [to] locations of over 60,000 accounts around the US, 85% of pharmacies ordered product from Anda last year at some point in time. . . .  And Anda is the fourth largest distributor of generic products within the US and they do a fantastic job with launches and things like that."

- January 31, 2014, Bisaro (Actavis CEO):  "We love Anda. We love the business. It is a major contributor to our overall profitability.  Not only are we able to touch over 60,000 customers, 85% of the pharmacies, we have the ability to put our products through that asset and that is a very valuable asset for us."

415.     Defendants had a duty to disclose the impact of this key development.  Defendants spent significant time on the August 9, 2016 call touting the success of Impax's Teva drug purchase (the "portfolio has an attractive margin profile") and specifically called out budesonide multiple times ("we're especially pleased to be adding Budesonide," "Budesonide, is the largest product in the mix").  In September, defendants assured investors that integration of the acquisition had been a success.  However, defendants said nothing about the capture of their key budesonide customer by Impax's top competitor – *the same company that sold Impax the impaired product* – or its devastating impact on the Company's budesonide profits.

416.     *Fourth*, Impax knew the precise level of pricing degradation in Actavis's generic budesonide product as of August 2016 through Actavis Stock Keeping Unit ("SKU") pricing data

available to it pursuant to the Asset Purchase Agreement.  Defendants later recognized the pricing data as another key factor in the budesonide impairment.  At the November 2016 investor presentation, defendants blamed limited visibility into the SKU pricing data prior to the acquisition as a reason why the pricing degradation was not recognized earlier, falsely claiming: "*[W]hat happened during the process, obviously, we don't see pricing.  You just see market pricing until right as the deal closed*.  When the deal closed, you're in the process of converting all of the business that we acquired from Teva Allergan over to, now, an Impax contract."

417.    This excuse directly contradicts Impax's prior claims on the June 21 call that its pricing was based on significant and thorough due diligence.  Indeed, when asked how Impax arrived at the price it agreed to pay, Reasons assured investors that "we obviously did a bunch of due diligence, studied carefully *all the data we could* on the competitive landscape and where we think each product was going.  And then based on that, modeled out a range of value.  And based on that, came up with our proposed purchase price that we negotiated."  Likewise, Wilkinson stated, "we have individual valuations on not only the basket of products but each of the individual products that come with it."

418.    "[A]ll the data" Impax "could" study included SKU pricing from Actavis.  The Asset Purchase Agreement governing the deal required Actavis to provide this data to Impax prior to closing the acquisition.  Specifically, the Asset Purchase Agreement stated:  SECTION 7.6(a) "On the Effective Date, *Seller shall deliver to Buyer quarterly net sales data by SKU . . . for the previous six (6) month period*."  SECTION 7.6(c) "On or before the date that is [****] prior to the Closing Date, *Seller shall deliver to Buyer a report setting forth (i) the monthly sold units per SKU by Customer for the Products* (as calculated by Seller in accordance with its standard practice) *for the previous six (6) month period and (ii) the current Net Price after all discounts by SKU by Customer*."[34]

419.    The FTC also established an absolute deadline of July 27, 2016 for Teva and Actavis to provide pricing information to Impax.  In its Order to Maintain Assets issued to Teva and

---

[34]    Again, the exact date the report was to be delivered is redacted in the publicly-filed contract but it was "prior to" the August 3, 2016 Closing Date.

1    Allergan, the FTC required that both parties, by no later than July 27, 2016, to provide to Impax

2    "current net price per SKU or NDC Number, *i.e.* the final price per SKU or NDC Number . . . net of

3    all customer-level discounts, rebates, or promotions, for that Divestiture Product, as of five (5)

4    business days or less prior to the date this Order to Maintain Assets is issued" for each "High

5    Volume Account."  High Volume Account was defined as the top 20 buyers of each generic drug.

6         420.    Teva, in managing the asset divestiture process and in an effort to avoid delays in

7    closing the Actavis acquisition, announced that it had signed Confidential Disclosure Agreements

8    with "companies that want to buy any divestiture" as early as October 29, 2015 – over nine months

9    prior to Impax's asset purchase.  By February 11, 2016, Teva announced that it was "working

10   closely with four to five potential buyers in divesting necessary assets."  The five buyers that

11   purchased the bulk of the divested assets were Impax, Mayne, Dr. Reddy's, Sagent, and Cipra.

12   Indeed, Reasons admitted to investors on March 7, 2016 that "we are looking at divestitures that

13   might come along as part of [the] mergers."  On May 10, 2016, Wilkinson confirmed that Impax was

14   participating in the Teva divestiture by stating Teva "reported yesterday . . . and they gave a pretty

15   good update on their divestiture process.  Obviously, we are in the process."  As such, Impax was

16   receiving confidential business disclosures on budesonide throughout the nine-month due diligence

17   process.  The Company had received "all data" that enabled it to "model[] out a range of value,"

18   including pricing information.

19        421.    *Fifth*, the largest budesonide seller, Teva, had cited increased competition for

20   budesonide as a cause of weakening revenues in May and August 2016.  On May 9, 2016, Teva

21   blamed 1Q16 weakness on competition in budesonide:  "The sales decrease in the United States, as

22   you can see from the geographical mix, was driven by the generics segment, mostly due to ***loss of***

23   ***exclusivity*** of esomeprazole and ***budesonide***."  As Teva acknowledged, that competition accelerated

24   in the second quarter.  On August 4, 2016, Teva stated:  "Revenues of our US generics business was

25   impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide. . . . I think on the US

26   side, clearly the impact we highlighted, the impact of having a ***competition*** on Aripiprazole,

27   Esomeprazole, and ***Budesonide was very, very significant***."

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
4:16-cv-06557-HSG                                                                    - 173 -

422.     On November 9, 2016, just one quarter after the acquisition, defendants were forced to take a massive $251 million intangible asset impairment charge – nearly half the total purchase price.  The charge was triggered primarily by increased competition, key customer pricing concessions, and significant price degradation on budesonide.  Defendants knew when they spoke on June 21, 2016, August 9, 2016 and September 14, 2016, that the budesonide product it had purchased was already subject to increased competition, key customer pricing concessions, and severe price degradation.  Thus, the exact same factors that triggered the massive impairment charge in 3Q16 were already known by defendants as of June 21, 2016.

423.     In addition to the above statements, Impax's Form 10-Q for 2Q16, filed with the SEC on August 9, 2016, was materially false and misleading because (1) Impax failed to timely record impairment charges on budesonide, in violation of GAAP; and (2) Impax failed to disclose adverse revenue trends regarding budesonide, in violation of SEC disclosure rules, as described at §§VII.C.-D. below.

C.     **Impax Failed to Timely Record Impairment Charges on Budesonide in Violation of GAAP**

424.     As detailed herein, on August 3, 2016 Impax paid $586 million to acquire 18 generic drugs from Teva/Allergan.  The primary generic drug acquired in the transaction was budesonide.

425.     GAAP[35] required Impax to allocate the purchase price for the Teva transaction based upon the estimated fair value of the assets acquired.  Defendants allocated the majority of the purchase price to "Marketed product rights" which were finite-lived intangible assets in accordance with Financial Accounting Standards Board  Accounting Standards Codification 350, *Intangibles – Goodwill and Other Intangibles* ("ASC 350").  Following the acquisition, Impax was required to regularly test the finite-lived intangible assets for impairment in accordance with Financial Accounting Standards Board  Accounting Standards Codification 360-10, *Impairment and Disposal of Long-Lived Assets* ("ASC 360").  In its 2016 10-K Impax stated:

---

[35]   GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.

We regularly evaluate and will continue to regularly evaluate whether events or circumstances have occurred to indicate all, or a portion, of the carrying amount of intangible assets . . . may no longer be recoverable, in which case an impairment charge to earnings would become necessary.

\*        \*        \*

Finite lived intangible assets, consisting of marketed product rights . . .are tested for impairment when events or changes in circumstances indicate that the carrying value of the asset may not be recoverable. . . .  We recognize an impairment loss when and to the extent that the estimated fair value of an intangible asset is less than its carrying value.

426.    ASC 360 provides examples of events or changes in circumstances that management should consider when assessing whether an intangible asset should be tested for impairment. According to the PriceWaterhouseCoopers pharmaceuticals accounting guide, management of pharmaceutical and life sciences entities should also consider other industry-specific indicators including the development of a competing drug.[36]

427.    Impax failed to timely recognize the impairment of the intangible assets acquired in the Teva transaction.  As a result, Impax's 2Q16 and 3Q16 financial statements were materially misstated and in violation of GAAP.

428.    In its 3Q16 results, issued on November 9, 2016, defendants disclosed the massive $251 million intangible asset impairment charge which was triggered, primarily, by lower than expected future cash flows on its generic budesonide product.  The decline in expected future budesonide revenues was blamed on  increased competition, key customer pricing concessions, and significant price degradation.  In its 3Q16 Form 10-Q, the Company stated:

Upon closing the Teva Transaction on August 3, 2016, the Company initiated the process of transferring and securing Teva's and Allergan's customers for the acquired products to its account. *The Company assumed certain price concessions would occur* following the closing, however, the Company elected to take *additional price reductions on certain of the acquired products* in order to retain key customers. *These reductions produced significantly lower than expected operating cash flows from the Acquired Product Lines and triggered an impairment analysis. The Company's impairment analysis resulted in the recognition of a total $251.0 million non-cash impairment charge to earnings*.[37]

---

[36]    US GAAP – Issues and solutions for the pharmaceuticals and life sciences industries; PriceWaterhouseCoopers (Mar. 2017).

[37]    On the 3Q earnings call, defendants attributed the majority of the impairment to budesonide: "The impairment charge was driven by higher value applied to a few of the large revenue products

429.   As alleged herein,  three months earlier, on August 9, 2016 when Impax issued its Form 10-Q for 2Q16, defendants were already aware of increased competition, the need for key customer pricing concessions, and severe price degradation in the budesonide market.  Thus, the exact same factors that triggered a massive impairment charge in 3Q16 were already known by defendants as of August 9, 2016.  As set forth in §VII.A.-B., evidence that these impairment triggers existed prior to August 9, 2016 included:

(a)   On June 14, 2016, a new competitor, Nephron, had entered the generic budesonide market.  Defendants acknowledged at a November 2016 investor presentation that Nephron entering the budesonide market as a new competitor "in the end of May, early June" was so significant that Impax had to reprice the entire Teva/Allergan acquisition.

(b)   On August 3, 2016, Teva announced that it had agreed to acquire Anda from Allergan/Actavis.  The sale of Anda to Teva was a major event.

(c)   The SKU level pricing data available directly from Actavis before August 9, 2016 indicated pricing degradation in Actavis's generic budesonide product (which Impax acquired) as of August 2016.  Defendants told investors they considered all available data, and later recognized the pricing data as a key factor in the budesonide impairment.  After taking the write-down, defendants blamed limited visibility into the SKU pricing data prior to the acquisition as a reason why the pricing degradation was not recognized earlier.  But, according to the Asset Purchase Agreement and pursuant to the FTC's order, Impax did have access to the SKU level pricing data from Actavis prior to closing the acquisition.

(d)   Teva, the largest budesonide seller, had cited increased competition for budesonide as a cause of weakening revenues in May and August 2016.  On May 9, 2016, Teva blamed 1Q weakness on competition in budesonide: "The sales decrease in the United States, as you can see from the geographical mix, was driven by the generics segment, mostly due to *loss of exclusivity* of esomeprazole and *budesonide*."  On August 4, 2016, Teva blamed 2Q weakness on

such as budesonide, inhalation suspension, and propranolol tablets"; "[t]he impairment charge was driven by . . . a few of the large revenue products such as *budesonide*, inhalation suspension, and propranolol tablets"; "[h]eavily concentrated on a handful [of acquired drugs].  It was not all 15 [acquired drugs]. . . .  I think it was really focused on *budesonide*."

1   competition in budesonide: "Revenues of our US generics business was impacted by competition to

2   our Aripiprazole, Esomeprazole, and Budesonide. . . . I think on the US side, clearly the impact we

3   highlighted, the impact of having a ***competition*** on Aripiprazole, Esomeprazole, and Budesonide was

4   ***very, very significant***."

5        430.    Defendants were aware, by August 9, 2016, that each of these recent developments

6   would materially limit future cash flows from Impax's generic budesonide product.  In accordance

7   with GAAP, these factors were undeniably "events or circumstances [that] indicat[ed] all, or a

8   portion, of the carrying amount of [Impax's] intangible assets . . . [were] no longer . . . recoverable,"

9   thus triggering an immediate impairment charge.  In fact, each of these factors were belatedly cited

10  by defendants as primary causes of the budesonide impairment charge in 3Q16.  Defendants' failure

11  to timely record the budesonide impairment charge as of August 9, 2016 rendered Impax's 2Q16

12  financial statements materially misstated and in violation of  GAAP.

13       **D.    Impax Failed to Disclose Adverse Revenue Trends Regarding
                 Budesonide**

14

15       431.    As alleged herein, during 2016, investors were blindsided by defendants' surprise

16  negative announcements regarding key generic products.  Defendants recorded material impairment

17  charges in both 3Q16 and 4Q16 when Impax belatedly acknowledged that the primary generic drug

18  it had acquired in the Teva/Allergan transaction, budesonide, would not generate meaningful future

19  cash flows and had to be written off.  As detailed below, defendants were aware of, or should have

20  reasonably anticipated, the adverse revenue trends affecting budesonide.

21       432.    SEC disclosure rules required defendants to disclose these  material adverse trends in

22  its Class Period financials statements.  Importantly, the SEC requires disclosure of material trends

23  and uncertainties to warn investors that past reported financial results are not indicative of future

24  results.  The requirements under SEC Release 33-8350, SAB 104 and Item 303 of Reg S-K are

25  outlined in §V.D.

26       433.    Defendants have acknowledged, in direct correspondence to the SEC, that Impax was

27  required to disclose ***known or anticipated*** trends related specifically to its generic drug pricing and

28  competition.  In late 2016, the SEC reminded the Company that "***recent competitor and pricing***

1   *activities*" in the budesonide market must be considered for disclosure "*as a known trend or*

2   *uncertainty*" in accordance with Item 303(a) of Regulation S-K.  In the Company's response,

3   defendants acknowledged that future pricing reductions consistent with an "*anticipated or known*

4   *trend or uncertainty affecting its future operations*" were required to be disclosed.

5       434.   As detailed above (§VII.A.-C.), as of August 9, 2016 when Impax issued its Form 10-

6   Q for 2Q16, defendants were aware of increased competition and related price degradation in the

7   generic budesonide market that could reasonably have been expected to impact Impax's future

8   revenue.  In particular, each of the factors described clearly indicated that "*reported financial*

9   *information [was not] indicative of future results*."

10      435.   The SEC disclosure rules described above required Impax to disclose known or

11  anticipated trends in budesonide revenue, including competition and pricing trends, that were

12  reasonably expected to impact the Company's future results as of August 9, 2016.  In particular,

13  defendants were required to disclose to investors that *past budesonide revenue was not indicative of*

14  *future budesonide revenue*.  Instead, defendants did exactly the opposite – misleading investors by

15  indicating that budesonide revenue was expected to *increase* in FY 2016 compared to FY 2015.[38]

16      436.   Based on defendants' misrepresentations, analysts were misled as to the adverse

17  trends in budesonide revenue and pricing that existed as of August 9, 2016.  Less than three months

18  later, on November 9, 2016, defendants disclosed a massive impairment charge tied to adverse trends

19  in budesonide competition and pricing.  In particular, defendants blindsided investors by disclosing

20  that the drugs acquired in the Teva acquisition, including budesonide, had experienced a 35% price

21  decline due to increased competition.

22      437.   The SEC reviewed the Company's 3Q disclosures regarding budesonide, including

23  the disclosure of 35% price declines, and reminded the Company that "*recent competitor and*

---

24  [38]  On June 21, 2016, Impax disclosed that the Teva/Allergan-acquired generics portfolio had 2015

25  revenue of "approximately $150 million" and was "expected to add approximately $80 million of
    revenue in the second half of 2016."  Therefore revenue on the acquired generics portfolio was

26  expected to *increase* in 2016.  Approximately 67% of the generics portfolio, as measured by the
    prior 12 months' sales, consisted of budesonide.  As a result, defendants' representations to investors

27  indicated that budesonide revenue was expected to increase in 2016.  The same representation, in the
    form of unchanged revenue guidance for the acquired generics portfolio, was repeated on August 9,

28  2016.

1    *pricing activities*" in the budesonide market must be considered for disclosure "*as a known trend or*

2    *uncertainty*" in accordance with Item 303(a) of Regulation S-K.  In the Company's response,

3    defendants acknowledged that pricing reductions consistent with an "*anticipated or known trend or*

4    *uncertainty affecting its future operations*" were required to be disclosed.  Impax also emphasized

5    to the SEC that "the Company included disclosure throughout the [November 9, 2016] Form 10-Q

6    that the pricing reductions would result in lower than expected cash flows for the Company, which

7    indicate an unfavorable impact on the Company's future results. . . .  [T]he Company respectfully

8    submits that the disclosure included in the Form 10-Q satisfy the requirements of Item 303(a) of

9    Regulation S-K."  As alleged herein, the same disclosures defendants referenced in the November 9,

10   2016 Form 10-Q, whereby the Company warned investors that "the [budesonide] pricing reductions

11   would result in lower than expected cash flows for the Company," were required in the August 9,

12   2016 Form 10-Q based on the factors known to defendants at that time.

13   **VIII.   THE MISSTATEMENTS DESCRIBED ABOVE WERE MATERIAL TO
         IMPAX'S FINANCIAL STATEMENTS**

14

15        438.   As alleged herein, throughout the Class Period defendants were engaged in illegal

16   price fixing activity on two of its generic products: digoxin and pyridostigmine.  In addition,

17   defendants concealed adverse revenue trends affecting two of its primary generic drugs, diclofenac

18   and budesonide.  Defendants' failure to disclose these issues rendered Impax's Class Period financial

19   statements materially misstated for the following reasons:

20        (a)    Impax failed to make required disclosures regarding the impact of artificial

21   price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC

22   disclosure rules;

23        (b)    Impax failed to timely record impairment charges on budesonide in violation

24   of GAAP; and

25        (c)    Impax failed to disclose adverse revenue trends regarding diclofenac and

26   budesonide in violation of SEC disclosure rules.

27        439.   The above misstatements affected the following Class Period financial statements:

28

|  | FY 2013 Form 10-K | Q1-Q3 2014 Form 10-Qs | FY 2014 Form 10-K | Q1-Q3 2015 Form 10-Qs | FY 2015 Form 10-K | Q1 2016 Form 10-Q | Q2 2016 Form 10-Q |
|---|---|---|---|---|---|---|---|
| Impax failed to disclose the impact of illegal price-fixing activity on reported revenues, in violation of SEC disclosure rules | x digoxin | x digoxin | x digoxin pyridostigmine | x digoxin pyridostigmine | x digoxin pyridostigmine | x digoxin pyridostigmine | x digoxin pyridostigmine |
| Impax failed to timely record impairment charges, in violation of GAAP |  |  |  |  |  |  | x budesonide |
| Impax failed to disclose adverse revenue trends regarding key generic products, in violation of SEC disclosure rules |  |  |  |  |  | x diclofenac | x budesonide |

440.    The misstatements were material to Impax's Class Period financial statements, in accordance with SEC rules on materiality.

441.    SEC Codification of Staff Accounting Bulletins Topic 1-M, *Materiality* ("SEC Topic 1-M") sets forth the generally accepted methods for accountants to evaluate materiality as it relates to the financial statements of SEC registrants.  SEC Topic 1-M states: "The omission . . . of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion . . . of the item."  SEC Topic 1-M also states that both "quantitative" and "qualitative" factors must be considered in assessing materiality.[39] As detailed below, each of the misstatements and disclosure violations described above were both quantitatively and qualitatively material to Impax's Class Period financial statements.

**A.    The Misstatements Were Quantitatively Material**

442.    The misstatements and disclosure violations described above were quantitatively material to Impax's Class Period financial statements.  As described below, Impax recognized material amounts of revenue from digoxin, budesonide, and diclofenac during the Class Period.

(a)    Digoxin was among Impax's largest generic drugs, based on revenue.  After the Class Period, the SEC required the Company to retroactively disclose product sales for each of its top five revenue-generating products during the Class Period.  For fiscal 2014, digoxin was the

---

[39]    SEC Topic 1M provides: "there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material."

Company's 5th largest product.  Impax sold nearly $50 million of generic digoxin in FY 2014 which was over 8% of the Company's total reported revenue.  Digoxin remained one of the Company's top 10 products, by net revenue, in 2016.

(b)     Sales of Impax's budesonide generic product were approximately $158 million in the 12 months leading up to Impax's acquisition of the product from Teva/Allergan. At the time of the acquisition, Impax provided revenue guidance that called for increased sales in 2016.  Analysts estimated that budesonide would generate annualized revenue of at least $75 million in 2016.  By comparison, Impax's top five products averaged $74 million in revenue in 2016.  Thus, based on the revenue guidance Impax provided to investors following the acquisition, budesonide was expected to be among the Company's top products, by revenue.

(c)     Diclofenac was the Company's largest product, by revenue, in 2015.  Fiscal year 2015 sales exceeded $148 million, more than 17% of the Company's total reported revenue.

## B.     The Misstatements Were Qualitatively Material

443.     Each of the misstatements and disclosure violations described above were also qualitatively material to Impax's Class Period financial statements.   The misstatements and disclosure violations met at least the following qualitative materiality criteria listed in SEC Topic 1M.

### 1.     The Misstatements Involve Concealment of an Unlawful Transaction

444.     SEC Topic 1M states: "Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are: . . .  Whether the misstatement involves concealment of an unlawful transaction."[40]   As alleged herein, the digoxin and pyridostigmine misstatements identified above involved illegal price-fixing activity.   This automatically rendered the digoxin and pyridostigmine misstatements material to Impax's Class Period financial statements.

---

[40]   *See also* Wiley GAAP 2017 – Interpretation and Application of Generally Accepted Accounting Principles: "litigation proceedings against the company pursuant to price-fixing or antitrust allegations . . . *can have a material impact on the enterprise's future profitability* and, thus . . . would not be capable of being evaluated for materiality based solely upon numerical calculations."

### 2. The Misstatements Masked a Change in Earnings or Other Trends

445.    The digoxin, pyridostigmine, budesonide, and diclofenac misstatements identified above involved concealment of adverse revenue trends in which past performance was not indicative of future performance.

### 3. The Misstatements Concerned a Segment or Other Portion of the Registrant's Business that Has Been Identified as Playing a Significant Role in the Registrant's Operations or Profitability

446.    The digoxin, pyridostigmine, budesonide, and diclofenac misstatements identified above concerned Impax's most important segment: generic drugs.  In addition, during the Class Period, Impax highlighted the importance of making strategic acquisitions to expand its generic product portfolio.  As detailed herein, budesonide was part of an important acquisition that Impax entered into during the Class Period.  The Teva/Allergan acquisition played a key role in Impax's future operations and profitability.

### 4. The Misstatements Affected Management's Compensation

447.    SEC Topic 1M includes the following qualitative materiality consideration: "Whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation."  The misstatements  described above impacted defendants' incentive compensation.

## IX.    LOSS CAUSATION

448.    The markets for Impax's common stock and Convertible Senior Notes were open, well-developed and efficient at all relevant times.  During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market that artificially inflated the price of Impax's publicly-traded securities.  Defendants misled investors about Impax's financial health and performance and its prospects for future financial success by failing to disclose: (i) Impax and several of its pharmaceutical industry peers colluded to fix generic drug prices in violation of U.S. and state antitrust laws; (ii) consequently, Impax's revenues during the Class Period were in part the result of illegal conduct; (iii) foreseeable market forces for diclofenac, a key product, would drive down revenues; (iv) acquisitions of overvalued generic drugs

1  from other pharmaceutical companies would result in multiple write-downs and impairment charges;

2  and (v) as a result of the foregoing, Impax's public statements were materially false and misleading

3  at all relevant times.

4      449.   Later, when defendants' prior misrepresentations and fraudulent conduct were

5  absorbed by the market, the price of Impax's publicly-traded securities fell significantly, as the

6  artificial inflation came out of the price over time.   As a result of their purchases of Impax's

7  publicly-traded securities during the Class Period, plaintiff and other members of the Class suffered

8  economic loss, *i.e.*, damages, under the federal securities laws.

9      **A.   Losses Caused by Defendants' Price Fixing False and Misleading
            Statements and Omissions**

10

11     450.   Partial disclosures relating to the illegal price-fixing activity and its impact to the

12  Company's operations began to enter the market in mid-2015.   The very facts defendants

13  misrepresented and omitted during the Class Period were a substantial factor in causing each of the

14  stock price declines described below and led directly to plaintiff's and other Class members'

15  significant losses and damages.

16     451.   Starting in November 2013, Impax used an illegal price-fixing scheme to charge

17  dramatically inflated prices for generic digoxin, and these prices remained unconstrained for over 18

18  months.   Investors began to understand the unsustainability of these prices on May 11, 2015, when

19  Impax made its first partial disclosure concerning its illegal price-fixing scheme.

20     452.   After market close, on May 11, 2015, the Company disclosed in its 1Q15 Form 10-Q

21  that the DoJ had issued a grand jury subpoena to Impax for four generic medications: digoxin,

22  terbutaline sulfate, prilocaine/lidocaine cream, and calcipotriene topical solution, stating:

23         Previously on November 6, 2014, the Company disclosed that one of its sales
           representatives received a grand jury subpoena from the Antitrust Division of the
           United States Justice Department (the "Justice Department").  In connection with this
24         same investigation, on March 13, 2015, the Company received a grand jury subpoena
           from the Justice Department requesting the production of information and documents
25         regarding the sales, marketing, and ***pricing of certain generic prescription
           medications***.  In particular, the Justice Department's investigation currently focuses
26         on four generic medications: ***digoxin tablets***, terbutaline sulfate tablets,
           prilocaine/lidocaine cream, and calcipotriene topical solution.  The Company has
27         been cooperating and intends to continue cooperating with the investigation.
           However, no assurance can be given as to the timing or outcome of the investigation.

28

453.     On the same day, the Company held a conference call to discuss its 1Q15 earnings. During the call, Reasons disclosed that gross margins had decreased to 47% from 61% the prior year, which he attributed to "the impact of additional competition on generic digoxin."

454.     Analysts took note.  Leerink analysts blamed the substandard performance on "increased competition for digoxin," and Wells Fargo analysts said, "we suspect digoxin pricing erosion with additional competition was a primary culprit" for the unexpectedly narrow gross margins.

455.     In fact, Impax had ceded market share to the "additional competition on generic digoxin" in order to maintain market share equilibrium under the "general rules of the road" governing the generic drug price fixing conspiracy.  As a result, Impax's digoxin market share fell 5% during 1Q15 from 42% to 37%, which, along with slight digoxin price declines from the new competition, resulted in the gross margin decline announced on the May 11, 2015 earnings call.

456.     In particular, as set forth in the Amended AG Complaint, the "general rules of the road" held that each competitor was entitled to a certain percentage of market share "based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry."  *Id.*, ¶¶90-91.  After the market reached an equilibrium, the manufacturers then agreed either to not compete on prices or to significantly raise prices in coordination.  *Id.*  Adherence to the "general rules of the road" by all competitors was crucial to maintaining high prices, because even a single deviant could lead to competition and lower prices.  *Id.*, ¶107.  Even for a new entrant to the market seeking to attain market share, "an underlying code of conduct," widespread in the industry, was adhered to that allowed the new entrant and existing manufacturers to determine "a generally agreed-upon standard of 'fair share' in order to avoid competing and keep prices high."  *Id.*, ¶¶14, 100.  Impax's adherence to these "general rules of the road" caused the Company to lose digoxin market share in 1Q15 after Mylan entered the market.

457.     As a result of Impax's disclosure of the DoJ subpoena and decreased gross margins, the Company's stock dropped $1.25 per share on May 12, 2015, or 2.7%, to close at $44.85 – on over three times the past week's average volume.  Meanwhile, the S&P 500 dropped only 0.3%.

1    458.    Impax's stock price remained inflated, however, because defendants continued to

2    conceal the existence and full impact of defendants' price-fixing scheme.

3    459.    The next partial disclosure occurred on August 10, 2015, when the Company

4    announced 2Q15 earnings.  During a conference call that morning, Reasons reported significant

5    declines in revenue, gross margins, and earnings compared to the prior year, and specifically named

6    "additional competition on generic Digoxin" as a primary cause for each.

7    460.    That same day, analysts expressed surprise about the negative news.  For example, a

8    UBS analyst report stated "the lower gross margin guidance was disappointing."  The news caused

9    Impax's stock price to fall for two consecutive days.  On August 10, 2015, it fell $1.43, or 3.0%, to

10   close at $45.64 – on a volume of nearly double the prior week's average.  The next day, it fell

11   another $1.03, or 2.3%, to close at $44.61 – again on a volume above the prior week's average.  By

12   contrast, the S&P 500 actually ***increased*** 1.3% on August 10, and fell only 1.0% on August 11.

13   461.    The August 10-11, 2016 price decline was caused by Impax ceding further market

14   share to the "additional competition on generic Digoxin" in order to maintain market share

15   equilibrium under the "general rules of the road" governing the generic drug price fixing conspiracy.

16   Impax's adherence to the "general rules of the road" caused the Company to lose digoxin market

17   share in 2Q15 after additional competition entered the market, and by the end of 2Q15, Impax's

18   digoxin market share was down 8% on the year to 34%.

19   462.    Even after this loss, Impax's stock price remained inflated, however, because

20   defendants continued to conceal the existence and full impact of their price-fixing scheme.  For the

21   next year and a half, Impax convinced investors that the massive price hikes for digoxin resulted

22   from legal activity, and not illegal collusion.

23   463.    Then, on November 3, 2016, media outlets reported that U.S. prosecutors might file

24   criminal charges by the end of 2016 against Impax and several other pharmaceutical companies for

25   unlawfully colluding to fix generic drug prices.  Bloomberg specifically named Impax as one of the

26   manufacturers implicated through digoxin, reporting that its coordinated and seven-fold price

27   increase caused Medicaid to spend 90% more on the drug during 2013 and 2014.

28

464.    On this news, Impax's share price fell $4.00, or 19.5%, to close at $16.50 on November 3, 2016 – on almost three times the past week's average trading volume. The Company's Convertible Senior Notes dropped $3.46, losing 4.0% of their value. As a comparison, the S&P 500 fell only 0.4% that day. Industry analysts immediately attributed the drop to the recent reports. On November 4, 2016, Bloomberg reported that, even among other major generic drug companies, Impax was the "most exposed on [the DoJ] probe."

465.    Fortune also specifically named Impax as one of the "Pharma Stocks [That] Plunged on Reports of Pending Price Collusion Charges" noting that the announcement confirmed investor fears of a formal criminal investigation and subsequent charges against the Company sparked by Impax's earlier disclosure "that the Justice Department had requested information on four drugs: blood pressure pill digoxin, asthma drug terbutaline sulfate, prilocaine/lidocaine cream and calcipotriene solution, which is used to treat psoriasis."

466.    Nevertheless, the price remained artificially inflated as Impax executives continued to conceal the existence and full impact of their price-fixing scheme to investors, as evidenced by the December 5, 2016 Leerink analyst report:

> Mgmt addresses DoJ investigation:  At the meeting, mgmt commented that it has completed its own internal investigation relating to the DoJ's inquiry into price collusion and feels good the company has not engaged in any impropriety.  Mgmt commented that they haven't had conversations with the DoJ in over one year and noted that if any of the company's products implicated in the Bloomberg story are indicated, they'd expect broader investigation could linger, so investors should not expect this sector-level story to go away with the first indictment.

467.    The final price-fixing disclosures came in early January 2017.  Right as the market closed on January 5, 2017, the DoJ affirmatively acted against Impax by intervening in a civil antitrust action in the Eastern District of Pennsylvania.  The following day, Friday, January 6, 2017, the Court granted the DoJ's motion and added it to the action.  The bad news continued on Monday, January 9, when Jeffrey Glazer, Heritage's former CEO, pled guilty to price-fixing charges, admitting he had conspired with competitors to increase the price of generic drugs.  The following day, Jason Malek, Heritage's former President, followed suit and also pled guilty to price-fixing.

468.    Analysts and legal commentators noted the severity of the DoJ's investigation in the January 6, 2017 Law360 article entitled "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg."

Law360 specifically named Impax as one of the manufacturers implicated in the "DoJ Probe" and stated that recently unsealed court documents demonstrate that:

> [t]he companies got together at trade shows and customer events to carry out the conspiracies, according to the state AGs' complaint. The states also allege that company CEOs and other high-ranking brass mingled at industry dinners, such as a Jan. 14, 2014, meeting at a steakhouse in Bridgewater, New Jersey, attended by at least 13 male executives. Female pharmaceutical sales reps also met at 'girls night out' dinners at which they exchanged sensitive information, according to the state AG complaint.

469.    The January 6, 2017 Law360 article also reported that other recently unsealed court documents demonstrate that "Company executives communicated by emails and text message, sharing pricing and bidding strategies, the state AGs said.  Meanwhile, prices for generic drugs shot up in 2013 and 2014, according to the complaint, which cited a report that more than 1,200 generic medications increased in price by an average of 448 percent between July 2013 and July 2014."

470.    This wave of negative news caused drops in Impax's stock price on January 6, 9, 10, and 11.  The stock price, which began the slide at $14.20, declined $0.40 (2.8%), $0.40 (2.9%), $0.70 (5.2%), and $0.30 (2.4%), respectively, before closing at $12.40 on January 11; each day had above-average trading volumes.  The Convertible Senior Notes also dropped during this time period, losing $0.91 (1.1%) on January 6, $0.15 (0.2%) on January 9, and $0.24 (0.3%) on January 10.  By contrast, the S&P 500 *increased* 0.4% on January 6, decreased just 0.4% on January 9, remained steady on January 10, and *increased* 0.3% on January 11.

**B.    Losses Caused by Defendants' Diclofenac False and Misleading Statements and Omissions**

471.    Partial disclosures relating to the sudden influx of competition for diclofenac and its impact to the Company's operations began to enter the market in mid-2016.

472.    In May 2016, Wilkinson told investors that diclofenac – one of Impax's key products – would "meet new competition sometime in the first half of this year."  Impax knew this new competition would have a dramatic impact on revenues, but Wilkinson publicly minimized it, calling the change "anticipated" and promising that Impax had "defended share" and still "expect[ed] revenue growth."  During a June 21, 2016 conference call, defendants revealed that diclofenac revenue had not "normalized," and announced significant reductions to its 2016 revenue

1  guidance based on "lower revenues on diclofenac gel and metaxalone as a result of the impact of

2  additional competition occurring during the second quarter."

3      473.    During the call, analysts immediately questioned why Impax did not disclose the

4  impact of the diclofenac competition earlier.  A Deutsche Bank analyst observed that "[y]ou knew

5  the accelerated competitors last call."  A JP Morgan analyst echoed the sentiment:  "Sounds like you

6  knew or had factored in some competition coming in on some of those key products, trying to

7  understand that."  As a result of this news, Impax's stock price dropped $3.66, or 11.4%, to close at

8  $28.31; the trading volume was six times greater than the prior week's average.  The Convertible

9  Senior Notes fell $4.00, losing 4.4% of their value.  Meanwhile, the S&P 500 *increased* 0.3%.

10     474.    Although the news was disappointing, with only nine days left in the quarter, analysts

11  felt confident that they understood the negative impact from the diclofenac competition and could

12  reliably predict Q2 results.  On June 21, 2016, Leerink analysts commented that they felt Impax's

13  portfolio had "stabilized."

14     475.    The market did not fully understand the devastating impact of the diclofenac

15  competition until August 9, 2016, when Impax held its 2Q16 earnings call.  During the call,

16  defendants blindsided investors by disclosing the true status of diclofenac: its profits had dropped off

17  a cliff, driving generic division revenues down $53 million in the second quarter alone.  The

18  Company also had to take a massive $15 million "shelf-stock adjustment" to write down the value of

19  existing diclofenac in its customers' inventories.

20     476.    Analysts were shocked that defendants had concealed the extent of the deterioration

21  in diclofenac just weeks earlier.  On August 9, 2016, a Piper Jaffray analyst report expressed the

22  market's frustration: "*we find it hard to fathom how [Impax] could not have foreseen or known*

23  *how conditions surrounding key products would further deteriorate*."  The same report also noted:

24  "*We are deeply disappointed that [Impax] was slow in recognizing and communicating the extent*

25  *of the competitive pressures on its key assets, at a minimum because it damages the credibility of a*

26  *senior management team*."  As a result of this news, Impax's stock price plummeted $7.16, or

27  23.4%, to close at $23.43; the trading volume was *12 times* higher than the prior week's average.

28

1   The Company's Convertible Senior Notes dropped $7.77, losing 8.3% of their value.[41]   On the same

2   day of this decline, the S&P 500 *remained stable.*

3       **C.   Losses Caused by Defendants' Budesonide False and Misleading**
        **Statements and Omissions**

4

5       477.   The disclosure relating to the failed Teva transaction and its impact to the Company's

6   operations caused a significant stock price decline.

7       478.   On June 21, 2016, Impax announced that it had purchased a basket of generic drugs

8   from Teva, that the transaction was "immediately accretive," and that the drugs were "primarily . . .

9   difficult-to-manufacture or limited competition products."   However, following the transaction,

10   defendants concealed that budesonide – by far the most valuable drug in the basket – had

11   encountered increased competition, key customer pricing concessions, and severe price degradation

12   at the time the deal closed.   Defendants finally disclosed the truth on November 9, 2016, when they

13   announced a $251 million impairment charge related to the deal.

14       479.   As a result of this news, Impax's stock price plummeted.   This time, it dropped $3.60,

15   or 20.5%, to close at $14.00 on November 9, 2016 – on over four times the past week's average

16   trading volume.   The Convertible Senior Notes fell $2.13, losing 2.6% of their value.   During the

17   same time period, the S&P 500 *increased* 1.1%.   Analysts immediately attributed the decline to the

18   impairment charge.   A Leerink analyst noted: "So far, TEVA deal has been a mess for IPXL."

19       480.   Each disclosure of adverse facts which removed inflation from Impax's stock price

20   was connected to defendants' false statements and omissions and fraudulent conduct alleged herein.

21   The timing and magnitude of Impax's stock price declines negate any inference that the loss suffered

22   by plaintiff and other Class members was caused by changed market conditions, macroeconomic or

23   industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.   As a

24   direct result of defendants' wrongful acts and omissions, and the precipitous decline in the market

25   value of the Company's securities, plaintiff and other Class members have suffered significant losses

26   and damages.

27   _____

28   [41]   The percentage drop runs from Friday, August 5.

1    X.    **NO SAFE HARBOR**

2        481.    Impax's verbal "Safe Harbor" warnings accompanying its oral forward-looking

3    statements ("FLS") issued during the Class Period were ineffective to shield those statements from

4    liability.

5        482.    The defendants are also liable for any false or misleading FLS pleaded because, at the

6    time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

7    authorized and/or approved by an executive officer of Impax who knew that the FLS was false.

8    XI.   **APPLICABILITY OF THE PRESUMPTION OF RELIANCE:**
          **FRAUD ON THE MARKET**
9
10       483.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-
     on-the-market doctrine in that:
11

12       •    defendants made public misrepresentations or failed to disclose material facts during
              the Class Period;

13       •    the omissions and misrepresentations were material;

14       •    Impax securities (common stock and 2% Convertible Senior Notes) are traded in an
              efficient market; the Company's securities were liquid and traded with moderate to
15            heavy volume during the Class Period;

16       •    the Company's common stock was traded on the NASDAQ and was covered by
              multiple analysts;
17
18       •    the misrepresentations and omissions alleged would tend to induce a reasonable
              investor to misjudge the value of the Company's securities; and

19       •    plaintiff and members of the Class purchased, acquired and/or sold Impax securities
              between the time the defendants failed to disclose or misrepresented material facts
20            and the time the true facts were disclosed, without knowledge of the omitted or
              misrepresented facts.
21
22       484.    Based upon the foregoing, plaintiff and the members of the Class are entitled to a
     presumption of reliance upon the integrity of the market.
23

24       485.    Alternatively, plaintiff and the members of the Class are entitled to the presumption
     of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*
25
     *States*, 406 U.S. 128 (1972), as defendants omitted material information in their Class Period
26
     statements in violation of a duty to disclose such information, as detailed above.
27

28

## XII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

486.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Impax securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are defendants herein and the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

487.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Impax common stock was actively traded on the NASDAQ and its 2% Convertible Senior Notes traded in an efficient market.  While the exact number of Class members is unknown to plaintiff at this time and can be ascertained only through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Impax or its transfer agent and may be notified of the  pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

488.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

489.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

490.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Impax;

- whether the Individual Defendants caused Impax to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Impax securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

491. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

492. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

493. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

494. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members as alleged

1  herein; (ii) artificially inflate and maintain the market price of Impax securities; and (iii) cause

2  plaintiff and other members of the Class to purchase or otherwise acquire Impax securities and

3  options at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of

4  conduct, defendants, and each of them, took the actions set forth herein.

5  495.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the

6  defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and

7  annual reports, SEC filings, press releases and other statements and documents described above,

8  including statements made to securities analysts and the media that were designed to influence the

9  market for Impax securities.  Such reports, filings, releases and statements were materially false and

10  misleading in that they failed to disclose material adverse information and misrepresented the truth

11  about Impax's business practices.

12  496.   By virtue of their positions at Impax, defendants had actual knowledge of the

13  materially false and misleading statements and material omissions alleged herein and intended

14  thereby to deceive plaintiff and the other members of the Class, or, in the alternative, defendants

15  acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such

16  facts as would reveal the materially false and misleading nature of the statements made although

17  such facts were readily available to defendants.  Said acts and omissions of defendants were

18  committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or

19  recklessly disregarded that material facts were being misrepresented or omitted as described above.

20  497.   Information showing that defendants acted knowingly or with reckless disregard for

21  the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or

22  directors of Impax, the Individual Defendants had knowledge of the details of Impax's internal

23  affairs.

24  498.   The Individual Defendants are liable both directly and indirectly for the wrongs

25  complained of herein.  Because of their positions of control and authority, the Individual Defendants

26  were able to and did, directly or indirectly, control the content of the statements of Impax.  As

27  officers and/or directors of a publicly-held company, the Individual Defendants had a duty to

28  disseminate timely, accurate, and truthful information with respect to Impax's business practices.  As

1    a result of the dissemination of the aforementioned false and misleading reports, releases and public

2    statements, the market price of Impax securities was artificially inflated throughout the Class Period.

3    In ignorance of the adverse facts concerning Impax's business and financial condition which were

4    concealed by defendants, plaintiff and the other members of the Class purchased or otherwise

5    acquired Impax securities at artificially-inflated prices and relied upon the price of the securities, the

6    integrity of the market for the securities and/or upon statements disseminated by defendants, and

7    were damaged thereby.

8         499.    During the Class Period, Impax securities were traded on an active and efficient

9    market.  Plaintiff and the other members of the Class, relying on the materially false and misleading

10   statements described herein, which the defendants made, issued or caused to be disseminated, or

11   relying upon the integrity of the market, purchased or otherwise acquired shares of Impax securities

12   at prices artificially inflated by defendants' wrongful conduct.  Had plaintiff and the other members

13   of the Class known the truth, they would not have purchased or otherwise acquired said securities, or

14   would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the

15   time of the purchases and/or acquisitions by plaintiff and the Class, the true value of Impax securities

16   was substantially lower than the prices paid by plaintiff and the other members of the Class.  The

17   market price of Impax securities declined sharply upon public disclosure of the facts alleged herein

18   to the injury of plaintiff and the other Class members.

19        500.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly

20   or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

21        501.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

22   other members of the Class suffered damages in connection with their respective purchases,

23   acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that

24   the Company had been disseminating misrepresented financial statements to the investing public.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants)**

502.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

503.    During the Class Period, the Individual Defendants participated in the operation and management of Impax, and conducted and participated, directly and indirectly, in the conduct of Impax's business affairs.  Because of their senior positions, they knew the adverse non-public information about Impax's business practices.

504.    As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Impax's financial condition and results of operations, and to correct promptly any public statements issued by Impax which had become materially false or misleading.

505.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Impax disseminated in the marketplace during the Class Period concerning Impax's results and operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Impax to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Impax within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Impax securities.

506.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Impax.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying plaintiff as the Class representative;

1          B.      Requiring defendants to pay damages sustained by plaintiff and the Class by reason of

2   the acts and transactions alleged herein; and

3          C.      Awarding plaintiff and the other members of the Class prejudgment and post

4   judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

5   awarding such other and further relief as this Court may deem just and proper.

6                                **DEMAND FOR TRIAL BY JURY**

7          Plaintiff hereby demands a trial by jury.

8   DATED:  October 26, 2018                    ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
9                                               SPENCER A. BURKHOLZ
                                                LUKE O. BROOKS
10                                              ERIC I. NIEHAUS
                                                ANGEL P. LAU
11                                              JEFFREY J. STEIN

12

13                                                     s/ Luke O. Brooks
                                                     LUKE O. BROOKS
14
                                                655 West Broadway, Suite 1900
15                                              San Diego, CA  92101
                                                Telephone:  619/231-1058
16                                              619/231-7423 (fax)

17                                              ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
18                                              SHAWN A. WILLIAMS
                                                Post Montgomery Center
19                                              One Montgomery Street, Suite 1800
                                                San Francisco, CA  94104
20                                              Telephone:  415/288-4545
                                                415/288-4534 (fax)
21
                                                ROBBINS GELLER RUDMAN
22                                                  & DOWD LLP
                                                SAMUEL H. RUDMAN
23                                              58 South Service Road, Suite 200
                                                Melville, NY  11747
24                                              Telephone:  631/367-7100
                                                631/367-1173 (fax)
25
                                                Lead Counsel for Plaintiff
26

27

28

EXHIBIT 1

**EXHIBIT 1**

**DEFENDANTS' CLASS PERIOD FALSE STATEMENTS AND OMISSIONS**

| False Statements in Form 10-K Filings During the Class Period | | |
|---|---|---|
| **2013 Form 10-K**<br>**Filed on February 25, 2014** | **2014 Form 10-K**<br>**Filed on February 26, 2015** | **2015 Form 10-K**<br>**Filed on February 22, 2016** |
| We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements. | We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements. | We also develop, manufacture, sell and distribute specialty generic pharmaceuticals that we believe present certain competitive advantages, such as difficulty in raw materials sourcing, complex formulation or development characteristics or special handling requirements. |
| The pharmaceutical industry is highly competitive and is affected by new technologies, new developments, government regulations, health care legislation, availability of financing, and other factors. Many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. We compete with numerous other companies that currently operate, or intend to operate, in the pharmaceutical industry, including companies that are engaged in the development of controlled-release drug delivery technologies and products, and other manufacturers that may decide to undertake development of such products. Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc. and Par Pharmaceutical Companies, Inc. | The pharmaceutical industry is highly competitive and is affected by new technologies, new developments, government regulations, health care legislation, availability of financing, and other factors. Many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. We compete with numerous other companies that currently operate, or intend to operate, in the pharmaceutical industry, including companies that are engaged in the development of controlled-release drug delivery technologies and products, and other manufacturers that may decide to undertake development of such products. Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Par Pharmaceutical Companies, Inc. and Sandoz. | The pharmaceutical industry is highly competitive and is affected by new technologies, new developments, government regulations, health care legislation, availability of financing, and other factors. Many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. We compete with numerous other companies that currently operate, or intend to operate, in the pharmaceutical industry, including companies that are engaged in the development of controlled-release drug delivery technologies and products, and other manufacturers that may decide to undertake development of such products. Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Allergan Inc., Mylan N.V., Sun Pharmaceutical Industries Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Endo International plc and Sandoz. |

| False Statements in Form 10-K Filings During the Class Period | | |
|---|---|---|
| **2013 Form 10-K**<br>**Filed on February 25, 2014** | **2014 Form 10-K**<br>**Filed on February 26, 2015** | **2015 Form 10-K**<br>**Filed on February 22, 2016** |
| Due to our focus on relatively hard to replicate controlled-release products, competition in the generic pharmaceutical market is sometimes limited to those competitors who possess the appropriate drug delivery technology. The principal competitive factors in the generic pharmaceutical market are:<br>• the ability to introduce generic versions of products promptly after a patent expires;<br>• price;<br>• product quality;<br>• customer service (including maintenance of inventories for timely delivery); and<br>• the ability to identify and market niche products. | Due to our focus on relatively hard to replicate controlled-release products, competition in the generic pharmaceutical market is sometimes limited to those competitors who possess the appropriate drug delivery technology. The principal competitive factors in the generic pharmaceutical market are:<br>• the ability to introduce generic versions of products promptly after a patent expires;<br>• price;<br>• product quality;<br>• customer service (including maintenance of inventories for timely delivery); and<br>• the ability to identify and market niche products. | Due to our focus on relatively hard to replicate controlled-release products, competition in the generic pharmaceutical market is sometimes limited to those competitors who possess the appropriate drug delivery technology. The principal competitive factors in the generic pharmaceutical market are:<br>• the ability to introduce generic versions of products promptly after a patent expires;<br>• price;<br>• product quality;<br>• customer service (including maintenance of inventories for timely delivery); and<br>• the ability to identify and market niche products. |
| Our revenues and operating results may vary significantly from year-to-year and quarter to quarter as well as in comparison to the corresponding quarter of the preceding year. Variations may result from, among other factors:<br>* * *<br>• the introduction of new products by others that render our products obsolete or noncompetitive;<br>• the ability to maintain selling prices and gross margins on our products. | Our revenues and operating results may vary significantly from year-to-year and quarter to quarter as well as in comparison to the corresponding quarter of the preceding year. Variations may result from, among other factors:<br>* * *<br>• the introduction of new products by others that render our products obsolete or noncompetitive;<br>• the ability to maintain selling prices and gross margins on our products. | Our revenues and operating results may vary significantly from year-to-year and quarter to quarter as well as in comparison to the corresponding quarter of the preceding year. Variations may result from, among other factors:<br>* * *<br>• the introduction of new products by others that render our products obsolete or noncompetitive;<br>• the ability to maintain selling prices and gross margins on our products. |
| We derive a substantial portion of our revenue from sales of a limited number of products. In 2013, our top five products in our Global Division accounted for 11%, 10%, 9%, 8% and 8%, or an aggregate of 46%, of Global product | We derive a substantial portion of our revenue from sales of a limited number of products. In 2014, our top five products in our Global Division accounted for 15%, 8%, 6%, 6% and 6%, or an aggregate of 41%, of Global product | We derive a substantial portion of our revenue from sales of a limited number of products. In 2015, our top five products accounted for 17%, 12%, 8%, 7% and 6%, or an aggregate of 50%, of our product sales, net. The sale of our |

| False Statements in Form 10-K Filings During the Class Period | | |
|---|---|---|
| **2013 Form 10-K**<br>**Filed on February 25, 2014** | **2014 Form 10-K**<br>**Filed on February 26, 2015** | **2015 Form 10-K**<br>**Filed on February 22, 2016** |
| sales, net. . . .  The sale of our products can be significantly influenced by market conditions, as well as regulatory actions. We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions, or as a result of regulatory actions related to our products or to competing products, which could have a material impact on our results of operations. Actions which could be taken by our competitors, which may materially and adversely affect our business, results of operations and financial condition, may include, without limitation, pricing changes and entering or exiting the market for specific products. | sales, net. . . .  The sale of our products can be significantly influenced by market conditions, as well as regulatory actions. We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions, or as a result of regulatory actions related to our products or to competing products, which could have a material impact on our results of operations. Actions which could be taken by our competitors, which may materially and adversely affect our business, results of operations and financial condition, may include, without limitation, pricing changes and entering or exiting the market for specific products. | products can be significantly influenced by market conditions, as well as regulatory actions. We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions, or as a result of regulatory actions related to our products or to competing products, which could have a material impact on our results of operations. Actions which could be taken by our competitors, which may materially and adversely affect our business, results of operations and financial condition, may include, without limitation, pricing changes and entering or exiting the market for specific products. |
| The pharmaceutical industry is highly competitive and many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. | The pharmaceutical industry is highly competitive and many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. | The pharmaceutical industry is highly competitive and many of our competitors have longer operating histories and substantially greater financial, research and development, marketing, and other resources than we have. Further, the pharmaceutical industry has in recent years seen increased consolidation, resulting in larger competitors and placing further pressure on prices, development activities and customer retention. |
| With respect to generic pharmaceutical products, the FDA approval process often results in the FDA granting final approval to a number of ANDAs for a given product at the time a patent claim for a corresponding brand product or other market exclusivity expires. This often forces us to face immediate | Further, the FDA approval process often results in the FDA granting final approval to a number of ANDAs for a given product at the time a patent for a corresponding brand product or other market exclusivity expires. This often forces us to face immediate competition when we introduce a generic product into the market. | In the generic products market, we face competition from other generic pharmaceutical companies, which may impact our selling price and revenues from such products. . . .  As competition from other generic pharmaceutical companies intensifies, selling prices and gross profit margins often decline, which has been our |

| False Statements in Form 10-K Filings During the Class Period | | |
|---|---|---|
| **2013 Form 10-K**<br>**Filed on February 25, 2014** | **2014 Form 10-K**<br>**Filed on February 26, 2015** | **2015 Form 10-K**<br>**Filed on February 22, 2016** |
| competition when we introduce a generic product into the market. As competition from other generic pharmaceutical companies intensifies, selling prices and gross profit margins often decline, which has been our experience with our existing products. . . . Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product that we develop is generally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Although we cannot assure, we strive to develop and introduce new products in a timely and cost effective manner to be competitive in our industry . . . . Additionally, ANDA approvals often continue to be granted for a given product subsequent to the initial launch of the generic product. These circumstances generally result in significantly lower prices and reduced margins for generic products compared to brand products. New generic market entrants generally cause continued price and margin erosion over the generic product life cycle.<br><br>* * *<br>Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc. and Par Pharmaceutical Companies, Inc. | As competition from other generic pharmaceutical companies intensifies, selling prices and gross profit margins often decline, which has been our experience with our existing products. . . . Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product that we develop is generally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Although we cannot assure, we strive to develop and introduce new products in a timely and cost effective manner to be competitive in our industry . . . . Additionally, ANDA approvals often continue to be granted for a given product subsequent to the initial launch of the generic product. These circumstances generally result in significantly lower prices and reduced margins for generic products compared to brand products. New generic market entrants generally cause continued price and margin erosion over the generic product life cycle.<br><br>* * *<br>Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Actavis plc., Mylan Inc., Ranbaxy Laboratories Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Par Pharmaceutical Companies, Inc. and Sandoz. | experience with our existing products. . . . Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product that we develop is generally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Although we cannot assure, we strive to develop and introduce new products in a timely and cost effective manner to be competitive in our industry . . . . Additionally, ANDA approvals often continue to be granted for a given product subsequent to the initial launch of the generic product. These circumstances generally result in significantly lower prices and reduced margins for generic products compared to brand products. New generic market entrants generally cause continued price and margin erosion over the generic product life cycle.<br><br>* * *<br>Our principal competitors in the generic pharmaceutical products market are Teva Pharmaceutical Industries Ltd., Allergan Inc., Mylan N.V., Sun Pharmaceutical Industries Ltd., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Endo International plc and Sandoz. |

| False Statements in Form 10-K Filings During the Class Period | | |
|---|---|---|
| **2013 Form 10-K**<br>**Filed on February 25, 2014** | **2014 Form 10-K**<br>**Filed on February 26, 2015** | **2015 Form 10-K**<br>**Filed on February 22, 2016** |
| A significant proportion of our sales is made to relatively few retail drug chains, wholesalers, and managed care purchasing organizations. These customers are continuing to undergo significant consolidation. Such consolidation has provided and may continue to provide them with additional purchasing leverage, and consequently may increase the pricing pressures that we face. Additionally, the emergence of large buying groups representing independent retail pharmacies, and the prevalence and influence of managed care organizations and similar institutions, enable those groups to extract price discounts on our products. | A significant proportion of our sales is made to relatively few retail drug chains, wholesalers, and managed care purchasing organizations. These customers are continuing to undergo significant consolidation. Such consolidation has provided and may continue to provide them with additional purchasing leverage, and consequently may increase the pricing pressures that we face. Additionally, the emergence of large buying groups representing independent retail pharmacies, and the prevalence and influence of managed care organizations and similar institutions, enable those groups to extract price discounts on our products. | A significant proportion of our sales is made to relatively few retail drug chains, wholesalers, and managed care organizations. These customers are continuing to undergo significant consolidation. Such consolidation has provided and may continue to provide them with additional purchasing leverage, and consequently may increase the pricing pressures that we face. Additionally, the emergence of large buying groups representing independent retail pharmacies, and the prevalence and influence of managed care organizations and similar institutions, enable those groups to extract price discounts on our products. |
| Based on industry practice, generic drug manufacturers have liberal return policies and have been willing to give customers post-sale inventory allowances. Under these arrangements, from time to time, we give our customers credits on our generic products that our customers hold in inventory after we have decreased the market prices of the same generic products due to competitive pricing. Therefore, if new competitors enter the marketplace and significantly lower the prices of any of their competing products, we would likely reduce the price of our product. As a result, we would be obligated to provide credits to our customers who are then holding inventories of such products, which could reduce sales revenue and gross margin for the period the credit is provided. | Based on industry practice, generic drug manufacturers have liberal return policies and have been willing to give customers post-sale inventory allowances. Under these arrangements, from time to time, we give our customers credits on our generic products that our customers hold in inventory after we have decreased the market prices of the same generic products due to competitive pricing. Therefore, if new competitors enter the marketplace and significantly lower the prices of any of their competing products, we would likely reduce the price of our product. As a result, we would be obligated to provide credits to our customers who are then holding inventories of such products, which could reduce sales revenue and gross margin for the period the credit is provided. | Based on industry practice, generic drug manufacturers have liberal return policies and have been willing to give customers post-sale inventory allowances. Under these arrangements, from time to time, we give our customers credits on our generic products that our customers hold in inventory after we have decreased the market prices of the same generic products due to competitive pricing. Therefore, if new competitors enter the marketplace and significantly lower the prices of any of their competing products, we would likely reduce the price of our product. As a result, we would be obligated to provide credits to our customers who are then holding inventories of such products, which could reduce sales revenue and gross margin for the period the credit is provided. |

| False Statements in Form 10-K Filings During the Class Period | | |
|---|---|---|
| **2013 Form 10-K**<br>**Filed on February 25, 2014** | **2014 Form 10-K**<br>**Filed on February 26, 2015** | **2015 Form 10-K**<br>**Filed on February 22, 2016** |
| In addition, third-party payers are attempting to control costs by limiting the level of reimbursement for medical products, including pharmaceuticals, and increasingly challenge the pricing of these products which may adversely affect the pricing of our products. | In addition, third-party payers are attempting to control costs by limiting the level of reimbursement for medical products, including pharmaceuticals, and increasingly challenge the pricing of these products which may adversely affect the pricing of our products. | In addition, third-party payers are attempting to control costs by limiting the level of reimbursement for medical products, including pharmaceuticals, and increasingly challenge the pricing of these products which may adversely affect the pricing of our products. |
| Consolidated total revenues for 2013 decreased $70.2 million, or 12%, as compared to 2012. New product launches increased revenues during the year ended December 31, 2013 by $97.1 million, or 17%, compared to the prior year period, primarily related to our January 2013 launch of non-AB rated Oxymorphone Hydrochloride Extended-Release Tablets and our July 2013 launch of authorized generic Trilipix® delayed release capsules. Decreased product volumes (excluding new product launches) decreased revenues during the year ended December 31, 2013 by $85.5 million, or 15%, compared to the prior year period, while selling price and product mix decreased revenues by $81.8 million, or 14%, compared to the prior year period. Revenues from our Global Division decreased $50.3 million during the year ended December 31, 2013, as compared to the prior year period, driven primarily by lower sales of our authorized generic Adderall XR® and fenofibrate products, as discussed below. | Consolidated total revenues for the year ended December 31, 2014 increased $84.5 million, or 17%, as compared to the year ended December 31, 2013. New product launches increased revenues during the year ended December 31, 2014 by $84.4 million, or 17%, related to sales of our authorized generic Renvela® tablets and generic Solaraze®. Decreased product volumes (excluding new product launches) decreased revenues during the year ended December 31, 2014 by $20.3 million, or 4%, compared to the prior year period, while selling price and product mix increased revenues by $20.4 million, or 4%, compared to the prior year period. Revenues from our Global Division increased $150.7 million during the year ended December 31, 2014, as compared to the prior year period, driven primarily by sales of our authorized generic Renvela® tablets, in addition to higher sales of our Digoxin and generic Solaraze® products. | Consolidated total revenues for the year ended December 31, 2015 increased by 44% or $264.5 million to $860.5 million, compared to $596.0 million for the year ended December 31, 2014. The increase in consolidated total revenues during 2015 was primarily due to the addition of product revenues from our acquisition of Tower and increased sales of diclofenac sodium gel and the addition of sales from Rytary® and 14 generic products launched in 2015. The year-over-year increase in revenue was partially offset by the absence of authorized generic Renvela® sales during 2015, for which there were sales during the prior year. Product volumes (including from acquisitions) increased revenues by approximately 36.0%, while product selling price decreased revenues by approximately 4%, in each case compared to the prior year. New product launches increased revenues by approximately 12% compared to the prior year.<br><br>Revenues from our Impax Generics division increased by $161.9 million during 2015, as compared to the prior year, driven primarily by the increase in revenues from the Tower |

| False Statements in Form 10-K Filings During the Class Period | | |
| --- | --- | --- |
| **2013 Form 10-K**<br>**Filed on February 25, 2014** | **2014 Form 10-K**<br>**Filed on February 26, 2015** | **2015 Form 10-K**<br>**Filed on February 22, 2016** |
| | | Acquisition and increased sales volume from diclofenac sodium gel, partially offset by the absence of sales of authorized generic Renvela® during 2015, for which there were sales during the prior year. |
| | | Consolidated total revenues for the year ended December 31, 2014 increased $84.5 million, or 17%, as compared to the year ended December 31, 2013. New product launches increased revenues during the year ended December 31, 2014 by $84.4 million, or 17%, compared to 2013, primarily related to sales of our authorized generic Renvela® tablets and generic Solaraze®. Decreased product volumes (excluding new product launches) decreased revenues during the year ended December 31, 2014 by $20.3 million, or 4%, compared to 2013, while selling price and product mix increased revenues by $20.4 million, or 4%, compared to 2013. Revenues from our Impax Generics division increased $150.7 million during the year ended December 31, 2014, as compared to 2013, driven primarily by sales of our authorized generic Renvela® tablets, in addition to higher sales of our Digoxin and generic Solaraze® products. |
| Net income for the year ended December 31, 2013 was $101.3 million, an increase of $45.4 million as compared to $55.9 million for the year ended December 31, 2012. | Net income for the year ended December 31, 2014 was $57.4 million, a decrease of $43.9 million as compared to $101.3 million for the year ended December 31, 2013. . . .   Also contributing to the change in net income was an increase in Global Product sales related to | Net income for the year ended December 31, 2015 was $39.0 million, a decrease of $18.4 million as compared to $57.4 million for the year ended December 31, 2014. . . .   The decrease in net income during 2015 was partially offset by the gain of $45.6 million |

| False Statements in Form 10-K Filings During the Class Period | | |
|---|---|---|
| **2013 Form 10-K**<br>**Filed on February 25, 2014** | **2014 Form 10-K**<br>**Filed on February 26, 2015** | **2015 Form 10-K**<br>**Filed on February 22, 2016** |
| | increased sales on several of our higher margin products, partially offset by a decline in sales of our Impax-labeled branded Zomig® products, as discussed above. | from the sale of our rights to Daraprim® in 2015. |
| Total revenues for the Global Division for the year ended December 31, 2013, were $398.3 million, a decrease of 11% from 2012, resulting from decreases in Global Product sales, net, and Other Revenues, as discussed below.<br><br>Global Product sales, net, were $383.7 million for the year ended December 31, 2013, a decrease of 9% from the same period in 2012, primarily as a result of lower sales of our authorized generic Adderall XR® and our fenofibrate products. | Total revenues for the Global Division for the year ended December 31, 2014, were $549.1 million, an increase of 38% from the same period in 2013, resulting from increases in Global Product sales, net, and Other Revenues, as discussed below.<br><br>Global Product sales, net, were $528.5 million for the year ended December 31, 2014, an increase of 38% from the same period in 2013, primarily as a result of sales of our authorized generic Renvela® tablets launched during the three month period ended June 30, 2014 as well as higher sales of our Digoxin products, in addition to the launch of our generic Solaraze® during the fourth quarter of 2013. | Total revenues for the Impax Generics division for the year ended December 31, 2015 were $710.9 million, an increase of 29% from the same period in 2014, principally resulting from the addition of product revenue from the Tower acquisition as well as increased sales from diclofenac sodium gel and 14 generic products launched during 2015 including Lamotrigine ODT . . . . |
| | | Total revenues for the Impax Generics division for the year ended December 31, 2014, were $549.1 million, an increase of 38% from 2013, resulting from increases in Impax Generics sales, net, and Other Revenues, as discussed below.<br><br>Impax Generics sales, net, were $528.5 million for the year ended December 31, 2014, an increase of 38% from 2013, primarily as a result of sales of our authorized generic Renvela® tablets launched during the three month period |

| **False Statements in Form 10-K Filings During the Class Period** | | |
| --- | --- | --- |
| **2013 Form 10-K**<br>**Filed on February 25, 2014** | **2014 Form 10-K**<br>**Filed on February 26, 2015** | **2015 Form 10-K**<br>**Filed on February 22, 2016** |
| | | ended June 30, 2014, higher sales of our Digoxin products and the launch of our generic Solaraze® during the fourth quarter of 2013. |
| Gross profit for the year ended December 31, 2013 was $144.5 million, or approximately 36% of total revenues, as compared to $219.3 million, or approximately 49% of total revenues, in the prior year. Gross profit as a percent of total revenues decreased in 2013 as compared to the prior year period primarily as the result of the intangible asset impairment charge noted above and an increase in expenses associated with new product launch delays caused by the warning letter related to our Hayward, California manufacturing facility, including a $6.4 million charge related to pre-launch inventory for products which will no longer be marketed and $6.7 million of inventory reserves recorded in the three month period ended March 31, 2013 for products discontinued by the Company during the period. | Gross profit for the year ended December 31, 2014 was $288.6 million, or approximately 53% of total revenues, as compared to $144.5 million, or approximately 36% of total revenues, in the prior year. Gross profit as a percent of total revenues increased in 2014 as compared to the prior year largely due to favorable product contribution from higher margin products, including Renvela®, as well as the other items noted above under Cost of Revenues. | Gross profit for the year ended December 31, 2015 was $260.9 million, or 37% of total revenues, as compared to $288.6 million, or approximately 53% of total revenues, in the prior year. The decline in gross profit and gross margin was primarily driven by product mix. Sales during 2014 of authorized generic Renvela®, a high margin product, for which we had no sales in 2015, were replaced by lower margin products from the Tower acquisition and sales of diclofenac sodium gel which carry a 50% profit share with our third party partner. |
| Based upon competitive market conditions, the Company may reduce the selling price of certain Global Division products. | Based upon competitive market conditions, the Company may reduce the selling price of certain Global Division products. | Based upon competitive market conditions, the Company may reduce the selling price of certain Impax Generics division products. |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on October 26, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Luke O. Brooks
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
 & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  lukeb@rgrdlaw.com

1491380_2

# Mailing Information for a Case 4:16-cv-06557-HSG Fleming v. Impax Laboratories Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Luke O Brooks**
  lukeb@rgrdlaw.com,schateauneuf@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Spencer A. Burkholz**
  SpenceB@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Angel Puimei Lau**
  alau@rgrdlaw.com,8467512420@filings.docketbird.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Eric Ian Niehaus**
  ericn@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Marcy Christina Priedeman**
  marcy.priedeman@lw.com,#sflitigationservices@lw.com,marcy-priedeman-
  6759@ecf.pacerpro.com,judy.nguyen@lw.com

- **Jeffrey James Stein**
  jstein@rgrdlaw.com,kmccormack@rgrdlaw.com,2859905420@filings.docketbird.com

- **Christopher S. Turner**
  christopher.turner@lw.com,washington-dc-litigation-services-5378@ecf.pacerpro.com,christopher-
  turner-6162@ecf.pacerpro.com,DCECFNotificationsDC@lw.com

- **Peter Allen Wald**
  peter.wald@lw.com,peter-wald-7073@ecf.pacerpro.com,#sflitigationservices@lw.com

- **Morgan Edwin Whitworth**
  morgan.whitworth@lw.com,#sflitigationservices@lw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,kmccarty@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)